**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re | § | |
| | § | Case No. 15-12500 (___) |
| Cubic Energy, Inc., et al.,[1] | § | (Jointly Administered) |
| | § | |
| Debtors. | § | (Chapter 11) |

**DISCLOSURE STATEMENT WITH RESPECT TO PREPACKAGED PLAN OF
REORGANIZATION OF CUBIC ENERGY, INC., ET AL., PURSUANT TO
CHAPTER 11 OF THE BANKRUPTCY CODE**

Robert W. Jones
Brent R. McIlwain
Brian Smith
HOLLAND & KNIGHT LLP
200 Crescent Court, Suite 1600
Dallas, TX 75201
Telephone:      (214) 964-9500
Facsimile:      (214) 964-9501
Email:      robert.jones@hklaw.com
              brent.mcilwain@hklaw.com
              brian.smith@hklaw.com

Neil B. Glassman, Esq.
Scott D. Cousins, Esq.
Justin R. Alberto, Esq.
BAYARD, P.A.
222 Delaware Avenue, Suite 900
Wilmington, DE 19801
Telephone:      (302) 655-5000
Facsimile:      (302) 658-6395
Email:      nglassman@bayardlaw.com
              scousins@bayardlaw.com
              jalberto@bayardlaw.com

Proposed Counsel for the
Debtors and Debtors in Possession

DATED: December 10, 2015.

---

[1]       The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows:  Cubic Energy, Inc. (2095); Cubic Asset Holding, LLC (3106); Cubic Asset, LLC (7565); Cubic Louisiana Holding, LLC (0729); and Cubic Louisiana, LLC (1412).

# TABLE OF CONTENTS

Page

ARTICLE I PLAN OVERVIEW ........................................................................4
    1.1    Post-Confirmation Ownership by Class 3 and 4 Claimants.................4
    1.2    Class 5A ..........................................................................................4
    1.3    Classes 1A, 1B, 2A, and 2B...........................................................5
    1.4    Classes 5B, 6A, 6B, 7, 8, 9A, 9B, 10A, and 10B ...........................5

ARTICLE II INTRODUCTION ........................................................................5
    2.1    Purpose of Disclosure Statement .....................................................5
    2.2    Explanation of Chapter 11 ...............................................................5
    2.3    Voting Procedures and Requirements................................................7

ARTICLE III HISTORY OF THE DEBTORS ...................................................9
    3.1    Overview...........................................................................................9
    3.2    Prepetition Secured Indebtedness ..................................................10
    3.3    Valuation of the Cubic Asset Debtors and Cubic Louisiana Debtors...................11
    3.4    Cubic Energy Ownership and Listing .............................................11

ARTICLE IV THE REORGANIZATION CASE................................................11
    4.1    The Debtors and the Reorganization Cases ...................................11
    4.2    Sources of Information ...................................................................14
    4.3    Liquidation Analysis ......................................................................14
    4.4    Other Financial Information ...........................................................14
    4.5    Insurance Policies and Indemnification .........................................14

ARTICLE V DESCRIPTION OF THE PLAN ..................................................15
    5.1    Structure of the Plan.......................................................................15
    5.2    Classification, Estimated Amount and Treatment of Claims and Interests ...........15
    5.3    Means for Implementation of the Plan............................................21
    5.4    Treatment of Executory Contracts and Unexpired Leases ...................31
    5.5    Conditions Precedent to the Plan's Confirmation and Consummation ................36
    5.6    Modification; Withdrawal................................................................37
    5.7    Retention of Jurisdiction ................................................................37
    5.8    Binding Effect and Discharge of the Debtor...................................38
    5.9    Vesting ...........................................................................................39
    5.10   Objections to Claims......................................................................39
    5.11   Payment of Statutory Fees .............................................................39
    5.12   Severability of Plan Provisions......................................................39
    5.13   Successors and Assigns..................................................................39
    5.14   Term of Injunctions or Stays..........................................................40

ARTICLE VI CERTAIN RISK FACTORS TO BE CONSIDERED .........................40
    6.1    Risks Related to the Bankruptcy Case ...........................................40
    6.2    Risks Related to Financial Condition of Reorganized Debtors ............41

6.3     Risks Related to the Reorganized Debtors' Assets and Projected Operations ......42

6.4     Payments and Insolvency Risks Related to the Newly Issued Equity Interests ....47

**ARTICLE VII FINANCIAL INFORMATION AND FEASIBILITY**........................................48

7.1     Financial Information..............................................................................48

7.2     Feasibility of the Plan ............................................................................48

**ARTICLE VIII LIQUIDATION ANALYSIS** ...................................................................49

8.1     Liquidation Analysis ..............................................................................49

**ARTICLE IX POST CONFIRMATION MANAGEMENT** ...........................................50

9.1     Officers and Directors ...........................................................................50

**ARTICLE X DISTRIBUTIONS AND CLAIMS RESOLUTION**.................................50

10.1    Delivery of Distributions; Undeliverable or Unclaimed Distributions................50

**ARTICLE XI FEDERAL INCOME TAX CONSEQUENCES** ...................................52

11.1    General ...............................................................................................52

11.2    Tax Consequences to the Debtors.............................................................54

11.3    Tax Consequences to Holders of Class 3, 4, and 5A Claims..............................57

11.4    Information Reporting and Backup Withholding ...........................................59

11.5    Importance of Obtaining Professional Tax Assistance ......................................60

**ARTICLE XII REQUIREMENTS FOR CONFIRMATION** ....................................60

12.1    Solicitation and Voting Requirements .......................................................60

12.2    Best Interests Test .................................................................................61

12.3    Confirmation Without Acceptance of All Impaired Classes - "Cramdown .........61

**ARTICLE XIII ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN** .............................................................................................................62

**ARTICLE XIV OTHER MATTERS**..............................................................................63

Exhibits:

Exhibit A    Prepackaged Plan of Reorganization dated December 10, 2015 of Cubic Energy, Inc., Et. Al. Pursuant to Chapter 11 of the Bankruptcy Code

Exhibit B    Valuation Report prepared by Houlihan Lokey Capital, Inc.

Exhibit C    *Pro forma* Financial Projections of Cubic Asset Debtors and Cubic Louisiana Debtors.

Exhibit D    Debtors' Liquidation Analysis

Exhibit E    Financial Statements and Financial Statement Schedules of Cubic Energy, Inc. for the fiscal year ended June 30, 2014, as filed with the Securities and Exchange Commission on Form 10-K

Exhibit F    Quarterly Report of Cubic Energy, Inc., for the period ending March 31, 2015, as filed with the Securities and Exchange Commission on Form 10-Q

THE DIRECTORS, MANAGERS, AND/OR MEMBERS (AS APPLICABLE) OF CUBIC ENERGY, INC. ("CUBIC ENERGY"), CUBIC ASSET HOLDING, LLC ("CUBIC ASSET HOLDING"), CUBIC ASSET, LLC ("CUBIC ASSET"), CUBIC LOUISIANA HOLDING, LLC ("CUBIC LOUISIANA HOLDING"), AND CUBIC LOUISIANA, LLC ("CUBIC LOUISIANA",  AND COLLECTIVELY, WITH CUBIC ENERGY, CUBIC ASSET HOLDING, CUBIC ASSET, AND CUBIC LOUISIANA HOLDING, THE "DEBTORS" AND EACH A "DEBTOR") BELIEVE THAT THE PREPACKAGED PLAN OF REORGANIZATION OF CUBIC ENERGY, INC., ET AL., PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE DATED DECEMBER 10, 2015 (THE "PLAN") IS IN THE BEST INTERESTS OF THE DEBTORS' CREDITORS AND STAKEHOLDERS.  HOLDERS OF PREPETITION CLASS 3 CLAIMS, CLASS 4 CLAIMS, AND CLASS 5A CLAIMS ARE IMPAIRED UNDER THE PLAN AND ARE BEING SOLICITED FOR ACCEPTANCES AND REJECTIONS OF THE PLAN.  SUCH CREDITORS ARE URGED TO VOTE IN FAVOR OF THE PLAN.

THE SOLICITATION OF VOTES IS BEING CONDUCTED TO OBTAIN SUFFICIENT ACCEPTANCES OF THE PLAN *BEFORE* THE FILING OF A VOLUNTARY REORGANIZATION CASE UNDER CHAPTER 11 OF THE BANKRUPTCY CODE.  THIS DISCLOSURE STATEMENT AND THE ACCOMPANYING BALLOT HAVE NOT BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION WITHIN THE MEANING OF SECTION 1125(a) OF THE BANKRUPTCY CODE AS THIS IS A SOLICITATION IN ADVANCE OF A CHAPTER 11 FILING.  FOLLOWING THE COMMENCEMENT OF THEIR CASES, THE DEBTORS EXPECT TO PROMPTLY SEEK AN ORDER OF THE BANKRUPTCY COURT APPROVING THIS DISCLOSURE STATEMENT AS CONTAINING ADEQUATE INFORMATION, APPROVING ITS SOLICITATION OF VOTES AS BEING IN COMPLIANCE WITH SECTIONS 1125 AND 1126(b) OF THE BANKRUPTCY CODE, AND CONFIRMING THE PLAN.

SECURITIES TO BE ISSUED UNDER THE PLAN AND DESCRIBED HEREIN HAVE NOT BEEN REGISTERED WITH, RECOMMENDED BY OR APPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY OTHER U.S. (STATE OR FEDERAL) OR NON-U.S. FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY.  NEITHER THE SEC NOR ANY SUCH STATE, FEDERAL OR FOREIGN SECURITIES COMMISSION OR AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT.  ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THE SECURITIES TO BE ISSUED UNDER THE PLAN TO CLASS 3 AND CLASS 4 CREDITORS MAY BE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE UNDER THE APPLICABLE SECURITIES LAWS AND RULES AND AS SET FORTH IN THE SEVERAL AGREEMENTS GOVERNING THE ISSUANCE OF SUCH EQUITY INTERESTS, AND MAY NOT BE SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT IN COMPLIANCE WITH SUCH RESTRICTIONS, AND EXCEPT AS PERMITTED UNDER THE APPLICABLE

**SECURITIES LAWS AND RULES PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM.  CLASS CREDITORS IN CLASSES 3 AND 4 SHOULD BE AWARE THAT THEY MAY BE REQUIRED TO BEAR THE FINANCIAL RISKS INDEFINITELY OF ANY DEEMED INVESTMENT IN THE SECURITIES BY REASON OF THEIR ACCEPTANCE OF THE PLAN.**

The summary of the Plan and other documents described in this Disclosure Statement are qualified by reference to documents themselves and the exhibits thereto.  **Capitalized terms not otherwise defined in this Disclosure Statement shall have the meanings ascribed to them in the Plan.  In the event of any conflict between the provisions of this Disclosure Statement and the Plan, the provisions of the Plan shall control.**

## PRELIMINARY STATEMENT

On or before December 11, 2015 the Debtors intend to commence their Chapter 11 Cases by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code, as amended, in the United States Bankruptcy Court for the District of Delaware, subject to receiving in advance, the requisite acceptances of the Debtors' Plan from holders of the Class 3 Prepetition Secured Notes Claims, Class 4 Wells Fargo Claims, and Class 5A Cubic Asset BP Claims.  If the petitions are filed, the Debtors will seek confirmation of the Plan on or before February 12, 2016.

The Debtors hereby transmit this Disclosure Statement for use concerning solicitation of acceptances or rejections of the Plan.  This Disclosure Statement has been prepared in accordance with Section 1125 of the Bankruptcy Code and Bankruptcy Rules 3016(c) and 3018. A copy of the Plan is attached to this Disclosure Statement as <u>Exhibit A</u>.  This Disclosure Statement, among other things, (a) contains certain information regarding the Debtors' prepetition history, (b) describes the Plan, the effects of confirmation of the Plan, including the treatment of claims and interests and distributions under the Plan, and (c) discusses the confirmation process and voting procedures that Class 3, Class 4, and Class 5A creditors must follow for their votes to be counted.  The holders of Class 3, 4, and 5A Claims are the only Claims Impaired under the Plan being solicited to vote to accept or reject the Plan.

Holders of Claims and Interests in Classes 3, 4, and 5A are urged to read the Disclosure Statement and the Plan in full.  **The Debtors believe that the Plan is in the best interests of creditors and urge holders of Claims in Classes 3, 4, and 5A to vote in favor of the Plan.**

The statements in this Disclosure Statement are made as of the date hereof.  Neither the Disclosure Statement's distribution, nor the Plan's consummation will, under any circumstance, create any implication that the information herein is correct at any time after the date hereof.  All summaries herein are qualified by reference to the Plan as a whole.  In any contested matter or adversary proceeding, this Disclosure Statement shall not constitute an admission of any fact or liability but shall be deemed a statement made in settlement negotiations.  Unless otherwise indicated, the Debtors' management has provided the factual information in this Disclosure Statement.  The Debtors' management believes that the information herein is accurate but is unable to warrant that it is without any inaccuracy or omission.

In making a decision in connection with the Plan, holders of Class 3, 4, and 5A Claims must rely on their own review of the terms of the Plan, including the merits and risks involved and should not construe the contents of this Disclosure Statement as providing any legal, business, financial, or tax advice.  Members of such Classes should consult their own advisors with respect to those matters and related aspects of their acceptance or rejection of the Plan and any deemed investment in any securities issued by the Reorganized Debtor under the Plan.

No person has been authorized to give any information or to make any representations other than those contained in the Solicitation Package (as defined herein), and, if given or made, such information and representations must not be relied upon as having been authorized.  Neither the delivery of the Solicitation Package nor any deemed offer of any securities to be issued by any of the Reorganized Debtors under the Plan as a result thereof, under any circumstances, shall create the implication that there has been no change in any Debtor's affairs since the date of this Disclosure Statement or that the information contained therein is correct as of any time subsequent to its date.

This Disclosure Statement contains summaries, believed to be accurate, of some of the terms of specific documents incorporated herein by reference.  All summaries are qualified in their entirety by such reference and holders of Class 3, 4, and 5A Claims should read the actual documents, copies of which are attached as exhibits to this Disclosure Statement or which will be made available by the Debtors and their counsel, on request, for the complete information contained in such documents.

## U.S. FEDERAL SECURITIES LAW MATTERS

The Debtors, to the extent available, are relying on Section 1145(a)(1) of the Bankruptcy Code to exempt the exchange, issuance and distribution of any securities to be issued by the Reorganized Debtors under the Plan from the provisions of the Securities Act of 1933, as amended (the "Securities Act"), and other U.S. and non-U.S. federal and state securities and "blue sky" laws insofar as: the securities will be issued by a debtor, an affiliate of a debtor, or a successor to a debtor under a plan approved by a Bankruptcy Court; the recipients of the securities hold a claim against, an interest in, or a claim for an administrative expense in a case concerning a debtor or such affiliate; and the securities are issued entirely in exchange for the recipient's claim against or interest in the debtor, or are issued "principally" in such exchange and "partly" in exchange for cash or property.

The solicitation of acceptances and rejections from Class 3, 4, and 5A creditors and the deemed offer of the securities to be issued by the Reorganized Debtors under the Plan as a result thereof are being made on the basis of the Solicitation Package and in reliance upon one or more exemptions from the registration requirements of the Securities Act and any U.S. and non-U.S. state or local laws requiring registration, including Section 4(2) of the Securities Act and/or Regulation D, Rule 144A or Regulation S thereof, as applicable, with respect to transactions not involving a public offering and with accredited investors, qualified institutional buyers or non-U.S. persons, and also, in part, upon the truth and accuracy of the certifications made by the Class 3, 4, and 5A creditors in their applicable Ballots.

## FORWARD-LOOKING STATEMENTS

The information presented in this Disclosure Statement includes forward-looking statements in addition to historical information.  These statements involve known and unknown risks and relate to future events, the Debtors' and the Reorganized Debtors' future financial performance or the Debtors' and the Reorganized Debtors' projected business results.  In some cases, you can identify forward-looking statements by terminology such as "may," "will," "should," "expects," "plans," "anticipates," "believes," "estimates," "predicts," "targets," "potential" or "continue" or the negative of these terms or other comparable terminology.  Forward-looking statements are only predictions.  Actual events or results may differ materially from any forward-looking statement as a result of various factors, including those contained in the section entitled "Risk Factors" and other sections of this Disclosure Statement, including the documents incorporated by reference herein.  Although the Debtors believe that the expectations reflected in the forward-looking statements are reasonable, the Debtors cannot guarantee future results, events, levels of activity, performance or achievements.  The Debtors expressly disclaim any duty to update any of the forward-looking statements.

## ARTICLE I

## PLAN OVERVIEW

The following summarizes the classification and treatment under the Plan of the Claims against and Interests in the Debtors.  The summary contained herein is qualified in its entirety by reference to the provisions of the Plan, a copy of which is attached hereto as Exhibit A, and by this Disclosure Statement.  The Plan places all Claims and Interests into Classes.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion thereof qualifies within the description of a different Class.  Claims against or Interests in each of the Debtors are grouped pursuant to Section 1122(a) of the Bankruptcy Code.  The classification and treatment for all Claims and Interests are described in more detail elsewhere in this Disclosure Statement.

### 1.1    Post-Confirmation Ownership by Class 3 and 4 Claimants.

The Plan contemplates a transfer of ownership of controlling stakes in each of the Debtors to their respective senior secured lenders holding Class 3 and 4 Claims.  Upon the Plan's Effective Date, such senior, secured lenders will obtain control of their applicable Debtors in respect of their applicable Class 3 and Class 4 Claims.

### 1.2    Class 5A.

The Reorganized Debtors propose to satisfy the Claims in Class 5A through execution and delivery of the Modified Cubic Asset BP Hedges, which shall take effect on the Effective Date and replace the Cubic Asset BP Hedges in their entirety.

**1.3    Classes 1A, 1B, 2A, and 2B**.

The Reorganized Debtors propose to satisfy Claims in Classes 1A, 1B, 2A, and 2B through payment of cash and/or return of collateral to the holders of Claims in such Classes in a manner that renders them unimpaired.  Claims in such classes are not Impaired, are deemed to have accepted the Plan, and therefore are not entitled to vote in respect of the Plan.

**1.4    Classes 5B, 6A, 6B, 7, 8, 9A, 9B, 10A, and 10B**.

The Reorganized Debtors propose to cancel and or extinguish the Claims and Interests in Classes 5B, 6A, 6B, 7, 8, 9A, 9B, 10A, and 10B without payment or distribution of property of any kind.  Claims and Interests in such classes are Impaired, are deemed to have rejected the Plan, and therefore are not entitled to vote in respect of the Plan.

**ARTICLE II**

**INTRODUCTION**

**2.1    Purpose of Disclosure Statement**.

The purpose of this Disclosure Statement is to provide adequate information about the Debtors and about the treatment of Claims and Interests under the Plan, including a description of the securities to be issued under the Plan in satisfaction of certain Claims, to enable the holders of Impaired Claims and Interests to make an informed decision with respect to acceptance or rejection of the Plan.  **Each holder of a Claim or Interest is urged to carefully consider the Plan and this Disclosure Statement in their entirety and consult with legal or other available counsel, if necessary, to understand the Plan and its effects, including possible tax consequences.**

**2.2    Explanation of Chapter 11**.

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code.  Upon the commencement of a chapter 11 case, Section 362 of the Bankruptcy Code provides for an automatic stay of all actions to collect, or otherwise enforce, claims against a debtor that arose prior to a bankruptcy filing.  Generally speaking, the automatic stay prohibits interference with a debtor's property and business affairs.

Under chapter 11, a debtor attempts to reorganize.  Confirmation of a plan of reorganization is the primary goal of a reorganization case under chapter 11 of the Bankruptcy Code.  A plan of reorganization sets forth the means for satisfying claims against, and interests in, a debtor.  Generally, a claim against a debtor arises as the result of an extension of credit, including loan transactions and trade credit relationships, but may also arise from other contractual agreements or from alleged torts.  An interest in a debtor is held by a party that owns the debtor, such as a shareholder.

A chapter 11 case is a "prepackaged chapter 11 case" when a debtor transmits its solicitation materials to holders of claims or interests whose acceptances and rejections of the

Plan are sought before the debtor files its chapter 11 case. Section 1126(b) of the Bankruptcy Code governs acceptances and rejections of plans obtained by parties entitled to vote, before the commencement of a chapter 11 case. Section 1126(b) counts a prepetition acceptance or rejection toward the required amounts and number of acceptances only if solicitation was in compliance with any applicable non-bankruptcy law or rule or such acceptance was solicited after disclosure of adequate information as defined in Section 1125(a) of the Bankruptcy Code.

Section 1125 of the Bankruptcy Code requires that a plan proponent fully disclose adequate information about the debtor, its assets, liabilities, claims and the plan from voting creditors and interest holders before soliciting acceptances and rejections of that plan. This Disclosure Statement is being provided to the Class 3, Class 4, and Class 5A Creditors to satisfy the requirements of Section 1125 of the Bankruptcy Code.

The Bankruptcy Code does not require that each claimant or shareholder vote in favor of a plan in order for the court to confirm a plan. Rather, a plan must be accepted by each Class of Claims and Interests (subject to the "cramdown" exception discussed below). A Class of Claims accepts the Plan if, of the claimants in the Class who actually vote on the plan, such claimants holding at least two-thirds in dollar amount and more than one-half in number of allowed Claims vote to accept the Plan. For example, if a hypothetical Class has twenty-five creditors that vote and the total dollar amount of those ten creditors' claims is $1,000,000, then for such Class to have accepted the Plan, thirteen or more of those creditors must have voted to accept the Plan (a simple majority) *and* the claims of the creditors voting to accept the plan must total at least $666,667 (a two-thirds majority). A Class of Interest holders accepts the Plan if, of the holders in such class who actually vote on such plan, at least two-thirds in amount vote to accept the Plan.

The Bankruptcy Court may confirm the Plan even though fewer than all classes of Claims and Interests vote to accept the Plan. In this instance, the Plan must be accepted by at least one "Impaired" class of Claims, without including any acceptance of the Plan by certain disqualified parties that actually vote on the Plan (as defined in the Bankruptcy Code). Section 1124 of the Bankruptcy Code defines "impairment" and generally provides that a claim as to which legal, equitable or contractual rights are altered under a plan is deemed to be "impaired." Under the Plan, Classes 3, 4, and 5A are Impaired and entitled to vote regarding the Plan.

The Debtors have been advised that the Holders of Class 3 Prepetition Secured Notes Claims, Class 4 Wells Fargo Claims, and Class 5A Cubic Asset BP Claims intend to vote to accept the Plan, subject to the terms and conditions of the Plan Support Agreement dated as of December 10, 2015, (the "Plan Support Agreement"). If such Classes accept the Plan, the Debtors will have sufficient Impaired Classes of Claims voting to accept the Plan and will seek confirmation of the Plan under the "cramdown" provisions, over the dissenting votes of other Classes of Claims and Interests. Claims and Interests in Classes 5B, 6A, 6B, 7, 8, 9A, 9B, 10A, and 10B are deemed to have rejected the Plan by the Debtors and/or by operation of law and are not entitled to vote in respect of the Plan.

Independent of the acceptance of the Plan by holders of Claims and Interests as described above, in order to confirm the Plan, the Bankruptcy Court must determine that the requirements

of Section 1129(a) of the Bankruptcy Code have been satisfied.  The Debtors believe that the Plan satisfies the confirmation requirements of the Bankruptcy Code.  Confirmation of the Plan will bind the Debtors, the Reorganized Debtors, all holders of Claims and Interests, and other parties in interest with regard to the Debtors, irrespective of whether such parties have filed proofs of claim, proofs of interest, or voted to accept the Plan.

**2.3     Voting Procedures and Requirements**.

  **A.     Persons Entitled to Vote.**

   Only the holders of Claims in Classes 3, 4, and 5A are entitled to vote on the Plan.  The holders of Claims classified in Classes 1A, 1B, 2A, and 2B are not entitled to vote under the Plan, as such holders are either receiving their statutory treatment under the Bankruptcy Code or are not Impaired under the Plan.  Claims and Interests in Classes 5B, 6A, 6B, 7, 8, 9A, 9B, 10A, and 10B are receiving no consideration under the Plan, are therefore deemed to reject the Plan, and are not entitled to vote.

  **B.     Notice to Holders of Claims and Interests.**

   The primary purpose of this Disclosure Statement is to provide adequate information to enable members of Classes 3, 4, and 5A to make a reasonably informed decision with respect to the Plan prior to exercising their right to vote to accept or to reject the Plan.  Upon commencing the Chapter 11 Cases, the Debtors will request that the Bankruptcy Court approve this Disclosure Statement as containing information of a kind and in sufficient detail adequate to enable the holders of Class 3, 4, and 5A Claims to make an informed judgment about the merits of the Plan. The Debtors simultaneously will request that the Bankruptcy Court confirm the Plan.

  **WHEN AND IF CONFIRMED BY THE COURT, THE PLAN WILL BIND ALL HOLDERS OF CLAIMS AGAINST, AND INTERESTS IN, THE DEBTORS, WHETHER OR NOT THEY ARE ENTITLED TO VOTE OR DID VOTE ON THE PLAN AND WHETHER OR NOT THEY RECEIVE OR RETAIN ANY DISTRIBUTIONS OR PROPERTY UNDER THE PLAN.  IN PARTICULAR, HOLDERS OF CLASS 3, 4, AND 5A CLAIMS THAT ARE ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT, THE PLAN, AND THE EXHIBITS TO THE PLAN AND DISCLOSURE STATEMENT CAREFULLY AND IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR TO REJECT THE PLAN.**

  **THIS DISCLOSURE STATEMENT IS THE ONLY DOCUMENT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE PLAN.  NO SOLICITATION OF VOTES MAY BE MADE UNTIL DISTRIBUTION OF THIS DISCLOSURE STATEMENT, AND NO PERSON HAS BEEN AUTHORIZED TO DISTRIBUTE ANY INFORMATION CONCERNING THE DEBTORS OTHER THAN THE INFORMATION CONTAINED HEREIN.**

  **C.     Voting Instructions, Ballots and Voting Deadline.**

Accompanying this Disclosure Statement and forming a part of the solicitation package are copies of (a) the Plan (Exhibit A to this Disclosure Statement), (b) information concerning the Debtors and Reorganized Debtors (*see* Exhibits B-F of this Disclosure Statement), and (c) for holders of Class 3, 4 and 5A Claims who are entitled to vote on the Plan, one or more ballots (the "Ballot" or "Ballots") (together, the Plan, the Disclosure Statement and all other exhibits thereto and the Ballots shall be referred to as the "Solicitation Package"). If you did not receive a Ballot in your Solicitation Package and believe you are entitled to vote on the Plan, please contact the Debtors' counsel at the addresses and telephone numbers set forth on the cover of this Disclosure Statement and below, or alternatively, contact the Debtor's counsel through Brian Smith, Holland & Knight, LLP, (Tel.) 214-964-9464 or brian.smith@hklaw.com.

After carefully reviewing the Plan, this Disclosure Statement, and the instructions on the enclosed Ballot, each Holder of Class 3, 4, and 5A Claims may indicate its acceptance or rejection of the Plan. As part of the Ballot, each Holder shall make those certifications contained in the Ballot with respect to applicable U.S. federal and state securities laws.

IF YOU ARE A HOLDER OF A CLASS 3, 4, OR 5A CLAIM, FOR YOUR VOTE TO BE COUNTED, YOU MUST PROPERLY COMPLETE AND DELIVER YOUR BALLOT SO THAT YOUR VOTE IS ACTUALLY **RECEIVED** BY THE VOTING AGENT NO LATER THAN **THE VOTING DEADLINE, DECEMBER 11, 2015**. IN ORDER TO PROMPTLY TRANSMIT YOUR BALLOT, YOU MUST **SEND IT VIA FAX OR EMAIL,** TO THE FOLLOWING PERSON:

> Brent R. McIlwain, Esq. and Brian Smith, Esq.
> Holland & Knight LLP
> 200 Crescent Court, Suite 1600
> Dallas, Texas 75201
> Fax: 214.964.9501
> Email: brent.mcilwain@hklaw.com
>            brian.smith@hklaw.com

Ballots that are not executed, not timely delivered or otherwise deficient will not be counted. The Debtors reserve the right to challenge the validity of all Ballots submitted.

### D.    Confirmation Hearing and Deadline for Objections.

As noted above, the Debtors will ask the Bankruptcy Court to consider the adequacy of this Disclosure Statement and to confirm the Plan on or before February 12, 2016, subject to the Bankruptcy Court's calendar. At the Confirmation Hearing, the Debtors will request Confirmation of the Plan, as it may be modified from time to time, under Section 1129(b) of the Bankruptcy Code.

The Debtors may modify the Plan, in accordance with the Plan Support Agreement and as may be permitted by Section 1127(a) of the Bankruptcy Code and Bankruptcy Rule 3019.

Notice of the anticipated Confirmation Hearing and the time to present objections will be provided to holders of all known Claims and Interests.  In addition, subject to approval by the Bankruptcy Court, the Debtors will publish a notice of the anticipated Confirmation hearing and the time to present objections in the national edition of USA Today.  Objections, if any, to Confirmation of the Plan must be presented to the Bankruptcy Court at the Confirmation Hearing.  The Debtors will request that any written objections must also be served so that they are RECEIVED not less than eight (8) days before the Confirmation Hearing by:

> Counsel to the Debtors:
> Brent McIlwain, Esq.
> Holland & Knight LLP
> 200 Crescent Court, Suite 1600
> Dallas, Texas 75201
> Fax: 214.964.9501
> Email: brent.mcilwain@hklaw.com
>
> AND
>
> Scott D. Cousins, Esq.
> BAYARD, P.A.
> 222 Delaware Avenue, Suite 900
> Wilmington, DE 19801
> Fax: 302.658.6395
> Email: scousins@bayardlaw.com

**After filing of the Chapter 11 Cases, the Bankruptcy Court will schedule a Confirmation Hearing, together with a date by which objections, if any, must be presented. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjournment at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.**

## ARTICLE III

## HISTORY OF THE DEBTORS

**3.1     Overview**.

Debtor Cubic Energy was incorporated in 1999 as a Texas corporation. The Debtors' principal executive office is located at 9870 Plano Road, Dallas, Texas 75238.

Cubic Energy is the parent company of two wholly owned direct subsidiaries, Cubic Asset Holding, LLC, a Delaware limited liability company ("Cubic Asset Holding"), and Cubic Louisiana Holding, LLC, a Delaware limited liability company ("Cubic Louisiana Holding"), and two wholly owned indirect subsidiaries, Cubic Asset, LLC, a Delaware limited liability company and a direct subsidiary of Cubic Asset Holding ("Cubic Asset"), and Cubic

Louisiana, LLC, a Delaware limited liability company and a direct subsidiary of Cubic Louisiana Holding ("Cubic Louisiana").

The Debtors are independent energy companies engaged in the development and production of, and exploration for, crude oil, natural gas and natural gas liquids. The Debtors' oil and gas assets are concentrated in Texas and Louisiana.

## 3.2    Prepetition Secured Indebtedness

As of the Petition Date, the Debtors had outstanding, secured obligations to two principal secured creditors: (1) the holders of the Prepetition Secured Notes; and (2) Wells Fargo Energy Capital, Inc. ("WFEC").    Additionally, the Debtors were parties to one or more financial derivative contracts with the BP Entities, which are secured by liens on the assets of Cubic Asset and Cubic Louisiana.

### A.    Prepetition Secured Notes Indebtedness

Cubic Energy entered into the Prepetition Note Purchase Agreement on October 2, 2013, pursuant to which Cubic Energy issued an aggregate of $66,000,000 of Prepetition Secured Notes due October 2, 2016 to certain investors.  The Prepetition Secured Notes were issued in two series, Series A, and Series B.  Wilmington Trust, N.A. serves as the Prepetition Secured Notes Agent.  The indebtedness under the Prepetition Note Purchase Agreement and Prepetition Secured Notes is secured by first priority liens on substantially all of the assets of Cubic Energy, Cubic Asset and Cubic Asset Holding, and second priority liens on substantially all assets of Cubic Louisiana and Cubic Louisiana Holding.  The Debtors estimate that as of November 30, 2015, the aggregate outstanding principal and interest owed under the Series A Prepetition Secured Notes totals approximately $73,144,371 (which includes approximately $2,147,578 of additional Series A notes issued as payment of payment-in-kind interest), and the aggregate, outstanding principal and interest owed under the Series B Prepetition Secured Notes total approximately $23,406,192 (which includes approximately $687,219 of additional Series B notes issued as payment of payment-in-kind interest).

### B.    Prepetition WFEC Indebtedness

On March 5, 2007, Cubic Energy entered into a credit agreement with WFEC.   In connection with the issuance of the Prepetition Secured Notes on October, 2013, the Wells Fargo Credit Agreement was amended and restated, which amendment and restatement, among other things, substituted Cubic Louisiana as the underlying borrower.  The indebtedness to WFEC pursuant to the Wells Fargo Credit Agreement is secured by a first priority lien on substantially all of the assets of Cubic Louisiana and Cubic Louisiana Holding.   The oil and gas assets of Cubic Asset and Cubic Asset Holding do not secured the indebtedness under the Wells Fargo Credit Agreement.  As of November 30, 2015, the Debtors estimate that the outstanding balance of Wells Fargo Credit Obligations is approximately $29,876,638.

C.      BP Derivative Agreements

As of the Petition Date, the Debtors are party to one or more hedging and call option arrangements with the BP Entities.  The Debtors' obligations under such derivative contracts are secured by liens on the assets of Cubic Asset and Cubic Louisiana.  In connection with the Plan, Reorganized Cubic Energy, Reorganized Cubic Asset, and reorganized Cubic Asset Holding intend to enter into the Modified Cubic Asset BP Hedges, which will amend the terms of the Debtors' existing hedge agreements in respect of such entities.  The Plan will extinguish, without payment, any Claims that the BP Entities may hold against Debtors Cubic Louisiana or Cubic Louisiana Holding.

3.3     Valuation of the Cubic Asset Debtors and Cubic Louisiana Debtors

As described in greater detail below, prior to the Petition Date, the Debtors retained Houlihan Lokey Capital, Inc. ("Houlihan") to perform a valuation and appraisal of: (i) the assets and properties owned by Debtor Cubic Asset; and (ii) the assets and properties owned by Debtor Cubic Louisiana.  The results of Houlihan's valuation are that both: (a) the value of the assets of Cubic Asset is less than the amount of the outstanding, first priority liens on the assets of Cubic Asset, which secure the Debtors' prepetition obligations to the Holders of the Prepetition Secured Notes; and (b) the value of the assets of Cubic Louisiana is less than the amount of the outstanding, first priority liens on Cubic Louisiana's assets, which secure the Debtors' prepetition obligations to WFEC.

3.4     Cubic Energy Ownership and Listing.

Cubic Energy is a publicly-traded company incorporated under the laws of the State of Texas, whose common stock presently is quoted on the OTCQB under the symbol "CBNR".  On the Petition Date, Cubic Energy will have outstanding one or more classes of common and preferred equity.  Pursuant to the Plan, all of such Cubic Energy Interests will be extinguished, without payment or distribution of any kind.

ARTICLE IV

THE REORGANIZATION CASE

4.1     The Debtors and the Reorganization Cases.

A.      Timing of the Chapter 11 Cases.

Subject to receiving the requisite acceptances on the Plan from the holders of Class 3, 4, and 5A Claims, the Debtors intend to commence their Chapter 11 Cases on or before December 11, 2015.

As the Debtors have received commitments from the Holders of Class 3 Prepetition Secured Notes Claims, Class 4 Wells Fargo Claims, and Class 5A Cubic Asset BP Claims to support confirmation of the Plan, subject to the terms and conditions of the Plan Support

Agreement, the Debtors do not expect the Chapter 11 Cases to be protracted. Thus, the Debtors anticipate requesting confirmation of the Plan at the earliest possible opportunity. Specifically, the Debtors anticipate requesting that the hearing to consider the adequacy of the Disclosure Statement and Confirmation of the Plan occur on or before February 12, 2016.

The Plan provides that the Effective Date of the Plan will be the Business Day on which all conditions precedent to the Plan's Confirmation and Effective Date have been satisfied or waived. The Effective Date could be the same day as the Confirmation Hearing or as soon thereafter as is administratively practical. There is a possibility, however, that this projected timetable cannot be achieved due to factors beyond the Debtors' control.

The Debtors believe that the length of their stay in Chapter 11 must be as short as possible to preserve the value of their assets and avoid the unnecessary costs associated with payment of professional fees and other administrative expenses that would accrue during a protracted Chapter 11 proceeding.

B.    **Events Leading to the Chapter 11 Filing and the Plan.**

The Debtors, like many other independent oil and gas exploration and production companies, have been adversely impacted by the significant decline in oil and gas prices that began in 2014. The financial difficulties associated with the recent decline in oil and gas prices have been compounded by unexpected operational difficulties associated with certain of the Debtors' properties, including the failure of drilling contractors to properly complete well overhauls that should have increased the Debtors' productive capacity and the last minute withdrawal by a third party of an acquisition opportunity that would have significantly enhanced the Debtors' cash flow and allowed them to take advantage of certain cost savings and production economies of scale.

These financial and operational factors have materially impaired the Debtors' ability to service their significant prepetition debts owed to WFEC and the Prepetition Secured Noteholders, and also significantly impaired the value of the Debtors' productive assets (which in turn, prevented the Debtors from finding potential investors willing to refinance the Debtors' obligations to WFEC or the Prepetition Secured Noteholders). As a result of dwindling revenues and a dwindling asset base, the Debtors believe that, as set forth below, the value of their assets is significantly less than the amount of their prepetition secured debts. Consequently, the Debtors, in conjunction with WFEC and the Prepetition Secured Noteholders, developed and proposed the prepackaged Plan, which will preserve the value of the Debtors' assets for the benefit of their creditors and prevent the destruction of "going concern" value that could occur in a disorderly liquidation.

C.    **Valuation of the Debtors' Assets by Independent Advisor.**

Prior to the Petition Date, the Debtors engaged the corporate advisory and restructuring services of Houlihan Lokey Capital, Inc. to determine the post-confirmation, going concern value of Reorganized Cubic Asset and Reorganized Cubic Louisiana. Attached as <u>Exhibit B</u> is the valuation analysis prepared by Houlihan (the "<u>Valuation Report</u>"). In the Valuation Report,

Houlihan concludes that the estimated reorganization value of Cubic Asset ranges between $46 million and $76 million (with a midpoint of $61 million).  Such values fall below the approximately $96.5 million of Prepetition Secured Notes Claims that are secured by first priority liens on the Cubic Asset Debtors' assets.  Houlihan's Valuation Report also concluded that the estimated reorganization value of the Cubic Louisiana Debtor ranges between  $7 million and $10 million (with a midpoint of $8.5 million).  Such values fall below the approximately 29.9 million of Wells Fargo claims that are secured by first priority liens on the Cubic Louisiana Debtors' assets.  Such valuation was based upon Houlihan's analysis of (a) publicly announced business transactions of oil and gas companies with similar characteristics, (b) the average market trading multiples of members of applicable, publicly traded peers of the applicable Debtors, and (c) a net asset value analysis that provided a range of values that are reasonably expected to be realized from the Debtors' existing oil and gas reserve base.  Accordingly, the Debtors believe that they are insolvent and that any bankruptcy proceeding concerning the Debtors (whether it is a chapter 11 proceeding or chapter 7 proceeding) will not yield any payment or distribution to general unsecured creditors or any Holders of the Debtors' prepetition Interests.

### D.    The Reorganized Debtors.

After Confirmation: 100% of the outstanding capital stock of the Reorganized Cubic Asset Debtors will be owned by the Holders of Class 3 Prepetition Secured Notes Claims and 100% of the outstanding capital stock of the Reorganized Cubic Louisiana Debtors will be held by the Holders of Class 4 Wells Fargo Claims.  Such ownership transfers will be subject to confirmation of the Plan and approval by the Bankruptcy Court of the solicitation of acceptances and rejections by the Debtors as described herein.

The Reorganized Debtors will emerge from Chapter 11 as privately-held companies, and will seek to deregister under the Securities Exchange Act of 1934, as amended, as soon as commercially practicable on or following the Effective Date.

Attached as Exhibit C is a *pro forma* set of financial projections of the intended business operations of the Reorganized Cubic Asset Debtors and the Reorganized Cubic Louisiana Debtors (the "Projections").  The Projections reflect the Debtors' reasonable judgments as to the cash flow of Reorganized Cubic Asset and Reorganized Cubic Louisiana.  However, there can be no assurance that any of the various assumptions on which the Projections are based will prove to be accurate, that any of the forecasted expenses will not exceed assumptions or that the projected results will be realized any time in the future or at all.  Actual results will be impacted by a number of factors, including, without limitation, general economic and business conditions, successful implementation of business plans, third-party contractual relationships, sufficient working capital and available sources of funding, as well as other conditions which affect the capital markets and the oil and natural gas industry, all of which can be materially adverse to the Reorganized Debtors.

**4.2      Sources of Information**.

The descriptions contained in this Disclosure Statement of the Debtors' history, capitalization, assets, operations, and financial condition primarily are based upon public reports filed by the Debtors pursuant to the Securities Exchange Act of 1934, as amended (the "Exchange Act"), in the form of current reports on Forms 8-K and periodic reports on Forms 10-K and 10- Q.  Reports and any other documents filed by the Debtor with the SEC are available for reading and copying at the SEC's public reference room at 100 F Street N.E., Washington, D.C. 20549 (tel. 1-800-SEC0330 for further information), as well as available for retrieval on the SEC's website at www.sec.gov.

**4.3      Liquidation Analysis**.

In connection with preparation of the Plan, the Debtors, with the assistance of their external advisors (including Houlihan) prepared an analysis of the expected cash proceeds that would be distributed to creditors in a liquidation of Cubic Asset and Cubic Louisiana (the "Liquidation Analysis").  A copy of the Liquidation Analysis is attached hereto as Exhibit D. The Liquidation Analysis demonstrates that no creditors other than the Holders of Class 3 or Class 4 claims would receive any distribution in a liquidation of Cubic Asset and Cubic Louisiana.  The Liquidation Analysis also shows that the expected chapter 7 liquidating distributions to Class 3 Prepetition Secured Notes Claims would likely not exceed $44.3 million and the expected chapter 7 liquidating distributions to Class 4 wells Fargo Claims would likely not exceed $4.5 million.  These anticipated chapter 7 liquidation distributions are less than the values that such Classes would receive under the Plan, pursuant to which Class 3 Prepetition Secured Notes Claims would receive assets valued at up to $76 million and Class 4 Wells Fargo Claims would receive assets valued at up to $10 million.  The Liquidation Analysis also shows that all remaining Classes would not receive a distribution on account of their Allowed Claims or Interests if the Debtors were to be liquidated.

**4.4      Other Financial Information**.

The most recent unaudited financial statements of the Debtors for the quarter ended March 31, 2015, are contained in the Debtors' quarterly report on Form 10-Q filed with the SEC on May 15, 2015, and attached hereto as Exhibit F.  Audited financial statements of the Debtors for the year ended June 30, 2014, are contained in the Debtors' annual report on Form 10-K filed with the SEC on November 10, 2014, which financial statements are attached hereto as Exhibit E.

**4.5      Insurance Policies and Indemnification**.

The Debtors maintain customary insurance coverage with respect to their employees and assets.  In addition, the Debtors carry directors and officers liability insurance.

# ARTICLE V

# DESCRIPTION OF THE PLAN

THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE AND MEANS FOR IMPLEMENTATION OF THE PLAN AND OF THE CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN.  IT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, ATTACHED TO THIS DISCLOSURE STATEMENT AS <u>EXHIBIT A.</u>

THE SUMMARY OF THE PLAN AND OF OTHER DOCUMENTS REFERRED TO HEREIN DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THOSE DOCUMENTS, AND REFERENCE IS MADE TO THE PLAN AND SUCH OTHER DOCUMENTS FOR THE FULL AND COMPLETE STATEMENT OF THEIR TERMS AND PROVISIONS.

THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN CONTROL THE ACTUAL TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN, AND, UPON THE EFFECTIVE DATE, WILL BE BINDING UPON ALL HOLDERS OF CLAIMS, INTERESTS AND OTHER PARTIES IN INTEREST, IF ANY.  IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN OR ANY OTHER OPERATIVE DOCUMENT, THE TERMS OF THE PLAN OR THE OTHER OPERATIVE DOCUMENT SHALL CONTROL.

## 5.1    **Structure of the Plan**.

Under the Plan, Claims against and Interests in the Debtors are divided into Classes according to the payment priority set forth in the Bankruptcy Code.  If the Plan is confirmed by the Bankruptcy Court and consummated, each Class of Claims and Interests shall receive the treatment set forth in the Plan.

## 5.2    **Classification, Estimated Amount and Treatment of Claims and Interests**.

Section 1123 of the Bankruptcy Code provides that a plan of reorganization must classify certain Claims and Interests.  In accordance with Section 1123, the Plan divides requisite Claims and Interests into 16 Classes and sets forth the treatment to be provided to each such Class. Section 1122 of the Bankruptcy Code requires the Debtors to classify Claims and Interests into Classes containing Claims and Interests substantially similar to the other Claims and Interests in each such Class.

The Debtors believe the Plan has classified Claims and Interests in compliance with the provisions of Section 1122; however, a holder of a Claim or Interest may challenge the Debtors' classification of Claims and Interests, and the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed.  In that event, the Debtors intend, to the extent permitted by the Bankruptcy Code, the Plan, the Plan Support Agreement, and the Bankruptcy Court, to make such reasonable modifications of the classifications under the Plan to

permit confirmation and to use the Plan acceptances received in this solicitation for purposes of obtaining the approval of the reconstituted Class or Classes of which each accepting holder ultimately is deemed to be a member.  Any such reclassification could adversely affect the Class in which such holder initially was a member, or any other Class under the Plan, by changing the composition of such Class and the vote required of that Class for approval of the Plan. Furthermore, a reclassification of a Claim or Interest after approval of the Plan could necessitate a redistribution of the Disclosure Statement and re-solicitations of acceptances under the Plan.

    **A.**    **Unclassified Claims.**  The Plan does not separately classify the administrative and priority tax Claims.  A description of such unclassified Claims, along with an explanation of the Plan treatment afforded to such unclassified Claims is set forth below:

    <u>Cubic Asset Administrative Claims</u>.  Each Holder of an Allowed Cubic Asset Administrative Claim shall receive payment in full in Cash by Reorganized Cubic Energy of the unpaid portion of such Cubic Asset Administrative Claim, at the sole discretion of Reorganized Cubic Energy, (a) on the Effective Date or as soon thereafter as is reasonably practicable, (b) in the ordinary course of Reorganized Cubic Energy's business, or (c) as otherwise agreed by Reorganized Cubic Energy and the Holder of such Allowed Cubic Asset Administrative Claim.

    <u>Cubic Asset Priority Tax Claims</u>. Each Holder of an Allowed Cubic Asset Priority Tax Claim shall receive, at the sole discretion of Reorganized Cubic Energy, (a) payment in Cash by Reorganized Cubic Energy in an amount of such Holder's Allowed Cubic Asset Priority Tax Claim on the later of the Effective Date or when such Allowed Cubic Asset Priority Tax Claim becomes due, or (b) deferred Cash payments in accordance with section 1129(a)(9)(C) of the Bankruptcy Code.  No Holder of an Allowed Cubic Asset Priority Tax Claim will be entitled to receive any payments on account of any pre-Effective Date interest accrued on, or penalty arising after the Petition Date with respect to or in connection with, any Allowed Cubic Asset Priority Tax Claim. Notwithstanding the foregoing, if any Cubic Asset Priority Tax Claim arises on account of any taxable income generated from any Cubic Louisiana Debtor and such Claim must be satisfied in Cash (*i.e.*, such taxable income cannot be offset by net operating losses available to Reorganized Cubic Energy), such amount shall be paid by Reorganized Cubic Louisiana.

    <u>Cubic Louisiana Administrative Claims</u>.  Each Holder of an Allowed Cubic Louisiana Administrative Claim shall receive payment in full in Cash by Cubic Louisiana of the unpaid portion of such Cubic Louisiana Administrative Claim, at the sole discretion of Reorganized Cubic Louisiana, (a) on the Effective Date or as soon thereafter as is reasonably practicable, (b) in the ordinary course of Reorganized Cubic Louisiana's business, or (c) as otherwise agreed by Reorganized Cubic Louisiana and the Holder of such Allowed Cubic Louisiana Administrative Claim.

    <u>Cubic Louisiana Priority Tax Claims</u>. Each Holder of an Allowed Cubic Louisiana Priority Tax Claim shall receive, at the sole discretion of Reorganized Cubic Louisiana, (a) payment in Cash by Cubic Louisiana in an amount of such Holder's Allowed Cubic Louisiana Priority Tax Claim on the later of the Effective Date or when such Allowed

Cubic Louisiana Priority Tax Claim becomes due, or (b) deferred Cash payments in accordance with section 1129(a)(9)(C) of the Bankruptcy Code.

Professional Fees. Each Professional requesting compensation pursuant to sections 330, 331 or 503(b) of the Bankruptcy Code for services rendered in connection with the Chapter 11 Cases prior to the Confirmation Date shall file an application for allowance of final compensation and reimbursement of expenses in the Chapter 11 Cases on or before the sixtieth day following the Effective Date, which fees and expenses shall be consistent with the Budget. Without limiting the foregoing: (a) any Debtor or Reorganized Debtor, as the case may be, may pay the charges incurred by the Debtors on and after the Confirmation Date for any Professional's fees, disbursements, expenses or related support services incurred in accordance with the Budget, without application to or approval by the Bankruptcy Court; and (b) any professional fees payable to Houlihan for services performed before or after the Effective Date shall be payable in accordance with the payment schedule set forth in Houlihan's engagement letter with the Debtors (as such letter may be subsequently amended from time to time following the Effective Date).

Prepetition Secured Notes Agent Fees and Expenses. The Prepetition Secured Notes Agent has provided and will continue to provide necessary services under the Prepetition Note Purchase Agreement prior to and after the Petition Date. On, or as soon as practicable after, the Effective Date, the Debtors shall pay in cash all reasonable fees, costs and expenses incurred by the Prepetition Secured Notes Agent in the performance of its duties (including the reasonable fees, costs and expenses incurred by the Prepetition Secured Notes Agent's professionals (including, without limitation, Shipman & Goodwin LLP) (to the extent payable under the terms of the Prepetition Note Purchase Agreement)) prior to the Effective Date promptly upon submission of invoices therefor and without the need for filing fee applications with the Bankruptcy Court, provided (a) such fees, costs and expenses are reimbursable under the terms of the Prepetition Note Purchase Agreement and incurred in accordance with the Budget and (b) any dispute in connection with such fees, costs and expenses has been resolved by Final Order. Reorganized Cubic Energy shall promptly pay to the Prepetition Secured Notes Agent any fees, costs and expenses reimbursable under the terms of the Prepetition Note Purchase Agreement that are not disputed and shall attempt to resolve the disputed portion, if any, consensually. To the extent Reorganized Cubic Energy and the Prepetition Secured Notes Agent are unable to consensually resolve any disputes regarding fees, costs or expenses and the Prepetition Secured Notes Agent continues to seek payment of such disputed amount pursuant to Section 2.7 of the Plan, such payment shall occur following the entry of a Final Order of the Bankruptcy Court resolving such dispute. Distributions received by the holders of Prepetition Secured Notes Claims, pursuant to the Plan, shall not be reduced on account of the payment of the Prepetition Secured Notes Agent's fees, costs and expenses pursuant to the terms of the Plan.

WFEC Fees and Expenses. WFEC has provided and will continue to provide necessary services under the Wells Fargo Credit Agreement prior to and after the Petition Date. On, or as soon as practicable after, the Effective Date, the Cubic Louisiana Debtors shall pay in cash all reasonable fees, costs and expenses incurred by the WFEC in the performance of its duties (including the reasonable fees, costs and expenses incurred by WFEC's professionals (to the extent payable under the terms of the Wells Fargo Credit Agreement)) prior to the Effective

Date promptly upon submission of invoices therefor and without the need for filing fee applications with the Bankruptcy Court, provided (a) such fees, costs and expenses are reimbursable under the terms of the Wells Fargo Credit Agreement and incurred in accordance with the Budget and (b) any dispute in connection with such fees, costs and expenses has been resolved by Final Order.  The Reorganized Cubic Louisiana Debtors shall promptly pay to WFEC any fees, costs and expenses reimbursable under the terms of the Wells Fargo Credit Agreement that are not disputed and shall attempt to resolve the disputed portion, if any, consensually.  To the extent Reorganized Cubic Louisiana Debtors and WFEC are unable to consensually resolve any disputes regarding fees, costs or expenses and WFEC continues to seek payment of such disputed amount pursuant to Section 2.8 of the Plan, such payment shall occur following the entry of a Final Order of the Bankruptcy Court resolving such dispute. Distributions received by the holders of Wells Fargo Claims, pursuant to the Plan, shall not be reduced on account of the payment of WFEC's fees, costs and expenses pursuant to the terms of the Plan.

**B.    Classified Claims and Interests**.  Other than the unclassified Claims set forth above, the Plan groups all remaining Claims and Interest into Classes.  A description of such Plan Classes, and the proposed treatment to be afforded to such Classes of Claims and Interests is set forth below.

**1.    Classes of Claims and Interests Against Cubic Asset Debtors:**

Class 1A.    **Cubic Asset Other Priority Claims.**  Each Holder of an Allowed Class 1A Cubic Asset Other Priority Claim shall be paid in full by Reorganized Cubic Energy, in Cash, as soon as reasonably practicable on the later of (a) the Effective Date and (b) the date on which such Cubic Asset Other Priority Claim becomes an Allowed Claim payable under applicable law or any agreement relating thereto. Class 1A Claims are not Impaired, are deemed to have accepted the Plan, and therefore are not entitled to vote to accept or reject the Plan.

Class 2A.    **Cubic Asset Other Secured Claims**.  Each Holder of an Allowed Class 2A Cubic Asset Other Secured Claim shall receive, at the sole discretion of Reorganized Cubic Energy, on the Effective Date or as soon thereafter as is reasonably practicable, (a) payment in full by Reorganized Cubic Energy, in Cash, including payment of any interest Allowed and payable under section 506(b) of the Bankruptcy Code, of such Allowed Cubic Asset Other Secured Claim; (b) delivery of the collateral securing such Allowed Cubic Asset Other Secured Claim; or (c) treatment of such Allowed Cubic Asset Other Secured Claim in any other manner that renders such Claim unimpaired.  Class 2A Claims are not Impaired, are deemed to have accepted the Plan, and therefore are not entitled to vote to accept or reject the Plan.

Class 3.    **Prepetition Secured Notes Claims**.  Each Holder of Prepetition Secured Notes Claims shall receive, on the Effective Date, in full and final satisfaction, release, and discharge of, and in exchange for, its Prepetition Secured Notes Claims, its Pro Rata share of (A) 1,000 shares of Reorganized Cubic Energy Membership Interests, *plus* (B) the New Cubic Energy Senior Secured Notes.  In addition, notwithstanding

Section 2.7 of the Plan, all reasonable fees and expenses of the Professional Advisors to the Prepetition Secured Noteholders that are incurred in accordance with the Cubic Asset Budget in connection with the Chapter 11 Cases (whether incurred before or after the Petition Date, but no later than the Effective Date, and in each case, subject to the terms and provisions of the Prepetition Note Purchase Agreement, any order approving the use of cash collateral by Cubic Energy, Cubic Asset, and/or Cubic Asset Holding, the Plan Support Agreement and any applicable fee letter or other similar reimbursement agreement between any Debtor and the Prepetition Secured Noteholders or their Professional Advisors) shall be deemed to be Allowed Cubic Asset Administrative Claims for purposes of the Plan.  Class 3 Prepetition Secured Notes Claims are deemed Allowed, are Impaired, and are entitled to vote to accept or reject the Plan.

Class 5A.    **Cubic Asset BP Claims**.  In full and final satisfaction, release, and discharge of, and in exchange for, the Cubic Asset BP Claims. the BP Entities and the Reorganized Cubic Asset Debtors shall execute and deliver the Modified Cubic Asset BP Hedges, which shall take effect on the Effective Date, and such Modified Cubic Asset BP Hedges shall be deemed to supersede and replace the Cubic Asset BP Hedges in their entirety.  Class 5A Cubic Asset BP Claims are deemed Allowed, are Impaired, and are entitled to vote to accept or reject the Plan.

Class 6A.    **Cubic Asset General Unsecured Claims**.  On the Effective Date, Cubic Asset General Unsecured Claims will be discharged and eliminated, and the Holders of any Cubic Asset General Unsecured Claims will not receive any distributions or property under the Plan on account of such Claims.  Class 6A Cubic Asset General Unsecured Claims are Impaired, are deemed to have rejected the Plan, and therefore, are not entitled to vote to accept or reject the Plan.

Class 7.    **Section 510(b) Claims**.  On the Effective Date, Section 510(b) Claims (if any) will be discharged and eliminated, and the Holders of any Section 510(b) Claims will not receive any distributions or property under the Plan on account of such Claims (if any such Claims exist).  Class 7 Section 510(b) Claims are Impaired, are deemed to have rejected the Plan, and therefore, are not entitled to vote to accept or reject the Plan.

Class 8.    **Cubic Energy Equity Interests**.  On the Effective Date, all existing common and preferred shares, options, warrants, rights, similar instruments, and other prepetition Interests in Cubic Energy will be extinguished without payment. Holders of such Interests will not retain any such Interests from or after the Effective Date or receive any distributions or property under the Plan on account of such Interests. Class 8 Interests are Impaired, are deemed to have rejected the Plan, and therefore, are not entitled to vote to accept or reject the Plan.

Class 9A.    **Cubic Asset Holding Equity Interests**.  On the Effective Date, all existing common and preferred shares, options, warrants, rights, similar instruments, and other prepetition Interests in Cubic Asset Holding will be extinguished without payment. Holders of such Interests will not retain any such Interests from or after the Effective

Date or receive any distributions or property under the Plan on account of such Interests. Class 9A Interests are Impaired, are deemed to have rejected the Plan, and therefore, are not entitled to vote to accept or reject the Plan.

Class 9B.    **Cubic Asset Equity Interests**.  On the Effective Date, all existing common and preferred shares, options, warrants, rights, similar instruments, and other prepetition Interests in Cubic Asset will be extinguished without payment.  Holders of such Interests will not retain any such Interests from or after the Effective Date or receive any distributions or property under the Plan on account of such Interests.  Class 9B Interests are Impaired, are deemed to have rejected the Plan, and therefore, are not entitled to vote to accept or reject the Plan.

## 2.    Classes of Claims and Interests Against Cubic Louisiana Debtors:

Class 1B.    **Cubic Louisiana Other Priority Claims**.  Each Holder of an Allowed Class 1B Cubic Louisiana Other Priority Claim shall be paid in full by Reorganized Cubic Louisiana, in Cash, as soon as reasonably practicable on the later of (a) the Effective Date and (b) the date on which such Cubic Louisiana Other Priority Claim becomes an Allowed Claim payable under applicable law or any agreement relating thereto. Class 1B Claims are not Impaired, are deemed to have accepted the Plan, and therefore are not entitled to vote to accept or reject the Plan.

Class 2B.    **Cubic Louisiana Other Secured Claims**.  Each Holder of an Allowed Class 2B Cubic Louisiana Other Secured Claim shall receive, at the sole discretion of Reorganized Cubic Louisiana, on the Effective Date or as soon thereafter as is reasonably practicable, (a) payment in full by Reorganized Cubic Louisiana, in Cash, including payment of any interest Allowed and payable under section 506(b) of the Bankruptcy Code, of such Allowed Cubic Louisiana Other Secured Claim; (b) a return of the collateral securing such Allowed Cubic Louisiana Other Secured Claim; or (c) treatment of such Allowed Cubic Louisiana Other Secured Claim in any other manner that renders such Claim unimpaired.  Class 2B Claims are not Impaired, are deemed to have accepted the Plan, and therefore are not entitled to vote to accept or reject the Plan.

Class 3.    **Prepetition Secured Notes Claims**.  Holders of Prepetition Secured Notes Claims shall receive the treatment set forth above in the section describing Classes of Claims and Interests against the Cubic Asset Debtors.

Class 4.    **Wells Fargo Claims**.  Holders of Wells Fargo Claims shall receive, on the Effective Date, in full and final satisfaction, release, and discharge of, and in exchange for, the Wells Fargo Claims, their Pro Rata share of 100% of the membership interests in Reorganized Cubic Louisiana.  Class 4 Wells Fargo Claims are deemed Allowed, are Impaired, and are entitled to vote to accept or reject the Plan.

Class 5B.    **Cubic Louisiana BP Claims**.  The Cubic Louisiana BP Hedges are deemed rejected and terminated as of the day immediately prior to the Effective Date. On the Effective Date, all Cubic Louisiana BP Claims will be discharged and eliminated,

and the Holders of Cubic Louisiana BP Claims will receive no distributions under the Plan on account of such Claims.

Class 6B.        **Cubic Louisiana General Unsecured Claims**.  On the Effective Date, Cubic Louisiana General Unsecured Claims will be discharged and eliminated, and the Holders of any Cubic Louisiana General Unsecured Claims will not receive any distributions or property under the Plan on account of such Claims.  Class 6B Cubic Louisiana General Unsecured Claims are Impaired, are deemed to have rejected the Plan, and therefore, are not entitled to vote to accept or reject the Plan.

Class 7.        **Section 510(b) Claims**.  Holders of Section 510(b) Claims (if any) shall receive the treatment set forth above in the section describing Classes of Claims and Interests against the Cubic Asset Debtors.

Class 10A.        **Cubic Louisiana Holding Equity Interests**.  On the Effective Date, all existing common and preferred shares, options, warrants, rights, similar instruments, and other prepetition Interests in Cubic Louisiana Holding will be extinguished without payment.  Holders of such Interests will not retain any such Interests from or after the Effective Date or receive any distributions or property under the Plan on account of such Interests.  Class 10A Interests are Impaired, are deemed to have rejected the Plan, and therefore, are not entitled to vote to accept or reject the Plan.

Class 10B.        **Cubic Louisiana Equity Interests**.  On the Effective Date, all existing common and preferred shares, options, warrants, rights, similar instruments, and other prepetition Interests in Cubic Louisiana will be extinguished without payment.  Holders of such Interests will not retain any such Interests from or after the Effective Date or receive any distributions or property under the Plan on account of such Interests.  Class 10B Interests are Impaired, are deemed to have rejected the Plan, and therefore, are not entitled to vote to accept or reject the Plan.

**C.        Intercompany Claims.**

Notwithstanding anything herein or in the Plan to the contrary, on the Effective Date all Intercompany Claims will be cancelled and discharged in full, and the Holders thereof shall not be entitled to, and shall not receive or retain, any property or interest in property on account of such Intercompany Claims.  In no event shall Intercompany Claims be Allowed as unsecured Claims or entitled to any distributions under the Plan.

**5.3    Means for Implementation of the Plan**.

**A.        Limited Deemed Substantive Consolidation.**

The Plan shall serve as a motion by the Debtors seeking entry of a Bankruptcy Court order deeming the substantive consolidation of the Debtors' Estates for certain limited purposes relating to the Plan, including voting, confirmation, and distributions.  As a result of such deemed consolidations, each Class of Claims and Interests against or in a Debtor will be treated as being asserted against a single consolidated Estate of all of the Debtors without regard to the

separate legal existence of the Debtors.  The Plan will not result in the merger or otherwise affect the separate legal existence of each Debtor, other than with respect to voting and distribution rights as set forth herein and in the Plan.

### B.    Satisfaction of Allowed Claims.

The Holders of Allowed Claims in Classes 1 through 6B and Allowed Interests in Classes 7 through 10B shall be satisfied in accordance with the terms of the Plan.

### C.    Cancellation of Interests; Issuance of Reorganized Cubic Energy Membership Interests.

Cubic Energy Interests.  On the Effective Date, all Cubic Energy Interests shall be cancelled and annulled, and Reorganized Cubic Energy shall file a certificate of conversion and the Reorganized Cubic Energy Certificate of Formation with the office of the Secretary of State of Delaware and take all other actions necessary or advisable to reincorporate Reorganized Cubic Energy as a Delaware limited liability company, and the Reorganized Cubic Energy Membership Interests shall be issued and distributed to Holders of Prepetition Secured Notes Claims in accordance with the terms of the Plan.  The Reorganized Cubic Energy Operating Agreement shall be adopted on the Effective Date and shall be deemed to be valid, binding and enforceable in accordance with its terms, and each Holder of Reorganized Cubic Energy Membership Interests shall be bound thereby.

Cubic Asset Holding Interests. On the Effective Date, the Reorganized Cubic Asset Holdings Certificate of Formation shall be filed with the office of the Secretary of State of Delaware, and all Cubic Asset Holding Interests shall be cancelled and annulled.  Immediately following the filing of the Reorganized Cubic Asset Certificate of Formation with the office of the Secretary of State of Delaware, reorganized Cubic Asset Holding shall file a certificate of merger with the office of the Secretary of State of Delaware and shall, on the Effective Date, merge (the "Holdings Merger") with and into Reorganized Cubic Asset, whereupon the separate existence of reorganized Cubic Asset Holding shall cease and Reorganized Cubic Asset shall be the surviving Entity.

Cubic Asset Interests.  On the Effective Date, the Reorganized Cubic Asset Certificate of Formation shall be filed with the office of the Secretary of State of Delaware and all Cubic Asset Interests shall be cancelled and annulled. Following the Holdings Merger, 100% of the issued and outstanding Reorganized Cubic Asset Membership Interests shall vest in Reorganized Cubic Energy.

Cubic Louisiana Interests.  On the Effective Date, the Reorganized Cubic Louisiana Certificate of Formation shall be filed with the office of the Secretary of State of Delaware and all Cubic Louisiana Interests shall be cancelled and annulled.  On the Effective Date, newly issued Interests in Reorganized Cubic Louisiana will be distributed to Holders of Wells Fargo Claims in accordance with  Section 2.22 of the Plan.

Cubic Louisiana Holding Interests.    On the Effective Date, the Reorganized Cubic Louisiana Holding Certificate of Formation shall be filed with the office of the Secretary of State of Delaware, and all Cubic Louisiana Holding Interests shall be cancelled and annulled. Immediately following the filing of the Reorganized Cubic Louisiana Certificate of Formation with the office of the Secretary of State of Delaware, Reorganized Cubic Louisiana Holding shall file a certificate of merger with the office of the Secretary of State of Delaware and shall, on the Effective Date, merge with and into Reorganized Cubic Louisiana, whereupon the separate existence of Reorganized Cubic Louisiana Holding shall cease and Reorganized Cubic Louisiana shall be the surviving Entity.

### D.    Payment of Trade Unsecured Claims.

Cubic Asset Debtor Trade Unsecured Claims.    Within thirty (30) Business Days following the Effective Date, Holders of Reorganized Cubic Energy Membership Interests shall establish the Cubic Asset Trade Account.  Holders of Reorganized Cubic Energy Membership Interests shall contribute their Pro Rata share (based on their respective ownership percentage of Reorganized Cubic Energy) of an amount sufficient to satisfy the aggregate amount of Specified Cubic Asset Trade Claims to Reorganized Cubic Energy for deposit to such account.  Each Holder of a Specified Cubic Asset Trade Claim that (a) does not object to the confirmation of the Plan and (b) on or prior to the 30th Business Day following the Effective Date, executes a Trade Unsecured Claim Release (an "Eligible Cubic Asset Trade Holder") shall, unless otherwise agreed in writing between Reorganized Cubic Energy and such Holder, receive a Cash payment from the Cubic Asset Trade Account equal to the amount of its Specified Cubic Asset Trade Claim (any of the foregoing, a "Specified Cubic Asset Trade Payment").  After all Specified Cubic Asset Trade Payments have been distributed to Eligible Cubic Asset Trade Holders, the undistributed amount remaining in the Cubic Asset Trade Account, if any, shall become the sole and exclusive property of the Holders of Reorganized Cubic Energy Membership Interests. Pursuant to the Plan, the Cubic Asset Trade Account and the proceeds therein shall not be property of the Estates pursuant to section 541 of the Bankruptcy Code.

Cubic Louisiana Debtor Trade Unsecured Claims.    Within thirty (30) Business Days following the Effective Date, Holders of Wells Fargo Claims (or one of their Affiliates) shall establish the Cubic Louisiana Trade Account.  Holders of Wells Fargo Claims shall contribute an amount sufficient to satisfy the aggregate amount of Specified Cubic Louisiana Trade Claims to Reorganized Cubic Louisiana for deposit to such account.  Each Holder of a Specified Cubic Louisiana Trade Claim that (a) does not object to the confirmation of the Plan and (b) on or prior to the 30th Business Day following the Effective Date, executes a Trade Unsecured Claim Release (an "Eligible Cubic Louisiana Trade Holder") shall, unless otherwise agreed in writing between Reorganized Cubic Energy and such Holder, receive a Cash payment from the Cubic Louisiana Trade Account equal to the amount of its Specified Cubic Louisiana Trade Claim (any of the foregoing, a "Specified Cubic Louisiana Trade Payment").  After all Specified Cubic Louisiana Trade Payments have been distributed to Eligible Cubic Louisiana Trade Holders, the undistributed amount remaining in the Cubic Louisiana Trade Account, if any, shall become the sole and exclusive property of the Holders of Wells Fargo Claims.  Pursuant to the Plan, the Cubic Louisiana Trade Account and the proceeds therein shall not be property of the Estates pursuant to section 541 of the Bankruptcy Code.

**E.    Severance Payments**.  Within thirty (30) Business Days following the Effective Date, Holders of Reorganized Cubic Energy Membership Interests shall establish the Severance Account.  Holders of Reorganized Cubic Energy Membership Interests shall contribute their Pro Rata share (based on their respective ownership percentage of Reorganized Cubic Energy) of the amounts needed to fund the severance payments called for in the Severance List (taking into account any deferrals permitted pursuant to the Severance List).  Each Person set forth on the Severance List that (a) does not object to the confirmation of the Plan and (b) executes an Employee Claim Release (an "Eligible Employee") shall, unless otherwise agreed in writing between Reorganized Cubic Energy and such Person, receive a Cash payment from the Severance Account at the times set forth in the Severance List (taking into account any deferrals permitted pursuant to the Severance List) (a "Severance Payment").  After all Severance Payments have been distributed to Eligible Employees, the undistributed amount remaining in the Severance Account, if any, shall become the sole and exclusive property of the Holders of Reorganized Cubic Energy Membership Interests.

**F.    Restructuring Transactions and Plan Supplement.**

Restructuring Transactions.  On the Effective Date, and pursuant to the Plan or the applicable Plan Supplement, the Debtors or Reorganized Debtors shall enter into the restructuring transactions contemplated in the Plan, including the transactions contemplated by Sections 3.2 through 3.6 of the Plan, and in the Plan Supplement and Plan Support Agreement (the "Restructuring Transactions"), and shall take any actions as may be necessary or appropriate to effect the Restructuring Transactions or a restructuring of their respective businesses or the overall organizational structure of the Debtors, including the transfers of ownership of Cubic Energy and Cubic Louisiana as set forth herein and in the Plan and the conversion of Reorganized Cubic Energy into a Delaware limited liability company.  The actions to be taken by the Debtors and Reorganized Debtors to effect the Restructuring Transactions may include: (a) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition or transfer containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable state law and any other terms to which the applicable Entities may agree; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (c) the filing of appropriate certificates or articles of incorporation or reincorporation, certificates of limited partnership, or formation, merger or consolidation, and other similar documents and certificates pursuant to applicable state law; and (d) all other actions determined by the Debtors and, (x) with respect to the Cubic Asset Debtors, the Required Prepetition Noteholders, and (y) with respect to Cubic Louisiana, WFEC, to be reasonably necessary or appropriate, including making filings or recordings that may be required by applicable state law in connection with the Restructuring Transactions.  To the extent the Debtors or the Reorganized Debtors deem appropriate, the Restructuring Transactions may be effected pursuant to sections 368 and 381 of the Internal Revenue Code in order to preserve for the Debtors or the Reorganized Debtors the tax attributes of such Entities.  Notwithstanding anything else to the contrary herein or in the Plan, from and after the Confirmation Date, the Debtors may engage in any restructuring, reorganizations, liquidation, intercompany sales and similar transactions in furtherance of the foregoing, with the

prior written consent of (x) with respect to the Cubic Asset Debtors, the Required Prepetition Noteholders or (y) with respect to Cubic Louisiana or Cubic Louisiana Holding, WFEC and the Required Prepetition Noteholders in order to implement tax planning.

Authority to Consummate Restructuring Transactions.  The chairman of the board of directors, president, chief executive officer, chief financial officer, any executive vice president or senior vice president, or any other appropriate officer, manager or managing partner of each of the Debtors or Reorganized Debtors, as appropriate, shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, agreements or other documents, and take such other actions, as may be reasonably necessary or appropriate, to give effect to and further evidence the terms of the Plan. The secretary or assistant secretary of the Debtor or the Reorganized Debtor, as appropriate, shall be authorized to certify or attest to any of the foregoing actions.

### G.    Management of the Reorganized Debtors and Employee Matters.

Management of Reorganized Cubic Energy and Reorganized Cubic Asset Debtors.  On the Effective Date, the Reorganized Cubic Asset Debtors will enter into the New MSA.  The names, titles, and compensation to be paid to each of the officers of the Reorganized Cubic Asset Debtors (including any compensation payable pursuant to the New MSA) shall be set forth in the Plan Supplement.

Management of Reorganized Cubic Louisiana.  The Debtors anticipate that the Cubic Louisiana Debtors will continue to retain the services of their existing employees, officers, and managers that were serving such Entities immediately prior to the Effective Date.  Consistent with section 1129(a)(5) of the Bankruptcy Code, the Persons that will serve as officers of Reorganized Cubic Louisiana on the Effective Date, as well as the compensation of any such officers constituting "insiders" of the Cubic Louisiana Debtors, will be disclosed in the Plan Supplement to be submitted prior to the Confirmation Hearing.

### H.    SEC and Listing Matters.

Termination of Registration.  Upon the Effective Date, no Interests in any of the Debtors or Reorganized Debtors will be publicly traded or listed on any nationally recognized market or exchange.  On the Effective Date, (a) the obligation of each Reorganized Debtor to file periodic reports with respect to any of its Interests with the Securities and Exchange Commission will terminate, if not already terminated, and (b) each Reorganized Debtor will make all filings with and notifications to the Securities and Exchange Commission and/or the Financial Industry Regulatory Authority necessary or appropriate to terminate such obligations.

Exemption from Registration for Reorganized Cubic Energy Membership Interests.  Except with respect to any Entity that is an underwriter as defined in section 1145(b) of the Bankruptcy Code with respect to the Reorganized Cubic Energy Membership Interests, the offer, issuance, sale or distribution of the Reorganized Cubic Energy Membership Interests to be issued pursuant to the Plan shall be exempt from registration under section 5 of the Securities Act (or any state or local law requiring registration for offer or sale of a security) under section 1145 of

the Bankruptcy Code, and  may be resold by holders thereof without registration subject to the terms thereof and, in the case of Reorganized Cubic Energy Membership Interests, the New Cubic Energy Constituent Documents.

## I.        Continued Corporate Existence; New Corporate Documents

Except as otherwise provided in the Plan, each of the Reorganized Debtors shall continue to exist as a separate legal Entity after the Effective Date.  On the Effective Date, each of the Reorganized Debtors will duly file with the applicable Secretary of State an amended certificate of incorporation, certificate of formation, or analogous corporate document that will, among other things, pursuant to section 1123(a)(6) of the Bankruptcy Code, include a provision prohibiting the issuance of non-voting equity securities.

## J.        Governance of Reorganized Debtors

Cubic Energy Governance.  On the Effective Date, the existing board of directors of Cubic Energy shall be dissolved without any further action on the part of the Debtors, or the Debtors' officers, directors, managers, shareholders and members.   Pursuant to section 1129(a)(5) of the Bankruptcy Code, to the extent known, the proposed member of the initial Reorganized Cubic Energy Board of Managers and his/her affiliations shall be disclosed in the Plan Supplement.  The composition of the initial Reorganized Cubic Energy Board of Managers shall be consistent with the New Cubic Energy Constituent Documents and applicable non-bankruptcy law, and shall be approved by the Required Prepetition Noteholders in their sole discretion.  The sole member of the initial Reorganized Cubic Energy Board of Managers shall assume such position on the Effective Date and shall serve from and after the Effective Date until the first annual meeting of the holders of the Reorganized Cubic Energy Membership Interests. Thereafter, the members of the Reorganized Cubic Energy Board of Managers will be elected in accordance with the New Cubic Energy Constituent Documents and applicable non-bankruptcy law.

Cubic Louisiana Governance.  On the Effective Date, the existing board of directors of Cubic Louisiana shall be dissolved without any further action on the part of the Debtors, or the Debtors' officers, directors, shareholders and members.  Pursuant to section 1129(a)(5) of the Bankruptcy Code, to the extent known, the proposed member of the initial Reorganized Cubic Louisiana Board of Managers and his/her affiliations shall be disclosed in the Plan Supplement. The composition of the initial Reorganized Cubic Louisiana Board of Managers shall be consistent with applicable non-bankruptcy law, and shall be approved by the holders of the Wells Fargo Claims in their sole discretion.  The sole member of the initial Reorganized Cubic Louisiana Board of Managers shall assume such position on the Effective Date and shall serve from and after the Effective Date until the first annual meeting of the holders of the Reorganized Cubic Louisiana Membership Interests.   Thereafter, the members of the Reorganized Cubic Louisiana Board of Managers will be elected in accordance with applicable non-bankruptcy law.

### K.    Jurisdiction Over Estate Assets and Post-Effective Date Operations

Pre-Effective Date Jurisdiction.    Until the Effective Date, the Bankruptcy Court shall retain jurisdiction over the Debtors, their assets and operations.

Post-Effective Date Operations.    On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its businesses and may use, acquire, or dispose of property and compromise or settle any Claims or Causes of Action without supervision or approval of the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

### L.    Substantial Consummation

On the Effective Date, unless otherwise provided by the Confirmation Order, the following shall occur, be deemed to have occurred simultaneously, and constitute substantial consummation of the Plan: (a) new corporate governance documents furthering the Restructuring Transactions shall be authorized, approved and effective in all respects without further action under applicable law, regulation, order, or rule, including any action by the stockholders or directors of any of the Debtors or the Reorganized Debtors; and such new organizational documents for any of the Reorganized Debtors may be filed, as appropriate, with the applicable Secretary of State as soon as reasonably practicable on or after the Effective Date; (b) except as otherwise expressly provided in the Plan, title to all assets and property (tangible and intangible) of any Debtor, including its books and records, shall automatically vest in the applicable Reorganized Debtor without further action on the part of such Debtor or any other Entity free and clear of all Claims, Liens, encumbrances, charges and Interests; (c) Reorganized Cubic Energy Membership Interests and newly issued Interests in Reorganized Cubic Louisiana evidencing the change of ownership of Reorganized Cubic Energy and Cubic Louisiana shall have been issued and distributed as provided herein and in the Plan; and (d) the transactions contemplated by Sections 3.2 through 3.6 of the Plan shall occur.

### M.    Cancellation of Instruments and Agreements

On the Effective Date, so long as the treatments provided for, and the distributions contemplated by, Article II of the Plan are effectuated or made upon the Effective Date, except as otherwise provided in the Plan or in the Confirmation Order, instruments, indentures, notes, warrants, options, share certificates, or other documents (other than any insurance policy of any of the Debtors) evidencing, giving rise to, or governing any Claim or Interest, including, without limitation, the Prepetition Secured Notes Documents, shall be deemed canceled, terminated and annulled without further act or action under any applicable agreement, law, regulation, order, or rule, and shall represent only the right to receive the distributions, if any, to which the Holders thereof are entitled under the Plan, and the obligations of the Debtors under such agreements, instruments, indentures, notes, warrants, options, share certificates, or other documents shall be discharged.    On the Effective Date, so long as the treatments provided for, and the distributions contemplated by, Article II of the Plan are effectuated or made upon the Effective Date, except as otherwise provided in the Plan or in the Confirmation Order, the Prepetition Secured Notes Agent shall be discharged of its duties under the Prepetition Secured Notes Documents.

### N.    Cancellation of Liens

On the Effective Date, any Lien securing any Secured Claim (other than a Lien with respect to a Claim that is reinstated pursuant to Sections 2.11 and 2.20 of the Plan) shall be deemed released, and the Holder of such Secured Claim is directed to release any collateral or other property of any Debtor (including any cash collateral) held by such Holder and to take such actions as may be requested by any Debtor (or any Reorganized Debtor, as the case may be) to evidence the release of such Lien, including the execution, delivery and filing or recording of such releases as may be requested by any Debtor (or the Reorganized Debtors, as the case may be).

### O.    Certain Retained Causes of Action

Retention of Causes of Action.  In accordance with section 1123(b) of the Bankruptcy Code, each Reorganized Debtor shall receive, by transfer from the applicable, corresponding Debtor, and shall retain and may enforce, sue on, settle, or compromise (or decline to do any of the foregoing) all Claims, rights, Causes of Action, suits, and proceedings, whether in law or in equity, whether known or unknown, that its corresponding Debtor or Estate may hold against any Entity or that relates to a Claim.  Each Reorganized Debtor may pursue or abandon such retained Claims, rights, Causes of Action, suits, or proceedings as appropriate, in accordance with the best interests of its Estate.

Assignment of Causes of Action.  On the Effective Date, each Debtor shall be deemed to have assigned its Causes of Action or Claims, subject to the limitations set forth in the Plan, whether asserted or unasserted, to its corresponding Reorganized Debtor.

### P.    Tax Matters

Transfer Tax Exemption.  Pursuant to section 1146(a) of the Bankruptcy Code, any (a) transfers or mortgages or the making or delivery of any deed or other instrument of transfer from or by the Debtors to the Reorganized Debtors or any other Entity pursuant to the Plan, (b) issuance, transfer or exchange of notes, equity securities or other instruments, (c) the creation of any mortgage, deed of trust, Lien, pledge or other security interest  or (d) the making or assignment of any lease or sublease, in each case, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax or other similar tax or governmental assessment, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.  All sales, transfers and assignments of owned and leased property approved by the Bankruptcy Court shall be deemed to have been made pursuant to the Plan.

### Q.      Exculpation and Limitation of Liability

The Plan provides that notwithstanding anything in the Plan to the contrary, as of the Confirmation Date, the Debtors, the Prepetition Secured Noteholders, WFEC and their respective directors, officers, members, managers, equity holders, general or limited partners, controlling persons, employees, attorneys, investment bankers, financial advisors, restructuring advisors and other professional advisors, representatives and agents (a) will be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including section 1125(e) of the Bankruptcy Code and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with the solicitation, and (b) will be deemed to have participated in good faith, and in compliance with the applicable provisions of the Bankruptcy Code, in the offer and issuance of any securities under the Plan, and therefore, are not, and on account of such offer, issuance and solicitation shall not be, liable at any time for any violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or the offer and issuance of any securities under the Plan.  Except with respect to any acts or omissions determined by a Final Order to have constituted willful misconduct, gross negligence, or fraud or a criminal act, the Exculpated Parties shall neither have nor incur any liability to any Entity for any prepetition or postpetition act taken or omitted to be taken in connection with, or arising from or relating in any way to, the Chapter 11 Cases, including: (a) the operation of the Debtors' businesses during the pendency of these Chapter 11 Cases; (b) formulating, negotiating, preparing, disseminating, implementing, administering, confirming, making distributions and/or effecting the issuance of any equity interests in connection with the Plan, the Disclosure Statement, the Plan Supplement, the Plan Support Agreement and, in each case, any related contract, instrument, release or other agreement or document created or entered into in connection therewith, including the solicitation of votes for the Plan and other actions taken in furtherance of Confirmation and consummation of the Plan; (c) the offer and issuance of any securities under or in connection with the Plan; or (d) any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors.

### R.      Injunction

The Plan provides that the satisfaction, release, and discharge of Claims and Interests pursuant to the Plan shall also act as a permanent injunction against any Entity who has held, holds, or may hold Claims or Interests (other than Claims reinstated pursuant to Sections 2.11 and 2.20 of the Plan).  Except as otherwise provided in the Plan, from and after the Confirmation Date, all Entities who have held, hold, or may hold Claims against or Interests in any of the Debtors prior to the Effective Date, or who have conveyed any Oil and Gas Leases to any of the Debtors prior to the Effective Date, are permanently enjoined from taking any of the following actions against any of the Debtors, Reorganized Debtors, Released Parties, Exculpated Parties, and  the Estates on account of or in connection with any such Claims or Interests or the activities and conduct of business of the Debtors prior to the Effective Date: (a) commencing or continuing, in any manner or in any place, any action or other proceeding; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (c) creating, perfecting or enforcing any Lien or encumbrance; (d) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to any of the

Debtors; and (e) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan.

**S.      Releases.**

Voluntary Releases by Certain Holders of Claims.  The Plan provides that for good and valuable consideration, including the service of the Released Parties to facilitate the reorganization of the Debtors and the implementation of the restructuring contemplated by the Plan, on and after the Effective Date, the Releasing Parties (regardless of whether a Releasing Party is a Released Party) shall be deemed to conclusively, absolutely, unconditionally, irrevocably and forever release, waive and discharge the Released Parties of any and all Claims, Interests, obligations, rights, suits, damages, judgments, Causes of Action, remedies and liabilities whatsoever, including any derivative claims asserted or assertable on behalf of a Debtor (including those that any of the Releasing Parties would have been legally entitled to assert in their own right (whether individually or collectively)), whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, contingent or fixed, existing or hereafter arising, in law, at equity or otherwise, whether for indemnification, tort, contract, violations of federal or state securities laws or otherwise, based on or relating to, or in any manner arising from, in whole or in part, the Debtors and their non-Debtor subsidiaries, the Estates, the activities and conduct of the businesses of the Debtors and their non-Debtor subsidiaries, the Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the restructuring of Claims and Interests prior to or during the Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Plan Supplement, the Disclosure Statement, the Plan Support Agreement, the Prepetition Secured Notes, the Cubic Asset BP Hedges, the Cubic Louisiana BP Hedges, the New Financing Documents, the Modified Cubic Asset BP Hedges and, in each case, related agreements, instruments or other documents, any action or omission as an officer, director, agent, representative, fiduciary, controlling person, lender, Affiliate or responsible party, any transaction entered into with or affecting, a Debtor or a non-Debtor subsidiary, including business or contractual relationships between the Debtors and any Released Party, or any other act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date of the Plan, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party to the extent such act or omission is determined by a Final Order to have constituted willful misconduct, gross negligence, or fraud.  Notwithstanding anything contained herein or in the Plan to the contrary, this release does not release any post-Effective Date obligations of any party under the Plan or any document, instrument or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Releases by the Debtors.  The Plan provides that for good and valuable consideration, including the service of the Released Parties to facilitate the reorganization of the Debtors and the implementation of the restructuring contemplated by the Plan, on and after the Effective Date, the Released Parties shall be released and discharged by the Debtors, the Reorganized Debtors and the Estates, including any successor to any Debtors or any Estate representative, from all Claims, Interests, obligations, rights, suits, damages, judgments, Causes of Action, remedies and liabilities whatsoever, including any derivative claims asserted or assertable on

behalf of a Debtor, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, contingent or fixed, existing or hereafter arising, in law, at equity or otherwise, whether for indemnification, tort, contract, violations of federal or state securities laws or otherwise, based on or relating to, or in any manner arising from, in whole or in part, the Debtors and their non-Debtor subsidiaries, the Estates, the activities and conduct of the businesses of the Debtors and their non-Debtor subsidiaries, the Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the restructuring of Claims and Interests prior to or during the Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Plan Supplement, the Disclosure Statement, the Plan Support Agreement, the Prepetition Secured Notes, the Cubic Asset BP Hedges, the Cubic Louisiana BP Hedges, the New Financing Documents, the Modified Cubic Asset BP Hedges and, in each case, related agreements, instruments or other documents, any action or omission as an officer, director, agent, representative, fiduciary, controlling person, lender, Affiliate or responsible party, any transaction entered into with or affecting, a Debtor or a non-Debtor subsidiary, including business or contractual relationships between the Debtors and any Released Party, or any other act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date of the Plan, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party to the extent such act or omission is determined by a Final Order to have constituted willful misconduct, gross negligence, or fraud.  Notwithstanding anything contained herein or in the Plan to the contrary, this release does not release any (a) post-Effective Date obligations of any party under (x) the Plan or (y) any document, instrument or agreement (including those set forth in the Plan Supplement) implementing the Plan or (b) continuing contractual obligation owed by any Released Party to or for the benefit of any Debtor or Reorganized Debtor.

**5.4    Treatment of Executory Contracts and Unexpired Leases**.

### A.    Deemed Rejection of Executory Contracts and Unexpired Leases.

The Plan provides that to the extent that any executory contract or unexpired lease is not: (i) included in the Assumed Contract List, (ii) assumed by a Debtor pursuant to a Final Order prior to the Effective Date, or (iii) as of the Effective Date, subject to a motion seeking assumption, then such executory contract and unexpired lease shall be deemed rejected on the Effective Date pursuant to sections 365 and 1123(b)(2) of the Bankruptcy Code.

### B.    Pass-Through.

The Plan provides that any rights or arrangements necessary or useful to the operation of the Debtors' business but not otherwise addressed as a Claim or Interest, including non-exclusive or exclusive patent, trademark, copyright, maskwork or other intellectual property licenses, bonding arrangements, operating licenses with the Texas Railroad Commission or other such regulatory authority, and other executory contracts not assumable under section 365(c) of the Bankruptcy Code, shall, in the absence of any other treatment under the Plan or Confirmation Order, be passed through the Chapter 11 Cases for the benefit of the applicable Reorganized Debtors and the counterparty or counterparties to such rights or arrangements and the legal,

equitable and contractual rights of the applicable Debtors and Reorganized Debtors under rights and arrangements shall be left unaltered and unaffected by the Chapter 11 Cases.

### C. Oil and Gas Leases.

Oil and Gas Leases do not constitute executory contracts or unexpired leases of real property under section 365 of the Bankruptcy Code.  Notwithstanding the foregoing, should Oil and Gas Leases be deemed to constitute executory contracts or unexpired leases under section 365 of the Bankruptcy Code, they will be assumed in accordance with sections 5.4 through 5.9 of the Plan.

Except for (i) the defaults of a kind specified in sections 365(b)(2) and 541(c)(1) of the Bankruptcy Code (which defaults the Debtors and Reorganized Debtors will not be required to cure) or (ii) as otherwise provided in the Plan, the legal, equitable and contractual rights of the counterparties to Oil and Gas Leases shall be unaltered by the Plan. To the extent a failure by the Debtors or Reorganized Debtors to pay or perform an obligation under an Oil and Gas Lease is a default under any applicable Oil and Gas Lease, such default shall be cured for all purposes by the payments provided for in the Plan or the applicable Reorganized Debtors' subsequent performance of such obligation with such applicable Oil and Gas Lease deemed to be, or otherwise remaining, in full force and effect for the benefit of the applicable Reorganized Debtor(s). To the extent such payment is due and owing on the Effective Date, such payment shall be made, in Cash, on the Effective Date, or upon such other terms as may be agreed to by the applicable Debtors or Reorganized Debtors and the Entity to whom such payment is due. To the extent such payment is not due and owing on the Effective Date, such payment (a) will be made, in Cash, in accordance with the terms of the Oil and Gas Lease (or other agreement) between the parties, or as such payment becomes due and owing under (i) applicable non-bankruptcy law, or (ii) in the ordinary course of business of the applicable Reorganized Debtor(s) or (b) will be made upon other terms as may be agreed upon by the applicable Reorganized Debtor and the Entity to whom such payment is due. To the extent it is impossible for a Reorganized Debtor to cure a default arising from any failure to perform a non-monetary obligation, such default shall be deemed cured by future performance by the applicable Reorganized Debtor(s) in accordance with the terms of the applicable Oil and Gas Lease with the applicable Oil and Gas Lease deemed to be, or otherwise remaining, in full force and effect for the benefit of the applicable Reorganized Debtor(s). If there is a dispute as to any Cure obligation (including Cure payments) between the applicable Debtor(s)/Reorganized Debtor(s) and the lessor of an Oil and Gas Lease, the applicable Reorganized Debtor(s) shall only have to pay or perform as provided in the Plan the non-disputed Cure obligation with the balance of the Cure payment or Cure performance to be made or performed after resolution of such dispute either by (i) agreement of the parties or (ii) resolution by the Bankruptcy Court by a Final Order.

### D. Assumed Executory Contracts and Unexpired Leases.

The Plan provides that on the Effective Date, all executory contracts and unexpired leases of the Debtors that are identified in the Assumed Contract List shall be deemed to have been assumed by the applicable Debtor(s) pursuant to sections 365 and 1123 of the Bankruptcy Code without further notice or order of the Bankruptcy Court.  Each executory contract and unexpired

lease (i) assumed pursuant to Section 5.5 of the Plan, (ii) assumed by a Debtor pursuant to a Final Order prior to the Effective Date, or (iii) that, as of the Effective Date, is subject to a motion seeking assumption,  in each case, shall revest in, and be fully enforceable by, the applicable Reorganized Debtor(s) in accordance with the terms thereof upon the date such contract is assumed by the applicable Debtor(s).

Any monetary amount by which any executory contract or unexpired lease to be assumed pursuant to the Plan is in default shall be satisfied, in accordance with section 365(b)(1) of the Bankruptcy Code, by payment of the Cure amounts set forth in the Assumed Contract List, in Cash, on the Effective Date, or upon such other terms as the parties to such executory contract or unexpired lease may otherwise agree with the prior written consent of (x) in the case of the Cubic Asset Debtors, the Required Prepetition Noteholders and (y) in the case of Cubic Louisiana, WFEC.

Each executory contract and unexpired lease that is assumed shall include each term set forth in all (a) amendments, modifications, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease, and (b) rights appurtenant to property, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, reciprocal easement agreements, vaults, tunnel or bridge agreements or franchises, and any other equity interests in real estate or rights in rem related to such premises, unless any of the foregoing agreements has been rejected pursuant to an order of the Bankruptcy Court or is the subject of a motion to reject filed on or before the Effective Date.

Amendments, modifications, supplements, and restatements to prepetition executory contracts and unexpired leases that are executed by a Debtor while its Chapter 11 Case is pending shall not be deemed to alter the prepetition nature of the executory contract or unexpired lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

Executory contracts and unexpired leases assumed by a Debtor may be performed by its corresponding Reorganized Debtor in the ordinary course of business.

### E.      Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases.

Rejection or repudiation of any executory contract or unexpired lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors under such contracts or leases. In particular, notwithstanding any non-bankruptcy law to the contrary, each Reorganized Debtor expressly reserves and does not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the applicable Debtor or Reorganized Debtor, as applicable, from counterparties to rejected or repudiated executory contracts or unexpired leases.

F.      **Director and Officer Insurance Policies and Agreements.**

To the extent that the D&O Liability Insurance Policies issued to, or entered into by, Cubic Energy prior to the Petition Date constitute executory contracts, notwithstanding anything in the Plan to the contrary, Cubic Energy shall be deemed to have assumed all of Cubic Energy's unexpired D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code, effective as of the Effective Date.   Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the assumption or assumption and assignment, as applicable, of each of the D&O Liability Insurance Policies.   Notwithstanding anything to the contrary contained in the Plan, confirmation of the Plan shall not discharge, impair or otherwise modify any advancement, indemnity or other obligations of the D&O Liability Insurance Policies.  After the Effective Date, none of the Reorganized Debtors shall terminate or otherwise reduce the coverage under any of the D&O Liability Insurance Policies with respect to conduct occurring prior thereto, and all directors and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled from the insurers to the full benefits of any such policy for the full term of such policy regardless of whether such directors and officers remain in such positions after the Effective Date.

G.      **Reservation of Rights.**

Neither the exclusion nor inclusion of any contract or lease in any pleading, exhibit or otherwise filed in the Chapter 11 Cases, nor anything contained in the Plan, shall constitute an admission by the Debtors or any Reorganized Debtor that any such contract or lease is in fact an executory contract or unexpired lease or that any Reorganized Debtor has any liability thereunder. If there is a dispute regarding whether any contract, lease or property interest, including any Oil and Gas Lease, is or was an executory contract or unexpired lease at the later of (x) the Effective Date or (y) the time of assumption or rejection, the applicable Reorganized Debtor shall have ninety (90) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease, including, if such contract, lease or property interest  is determined by a Final Order to be an executory contract or unexpired lease, by filing a motion with the Bankruptcy Court seeking to assume such contract, lease, or property interest.

H.      **Nonoccurrence of Effective Date.**

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request by the Debtors to extend the deadline for assuming or rejecting unexpired leases pursuant to section 365(d)(4) of the Bankruptcy Code.

I.      **Additional Cure Provisions**

Except as otherwise provided in Article V of the Plan, Cure payments shall be effected, or otherwise satisfied, by prompt payment by the applicable Reorganized Debtor as contemplated by section 365(b)(1)(A) of the Bankruptcy Code. If there is a dispute regarding (a) the timing of any payment required in order to meet the promptness requirement of 365(b)(1), (b) the nature, extent or amount of any Cure requirement, (c) the Reorganized Debtor's ability to provide "adequate assurance of future performance" (within the meaning of section 365 of the

Bankruptcy Code) under the contract or lease to be assumed, or (d) any other matter pertaining to assumption, the applicable executory contract or unexpired lease shall be assumed, and Cure payments shall be made, following the entry of a Final Order resolving the dispute and approving the assumption or assumption and assignment, as the case may be.

### J.    Claims Based on Rejection of Executory Contracts and Unexpired Leases.

All Allowed Claims arising from the rejection of a Debtor's executory contracts and unexpired leases shall be classified as Cubic Asset General Unsecured Claims or Cubic Louisiana General Unsecured Claims, as applicable, and shall be treated in accordance with the relevant provisions of the Plan; provided, however, if the Holder of an Allowed Claim for rejection damages has a properly perfected security interest in any collateral to secure obligations under such rejected executory contract or unexpired lease, the Allowed Claim for rejection damages shall be treated as a Cubic Asset Other Secured Claim or Cubic Louisiana Other Secured Claim, as applicable, to the extent of the value of such Holder's interest in the collateral, with the deficiency, if any, treated as a Cubic Asset General Unsecured Claim or Cubic Louisiana General Unsecured Claim, as applicable.

### K.    Compensation, Benefit, and Pension Programs.

All employee compensation, benefit and pension plans, and employment agreements or settlements reached thereunder of the Debtors entered into before or after the Petition Date and not since terminated, shall be deemed to be, and shall be treated as if they were, terminated executory contracts.  Such plans, agreements, or settlements do not constitute "retiree benefits" subject to sections 1114 and 1129(a)(13) of the Bankruptcy Code.

### L.    Indemnification Obligations.

Except as otherwise specifically provided in the Plan, any obligations or rights of any Debtor to indemnify, defend or advance expenses to its present and former directors, officers, employees, agents or representatives under its certificate of incorporation, by-laws, employee-indemnification policy, or under state law, or any agreement with respect to any Claim, demand, suit, cause of action, or proceeding related to such Person's service with, for, or on behalf of the Debtors prior to the Effective Date, shall be deemed to be, and shall be treated as if they were, terminated and rejected as of the Effective Date.  For the avoidance of doubt, Section 5.17 of the Plan shall not impair, limit or restrict any Entity's Claims against the D&O Liability Insurance Policies, nor shall it enjoin any Entity from pursuing such Claims.

### M.    Treatment of Change of Control Provisions.

The entry of the Confirmation Order, consummation of the Plan, and/or any other acts taken to implement the Plan shall not constitute a "change of control" under any provision of any contract, agreement or other document which provides for the occurrence of any event, the granting of any right, or any other change in the then-existing relationship between the parties upon a change in control.

**5.5     Conditions Precedent to the Plan's Confirmation and Consummation**.

    **A.     Conditions Precedent to Effective Date.**

The Plan's Effective Date is subject to the satisfaction or written waiver of each of the following conditions precedent:

    a.    the Confirmation Order shall have been entered, no timely appeal shall have been taken from the Confirmation Order, and the Confirmation Order shall have become a Final Order;

    b.    no Environmental Material Adverse Effect shall have occurred;

    c.    (i) each document included in the Plan Supplement, including all exhibits, schedules and annexes thereto, with respect to the Reorganized Cubic Asset Debtors shall be satisfactory to the Required Prepetition Noteholders in its sole discretion and (ii) each document included in the Plan Supplement, including all exhibits, schedules and annexes thereto, with respect to Reorganized Cubic Louisiana shall be satisfactory to WFEC in its sole discretion;

    d.    the New Cubic Energy Constituent Documents and a certificate of conversion each shall have been duly filed with the Secretary of State of Delaware;

    e.    all authorizations, consents and approvals determined to be necessary to implement the terms of the Plan by the applicable Debtor and (x) with respect to the Cubic Asset Debtors, the Required Prepetition Noteholders or (y) with respect to Cubic Louisiana, WFEC, in each case, shall have been obtained;

    f.    all fees, costs, expenses of and other amounts incurred by the Prepetition Secured Noteholders and the Prepetition Secured Notes Agent which are chargeable to or otherwise reimbursable by the Debtors under the Plan Support Agreement and Prepetition Secured Notes Documents shall have been paid in full;

    g.    the New MSA shall have been duly executed and delivered by all parties thereto; and

    h.    all other actions necessary to implement the terms of the Plan on the Effective Date shall have been taken.

    **B.     Condition Precedent for Wells Fargo Payments**

Notwithstanding any other provision to the contrary herein or in the Plan, no payments or distributions shall be made hereunder with respect to all or any portion of any Wells Fargo Claim unless, on or prior to the third (3rd) Business Day prior to the proposed Effective Date, WFEC pays $150,000 in Cash to Cubic Energy, as partial reimbursement of the expenses incurred by the Debtors in connection with the Chapter 11 Cases.

C.        **Waiver of Conditions.**

The conditions set forth above can be waived in writing, in whole or in part, jointly by the Debtors and (i) with respect to conditions affecting any Reorganized Cubic Asset Debtor, Prepetition Secured Noteholder or Holder of Reorganized Cubic Energy Membership Interests in any respect, the Required Prepetition Noteholders; (ii) with respect to conditions affecting Reorganized Cubic Louisiana or any Holder of a Wells Fargo Claim in any respect, WFEC, at any time without an order of the Bankruptcy Court. Unless waived, the failure to satisfy any condition precedent to the Effective Date will preclude the Effective Date's occurrence, regardless of the circumstances giving rise thereto (including any action or inaction by the Debtors or the Reorganized Debtors); (iii) with respect to conditions affecting the Prepetition Secured Notes Agent in any respect, the Prepetition Secured Notes Agent. The waiver of any condition to the Effective Date shall not constitute or be deemed a waiver of any other condition.

**5.6      Modification; Withdrawal**.

The Debtors may modify the Plan with the written approval of, in their sole discretion, (i) with respect to modifications affecting any Reorganized Cubic Asset Debtor, Prepetition Secured Noteholder or Holder of Reorganized Cubic Energy Membership Interests in any respect, the Required Prepetition Noteholders; (ii) with respect to modifications affecting Reorganized Cubic Louisiana or any Holder of a Wells Fargo Claim in any respect, WFEC, in each case, either before or after Confirmation, to the fullest extent permitted under section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.  The Debtors may withdraw the Plan at any time before the Effective Date.

**5.7      Retention of Jurisdiction**.

Under sections 105(a) and 1142 of the Bankruptcy Code, and notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Plan provides that the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of or related to the Chapter 11 Cases and the Plan, to the fullest extent permitted by law, including jurisdiction to:

a.        enter such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan, the Disclosure Statement or the Confirmation Order;

b.        hear and determine any matters related to the assumption, assumption and assignment or rejection of any executory contract or unexpired lease to which the Debtors are party or with respect to which any Debtor or Reorganized Debtor may be liable, and hear, determine and, if necessary, liquidated any Claims arising therefrom;

c.        decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving the Debtors that may be pending on the Effective Date;

d.      hear and determine disputes arising in connection with the interpretation, implementation, consummation, or enforcement of the Plan and all contracts, instruments, and other agreements executed in connection with the Plan;

e.      hear and determine any request to modify the Plan, the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order, or to cure any defect or omission or reconcile any inconsistency in the Plan or any order of the Bankruptcy Court;

f.      issue and enforce injunctions or other orders, or take any other action that may be necessary or appropriate to restrain any interference with the implementation, consummation, or enforcement of the Plan or the Confirmation Order;

g.      enter and implement such orders as may be necessary or appropriate if the Confirmation Order is for any reason reversed, stayed, revoked, modified, or vacated;

h.      hear and determine any matters arising in connection with or relating to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order;

i.      enforce all orders, judgments, injunctions, releases, exculpations, and rulings entered in connection with the Chapter 11 Cases, including with respect to Oil and Gas Leases;

j.      hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under, or not inconsistent with, provisions of the Bankruptcy Code;

k.      to hear and determine matters relating to the allowance, disallowance, estimation, and liquidation of Claims against the Debtor and to enter or enforce any order requiring the filing of any such Claim before a particular date;

l.      to determine all applications, Claims, adversary proceedings, and contested matters pending on the Effective Date; and

m.      enter a final decree closing the Chapter 11 Cases.

**5.8    Binding Effect and Discharge of the Debtor**.

The Plan shall be binding upon and inure to the benefit of the Debtors, all present and former Holders of Claims and Interests, and their respective successors and assigns, and all other parties-in-interest in the Chapter 11 Cases.  All consideration distributed under the Plan shall be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims of any nature whatsoever against, or Interests in, the Debtors or any of their assets or properties, and, except as otherwise provided in the Plan or in the Confirmation Order, and regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims or Interests or whether or not the Holder of such Claims or Interests accepted the

Plan, upon the Effective Date, all Claims and Interests shall be terminated and the Debtors shall be deemed discharged and released therefrom under section 1141(d)(1)(A) of the Bankruptcy Code.

**5.9    Vesting**.

Except as otherwise provided in the Plan or in the Confirmation Order, on the Effective Date, each Reorganized Debtor shall be vested with all of the property of its respective Estate free and clear of all Claims, Liens, encumbrances, charges and Interests, and shall thereafter hold, dispose or otherwise deal with such property and operate its business free of any restrictions imposed by the Bankruptcy Code or by the Bankruptcy Court.  Prosecution of Causes of Action shall be the exclusive responsibility of the applicable Reorganized Debtors, which shall have sole and absolute discretion over whether to prosecute or settle such Causes of Action.

**5.10    Objections to Claims**.

Objections to Claims as to which no objection is pending as of the Effective Date may be filed by any Reorganized Debtor against which the Claim is filed.

**5.11    Payment of Statutory Fees**.

All fees payable under section 1930 of Title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on or before the Effective Date.  All such fees that arise after the Effective Date but before the closing of the Chapter 11 Cases shall be paid from funds otherwise available for distribution hereunder.

**5.12    Severability of Plan Provisions**.

If, before Confirmation, the Bankruptcy Court holds that any provision of the Plan is invalid, void, or unenforceable, the Debtors, at their option, with the written approval of (a) with respect to provisions affecting any Reorganized Cubic Asset Debtor, Prepetition Secured Noteholder or Holder of Reorganized Cubic Energy Membership Interests in any respect, the Required Prepetition Noteholders and (b) with respect to modifications affecting Reorganized Cubic Louisiana or any Holder of a Wells Fargo Claim in any respect, WFEC, may amend or modify the Plan to correct the defect, by amending or deleting the offending provision or otherwise, or may withdraw the Plan.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been amended or modified in accordance with the foregoing, is valid and enforceable.

**5.13    Successors and Assigns**.

The Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of (x) any Entity named or referred to herein  or in the Plan or (y) any other Holder of any Claim or Interest.

**5.14    Term of Injunctions or Stays**.

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases, either by virtue of sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, shall remain in full force and effect until all distributions contemplated by the Plan have been made and the Bankruptcy Court has entered an order closing the Chapter 11 Cases.  The injunctive provisions of sections 524 and 1141 of the Bankruptcy Code and those contained in Article XI of the Plan are permanent and shall not be affected by this provision.

**5.15    Governing Law**.

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), (a) the laws of the State of New York shall govern the construction and implementation of the Plan, (b) the laws of the state of incorporation of the applicable Debtor shall govern corporate governance matters with respect to such Reorganized Debtor, in each case, without giving effect to the principles of conflicts of law thereof.

## ARTICLE VI

## CERTAIN RISK FACTORS TO BE CONSIDERED

Holders of Class 3, 4, and 5A Claims should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference herein), including those items discussed in the Projections, before deciding whether to vote to accept or to reject the Plan.  No other Classes described in the Plan are being solicited for acceptances and rejections of the Plan.

**6.1    Risks Related to the Chapter 11 Cases**.

**A.      The Plan may fail to be confirmed or not be submitted, which may result in the Debtors being liquidated inside or outside of bankruptcy.**

The most likely alternative to confirmation of the Plan is either a foreclosure by the Debtors' secured creditors or a sale process under § 363 of the Bankruptcy Code by which some or all of the assets of the Debtors would be sold to the highest bidder.  The Debtors have no reason to believe that such a process would yield a return to creditors and holders of Interests higher than the Plan, and, in fact, based on the liquidation analysis contained in Exhibit D, the Debtors believe there is a high likelihood that the outcome would be dramatically less.

**B.      The Chapter 11 proceedings may adversely affect the Debtors.**

While the Debtors will seek to make their stay in chapter 11 as brief as possible to minimize any potential disruption to their operations, it is possible that despite the belief and intent of the Debtors, the commencement of the Chapter 11 Cases could materially adversely affect relationships the Debtors and their key stakeholders, including, without limitation, royalty owners, joint interest owners, investors, employees, and suppliers.

C.      **The Plan is based upon the Projections, which are inherently uncertain.**

The Projections set forth in the Disclosure Statement and underlying the Plan are based on numerous assumptions, including the timing, confirmation and consummation of the Plan in accordance with its terms, the anticipated future performance of the applicable Reorganized Debtors, general business and economic conditions, and other matters, many of which are beyond the control of the Reorganized Debtors and some or all of which may not materialize. Additionally, unanticipated events and circumstances occurring subsequent to the date of this Disclosure Statement may affect the actual financial results of the Reorganized Debtors' operations.  As the actual results achieved throughout the periods covered by the Projections can be expected to vary from the projected results, the Projections should not be relied upon as a guaranty, representation, or other assurance that the actual results will occur.

**6.2     Risks Related to Financial Condition of Reorganized Debtors**.

A.      **Natural gas and oil prices are highly volatile, and lower prices negatively affect the Reorganized Debtor's financial results.**

The Reorganized Debtors' revenue, profitability, cash flow, oil and natural gas reserves value, future growth, and ability to borrow funds or obtain additional capital, as well as the carrying value of its properties, are substantially dependent on prevailing prices of natural gas and oil.  Historically, the markets for natural gas and oil have been volatile, and those markets are likely to continue to be volatile in the future.  Predicting future natural gas and oil price movements with certainty is impossible.  Prices for natural gas and oil are subject to wide fluctuations in response to relatively minor changes in the supply of and demand for natural gas and oil, market uncertainty, and a variety of additional factors beyond the Reorganized Debtors' control.  These factors include:

-       the level of consumer energy product demand;

-       the domestic and foreign supply of oil and natural gas;

-       overall economic conditions;

-       weather conditions;

-       domestic and foreign governmental regulations and taxes;

-       the price and availability of alternative fuels;

-       political conditions in or affecting oil and natural gas producing regions;

-       the level and price of foreign imports of oil and liquefied natural gas; and

-       the ability of the members of the Organization of Petroleum Exporting Countries and other state controlled oil companies to agree upon and maintain oil price and production controls.

Declines in natural gas and oil prices may materially adversely affect the financial condition, liquidity, ability to finance planned capital expenditures and results of operations of the Reorganized Debtors, Cubic Asset, and/or Cubic Louisiana,[2] and may reduce the amount of oil and/or natural gas that such entities can produce economically.

**B.    The Modified Cubic Asset BP Hedges may result in Reorganized Cubic Asset failing to benefit, to the fullest extent possible, from increases in prices for  natural gas and oil.**

In connection with the Plan's Effective Date, the Cubic Asset Debtors intend to execute and deliver the Modified Cubic Asset BP Hedges.  Such hedge agreements may limit the Reorganized Cubic Asset Debtors' ability to benefit from increases in the prices of natural gas and oil.  These arrangements could expose the Reorganized Cubic Asset Debtors to the risk of financial loss in certain circumstances, including instances in which production is less than expected, customers fail to purchase contracted quantities of natural gas and oil, or a sudden, unexpected event that materially impacts natural gas or oil prices.

**6.3    Risks Related to the Reorganized Debtors' Assets and Projected Operations**.

**A.    Drilling for and producing oil and natural gas are high risk activities with many uncertainties that could adversely affect the Reorganized Debtors' business, financial condition or results of operations.**

The applicable Reorganized Debtors' success largely depends on the success of their exploitation, exploration, development and production activities.  The applicable Reorganized Debtors' oil and natural gas exploration and production activities are subject to numerous risks beyond their control, including the risk that drilling will not result in commercially viable oil or natural gas production.  The applicable Reorganized Debtors' decisions to purchase, explore, develop or otherwise exploit prospects or properties will depend in part on the evaluation of data obtained through geophysical and geological analyses, production data and engineering studies, the results of which are often inconclusive or subject to varying interpretations.    The Reorganized Debtors' costs of drilling, completing and operating wells are often uncertain before drilling commences.  Overruns in budgeted expenditures are a common risk that can make a particular project uneconomical.  Further, many factors may curtail, delay or cancel drilling operations, including the following:

-    delays imposed by or resulting from compliance with regulatory requirements;

-    pressure or irregularities in geological formations;

-    shortages of or delays in obtaining equipment and qualified personnel;

-    equipment failures or accidents;

---

[2] Hereafter, references to the "Debtors", "Reorganized Debtors", "Debtors'", or the "Reorganized Debtors'" shall include references to Cubic Asset and Cubic Louisiana, as applicable.

- adverse weather conditions;

- reductions in oil and natural gas prices; and

- oil and natural gas property title problems.

**B.     Reserve estimates depend on many assumptions that may turn out to be inaccurate.    Any material inaccuracies in these reserve estimates or underlying assumptions will materially affect the quantities and present value of the applicable Reorganized Debtors' reserves.**

The process of estimating oil and natural gas reserves is complex, and it requires interpretations of available technical data and many assumptions, including assumptions relating to economic factors.  Any significant inaccuracies in these interpretations or assumptions could materially affect the estimated quantities and present value of the respective Reorganized Debtors' reported reserves.  In order to prepare the applicable Reorganized Debtor's estimates, it must project production rates and the timing of development expenditures.  It must also analyze available geological, geophysical, production and engineering data.  The extent, quality and reliability of this data can vary.  The process also requires that economic assumptions be made about matters such as oil and natural gas prices, drilling and operating expenses, capital expenditures, taxes, and availability of funds.   Therefore, estimates of oil and natural gas reserves are inherently imprecise.  Actual future production, oil and natural gas prices received, revenues, taxes, development expenditures, operating expenses and quantities of recoverable oil and natural gas reserves most likely will vary from the applicable Reorganized Debtor's estimates.  Any significant variance could materially affect the estimated quantities and present value of the applicable Reorganized Debtor's reported reserves.  In addition, the applicable Reorganized Debtors may adjust estimates of proved reserves to reflect production history, results of exploration and development, prevailing oil and natural gas prices and other factors, many of which are beyond the applicable Reorganized Debtor's control.

**C.     Seismic studies do not guarantee that hydrocarbons are present or if present will be produced in economic quantities.**

The applicable Reorganized Debtors will rely on seismic studies to assist them with assessing prospective drilling opportunities on its properties, as well as on properties that they may acquire.   Such seismic studies are merely an interpretive tool and do not necessarily guarantee that hydrocarbons are present or if present will be produced in economic quantities.

**D.     The Reorganized Debtors depend on successful exploration, development and acquisitions to maintain revenue in the future.**

Generally, the volume of production from natural gas and oil properties declines as reserves are depleted, with the rate of decline depending on reservoir characteristics.  Except to the extent that the applicable Reorganized Debtor(s) conduct successful exploration and development activities or acquires properties containing proved reserves, or both, their proved reserves will decline as reserves are produced.  To the extent that Reorganized Cubic Asset

and/or Cubic Louisiana have insufficient developmental opportunities within their existing acreage positions, their respective future natural gas and oil production will therefore be highly dependent on their level of success in finding or acquiring additional reserves.

As explained above, the business of exploring for, developing, or acquiring reserves is capital intensive.  Recovery of the Reorganized Debtors' reserves, particularly undeveloped reserves, will require significant additional capital expenditures and successful drilling operations.  To the extent cash flow from operations is lower than anticipated due to low commodity prices, the applicable Reorganized Debtor's ability to make the necessary capital investment to maintain or expand its asset base of natural gas and oil reserves may be impaired unless other external sources of capital become available.  In addition, the applicable Reorganized Debtors may be required to find partners for any future exploratory activity.  To the extent that others in the industry do not have the financial resources or choose not to participate in the applicable Reorganized Debtors' exploration activities, Reorganized Cubic Asset and/or Reorganized Cubic Louisiana could be adversely affected.

### E. Market conditions or operational impediments may hinder the Reorganized Debtors' access to oil and natural gas markets or delay its production.

Unexpected and depressed market conditions or the unavailability of satisfactory oil and natural gas transportation arrangements may hinder the applicable Reorganized Debtors' access to oil and natural gas markets or delay its production.  The availability of a ready market for the Reorganized Debtors' oil and natural gas production depends on a number of factors, including the demand for and supply of oil and natural gas and the proximity of reserves to pipelines and terminal facilities.  The Reorganized Debtors' ability to market production depends in substantial part on the availability and capacity of gathering systems, pipelines and processing facilities owned and operated by third parties.  The Reorganized Debtors' failure to obtain such services on acceptable terms could materially harm their business.  Productive properties may be located in areas with limited or no access to pipelines, thereby necessitating delivery by other means, such as trucking, or requiring compression facilities.  Such restrictions on the ability to sell oil or natural gas could have several adverse effects, including higher transportation costs, fewer potential purchasers (thereby potentially resulting in a lower selling price) or, in the event the applicable Reorganized Debtor is unable to market and sustain production from a particular lease for an extended time, possibly causing it to lose a lease due to lack of production.

### F. The Reorganized Debtors may not be able to keep pace with   technological developments.

The natural gas and oil industry is characterized by rapid and significant technological advancements and introduction of new products and services which utilize new technologies.  As others use or develop new technologies, the applicable Reorganized Debtors may be placed at a competitive disadvantage or competitive pressures may force it to implement those new technologies at substantial costs.  In addition, other natural gas and oil companies may have greater financial, technical, and personnel resources that allow them to enjoy technological advantages and may in the future allow them to implement new technologies before the Reorganized Debtors are able to implement such technologies.  The Reorganized Debtors may

not be able to respond to these competitive pressures and implement new technologies on a timely basis or at an acceptable cost.  If one or more of the technologies the Reorganized Debtors use now or in the future were to become obsolete or if they were unable to use the most advanced commercially available technology, the respective Reorganized Debtors' business, financial condition, and results of operations could be materially adversely affected.

**G.    The Reorganized Debtors face strong competition from other natural gas and oil companies.**

The Reorganized Debtors encounter competition from other natural gas and oil companies in all areas of operations, including the acquisition of exploratory prospects and proved properties.  The Reorganized Debtors' competitors include major integrated natural gas and oil companies and numerous independent natural gas and oil companies, individuals, and drilling and income programs.  Many of these competitors are large, well-established companies that have been engaged in the natural gas and oil business much longer than the respective Reorganized Debtors have and possess substantially larger operating staffs and greater capital resources than the respective Reorganized Debtors.  These companies may be able to pay more for exploratory projects and productive natural gas and oil properties and may be able to define, evaluate, bid for, and purchase a greater number of properties and prospects than the respective Reorganized Debtors' financial or human resources permit.  In addition, these companies may be able to expend greater resources on the existing and changing technologies that the Reorganized Debtors believe are and will be increasingly important to attaining success in the industry.  The Reorganized Debtors may not be able to conduct operations, evaluate, and select suitable properties and consummate transactions successfully in this highly competitive environment.

**H.    The Respective Reorganized Debtors are subject to complex laws that can affect the cost, manner or feasibility of doing business.**

The exploration, development, production and sale of oil and natural gas is subject to extensive federal, state, local and international regulation.  The respective Reorganized Debtors may be required to make large expenditures to comply with such governmental regulations. Matters subject to regulation include:

- permits for operations;

- drilling and plugging bonds;

- reports concerning operations;

- the spacing and density of wells;

- unitization and pooling of properties;

- environmental maintenance and cleanup of drill sites and surface facilities; and

- protection of human health.

From time to time, regulatory agencies have also imposed price controls and limitations on production by restricting the rate of flow of natural gas and oil wells below actual production capacity in order to conserve supplies of natural gas and oil.  Under these laws, the respective Reorganized Debtors could be liable for personal injuries, property damage and other damages. Failure to comply with these laws also may result in the suspension or termination of the respective Reorganized Debtors' operations and subject them to administrative, civil and criminal penalties.  Moreover, these laws could change in ways that substantially increase the respective Reorganized Debtors' costs.  Any such liabilities, penalties, suspensions, terminations or regulatory changes could materially adversely affect the respective Reorganized Debtors' financial condition and results of operations.

I.      **The Reorganized Debtors' Mineral Leases Could Expire or**
        **Become Involuntarily Terminated**

The Debtors' properties are held in the form of leases and working interests in leases. If the Debtors fail to meet the specific requirement of a lease, the lease may terminate or expire. There can be no assurance that any of the obligations required to maintain each of the Debtors' leases will be met or have been met prior to the Petition Date. The termination or expiration of a lease or the working interest relating to a lease may have a material adverse effect on the results of the Debtors' operations and business. In addition title to the Debtors' properties can become subject to dispute and defeat the Debtors' claim to title over certain of the Debtors' properties.

Prior to the Petition Date, a judgement was entered in a lawsuit styled, "Gloria's Ranch, L.L.C. v. Tauren Exploration, Inc., Cubic Energy, Inc., Wells Fargo Energy Capital, Inc. and EXCO USA Asset, LLC", in the 1st Judicial District Court, Caddo Parish, Louisiana, Case No. 541-768-A (the "Gloria's Ranch Suit").  The Gloria's Ranch Suit alleged that all or part of the mineral lease granted by Gloria's Ranch, L.L.C. on September 17, 2004 had lapsed, and sought a finding that the mineral lease lapsed, damages, attorney fees, and other equitable relief.  The judgement entered by the court in the Gloria's Ranch Suit found that the referenced lease did in fact lapse, and awarded the plaintiff damages related to the alleged lapsed lease.  The judgement is currently not final, as the defendants have requested a new trial.  While any damages associated with the Gloria's Ranch Suit would be Cubic Asset General Unsecured Claims and/or Cubic Louisiana General Unsecured Claims, in the event that it is finally determined that the Debtors' lease in fact lapsed, such property would not be property of the estate and would not be transferred under the terms of the Plan.

J.      **The Reorganized Debtors' operations may cause them to incur substantial**
        **liabilities for failure to comply with environmental laws and regulations.**

The respective Reorganized Debtors' oil and natural gas operations are subject to stringent federal, state and local laws and regulations relating to the release or disposal of materials into the environment or otherwise relating to environmental protection.  These laws and regulations may require the acquisition of a permit or other authorizations before drilling commences, restrict the types, quantities and concentration of substances that can be released into the environment in connection with drilling and production activities, require permitting or authorization for release of pollutants into the environment, limit or prohibit drilling activities on

certain lands lying within wilderness, wetlands, areas inhabited by endangered or threatened species, and other protected areas, and impose substantial liabilities for pollution resulting from historical and current operations.  Failure to comply with these laws and regulations may result in the assessment of administrative, civil and criminal penalties, incurrence of investigatory or remedial obligations or the imposition of injunctive relief.  Changes in environmental laws and regulations occur frequently, and any changes that result in more stringent or costly waste handling, storage, transport, disposal or cleanup requirements could require the respective Reorganized Debtors to make significant expenditures to maintain compliance, and may otherwise have a material adverse effect on its results of operations, competitive position or financial condition as well as on the industry in general.  Under these environmental laws and regulations, the respective Reorganized Debtors could be held strictly liable for the removal or remediation of previously released materials or property contamination regardless of whether they were responsible for the release or operations were standard in the industry at the time they were performed.

**K.    The Reorganized Debtors may not have enough insurance to cover all of the risks that they face, and operators of prospects in which they participate may not maintain or may fail to obtain adequate insurance.**

In accordance with customary industry practices, the Reorganized Debtors maintain insurance coverage against some, but not all, potential losses in order to protect against the risks they face.  The respective Reorganized Debtors may elect not to carry insurance if management believes that the cost of available insurance is excessive relative to the risks presented.  In addition, the respective Reorganized Debtors cannot insure fully against pollution and environmental risks.  The occurrence of an event not fully covered by insurance could have a material adverse effect on the respective Reorganized Debtors' financial condition and results of operations.

Oil and natural gas operations are subject to particular hazards incident to the drilling and production of oil and natural gas, such as blowouts, cratering, explosions, uncontrollable flows of oil, natural gas or well fluids, fires and pollution and other environmental risks.  These hazards can cause personal injury and loss of life, severe damage to and destruction of property and equipment, pollution or environmental damage and suspension of operation.  The occurrence of a significant adverse event that is not fully covered by insurance could result in the loss of the respective Reorganized Debtors' total investment in a particular prospect which could have a material adverse effect on its financial condition and results of operations.

**6.4    Payments and Insolvency Risks Related to the Newly Issued Equity Interests**.

**A.    The Reorganized Debtors may not be able to pay dividends on new equity securities and do not anticipate doing so for the foreseeable future.**

Under the Delaware General Corporation Law, cash dividends on capital stock may not be paid if, after giving effect to any such dividend, a corporation would not be able to pay its debts as they become due in the ordinary course of business or its total assets would be less than the sum of its total liabilities, plus any amount needed to satisfy preferential rights upon

dissolution of the applicable Reorganized Debtors.  Accordingly, the applicable Reorganized Debtors may not be able to make any dividend payments.

## ARTICLE VII

## FINANCIAL INFORMATION AND FEASIBILITY

**7.1    Financial Information**.

Attached as <u>Exhibit C</u> are the Projections prepared by the Debtors' management (with the assistance of their advisors, including Houlihan), setting forth the *pro forma* projections of the intended business operations of the Reorganized Cubic Asset Debtors and Reorganized Cubic Louisiana Debtors.

The Projections set forth in <u>Exhibit C</u> and the above summary reflect the Debtors' best judgment as to the cash flows of the Reorganized Cubic Asset Debtors and Reorganized Cubic Louisiana Debtors based upon assumptions the Debtors believe are reasonable; however, there can be no assurance that any of the assumptions on which they are based will prove to be accurate, that any of the forecasted expenses will not exceed assumptions or that the projected results will be realized.  Actual results will be affected by several factors, including, without limitation, commodity prices, general economic and business conditions, successful implementation of business plans, third-party contractual relationships, sufficiency of working capital and sources of funding, as well as other conditions that affect the capital markets and the oil and natural gas industry, all of which can be materially adverse to the Reorganized Cubic Asset Debtors and/or Reorganized Cubic Louisiana Debtors.

**7.2    Feasibility of the Plan**.

Section 1129(a)(11) of the Bankruptcy Code requires that the Bankruptcy Court find that confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the respective Reorganized Debtors.   This is the so-called "feasibility" test.   For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed the ability of the Reorganized Debtors to meet the obligations under the Plan.  As part of this analysis, the Debtors have prepared the Projections set forth in Exhibit C.  Ownership of the respective Cubic Asset Debtors and Cubic Louisiana Debtors will be transferred to their respective secured creditors under the Plan, each of whom intend to continue operation of their respective properties in the ordinary course of business.   Based on the Projections (and the assumptions on which they are based), it is the Debtors' best judgment that confirmation of the Plan is not likely to be followed by liquidation or need for further reorganization and that each of the respective Reorganized Debtors will have sufficient liquidity to make all payments required under the Plan and to enable them to fund obligations in the ordinary course, including development drilling and other capital operations.   Accordingly, the Debtors believe that the Plan complies with the standard of Section 1129(a)(11) of the Bankruptcy Code.

**ARTICLE VIII**

**LIQUIDATION ANALYSIS**

**8.1     Liquidation Analysis**.

To calculate the probable distribution to members of each impaired class of holders of claims or interests if the Debtors were liquidated under chapter 7, a Bankruptcy Court must first determine the aggregate dollar amount that would be generated from the respective Debtors if their Chapter 11 Cases were converted to chapter 7 cases under the Bankruptcy Code.   This "liquidation value" would consist primarily of the proceeds from a forced sale of the Debtors' assets by a chapter 7 trustee.

The amount of liquidation value available to unsecured creditors would be reduced by the claims of secured creditors to the extent of the value of their collateral and by the costs and expenses of liquidation, as well as by other administrative expenses and costs of both the chapter 7 case and the Chapter 11 Cases.   Costs of a liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a chapter 7 trustee, as well as of counsel and other professionals retained by the trustee, asset disposition expenses, all unpaid expenses incurred by the Debtors in the Chapter 11 Cases (such as compensation of attorneys, financial advisors, and accountants) that are allowed in their respective chapter 7 cases, litigation costs, and claims arising from the operations of the Debtors during the pendency of the bankruptcy.   The liquidation itself would trigger certain priority payments that otherwise would be due in the ordinary course of business.   Those priority claims would be paid in full from the liquidation proceeds before the balance would be made available to pay general unsecured claims or to make any distribution in respect of equity interests.   The liquidation would also prompt the rejection of executory contracts and unexpired leases and thereby create a significantly greater amount of unsecured claims.

Once the Bankruptcy Court ascertains the recoveries in liquidation of the secured creditors and priority claimants, it must determine the probable distribution to general unsecured creditors and equity security holders from the remaining available proceeds in liquidation, to determine whether such probable distribution has a value greater than the distributions to be received by such creditors and equity security holders under the Plan, and therefore whether the Plan is in the best interests of creditors and equity security holders.

As shown in the Debtors' Liquidation Analysis attached as <u>Exhibit D</u> to this Disclosure Statement, the Debtors' management is of the view that each Class of Claims will receive under the Plan more than they would receive if the Debtors were liquidated in chapter 7 proceedings. More specifically, a liquidation of the Debtors would significantly impair recoveries to all holders of Claims and clearly is not in the best interests of stakeholders.   Accordingly, it is clear that holders of Claims will fare much better under the Plan than in a liquidation.   Furthermore, in a liquidation, Interest Holders would not receive any distribution which is the same treatment provided to such Interest Holders under the Plan.   The Plan therefore satisfies the best interests test.

# ARTICLE IX

# POST CONFIRMATION MANAGEMENT

**9.1    Officers and Directors**.

Cubic Asset Debtors.  On the Effective Date, the Reorganized Cubic Asset Debtors will enter into the New MSA.  The names, titles, and compensation to be paid to each of the officers of the Reorganized Cubic Asset Debtors (including any compensation payable pursuant to the New MSA) shall be set forth in the Plan Supplement.  Consistent with section 1129(a)(5) of the Bankruptcy Code, any Persons that will serve as officers and/or directors of the Reorganized Cubic Asset Debtors on the Effective Date, as well as the compensation of any such officers constituting "insiders" of the Cubic Asset Debtors, will be disclosed in the Plan Supplement to be submitted prior to the Confirmation Hearing.

Cubic Louisiana Debtors.  The Debtors anticipate that the Cubic Louisiana Debtors will continue to retain the services of their existing employees, officers, and managers that were serving such Entities immediately prior to the Effective Date.  Consistent with section 1129(a)(5) of the Bankruptcy Code, the Persons that will serve as officers of Reorganized Cubic Louisiana on the Effective Date, as well as the compensation of any such officers constituting "insiders" of the Cubic Louisiana Debtors, will be disclosed in the Plan Supplement to be submitted prior to the Confirmation Hearing.

# ARTICLE X

# DISTRIBUTIONS AND CLAIMS RESOLUTION

**10.1    Delivery of Distributions; Undeliverable or Unclaimed Distributions**.

### A.    Delivery of Distributions in General.

The applicable Reorganized Debtor shall make distributions to each Holder of an Allowed Claim entitled to receive a distribution pursuant to the terms of the Plan at the address reflected in the books and records of the Debtors, unless otherwise notified in writing by such Holder sufficiently in advance of any distribution to allow the Debtors or Reorganized Debtor to reflect such change on its books and records.

### B.    Distributions to Prepetition Secured Noteholders.

Reorganized Cubic Energy Membership Interests shall be issued in accordance with Section 2.12 of the Plan solely to each Holder of Prepetition Secured Notes.  New Cubic Energy Senior Secured Notes shall be issued in accordance with Section 2.12 of the Plan to each Holder of Prepetition Secured Notes or its Affiliate as requested by such Holder; provided that such Holder provides the Debtors with such request (and the address of its affiliate) in writing sufficiently in advance of such distribution to allow the applicable Debtors or Reorganized Debtors to reflect the Affiliate on their books and records.

### C.      Undeliverable and Unclaimed Distributions.

Any undeliverable or unclaimed distribution under the Plan that does not become deliverable on or before the first anniversary of the Effective Date shall be deemed to have been forfeited and waived, and the Entity otherwise entitled thereto shall be forever barred and enjoined from asserting its Claim therefor against, or seeking to recover its distribution from, the Debtors, their Estates, or the Reorganized Debtors.

### D.      Allocation of Plan Distributions Between Principal and Interest.

To the extent that any Allowed Claim or Interest entitled to a distribution under the Plan is composed of indebtedness and accrued but unpaid interest thereon, such distribution shall, to the extent permitted by applicable law, be allocated for United States federal income tax purposes to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of the Claim representing accrued but unpaid interest.

### E.      Fractional Amounts.

Holders of Prepetition Secured Notes Claims and Wells Fargo Claims may be entitled to fractional amounts of Reorganized Cubic Energy Membership Interests or Reorganized Cubic Louisiana Interests pursuant to the distributions described in Sections 2.12 and 2.22 of the Plan. Notwithstanding such entitlement, all Reorganized Cubic Louisiana Interests distributed to Holders of Wells Fargo Claims pursuant to the Plan will be distributed only in full dollar denominations. To the extent any Holder would be entitled to a fractional denomination of Reorganized Cubic Louisiana Interests, but for this provision, the denomination of Reorganized Cubic Louisiana Interests to be distributed to such Holder shall be rounded downward to eliminate any fractional amount.  For the avoidance of doubt, fractional denominations of Reorganized Cubic Energy Membership Interests may be distributed to Holders of Prepetition Secured Notes Claims pursuant to the Plan.

### F.      Compliance with Applicable Laws.

In connection with the Plan and all distributions hereunder, the Debtors and Reorganized Debtors shall comply with all applicable tax withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all distributions hereunder shall be subject to those requirements. The Debtors and Reorganized Debtors shall be authorized to take all actions necessary or appropriate to comply with those withholding and reporting requirements.

### G.      Tax Identification Numbers.

If requested by the applicable Reorganized Debtor, before receiving any distributions under the Plan, a Holder of an Allowed Claim shall provide the applicable Debtors/Reorganized Debtors with written notification or confirmation of its federal tax identification number or social security number, and such other information as the applicable Reorganized Debtor may

reasonably request for the purpose of allowing such Debtor and the Reorganized Debtor to comply with the applicable tax laws and rules.

### H.    Filing Final Tax Return.

The Reorganized Cubic Asset Debtors shall be authorized to request an expedited determination under section 505(b) of the Bankruptcy Code for all tax returns filed for, or on behalf of, the Cubic Asset Debtors for any and all taxable periods ending after the Petition Date through, and including, the Effective Date, and the Reorganized Cubic Louisiana Debtors shall be authorized to request an expedited determination under section 505(b) of the Bankruptcy Code for all tax returns filed for, or on behalf of, the Cubic Louisiana Debtors for any and all taxable periods ending after the Petition Date through, and including, the Effective Date.

### I.    Setoffs.

The applicable Debtors and/or Reorganized Debtors may, but shall not be required to, set off against any Claim (other than the Prepetition Secured Notes Claims, which Claims shall not be subject to setoff, recoupment or reduction of any kind) and the payments or other distributions to be made in respect of that Claim, Claims of any nature whatsoever that the applicable Debtors or Reorganized Debtors may have against the Claim's Holder; but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or Reorganized Debtors of any Claim that the applicable Debtors or Reorganized Debtors may have.

## ARTICLE XI

## FEDERAL INCOME TAX CONSEQUENCES

### 11.1    General.

The following discussion summarizes certain anticipated U.S. federal income tax consequences of the Plan to the Debtors and certain holders of Claims or Interests. This summary is provided for general information purposes only and should not be relied upon for purposes of determining the specific tax consequences of the Plan with respect to any particular holder of a Claim or an Interest. This summary does not purport to be a complete analysis or listing of all potential tax considerations.

This summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury regulations promulgated thereunder (the "Regulations"), judicial authorities, current published administrative rulings and pronouncements of the Internal Revenue Service (the "IRS"), and other applicable authorities, all as in effect as of the date hereof. Legislative, judicial, or administrative changes or new interpretations enacted or promulgated after the date hereof could alter or modify the analyses set forth below with respect to the U.S. federal income tax consequences of the Plan. Any such changes or new interpretations could have retroactive effect and could significantly affect the U.S. federal income tax consequences described below.

This summary does not address all aspects of U.S. federal income taxation that may be relevant to a particular holder of a Claim or an Interest in light of its particular facts and circumstances or to certain types of holders of Claims subject to special treatment under the Tax Code (e.g., persons who are related to any of the Debtors within the meaning of the Tax Code, non-U.S. taxpayers, banks, mutual funds, financial institutions, broker-dealers, insurance companies, small business investment companies, tax-exempt organizations, real estate investment trusts, regulations investment companies, grantor trusts, persons holding a Claim as part of a "hedging," "integrated," or "constructive" sale or straddle transaction, persons holding Claims through a partnership or other pass-through entity, persons that have a "functional currency" other than the U.S. dollar, and holders of Claims or Interests who are themselves in bankruptcy).  If a partnership (or other entity or arrangement taxed as a partnership) holds a Claim or an Interest, the tax treatment of a partner in the partnership generally will depend upon the status of the partner and upon the activities of the partnership.  This summary does not address the tax considerations applicable to holders who obtained their Claims or Interests (or the rights underlying such Claims or Interests) in connection with the performance of services.  This summary does not discuss any aspects of foreign, state, local, estate, or gift taxation, nor does it apply to any person that acquires any of the exchange consideration in the secondary market.  This summary does not address the U.S. federal income tax consequences to holders of Claims or Interests that are not entitled to vote on the Plan, including holders whose Claims or Interests are entitled to reinstatement or payment in full in Cash under the Plan or holders whose Claims or Interests are otherwise not Impaired under the Plan.  The U.S. federal income tax consequences of the Plan are complex and are subject to significant uncertainties.  In addition, a substantial amount of time may elapse between the date of this Disclosure Statement and the receipt of a final distribution or transfer under the Plan.  Events occurring after the date of this Disclosure Statement, such as additional tax legislation, court decisions, or administrative changes, could affect the U.S. federal income tax consequences of the Plan and the transactions contemplated hereby.  Thus, there can be no assurance that the IRS will not take a contrary view with respect to one or more of the issues discussed below.  No ruling will be sought from the IRS with respect to any of the tax aspects of the Plan, and no opinion of counsel has been or will be obtained by the Debtor with respect thereto.

The U.S. federal income tax consequences of the Plan are complex and are subject to significant uncertainties.  In addition, a substantial amount of time may elapse between the date of this Disclosure Statement and the receipt of a final distribution or transfer under the Plan.  Events occurring after the date of this Disclosure Statement, such as additional tax legislation, court decisions, or administrative changes, could affect the U.S. federal income tax consequences of the Plan and the transactions contemplated hereby.  Thus, there can be no assurance that the IRS will not take a contrary view with respect to one or more of the issues discussed below.  No ruling will be sought from the IRS with respect to any of the tax aspects of the Plan, and no opinion of counsel has been or will be obtained by the Debtor with respect thereto.

**TO ENSURE COMPLIANCE WITH TREASURY DEPARTMENT CIRCULAR 230, EACH HOLDER OF A CLAIM OR AN INTEREST IS HEREBY NOTIFIED THAT (1) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY ANY HOLDER OF A CLAIM OR AN INTEREST**

FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON A HOLDER OF A CLAIM OR AN INTEREST UNDER THE TAX CODE; (2) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE CONFIRMATION OF THE PLAN TO WHICH THE TRANSACTIONS DESCRIBED IN THIS DISCLOSURE STATEMENT ARE ANCILLARY; AND (3) A HOLDER OF A CLAIM OR AN INTEREST SHOULD SEEK ADVICE BASED UPON ITS PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

THE DISCUSSION SET FORTH IN THIS DISCLOSURE STATEMENT IS INCLUDED FOR GENERAL INFORMATION ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED ON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR AN INTEREST. EACH HOLDER SHOULD CONSULT ITS OWN TAX ADVISOR REGARDING THE FEDERAL INCOME TAX CONSEQUENCES, AS WELL AS OTHER FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES, CONTEMPLATED UNDER OR IN CONNECTION WITH THE PLAN IN LIGHT OF ITS PARTICULAR CIRCUMSTANCES.

**11.2    Tax Consequences to the Debtors**.

      **A.        Cancellation of Debt Income.**

Under the Tax Code, a U.S. taxpayer generally must include in gross income the amount of any cancellation of indebtedness ("COD") income recognized during the taxable year.  COD income generally equals the excess of the adjusted issue price of the indebtedness discharged over the sum of (i) the amount of cash, (ii) the issue price of any new debt, and (iii) the fair market value of any other property (including stock) transferred by the debtor in satisfaction of such discharged indebtedness.  COD income also includes any interest that has been previously accrued and deducted but remains unpaid at the time the indebtedness is discharged.

Section 108(a)(l)(A) of the Tax Code provides an exception to this rule, however, where a taxpayer is in bankruptcy and where the discharge is granted, or is effected pursuant to a plan approved by, the bankruptcy court.  In such a case, instead of recognizing income, the taxpayer is required, under Section 108(b) of the Tax Code, to reduce certain of its tax attributes by the amount of COD income.  The attributes of the taxpayer are to be reduced in the following order: current year Net Operating Losses ("NOL") and NOL carryforwards, general business and minimum tax credit carryforwards, capital loss carryforwards, the basis of the taxpayer's assets, and finally, foreign tax credit carryforwards (collectively, "Tax Attributes").  The reduction in Tax Attributes generally occurs after the calculation of a debtor's tax for the year in which the debt is discharged.  Section 108(b)(5) of the Tax Code permits a taxpayer to elect to first apply the reduction to the basis of the taxpayer's depreciable assets, with any remaining balance applied to the taxpayer's other Tax Attributes in the order stated above.  In addition to the foregoing, Section 108(e)(2) of the Tax Code provides a further exception to the realization of COD income upon the discharge of debt, providing that a taxpayer will not recognize COD income to the extent that the taxpayer's satisfaction of the debt would have given rise to a deduction for federal income tax purposes.

The Debtors may realize COD income as a result of the Plan. The ultimate amount of any COD income realized by the applicable Cubic Asset Debtors and Cubic Louisiana Debtors is uncertain because, among other things, it will depend on the fair market value of all debt and equity securities issued to holders of Class 3 Prepetition Secured Notes Claims and Class 4 Wells Fargo Claims issued on the Effective Date.

### B.      NOLs and Other Attributes.

Following the Effective Date, the Cubic Asset Debtors and Cubic Louisiana Debtors expect to have NOLs. In addition, the respective Reorganized Debtors may generate NOLs in future taxable years if and to the extent that future deductible expenses exceed their income and gain in those years.

### C.      Annual Limitation on Use of NOLs.

The amount of the Debtors' NOLs may be reduced as a result of the reduction of Tax Attributes described above. Additionally, the Debtors' ability to utilize its NOLs allocable to periods prior to the Effective Date (the "Pre-Change Losses") may be subject to limitation pursuant to Section 382 of the Tax Code as a result of the change in ownership of the Debtors that will occur upon the emergence from bankruptcy, as described below.

General Section 382 Limitation. In general, when a corporation undergoes an "ownership change" and the corporation does not qualify for (or elects out of) the Bankruptcy Exception discussed below, Section 382 of the Tax Code limits the corporation's ability to utilize its Pre-Change Losses to offset future taxable income. Such limitation also may apply to certain losses or deductions that are "built-in" (i.e., economically accrued but unrecognized) as of the date of the ownership change and that are subsequently recognized. An "ownership change" generally is defined as a more than 50 percentage point aggregate increase in ownership of the value of the stock of a "loss corporation" (a corporation with NOLs) by one or more stockholders holding at least 5% of the outstanding equity of the corporation that takes place during a testing period (generally three years) ending on the date on which such change in ownership is tested. It is anticipated that the Debtors will undergo an ownership change as a result of the Plan.

In general, unless the corporation is eligible for and does not elect out of the Bankruptcy Exception (defined below), when a corporation undergoes an ownership change pursuant to a bankruptcy plan, Section 382 of the Tax Code places an annual limitation on a corporation's use of Pre-Change Losses equal to the product of (i) the fair market value of the stock of the corporation immediately after the ownership change (with certain adjustments, and unless the fair market value of all of the corporation's assets immediately before the ownership change is less than the post-change stock value); and (ii) the highest of the adjusted federal "long-term tax-exempt rates" in effect for any month in the three-calendar-month period ending with the month in which the ownership change occurs (the "Annual Limitation"). In the case of an ownership change occurring not under the Bankruptcy Exception, the stock value used in determining the Annual Limitation is the value immediately before the ownership change. For any taxable year ending after an ownership change, the NOLs that can be used in that year to offset taxable income of a corporation cannot exceed the amount of the Annual Limitation. Any unused

Annual Limitation may be carried forward, thereby increasing the Annual Limitation in the subsequent taxable years.  If the corporation does not continue its historic business or use a significant portion of its assets in a new business for two years after the ownership change, the Annual Limitation resulting from the ownership change is zero.

Built-in Gain and Losses.  Under certain circumstances, Section 382 of the Tax Code also limits the deductibility of certain built-in losses that are recognized during the five years following the date of an ownership change.  In particular, subject to a de minimis exception, if a loss corporation has a net unrealized built-in loss at the time of an ownership change (taking into account the difference between the tax basis and value of its assets and its items of "built-in" income and deduction), then any built-in losses recognized during the following five years (up to the amount of the net unrealized built-in loss at the time of the ownership change) generally will be treated as a Pre-Change Loss and will be subject to the Annual Limitation.

Conversely, if the loss corporation has more than a de minimis net unrealized built-in gain at the time of an ownership change, any built-in gains recognized during the following five years (up to the amount of the net unrealized built-in gain at the time of the ownership change) generally will increase the Annual Limitation in the year recognized, such that the loss corporation would be permitted to use its Pre-Change Losses against such built-in gain income in addition to its regular Annual Limitation.

Bankruptcy Exception.  Section 382(l)(5) of the Tax Code provides an exception to the Annual Limitation for corporations under the jurisdiction of a court in a Title 11 case (the "Bankruptcy Exception") if shareholders of the debtor immediately before an ownership change and qualified  "historic") creditors of a debtor receive, in respect of their claims, stock with at least 50% of the vote and value of all the stock of the reorganized debtor pursuant to a confirmed bankruptcy plan of reorganization.  For this purpose, a "historic creditor" is a creditor that (i) has held its indebtedness since the date that is at least eighteen months before the date on which the debtor filed its petition with the Bankruptcy Court; or (ii) whose indebtedness arose in the ordinary course of the business of the debtor and is held by the creditor who at all times was the beneficial owner of such claim.  In determining whether the Bankruptcy Exception applies, certain holders of claims that own directly or indirectly less than 5% of the total fair market value of the debtor's stock immediately after the ownership change are presumed to have held their claims since the origination of such claims, other than in certain cases where the debtor has actual knowledge that the creditor has not owned the debt for the requisite period.  The Bankruptcy Exception applies to a reorganized debtor if these requirements are satisfied unless the debtor files an election for the Bankruptcy Exception not to apply.

If a corporation is eligible for and applies the Bankruptcy Exception, its Pre-Change Losses will not be subject to the Annual Limitation.  However, under the Bankruptcy Exception, the amount of the corporation's Pre-Change Losses and certain pre-change Tax Attributes that may be carried over to a post-change year must be reduced to the extent attributable to any interest paid or accrued during the taxable year of the ownership change (up to the date of the ownership change) and the three preceding taxable years in respect of certain indebtedness that was exchanged for stock pursuant to the bankruptcy reorganization.  In addition, if the

Bankruptcy Exception applies and there is another ownership change of the Debtor within two years after consummation of the bankruptcy plan of reorganization, an Annual Limitation of zero will be imposed on the use of NOLs and built-in losses that remain on the date of the second ownership change.

Even if an applicable Debtor qualifies for the Bankruptcy Exception, it may nevertheless elect for such exception not to apply and instead remain subject to the Annual Limitation described above. This election would have to be made on the applicable Debtor's U.S. federal income tax return for the taxable year in which the ownership change occurs. The determination of the application of the Bankruptcy Exception is fact specific. The Debtors have not yet determined whether they will be eligible for the Bankruptcy Exception, and if any of the Debtors were entitled to such exception, whether such Debtor(s) would make the election not to have the Bankruptcy Exception apply.

### D.    Federal Alternative Minimum Tax.

In general, a federal alternative minimum tax ("<u>AMT</u>") is imposed on a corporation's alternative minimum taxable income at a rate of 20% to the extent that such tax exceeds the corporation's regular federal income tax for the year. A corporation's alternative minimum taxable income generally is equal to its regular taxable income with certain adjustments. In computing taxable income for AMT purposes, certain tax deductions and other beneficial allowances are modified or eliminated. In particular, even though a corporation otherwise might be able to offset all of its taxable income for regular federal income tax purposes by applying NOL carryforwards, only 90% of the corporation's taxable income for AMT purposes may be offset by available NOL carryforwards (as computed for AMT purposes). Accordingly, usage of the Debtors' NOLs by the applicable Reorganized Debtors may be subject to limitations for AMT purposes in addition to any other limitations that may apply.

In addition, if a corporation undergoes an "ownership change" within the meaning of Section 382 of the Tax Code and has a net unrealized built-in loss on the date of the ownership change, the corporation's aggregate tax basis in its assets may be reduced for certain AMT purposes to reflect the fair market value of the assets on the ownership change date. Accordingly, if an applicable Debtor is in a net unrealized built-in loss position on the Effective Date, for AMT purposes the tax benefits attributable to basis in assets may be reduced.

Any AMT that a corporation pays generally will be allowed as a nonrefundable credit against its regular federal income tax liability in future years when the corporation is no longer subject to the AMT.

### 11.3    Tax Consequences to Holders of Class 3, 4, and 5A Claims.

The U.S. federal income tax consequences of the Plan to the holders of Class 3, 4, and 5A Claims will depend upon, among other things, (a) the nature of the indebtedness owed to it; (b) whether the underlying documentation memorializing such Claims constitute "securities" for

U.S. federal income tax purposes; (c) the type of consideration received by the holder of an Allowed Class 3, 4, and 5A Claim in exchange for the Claim and whether such consideration constitutes a "security" for U.S. federal income tax purposes; (d) whether the holder reports income on the accrual or cash basis; (e) whether the holder has previously taken a bad debt deduction or worthless security deduction with respect to the Claims treated under the Plan; and (f) whether the holder receives distributions under the Plan in more than one taxable year.

**The tax consequences of the Plan to the Holders of Class 3 Prepetition Secured Notes Claims, Class 4 Wells Fargo Claims, and Class 5A Cubic Asset BP Claims are uncertain. Holders of such Claims should consult their tax advisors regarding whether the treatment of such Claims pursuant to the Plan will result in any taxable transactions or tax liability.**

### A.   Accrued but Unpaid Interest.

Whether or not the Prepetition Secured Notes and/or underlying loans extended by WFEC are treated as "securities" for U.S. federal income tax purposes, any amount received by a Holder of Prepetition Secured Notes Claims or Wells Fargo Claims that is attributable to accrued interest not theretofore included in income would be taxable to the lender as interest income. Conversely, a lender holding Prepetition Secured Notes Claims or Wells Fargo Claims may be able to recognize a deductible loss (or, possibly, a write-off against a reserve for worthless debts) to the extent that any accrued interest on the Prepetition Secured Notes or WFEC loan documents was previously included in the lender's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point.

Although the manner in which consideration is to be allocated between accrued interest and principal for these purposes is unclear.

Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Regulations treat payments as allocated first to any accrued but untaxed interest. Pursuant to the Plan, distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for U.S. federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest. However, the provisions of the Plan are not binding on either the IRS or a court with respect to the appropriate tax treatment for creditors.

### B.   Market Discount.

Under the "market discount" provisions of sections 1276 through 1278 of the Tax Code, some or all of any gain realized by a Holder exchanging the debt instruments constituting its Allowed Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt constituting the surrendered allowed claim.

In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if its Holder's adjusted tax basis in the debt instrument is less than (i) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or, (ii) in the case of a debt instrument issued with "original issue discount," its adjusted issue price, by at least a de minimis amount (equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a Holder on the taxable disposition (determined as described above) of debts that it acquired with market discount would be treated as ordinary income to the extent of the market discount that accrued thereon while such debts were considered to be held by the Holder (unless the Holder elected to include market discount in income as it accrued). To the extent that the surrendered debts that had been acquired with market discount are exchanged in a tax-free or other reorganization transaction for other property (as may occur here if the exchange is treated as a recapitalization), any market discount that accrued on such debts but was not recognized by the Holder may be required to be carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption or other disposition of such property may be treated as ordinary income to the extent of the accrued but unrecognized market discount with respect to the exchanged debt instrument.

## 11.4   Information Reporting and Backup Withholding.

Certain payments, including the payments with respect to Claims pursuant to the Plan, may be subject to information reporting by the Debtors to the IRS.  Moreover, such reportable payments may be subject to backup withholding under certain circumstances.  Backup withholding is not an additional tax.  Rather, amounts withheld under the backup withholding rules may be credited against a Holder's federal income tax liability, and a Holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally a U.S. federal income tax return).  The Debtors intend to comply with all applicable reporting withholding requirements of the Tax Code.

Holders should consult their tax advisors regarding their qualification for exemption from backup withholding and information reporting and the procedures for obtaining such an exemption.

The Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of certain thresholds.  Holders should consult their tax advisors regarding these Regulations and whether the exchanges contemplated by the Plan would be subject to these Regulations and require disclosure on the holders' tax returns.

**11.5**    **Importance of Obtaining Professional Tax Assistance**.

THE FOREGOING SUMMARY HAS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES. ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD CONSULT THEIR TAX ADVISORS CONCERNING THE FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

## ARTICLE XII

## REQUIREMENTS FOR CONFIRMATION

The Bankruptcy Court may confirm the Plan only if it determines that the Plan complies with the technical requirements of chapter 11, including, among other things, that (a) the Debtors' prepetition solicitation of votes complies with the requirements of Bankruptcy Rule 3018(b), (b) the Plan was transmitted to substantially all creditors and equity holders in the same class, (c) the solicitation was in compliance with Section 1126(b) of the Bankruptcy Code, (d) the Debtors did not prescribe an "unreasonably short" time for creditors and equity holders to accept or reject the Plan, (e) the Plan properly classifies Claims and Interests, (f) the Plan complies with applicable provisions of the Bankruptcy Code, (g) the Debtors have complied with applicable provisions of the Bankruptcy Code, (h) the Debtors have proposed the Plan in good faith and not by any means forbidden by law, (i) disclosure of "adequate information" as required by Section 1125 of the Bankruptcy Code has been made, (j) the Plan has been accepted by the requisite votes of creditors (except to the extent that "cramdown" is exercised under Section 1129(b) of the Bankruptcy Code), (k) the Plan is in the "best interests" of all holders of Claims or Interests in each Impaired Class, (l) all fees and expenses payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of such fees on the Effective Date, and (m) the Plan provides for the continuation after the Effective Date of all retiree benefits, as defined in Section 1114 of the Bankruptcy Code, at the level established at any time before Confirmation in accordance with Sections 1114(e)(1)(B) or 1114(g) of the Bankruptcy Code, for the duration of the period that the Debtor has obligated itself to provide such benefits.

**12.1**    **Solicitation and Voting Requirements**.

Bankruptcy Rule 3018(b) requires that the same reorganization plan be transmitted to substantially all creditors and equity holders in the same class. The Debtors are causing the Solicitation Materials to be transmitted to each holder of a Class 3, 4, and 5A Claim. Bankruptcy Rule 3018(b) further requires that the Debtors not fix an "unreasonably short time" for the holders of Class 3, 4, and 5A Claims to accept or reject the Plan. The Debtors are ensuring that all holders of Class 3, 4, and 5A Claims (the only Classes entitled to elect to accept or reject the Plan) received the Solicitation Materials with sufficient time to respond.

The only classes Impaired under the Plan and entitled to vote to accept or reject the Plan that are being solicited are Classes 3, 4, and 5A.  Holders of Claims in Classes 3, 4, and 5A are entitled to vote to accept or reject the Plan.  Claims and Interests in Classes 5B, 6A, 6B, 7, 8, 9A, 9B, 10A, and 10B are deemed to have rejected the Plan.  Thus, their votes will not be solicited. All other Classes of Claims are not Impaired under the Plan.  Thus, such Classes are deemed to have accepted the Plan and a solicitation of their votes is not required.

## 12.2    Best Interests Test.

Even if the Plan is accepted by each class of holders of Claims and Interests, the Bankruptcy Code requires a Bankruptcy Court to find that the Plan is in the "best interests" of all holders of Claims or Interests impaired by the Plan and that have not voted to accept the Plan. The "best interests" test, as set forth in Section 1129(a)(7) of the Bankruptcy Code, requires the Bankruptcy Court to find either that (a) all members of an impaired class of claims or interests have accepted the plan or (b) the plan will provide a dissenting class member with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code.  As described above, the liquidation values in the Valuation Report demonstrate that Holders of Claims receiving distributions under the Plan would recover a smaller percentage on account of their Allowed Claim if the applicable Debtor were to be liquidated than they would recover under the Plan and that no other Classes of Claims or Interests would receive a distribution under the plan or in an alternate liquidation proceeding.

## 12.3    Confirmation Without Acceptance of All Impaired Classes - "Cramdown."

The Debtors shall request Confirmation of the Plan, as it may be modified from time to time, under Section 1129(b) of the Bankruptcy Code, and reserve the right to modify the Plan to the extent permitted by the Plan Support Agreement and to the extent Confirmation in accordance with Section 1129(b) of the Bankruptcy Code requires modification.  Under Section 1129(b) of the Bankruptcy Code, a bankruptcy court may confirm a plan over the negative vote of a rejecting class, if, among other things, (a) at least one impaired class of claims has accepted the plan (not counting the votes of any disqualified parties) and (b) if the plan "does not discriminate unfairly" against and is "fair and equitable" to each rejecting class.

A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a rejecting impaired class is treated equally with respect to other classes of equal rank.  A plan is fair and equitable as to a class of secured claims that rejects the plan if, among other things, the plan provides (a) (i) that the holders of claims in the rejecting class retain the liens securing those claims (whether the property subject to those liens is retained by the debtor or transferred to another entity) to the extent of the allowed amount of such claims and (ii) that each holder of a claim of such class receives on account of that claim deferred cash payments totaling at least the allowed amount of that claim, of a value, as of the effective date of the plan, of at least the value of the holder's interest in the estate's interest in such property; (b) for the sale, subject to Section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing the claims included in the rejecting class, free and clear of the liens, with the liens to attach to the proceeds

of the sale, and the treatment of the liens on proceeds under clause (a) or (c) of this paragraph; or (c) for the realization by such holders of the indubitable equivalent of such claims.

A plan is fair and equitable as to a class of unsecured claims that rejects the plan, if, among other things, the plan provides that (a) each holder of a claim in the rejecting class will receive or retain on account of its claim property that has a value, as of the effective date of the plan, equal to the allowed amount of the claim; or (b) no holder of a claim or interest that is junior to the claims of the rejecting class will receive or retain under the plan any property on account of such junior claim or interest.

A plan is fair and equitable as to a class of interests that rejects the plan if the plan provides, among other things that (a) each holder of an interest of such class receive or retain on account of such interest property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or (b) that no holder of an interest that is junior to the interests of such class will receive or retain under the plan any property on account of such junior interest.

As explained above, the only Impaired Classes solicited by the Debtor to vote on the Plan are Classes 3, 4, and 5A, which are comprised of Holders of Prepetition Secured Notes Claims, Wells Fargo Claims, and Cubic Asset BP Claims. Classes 1A, 1B, 2A, and 2B are not Impaired and are deemed to have accepted the Plan. The remaining Classes of Claims and Interests are deemed, either by the Debtors or as a matter of law, to have rejected the Plan. Thus, the Debtors intend to pursue "cramdown" of those Classes.

Classes 3, 4, and 5A have entered into a Plan Support Agreement with the Debtors pursuant to which they agreed to vote to accept the Plan, subject to the terms and conditions of the Plan Support Agreement. If Classes 3, 4, and 5A accept the Plan, the Debtors will have at least one Impaired Class of Claims voting to accept the Plan and will seek confirmation of the Plan under the "cramdown" provision.

## ARTICLE XIII

## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtors believe the Plan affords the best alternative for maximizing the prospects of a successful turnaround and value for all stakeholders and, therefore, is in the best interests of all constituencies. If the Plan is not confirmed, theoretical alternatives under chapter 11 include: (a) continuation of the pending Chapter 11 Cases, and (b) formulation of an alternative plan or plans of reorganization. The Debtors do not believe that either of these theoretical alternatives is viable or realistic and that the only practical alternative to the prompt confirmation of the Plan is the immediate liquidation of the Debtors.

As explained above, the Debtors' management does not believe that a lengthy chapter 11 process under which a plan is developed and proposed post-petition is viable in this case given the Debtors' lack of liquidity, the values of the Debtors' assets (which are less than the amounts

of their prepetition secured debts owed to WFEC and the Prepetition Secured Noteholders), and the administrative costs of a protracted stay in chapter 11. The Debtors' business simply will not withstand the uncertainty, doubt and cost engendered by such a process.

While a lengthy chapter 11 is not a realistic alternative, the Debtors and their advisors did consider the possibility of a sale of their assets or other transaction under Section 363 of the Bankruptcy Code and alternative structures that theoretically would allow an infusion of cash from an outside source. However, this alternative is also not a realistic or value-maximizing proposition alternative at this time given current market conditions.

After much analysis of available alternatives and consideration of various options, the Debtors and their management concluded that the prepackaged Chapter 11 Cases were the best option.

Absent prompt confirmation, Debtors' management believes there is a substantial likelihood that creditors' recoveries would be reduced or impaired below the amounts that they would receive in the Plan. In a liquidation under chapter 7, before creditors received any distribution, additional administrative expenses involved in the appointment of a trustee and attorneys, accountants and other professionals to assist such trustee would cause a substantial diminution in the value of the assets available for distribution to creditors. Additionally, in a liquidation, additional Claims would likely be created by the rejection of leases and other executory contracts in connection with the cessation of operations and the failure to realize the greater going concern value.

As evidenced by the Liquidation Analysis, the holders of Claims against the Debtor will receive more under these prepackaged Chapter 11 Cases than they would in a chapter 7 case.

THE DEBTORS' MANAGEMENT THEREFORE BELIEVES THAT THE PLAN AFFORDS SUBSTANTIALLY GREATER BENEFITS TO HOLDERS OF CLAIMS AND INTERESTS THAN WOULD ANY OTHER ALTERNATIVE AND THAT THE PLAN SHOULD BE CONFIRMED PROMPTLY.

## ARTICLE XIV

## OTHER MATTERS

If you have any questions or require further information about the voting procedures for voting your Claim, or about the packet of material you received, or if you wish to obtain an additional copy of the Plan, the Disclosure Statement, or any exhibits to such documents (at your own expense, unless otherwise specifically required by Bankruptcy Rules 3017(d)), please contact the counsel for the Debtors.

Dated, December 10, 2015

CUBIC ENERGY, INC.

By:    /s/ Jon S. Ross
        Jon S. Ross
        Executive Vice President, Corporate Secretary

CUBIC ASSET HOLDING, LLC

By:    Cubic Energy, Inc.
Its:    Sole Member

        By:    /s/ Jon S. Ross
                Jon S. Ross
                Executive Vice President, Corporate Secretary

CUBIC ASSET, LLC

By:    Cubic Asset Holding, LLC
Its:    Sole Member
        By:    Cubic Energy, Inc.
        Its:    Sole Member
                By:    /s/ Jon S. Ross
                        Jon S. Ross
                        Executive Vice President, Corporate Secretary

CUBIC LOUISIANA HOLDING, LLC

By:    Cubic Energy, Inc.
Its:    Sole Member

        By:    /s/ Jon S. Ross
                Jon S. Ross
                Executive Vice President, Corporate Secretary

CUBIC LOUISIANA, LLC

By:    Cubic Louisiana Holding, LLC
Its:    Sole Member
        By:    Cubic Energy, Inc.
        Its:    Sole Member
                By:    /s/ Jon S. Ross
                        Jon S. Ross
                        Executive Vice President, Corporate Secretary