**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| Cubic Energy, Inc. *et al.*[1] | Case No.: 15-12500 (CSS) |
| Debtors. | (Jointly Administered) |

**NOTICE OF FILING OF PROPOSED AMENDED EXHIBITS TO PLAN SUPPLEMENT**
**FOR THE SECOND AMENDED PREPACKAGED PLAN OF REORGANIZATION OF**
**CUBIC ENERGY, INC., ET AL., PURSUANT TO CHAPTER 11**
**OF THE BANKRUPTCY CODE**

PLEASE TAKE NOTICE that on December 11, 2015, the above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), filed their *Prepackaged Plan of Reorganization of Cubic Energy, Inc., et al., Pursuant to Chapter 11 of the Bankruptcy Code*, which was amended by the *First Amended Prepackaged Plan of Reorganization of Cubic Energy, Inc., et al., Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 85], the *Second Amended Prepackaged Plan of Reorganization of Cubic Energy, Inc., et al., Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 94], and the *Third Amended Prepackaged Plan of Reorganization of Cubic Energy, Inc., et al., Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 174] (as amended, "Plan").[2]

PLEASE TAKE FURTHER NOTICE that the Plan incorporates the terms and conditions of certain exhibits to the Plan, in the form of the Plan Supplement, that are to be filed after the initial submission of the Plan, but before the hearing to confirm the Plan.

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: Cubic Energy, Inc. (2095), Cubic Asset Holding, LLC (3106), Cubic Asset, LLC (7565), Cubic Louisiana Holding, LLC (0729), and Cubic Louisiana, LLC (1412).

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Plan.

PLEASE TAKE FURTHER NOTICE that on or before February 9, 2015, the Debtors filed one or more exhibits [D.I. 60, 144, 148, 166] that collectively, constituted the Plan Supplement.

PLEASE TAKE FURTHER NOTICE that hereto as <u>Exhibit 1</u> are one or more modified versions of certain documents (originally filed on February 9, 2016, D.I. 166) comprising the Modified Cubic Asset BP Hedges, which exhibit constitutes a portion of the Plan Supplement. For reference, attached hereto as <u>Exhibit 1-a</u> are one or more "changed pages" only blackline documents comparing the modified documents included at <u>Exhibit 1</u> with their prior counterparts filed on February 9, 2016.

PLEASE TAKE FURTHER NOTICE that hereto as <u>Exhibit 2</u> are one or more modified versions of certain documents (originally filed on February 9, 2016, D.I. 166) that constitute the proposed form of New Cubic Energy Senior Secured Notes, which exhibit constitutes a portion of the Plan Supplement. For reference, attached hereto as <u>Exhibit 2-a</u> are one or more "changed pages" only blackline documents comparing the modified documents included at <u>Exhibit 2</u> with their prior counterparts filed on February 9, 2016.

PLEASE TAKE FURTHER NOTICE that hereto as <u>Exhibit 3</u> is a modified version of the proposed form of Reorganized Cubic Energy Certificate of Formation (originally filed on February 9, 2016), which exhibit constitutes a portion of the Plan Supplement. For reference, attached hereto as <u>Exhibit 2-a</u> is a "changed pages" only blackline document comparing the modified document included at <u>Exhibit 3</u> with its prior counterpart filed on February 9, 2016.

PLEASE TAKE FURTHER NOTICE that hereto as <u>Exhibit 4</u> is a modified version of the proposed form of Reorganized Cubic Energy Operating Agreement (originally filed on February 9, 2016), which exhibit constitutes a portion of the Plan Supplement. For reference,

attached hereto as Exhibit 4-a is a "changed pages" only blackline document comparing the modified document included at Exhibit 4 with its prior counterpart filed on February 9, 2016.

PLEASE TAKE FURTHER NOTICE that hereto as Exhibit 5 is a modified list of proposed officers and other corporate governance representatives of the Reorganized Cubic Asset Debtors as of the Effective Date (which list was originally filed on February 9, 2016), which exhibit constitutes a portion of the Plan Supplement.  For reference, attached hereto as Exhibit 5-a are one or more "changed pages" only blackline documents comparing the modified documents included at Exhibit 5 with their prior counterparts filed on February 9, 2016.

PLEASE TAKE FURTHER NOTICE that the Plan Supplement is integral to, part of, and incorporated by reference into the Plan.  The documents included in the Plan Supplement have not yet been approved by the Bankruptcy Court.

PLEASE TAKE FURTHER NOTICE that the Debtors reserve all rights to amend, modify, or supplement all or any portion of the Plan Supplement (including, without limitation, the Plan Supplement exhibits attached hereto) in accordance with the Plan and at any time prior to the Plan's Effective Date.

PLEASE TAKE FURTHER NOTICE that copies of the documents contained in the Plan Supplement (including, without limitation, the Plan Supplement exhibits attached hereto) may be obtained free of charge from the Debtors' claims and noticing agent at the following website: https://cases.primeclerk.com/cubicenergy.

[Remainder of Page Intentionally Blank – Signature Blocks Follow]

Dated: February 16, 2015
      Wilmington, Delaware

BAYARD, P.A.

*/s/ Justin R. Alberto*
Neil B. Glassman (No. 2087)
Scott D. Cousins (No. 3079)
Justin R. Alberto (No. 5126)
222 Delaware Avenue, Suite 900
Wilmington, Delaware 19801
Telephone:    (302) 655-5000
Facsimile:    (302) 658-6395
Email: nglassman@bayardlaw.com
      scousins@bayardlaw.com
      jalberto@bayardlaw.com

      -and-

Robert W. Jones, Esquire
Brent R. McIlwain, Esquire
Brian Smith, Esquire
HOLLAND & KNIGHT LLP
200 Crescent Court, Suite 1600
Dallas, Texas  75201
Telephone:    (214) 964-9500
Facsimile:    (214) 964-9501
Email: robert.jones@hklaw.com
      brent.mcilwain@hklaw.com
      brian.smith@hklaw.com

*Counsel for the*
*Debtors and Debtors in Possession*

**<u>Exhibit 1</u>**

**Modified Cubic Asset BP Hedges**

(see attached)

#38929962

DRAFT

# ISDA

## SCHEDULE
## to the
## 2002 Master Agreement

### dated as of [●], 2016

between

### BP Energy Company ("Party A"),
### a corporation incorporated under the State laws of Delaware

and

### Cubic Asset, LLC ("Party B"),
### a limited liability company incorporated under the laws of Delaware

Party A and Party B intend that the call option transaction entered into on [●], 2016 shall be the sole transaction with respect to this Agreement.

### Part 1 - Termination Provisions

In this Agreement:

(a)     ***"Specified Entity"*** means:

in relation to Party A and in relation to Party B, for the purpose of:

| | |
|---|---|
| Section 5(a)(v): | Not Applicable |
| Section 5(a)(vi): | Not Applicable |
| Section 5(a)(vii): | Not Applicable |
| Section 5(b)(v): | Not Applicable |

(b)     ***"Specified Transaction"*** has the meaning given to it in Section 14 of the Agreement.

(c)     The ***"Cross Default"*** provisions of Section 5(a)(vi) will  apply to Party A and will apply to Party B.

(i)     "Specified Indebtedness" has the meaning specified in Section 14 except that for Party A it excludes an obligation for borrowed money where the creditor's recourse on the obligation is limited to assets for which the money was borrowed; provided, however, that the words "or becoming capable at such time of being declared" in Section 5(a)(vi) will be deleted; and

(ii)     "Threshold Amount" means with respect to Party A: 3% of the Shareholders' Equity of the Credit Support Provider of Party A, and with respect to Party B, $1,000,000; and

**DRAFT**

For the purposes of the definition of Threshold Amount, "Shareholders' Equity" means, at any time, the amount represented in the most recent quarterly consolidated balance sheet.

(d)      The ***"Credit Event Upon Merger"*** provisions of Section 5(b)(v) will apply to Party A and will apply to Party B.

(e)      The ***"Automatic Early Termination"*** provision of Section 6(a) will not apply to Party A and will not apply to Party B.

(f)      ***"Termination Currency"*** means United States Dollars.

(g)      ***Additional Termination Event*** will apply.   The occurrence of the following event will constitute an Additional Termination Event with Party B as the sole Affected Party and all Transactions then outstanding as Affected Transactions:

If the Indenture (as defined below) or any or all of the Credit Support Documents  (i) expire, (ii) are terminated, replaced or refinanced, (iii) assigned to any third party, or (iv) amended, the result of which event under (i), (ii), (iii) or (iv) ) reduces the aggregate value of the collateral, security and credit support to less than 70% of the amount that would  be due to Party A under the Transactions then outstanding (the "Threshold Amount"), as reasonably calculated by Party A if an Early Termination Event where then to occur with respect to all such Transactions , while Transactions are still in effect or outstanding hereunder and Party B does not within two (2) business         days         of         such         expiration,         termination,         replacement, refinancing, assignment, or amendment, as applicable, either (A) deliver 2st lien replacement security having a value and terms and conditions acceptable to Party A in its sole discretion, or (B) provide Party A with replacement security sufficient in form, amount and for a term acceptable to Party A in its sole discretion (such security including but not limited to providing a standby irrevocable letter of credit, a prepayment, a security interest in an asset, a performance bond or guaranty, or a mutually agreed to Credit Support Annex and Paragraph 13 to this Agreement). In the event that Party B disagrees with the calculation of the Threshold Amount by Party A under this provision, Party A and Party B agree to have a nationally-recognized third party petroleum reserves engineering firm make a determination of the Threshold Amount within thirty days of notice by Party B that it wants such a determination made and under such procedures as dictated by the nationally-recognized third party petroleum reserve engineering firm in accordance with commercially reasonable standards.

**Part 2 - Tax Representations**

(a)      ***Payer Tax Representation***: For the purpose of Section 3(e), Party A and Party B will make the following representation:

It is not required by any applicable law, as modified by the practice, application or official interpretation of any relevant governmental revenue authority, of any Relevant Jurisdiction or under any applicable tax treaty between the Relevant Jurisdictions to make any deduction or withholding for or on account of any Tax from any payment (other than interest under Section 9(h) of this Agreement) to be made by

it to the other party under this Agreement.  In making this representation, it may rely on:

(i)    the accuracy of any representations made by the other party pursuant to Section 3(f) of this Agreement;

(ii)    the satisfaction of the agreement of the other party contained in Section 4(a)(i) or 4(a)(iii) of this Agreement and the accuracy and effectiveness of any document provided by the other party pursuant to Section 4(a)(i) or 4(a)(iii) of this Agreement; and

(iii)    the satisfaction of the agreement of the other party contained in Section 4(d) of this Agreement, *provided* that it shall not be a breach of this representation where reliance is placed on clause (ii) and the other party does not deliver a form or document under Section 4(a)(iii) by reason of material prejudice to its legal or commercial position.

(b)    ***Payee Tax Representations:*** For the purpose of Section 3(f) of this Agreement, Party A and Party B each make the representation(s) specified below:

(1)    For the purpose of Section 3(f) of this Agreement, Party A represents that (i) it is a corporation organized and existing under the laws of the State of Delaware, (ii) it is a U.S. person within the meaning of Section 7701 of the Internal Revenue Code, and (iii) its U.S. taxpayer identification number is 36-3421804.

(2)    For the purpose of Section 3(f) of this Agreement, Party B represents that (i) it is a limited liability company organized and existing under the laws of the State of Delaware, (ii) it is a U.S. person within the meaning of Section 7701 of the Internal Revenue Code, and (iii) its U.S. taxpayer identification number is 90-1017565.

DRAFT

**Part 3 – Agreement to Deliver Documents**

Each party agrees to deliver the following documents as applicable:

(a)    For the purpose of Section 4(a)(i) of this Agreement, tax forms, documents or certificates to be delivered are:

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered |
|---|---|---|
| Not Applicable | Not Applicable | Not Applicable |

(b)    For the purpose of Section 4(a)(ii) of this Agreement, other documents to be delivered are:

| Party required to deliver document | Form/Document/ Certificate | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| Party A | A certified copy of the resolution of the Board of Directors of Party A of its relevant committee, authorizing such party to enter into this Agreement and each Transaction, and an incumbency certificate. | Upon execution of this Agreement | Yes |
| Party A | Certification of the authenticity of the signature of Party A's signatory certified by Party A's Company Secretary. | Upon execution of this Agreement | Yes |
| Party A | Most recent annual audited financial statements of Party A's Credit Support Provider. | Upon written request, unless publicly available through EDGAR or some other source. | Yes |
| Party A | The guaranty of its Credit Support Provider. | Upon the execution of this Agreement. | No |
| Party B | A certified copy of the resolution of the Board of Directors of Party B of its relevant committee, authorizing such party to enter into this Agreement and each Transaction, and an incumbency certificate. | Upon execution of this Agreement | Yes |
| Party B | Certification of the authenticity of the signature of Party B's signatory certified by Party B's Company Secretary. | Upon execution of this Agreement | Yes |
| Party B | Copies of all documents, notices and/or reports required to be provided by | Upon execution of this Agreement, and thereafter as | Yes |

32

**DRAFT**

| | | | |
|---|---|---|---|
| | Party B to Collateral Agent and the Holders pursuant to Section 7.1 of the Indenture copies of any compliance certificates, financial covenant certificates, development plans, annual budgets, reserve reports, event of default notices and notification of the quarterly call with Note Holders. | soon as practicable after the receipt of each such report by Party B. | |
| Party B | Executed copies of the Indenture and all Credit Support Documents with respect to Party B. | Upon request, as soon as reasonably practicable. | Yes |

**Part 4 - Miscellaneous**

(a)     ***Addresses for Notices.***  For the purpose of Section 12(a) of this Agreement:

Address for **Confirmations** to Party A:

| | |
|---|---|
| Address: | BP Energy Company |
| | 201 Helios Way |
| | Houston, Texas 77079 |

| | |
|---|---|
| Attention: | Confirmation Department |

Facsimile No.:  281-227-8470
Telephone No.: 713-323-1866

Address for other **notices** or communications to Party A (other than Confirmations):

| | |
|---|---|
| Address: | BP Energy Company |
| | 201 Helios Way |
| | Houston, Texas 77079 |

| | |
|---|---|
| Attention: | Contract Services |

Facsimile No.:  713-323-0203
Telephone No.: 713-323-2000

Address for **Invoices** to Party A:

| | |
|---|---|
| Address: | BP Energy Company |
| | 201 Helios Way |
| | Houston, Texas 77079 |

| | |
|---|---|
| Attention: | Risk Accounting |

Facsimile No.:  713-323-5935

**DRAFT**

Telephone No.: 713-323-4919

Wire Payment Instructions:

For the Account of: BP Energy Company
JP Morgan Chase Bank, NY
ABA:  021-000021
Acct No.:  910-2-548097
New York, NY 10081-6000

Address for **Confirmations** to Party B:

| | |
|---|---|
| Address: | 9870 Plano Road |
| | Dallas, Texas 75238 |
| Attention: | Jason Gorsuch |
| Facsimile No.: | 972-681-9687 |
| Telephone No.: | 972-681-8047 |

Address for other **notices** or communications to Party B (other than Confirmations):

| | |
|---|---|
| Address: | 9870 Plano Road |
| | Dallas, Texas 75238 |
| Attention: | Jason Gorsuch |
| Facsimile No.: | 972-681-9687 |
| Telephone No.: | 972-681-8047 |

Address for **Invoices** to Party B:

| | |
|---|---|
| Address: | 9870 Plano Road |
| | Dallas, Texas 75238 |
| Attention: | Jason Gorsuch |
| Facsimile No.: | 972-681-9687 |
| Telephone No.: | 972-681-8047 |

Wire Payment Instructions:

Bank:  [●]
ABA:  [●]
Acct No.:  [●] for the account of Cubic Asset, LLC
City/State/Zip:  [●]

(b)    ***Process Agent.***  For the purpose of Section 13(c) of this Agreement:

Party A appoints as its Process Agent: Not Applicable

Party B appoints as its Process Agent: Not Applicable

(c)    ***Offices.***  The provisions of Section 10(a) will apply to this Agreement.

(d)    ***Multibranch Party.***  For the purpose of Section 10(b) of this Agreement:

**DRAFT**

Party A is not a Multibranch Party.
Party B is not a Multibranch Party.

(e)     ***Calculation Agent.*** The Calculation Agent is Party A, with any calculation or determination made by Party A in such capacity to be binding and conclusive absent manifest error.

(f)     ***Credit Support Document.*** Details of any Credit Support Document:

With respect to Party A, the guaranty of its Credit Support Provider.

With respect to Party B, the Second Lien Security Agreement (as defined below).

(g)     ***Credit Support Provider.***

Credit Support Provider means in relation to Party A, BP Corporation North America Inc., an Indiana corporation.

Credit Support Provider means in relation to Party B, each "Guarantor" (as defined in the Indenture).

(h)     ***Governing Law.*** This Agreement will be governed by and construed in accordance with New York law, without reference to its choice of law doctrine other than Section 5-1401 of the New York General Obligations Law.

(i)     ***Jurisdiction.*** Section 13(b) of the Agreement is hereby amended by (i) deleting the word "non-exclusive" appearing in paragraph (i)(1) and (i)(2) thereof and substituting therefor the word "exclusive" and (ii) deleting Section 13(b)(ii) and substituting therefor the following sentence:

"Nothing in this Agreement precludes either party from bringing Proceedings in any other jurisdiction if (A) the courts of the State of New York or the United States District Court located in the Borough of Manhattan in New York City lack jurisdiction over the parties or the subject matter of the Proceedings or declines to accept the Proceedings on the grounds of lacking such jurisdiction; (B) the Proceedings are commenced by a party for the purpose of enforcing against the other party's property, assets or estate any decision or judgment rendered by any court in which Proceedings may be brought as provided hereunder; (C) the Proceedings are commenced to appeal any such court's decision or judgment to any higher court with competent appellate jurisdiction over that court's decisions or judgments if that higher court is located outside the State of New York or Borough of Manhattan, such as a federal court of appeals or the U.S. Supreme Court; or (D) any suit, action or proceeding has been commenced in another jurisdiction by or against the other party or against its property, assets or estate (including, without limitation, any suit, action or proceeding described in Section 5(a)(vii)(4) of this Agreement), and, in order to exercise or protect its rights, interests or remedies under this Agreement, the party (1) joins, files a claim, or takes any other action, in any such suit, action or proceeding, or (2) otherwise commences any Proceeding in that other jurisdiction as the result of that other suit, action or proceeding having commenced in that other jurisdiction."

(j)     ***Netting of Payments.*** "Multiple Transaction Payment Netting" will apply for the purpose of Section 2(c) of this Agreement to all Transactions.

(k)     *"Affiliate"* will have the meaning specified in Section 14 of this Agreement; provided that Anchorage Capital Group, L.L.C., and O-CAP Capital Management, L.P. and any of their respective employees, partners, officers, directors, funds or affiliates shall not be deemed Affiliates of Part B or any of its Credit Support Providers.

(l)     *"Absence of Litigation".*

    (a)  Section 3(c) is amended by the inclusion of the word "adversely" before the word "affect" in the third line.

    (b)  For the purpose of Section 3(c):

*"Specified Entity"* means in relation to Party A, Not Applicable.
*"Specified Entity"* means in relation to Party B, Not Applicable.

(m)     *No Agency*. The provisions of Section 3(g) will apply to Party A and will apply to Party B.

(n)     *Additional Representation*. Will apply. For the purpose of Section 3 of this Agreement, the following will each constitute an Additional Representation (which representations will be deemed to be repeated by each party, as appropriate, on each date on which a Transaction is entered into):

    (i)     *Eligible Commercial Entity.*  It constitutes an "eligible commercial entity" as such term is defined in the U.S. Commodity Exchange Act, as amended.

    (ii)     *Eligible Contract Participant*.  It constitutes an "eligible contract participant" as such term is defined in the U.S. Commodity Exchange Act, as amended.

    (iii)     *Swap Agreement.*  This Agreement and any Transaction entered into hereunder constitutes a "swap agreement" within the meaning of the United States Bankruptcy Code (11 USC Sec. 101(53B) (2000)).

    (iv)     *Line of Business.*  It has entered into this Agreement (including each Transaction) in conjunction with its line of business (including financial intermediation services) or the financing of its business.

    (v)     *Relationship Between the Parties.*  In connection with the negotiation of, the entering into, and the confirming of the execution of, this Agreement, any Credit Support Document to which it is a party, and each Transaction: (i) it is acting as principal (and not as agent or in any other capacity, fiduciary or otherwise); (ii) the other party is not acting as a fiduciary or financial or investment advisor for it; (iii) it is not relying upon any representations (whether written or oral) of the other party other than the representations expressly set forth in this Agreement and in such Credit Support Document; (iv) the other party has not given to it (directly or indirectly through any other person) any advice, counsel, assurance, guaranty, or representation whatsoever as to the expected or projected success, profitability, return, performance, result, effect, consequence, or benefit (either legal, regulatory, tax, financial, accounting, or otherwise) of this Agreement, such Credit Support Document, or such Transaction; (v) it has consulted with its own legal, regulatory, tax, business, investment, financial, and accounting advisors to the extent it has deemed necessary, and it has made its own investment, hedging, and trading decisions based upon its own judgment and upon any advice from such advisors as it has deemed necessary, and not upon any view expressed by the other party; (vi) all trading decisions have

been the result of arm's length negotiations between the parties; and (vii) it is entering into this Agreement, such Credit Support Document, and such Transaction with a full understanding of all of the risks hereof and thereof (economic and otherwise), and it is capable of assuming and willing to assume (financially and otherwise) those risks.

(o)    ***Recording of Telephone Conversations.*** To the extent permitted by applicable law, each party: (i) consents to the recording of telephone conversations between the trading, marketing and other relevant personnel of the parties in connection with this Agreement or any potential Transaction, (ii) agrees to obtain prior to entering into any Transaction any necessary consent of, and give any necessary notice of such recording to, its relevant personnel, (iii) agrees that recordings may be submitted in evidence in any Proceedings, and (iv) acknowledges to the other party and consents that such other party may from time to time and without further notice (A) retain electronic transmissions (including telephone conversations, e-mail and instant messaging between the parties' respective representatives in connection with the Agreement, any potential Transaction and any Transaction or other commercial matters between the parties) on central and local databases for their respective legitimate purposes, and (B) monitor electronic transmissions through their internal and external networks for purposes of security and compliance with applicable laws, regulations and internal policies for their legitimate business purposes.  Each party further agrees that it will indemnify, defend and hold the other party harmless from any and all damages, losses, claims, liabilities, judgments, costs and expenses, including but not limited to reasonable attorney's fees and costs of court arising directly or indirectly from or out of such party's failure to obtain any consent necessary from a party's trading, marketing and other relevant personnel, agents or representatives or such party's failure to give any notice required to such individuals.

## Part 5 - Other Provisions

(a)    ***General Conditions.*** Section 2(a)(ii) shall be amended by the deletion of the final sentence thereof  and the addition of the following in substitution therefor: "The parties agree that all payments under this Agreement shall be made by wire transfer of immediately available funds to the party receiving payment, at the account specified by such party."

(b)    ***Limitation on Condition Precedent.***  With respect to any Transaction entered into under this Agreement, Section 2(a)(iii) of this Agreement is hereby amended by adding the following phrase at the end of clause (1) immediately before the last comma of such phrase:

"(provided, however, that in relation to any Transaction, if an Event of Default or a Potential Event of Default has occurred and is continuing for longer than ten (10) days without an Early Termination Date being designated, then the condition specified in this clause (1) shall cease to be a condition precedent to the obligations under Section 2(a)(i))."

(c)    ***Change of Account***.  Section 2(b) of this Agreement is hereby amended by the insertion of the following at the end thereof after the word "change":

", provided that if such new account shall not be in the same jurisdiction having the same power to tax as the original account, the party not changing its account shall not be obliged to pay any greater amounts and shall not receive less as a result of such change than would have been the case if such change had not taken place."

(d)  ***Deduction or Withholding for Tax***. Section 2(d)(i)(4) is amended by the addition of "; or" at the end of sub-paragraph (B) and the addition of a new sub-paragraph (C) as follows:

"(C) Y refusing to supply any form or document under Section 4(a)(iii) on grounds of material prejudice to its legal or commercial position."

(e)  ***Representations***.  The opening paragraph of Section 3 is amended by replacing "in the case of the representations in Section 3(f)" with "in the case of the representations in Sections 3(f) and 3(h)(iv)" and adding the following new sub-section 3(h):

"(h)  ***Dodd Frank Representations***.

(i)  ***Hedging Transactions***.  Unless otherwise noted in the applicable Confirmation for any Transaction, such Transaction constitutes for Party B a bona fide hedging transaction as defined in CFTC Regulation 1.3(z) (17 C.F.R. § 1.3(z)).

(ii)  ***End User Clearing Exemption***.  If with respect to any Transaction Party B has elected an exemption from the clearing requirement under Section 2(h)(7)(A) of the CEA, then as of the date of the execution of such Transaction (and not as of the date of this Agreement) (1) it is not a "financial entity" as defined in Section 2(h)(7)(C)(i) of the CEA, subject to certain exceptions in Sections 2(h)(7)(C)(ii), 2(h)(7)(C)(iii) and 2(h)(7)(D) of the CEA; (2) it is using such Transaction to hedge or mitigate commercial risk; (3) it has reported the information required to be submitted under 17 C.F.R. § 50.50(b)(1)(iii)  in an annual filing made no more than 365 days prior to the Trade Date of such Transaction, pursuant to 17 C.F.R. § 50.50(b)(2), and (4) to the extent it is required to do so under Section 2(j) of the CEA and 17 C.F.R. § 50.50(b)(1)(iii)(D)(2), it has obtained all necessary approvals by the appropriate committee (or equivalent body) of its board of directors to rely on the exception to the clearing requirement under Section 2(h)(7)(A) of the CEA.

(iii)  ***Special Entity Status***.  Party B is not a federal agency, state agency, city, county, municipality or other political subdivision of a state, or any instrumentality, department or entity established thereby, or any other Special Entity as defined by the CFTC Regulation 23.401(c).

(iv)  ***DF Protocols***.  Each of the parties hereby agrees to enter into additional reasonable documentation or modify existing documentation between the parties to satisfy the requirements imposed upon one or both of the parties by the Dodd-Frank Wall Street Reform and Consumer Protection Act, the CEA and/or CFTC Regulations thereunder, including, upon reasonable request, adhering to or entering into such other protocols, suggested amendments, market conventions and other contractual provisions published by ISDA from time to time and intended to enhance one or both party's compliance with the CEA, the Dodd-Frank Wall Street Reform and Consumer Protection Act, CFTC Regulations and other applicable laws, or to facilitate the orderly processing of Transactions."

(f)  ***Tax Event.*** Section 5(b)(iii) shall be amended by the addition of  "or (C)" after the words "or (B)" at the end of the last line.

(g)     *Set off.*  Section 6(f) is deleted in its entirety and replaced with the following:

"***Set-off***.  Without affecting or prejudicing the provisions of this Agreement requiring the calculation and payment of certain net payment amounts on Scheduled Settlement Dates, all payments will be made without Set-off or counterclaim; provided, however, that any Early Termination Amount payable to one party (the "Payee") by the other party (the "Payer") in circumstances where there is a Defaulting Party or where there is one Affected Party in the case where either a Credit Event Upon Merger has occurred or any other Termination Event in respect of which all outstanding Transactions are Affected Transactions has occurred, will, at the sole option of the Non-defaulting Party or the Non-affected Party, as the case may be ("X")  (and without prior Notice to the Defaulting Party or the Affected Party, as the case may be),  be reduced by its setoff against any other amounts payable by the Payee to the Payer (whether arising under this Agreement, matured or contingent and irrespective of the currency, place of payment or place of booking of the obligation (collectively "Other Amounts").  Additionally, the set-off rights under this section include but are not limited to the following: (i) any Early Termination Amount against any Posted Credit Support held by a party relating to the Agreement; (ii) any Early Termination Amount against any amount(s) (including any excess collateral, security or credit support) owed by or to a party under any other agreement or arrangement between the parties; (iii) any Early Termination Amount owed to the Non-defaulting Party against any amount(s) (including any excess collateral, security or credit support) owed by the Non-defaulting Party or its Affiliates to the Defaulting Party under any other agreement or arrangement; (iv) any Early Termination Amount owed to the Defaulting Party against any amount(s) (including any excess collateral, security or credit support) owed by the Defaulting Party to the Non-defaulting Party or its Affiliates under any other agreement or arrangement; and/or (v) any Early Termination Amount owed to the Defaulting Party against any amount(s) (including any excess collateral, security or credit support) owed by the Defaulting Party or its Affiliates to the Non-defaulting Party under any other agreement or arrangement.

If an obligation is unascertained, X may in good faith estimate that obligation and set off in respect of the estimate subject to the relevant party accounting to the other when the obligation is ascertained.

To the extent that Other Amounts or any other sums otherwise owed by the Non-defaulting Party's Affiliate to the Defaulting Party, have been setoff by the Non-defaulting Party pursuant to this Section 6(f), the Non-defaulting Party's Affiliate shall not be liable to, and shall be released by, the Defaulting Party; provided further that the Defaulting Party shall be forever estopped from asserting that the Non-defaulting Party's Affiliate owes such Other Amounts or other sums to the Defaulting Party.  The obligations of the Non-defaulting Party, the Non-defaulting Party's Affiliates, the Defaulting Party and the Defaulting Party's Affiliates under this Agreement or otherwise in respect of such Other Amounts or other sums shall be deemed satisfied and discharged to the extent of any such setoff.  For this purpose, the Other Amounts or other sums subject to the setoff may be converted at the applicable prevailing exchange rate into U.S. Dollars by the Non-defaulting Party. The Non-defaulting Party will give the Defaulting Party notice of any setoff effected under this section provided that failure to give such notice shall not affect the validity of the setoff.  Nothing in this paragraph shall be deemed to create a charge or other security interest. "Setoff" as used herein means setoff, offset, combination of accounts, right of retention or withholding or similar right or requirement to which the Non-defaulting Party is entitled or subject to (whether arising under this

Agreement, another contract, applicable law or otherwise) that is exercised by, or imposed on, the Non-defaulting Party."

(h)     Party A acknowledges that Party B has granted a security interest in its right, title and interest in, to and under this Agreement pursuant to the Security Agreements, and Party A hereby consents, for purposes of Section 7 of the Agreement, to such grant, as well to any further grant of such a security interest by Party B in connection with any Refinancing of a First Priority Obligation or Second Priority Obligation (each, as defined in the Intercreditor Agreements).

(i)     *Counterparts and Confirmations*.

(i)     Section 9(e)(i) shall be amended by deleting the words "and by electronic messaging system"; and

(ii)     The second and third sentences of Section 9(e)(ii) shall be deleted and replaced by the following:

"Any Transaction may be effectuated in an EDI transmission or telephone conversation or other electronic means of communication with the offer and acceptance constituting the agreement of the parties. The parties shall be legally bound from the time they so agree to transaction terms and may each rely thereon. Any such Transaction shall be considered a "writing" and to have been "signed". Notwithstanding the foregoing sentence, the parties agree that Party A (the "*Confirming Party*") will promptly send a Confirmation to Party B to confirm a telephonic transaction by any reasonable means, including, without limitation, by facsimile, hand delivery, courier, or certified United States mail (return receipt requested) within three Business Days of a Transaction, provided that the failure to send a Confirmation shall not invalidate the oral agreement of the parties. Confirming Party adopts its confirming letterhead, or the like, as its signature on any Confirmation as the identification and authentication of Confirming Party. If the Confirmation contains any provisions other than those relating to the commercial terms of the transaction (i.e., price, quantity, performance obligation, delivery point, period of delivery and/or transportation/transmission conditions), which modify or supplement the Transaction or the terms of this Master Agreement (e.g., Force Majeure, arbitration or additional representations and warranties), such provisions shall not be deemed to be accepted pursuant to this Section 9(e)(ii) but must be expressly agreed to by both parties; provided that the foregoing shall not invalidate any Transaction agreed to by the parties. If Party A's Confirmation is materially different from Party B's understanding of the Transaction, Party B shall notify the Confirming Party via facsimile, EDI or mutually agreeable electronic means by the Confirm Deadline, unless Party B has previously sent a Confirmation to the Confirming Party. The failure of Party B to so notify the Confirming Party in writing by the Confirm Deadline constitutes Party B's agreement to the terms of the Transaction described in the Confirming Party's Confirmation. If there are any material differences between timely sent Confirmations governing the same Transaction, or if Party B has timely objected to the terms of the Confirming Party's Confirmation, such Transaction remains valid and the parties remain legally bound thereby, however, both parties shall in good faith attempt to resolve such differences. Once such material differences are resolved, the Confirming Party shall transmit a written Confirmation to Party B, and such written Confirmation shall be accepted (or disputed) pursuant to the provisions of this Section 9(e)(ii). The

**DRAFT**

provisions of this Section 9(e)(ii) may be repeated as many times as necessary to produce a written Confirmation that is accepted or deemed accepted by Party B. In the event of a conflict among the terms of (i) a binding Confirmation pursuant to this Section 9(e)(ii), (ii) the oral agreement of the parties (which may be evidenced by a recording of such transaction, oral testimony, data in a computer system, trade tickets, and/or notes), and (iii) this Master Agreement, the terms of the items shall govern in the priority listed in this sentence.

"*Confirm Deadline*" shall mean the earlier of (1) 5:00 p.m. in Party B's time zone on the fifth New York Business Day following the New York Business Day a Confirmation is received by Party B; provided, if the Confirmation is received after 5:00 p.m. in Party B's time zone, it shall be deemed received at the opening of the next New York Business Day.  "*New York Business Day*" shall mean any day except for a Saturday, Sunday or a day on which the Federal Reserve Bank of New York is closed, or (2) on and after the effective date of the confirmation rules set forth in CFTC Regulation 23.501, such earlier time as is set forth in the compliance schedule in CFTC Regulation 23.501(a), as modified by CFTC Regulation 23.501(c).

Notwithstanding the provisions of Section 12(a)(iii) of the Agreement, a written Confirmation and any other writing related to or in response to a written Confirmation shall be deemed delivered to the receiving party (i) when actually received by the receiving party or (ii) with respect to a written Confirmation and other writing delivered by facsimile, when the sending party's facsimile machine indicates by an electronic or written facsimile log that the receiving party's facsimile machine received such written Confirmation.

Party A shall not be required to maintain or retain a paper-based version of the written Confirmation delivered to Party B.  In addition to a paper-based version of the written Confirmation delivered to Party B, the following shall constitute a "written Confirmation" for all purposes of this Agreement: (i) an electronic image of a paper-based version of the written Confirmation, and (ii) data in Party A's computer system.

Any document generated by the parties with respect to a Transaction, including this Agreement, may be imaged and stored electronically ("*Imaged Documents*").  Imaged Documents may be introduced as evidence in any proceeding as if such were original business records and neither party shall contest the admissibility of Imaged Documents as evidence in any proceeding."

(iii)     Notwithstanding the foregoing, the Confirming Party will endeavour to send the Confirmation to the other Party as soon as technologically practicable, but in any event will endeavour to do so in accordance with the compliance schedule set forth in CFTC Regulation 23.501(a), as modified by CFTC Regulation 23.501(c).

(j)     *Notices*. The wording of Section 12(a)(iii) shall be replaced in its entirety by the following:

"if sent by facsimile transmission, on receipt by the sender of a valid transmission report."

**DRAFT**

(k)    *ISDA Definitions and Inconsistency*.

(i)    This Agreement, each Confirmation and each Transaction between the parties are subject to the 2005 ISDA Commodity Definitions as published by the International Swaps and Derivatives Association, Inc., ("the Definitions"), and will be governed in all relevant respects by the provisions set forth in the Definitions, without regard to any amendment to the Definitions subsequent to the date hereof. The provisions of the Definitions are incorporated by reference and shall be deemed a part of this Agreement, except that sub-annexes B to I inclusive shall not apply.

(ii)    In the event of any inconsistency between the provisions of this Agreement and the Definitions, this Agreement will prevail. In the event of any inconsistency between the provisions of any Credit Support Document and the Definitions, the Credit Support Document will prevail. Subject to Section 1(b) of this Agreement, in the event of any inconsistency between the provisions of any Confirmation and this Agreement or the Definitions, the Confirmation will prevail for the purpose of the relevant Transaction.

(l)    *Market Disruption Events; Additional Market Disruption Events*.

(i)    The "Market Disruption Events" specified in Section 7.4(c) of the Definitions shall apply; and

(ii)    "Additional Market Disruption Events" shall apply only if specified in the relevant Confirmation.

(m)    *Disruption Fallbacks*.

The "Disruption Fallbacks" specified in Section 7.5(c) of the Definitions shall apply, except that:

(i)    "Fallback Reference Price" shall not apply;

(ii)    for the purposes of Section 7.6 of the Definitions, the Maximum Days of Disruption will be five (5) Commodity Business Days; and

(iii)    "Reference Dealers" means, with respect to any transaction for which the relevant Commodity Reference Price is "Commodity-Reference Dealers", the four independent leading dealers selected in good faith and jointly agreed upon by the parties satisfying all the criteria that the parties apply generally at the time of deciding whether to offer or to make an extension of credit or to enter into a transaction comparable to this Transaction.  Such dealers will be appointed to make a determination of the Commodity-Reference Price, taking into consideration the latest available quotation for the Commodity-Reference Price and any other information that in good faith they deem relevant. If the parties have not agreed upon the appointment of the dealers on or before the sixth Commodity Business Day following the first Pricing Date on which the Market Disruption Event occurred or existed, or if a determination of the relevant Commodity-Reference Price cannot be obtained from at least four dealers, the next applicable Disruption Fallback will apply to the Transaction.

(n)    *Severability.* In the event any one or more of the provisions contained in this Agreement should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall

not in any way be affected or impaired thereby. The parties shall endeavour, in good faith negotiations, to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

(o) ***Payment Date During Transfer Period.*** If the parties are required by Section 6(b)(ii) to make efforts to transfer certain obligations under this Agreement in connection with a Termination Event, and a Payment Date (as defined in the related Confirmation) will occur under the relevant Affected Transaction during the period specified in Section 6(b) for those efforts, then the payment(s) due to be made on that Payment Date shall be postponed until the earlier of (i) the Local Business Day following the day on which a transfer is effected in consequence of such efforts; (ii) the Local Business Day following the day on which such period ends, if an Early Termination Date is not designated by a party on such day; and (iii) the Early Termination Date for the relevant Affected Transaction, with such postponed payment(s) then being treated as Unpaid Amounts. In either case, the postponed payment(s) shall bear interest (before as well as after judgment) at the Applicable Deferral Rate from (and including) such Payment Date to (but excluding) the date of actual payment.

(p) ***Termination Payments by Non-defaulting Party.*** Notwithstanding the provisions of Sections 6(d) and 6(e) of the Agreement, if there is a Defaulting Party, the obligations of the Non-defaulting Party to pay to the Defaulting Party any amount under Section 6(e) shall not arise until, and shall be subject to the conditions precedent that, the Non-defaulting Party shall have received confirmation satisfactory to it in its sole discretion that (i) all Transactions are terminated in accordance with Section 6(c), and (ii) all obligations (contingent or absolute, matured or unmatured) of the Defaulting Party and any Affiliate of the Defaulting Party to make any payment to the Non-defaulting Party or any Affiliate of the Non-defaulting Party shall have been fully and finally performed; and provided, further, that if under the foregoing provisions it is determined that the Non-defaulting Party is to make a payment to the Defaulting Party, there shall be deducted from the amount of such payment all amounts which the Defaulting Party may be obligated to pay under Section 11.

(q) ***Confidentiality.*** The contents of this Agreement and all other documents relating to this Agreement, and any information (including any financial information) made available by one party or its Credit Support Provider to the other party or its Credit Support Provider with respect to this Agreement is confidential and shall not be disclosed to any third party (nor shall any public announcement relating to this Agreement be made by either party) without the prior written consent of the other party, except for such information (i) as may become generally available to the public, (ii) as may be necessary to enforce this Agreement or implement any Transaction hereunder, (iii) as may be required or appropriate in response to any summons, subpoena, or otherwise in connection with any litigation or to comply with any applicable law, order, regulation, ruling, or accounting disclosure rule or standard, (iv) as may be necessary to comply with a regulatory agency's reporting requirements, including but not limited to gas cost recovery proceedings; (v) as may be delivered to such third party for the sole purpose of calculating a published index; (vi) as may be obtained from a non-confidential source that disclosed such information in a manner that did not violate its obligations to the non-disclosing party or its Credit Support Provider in making such disclosure, or (vii) as may be furnished to the disclosing party's Affiliates, and to each of such person's auditors, attorneys, advisors, lenders, monitors or prospective purchasers of all or substantially all of a party's assets or any of its rights under this Agreement, provided such persons are

required to keep the information that is disclosed in confidence. Notwithstanding the foregoing, (i) if information would be permitted to be disclosed pursuant to DF Supplement Section 2.13, then such disclosure shall be permitted under any other applicable confidentiality provision or agreement, and (ii) information may be disclosed to any regulatory agency (including any governmental authority, swap data repository or other like agency or entity) as a party may determine is advisable in accordance with such party's reporting policies and procedures. Any confidential information received by a party may be used by such party and, to the extent disclosure is not restricted hereunder, may be disclosed and used by such permitted recipients, including in each case use by persons acting in a structuring, sales or trading capacity.

(r)    With respect to information provided with respect to this Agreement, this obligation shall survive for a period of one (1) year following the expiration or termination of this Agreement, provided, however, that with respect to information provided with respect to a Transaction, this obligation shall only survive for a period of one (1) year following the expiration or termination of such Transaction.

(s)    ***LIMITATION OF LIABILITY. NO PARTY SHALL BE REQUIRED TO PAY OR BE LIABLE FOR PUNITIVE, EXEMPLARY, CONSEQUENTIAL, SPECIAL, INCIDENTAL OR INDIRECT DAMAGES (WHETHER OR NOT ARISING FROM ITS NEGLIGENCE OR STRICT LIABILITY) TO ANY OTHER PARTY; PROVIDED, HOWEVER, THAT NOTHING IN THIS PROVISION SHALL AFFECT THE ENFORCEABILITY OF SECTION 6(e) OF THIS AGREEMENT OR THE OBLIGATION TO PAY ANY AMOUNT REQUIRED PURSUANT TO SECTION 6(e) OF THIS AGREEMENT. IF AND TO THE EXTENT ANY PAYMENT REQUIRED TO BE MADE PURSUANT TO THIS AGREEMENT IS DEEMED TO CONSTITUTE LIQUIDATED DAMAGES, THE PARTIES ACKNOWLEDGE AND AGREE THAT SUCH DAMAGES ARE DIFFICULT OR IMPOSSIBLE TO DETERMINE AND THAT SUCH PAYMENT IS INTENDED TO BE A REASONABLE APPROXIMATION OF THE AMOUNT OF SUCH DAMAGES AND NOT A PENALTY.***

(t)    ***Definitions.*** Section 14 shall be amended to add the following definition:

*"EDI"* shall mean an electronic data interchange pursuant to an agreement entered into by the parties, specifically relating to the communication of a Transaction.

*"Indenture"* shall mean that certain Indenture, dated as of [   ], 2016, among Cubic Energy, LLC., Party B, the note holders identified therein and Wilmington Trust, National Association ("***Wilmington Trust***"), as the noteholder agent (the "***Noteholder Agent***"), and the other parties named therein, as amended or otherwise modified from time to time.

"***Intercreditor Agreements***" shall have the meaning set forth in the Indenture.

"***Security Agreements***" means, collectively, (i) the Security Agreement, dated [   ], 2016, among Party B, Cubic Energy, LLC and Wilmington Trust, as collateral agent ("***First Lien Security Agreement***") and (ii) the Security Agreement, dated [   ], 2016, among Party B, Cubic Energy, LLC, Party A and Wilmington Trust, as collateral agent ("***Second Lien Security Agreement***"), in each case as amended or therwise modified from time to time.

DRAFT

(u)     ***2002 Master Agreement Protocol.***  The parties agree that, with effect from the date of this Agreement, the terms of each Annex to the 2002 Master Agreement Protocol published by the International Swaps and Derivatives Association Inc. on July 15, 2003, (the "Protocol") shall apply to this Agreement as if the parties had adhered to the Protocol without amendment.

(v)     **WAIVER OF RIGHT TO TRIAL BY JURY.  EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO A TRIAL BY JURY WITH RESPECT TO ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY TRANSACTION.**

(w)     ***Right to Clear and Choose DCO***.  Notwithstanding anything in DF Supplement Section 2.24, if a Transaction is subject to mandatory clearing requirements under Section 2(h) of the CEA, and the party other than BP Energy Company fails to designate a DCO in connection with the execution of the Transaction, then BP Energy Company may select a DCO to which the other party has transaction rights to be the DCO for such Transaction on behalf of such other party.

(x)     Party B's CFTC Interim Compliant Identifier ("CICI") is 549300FLOZN6PPXI0984.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

**BP Energy Company**                          **Cubic Asset, LLC**
**("Party A")**                                **("Party B")**

By: **DRAFT**                                  By: **DRAFT**
_____                    _____

Name:_____                    Name:_____

Title:_____                    Title:_____

Date:_____                     Date:_____

DRAFT

# ISDA

## SCHEDULE
## to the
## 2002 Master Agreement

**dated as of [●], 2016**

between

**BP Energy Company ("Party A"),
a corporation incorporated under the State laws of Delaware**

and

**Cubic Asset, LLC ("Party B"),
a limited liability company incorporated under the laws of Delaware**

### Part 1 - Termination Provisions

In this Agreement:

(a)      ***"Specified Entity"*** means:

in relation to Party A and in relation to Party B, for the purpose of:

|  |  |
|---|---|
| Section 5(a)(v): | Not Applicable |
| Section 5(a)(vi): | Not Applicable |
| Section 5(a)(vii): | Not Applicable |
| Section 5(b)(v): | Not Applicable |

(b)      ***"Specified Transaction"*** has the meaning given to it in Section 14 of the Agreement.

(c)      The ***"Cross Default"*** provisions of Section 5(a)(vi) will apply to Party A and will apply to Party B; provided, however, that the words "or becoming capable at such time of being declared" in Section 5(a)(vi) will be deleted.

(i)      "Specified Indebtedness" has the meaning specified in Section 14 except that for Party A it excludes an obligation for borrowed money where the creditor's recourse on the obligation is limited to assets for which the money was borrowed; and

(ii)     "Threshold Amount" means with respect to Party A: 3% of the Shareholders' Equity of the Credit Support Provider of Party A, and with respect to Party B, $1,000,000; and

For the purposes of the definition of Threshold Amount, "Shareholders' Equity" means, at any time, the amount represented in the most recent quarterly consolidated balance sheet.

(d)     The *"Credit Event Upon Merger"* provisions of Section 5(b)(v) will apply to Party A and will apply to Party B.

(e)     The *"Automatic Early Termination"* provision of Section 6(a) will not apply to Party A and will not apply to Party B.

(f)     *"Termination Currency"* means United States Dollars.

(g)     *Additional Termination Event* will apply.   The occurrence of the following event will constitute an Additional Termination Event with Party B as the sole Affected Party and all Transactions then outstanding as Affected Transactions:
Indenture Purchase Agreement (as defined below) or any or all of the Credit Support Documents  (i) expire, (ii) are terminated, replaced or refinanced, (iii) assigned to any third party, or (iv) amended, the result of which event under (i), (ii), (iii) or (iv) ) reduces the aggregate value of the collateral, security and credit support to less than 70% of the amount that would  be due to Party A under the Transactions then outstanding (the "Threshold Amount"), as reasonably calculated by Party A if an Early Termination Event where then to occur with respect to all such Transactions , while Transactions are still in effect or outstandinghereunder and Party B does not within two (2) business days of such expiration, termination, replacement, refinancing, assignment, or amendment, as applicable, either (A) deliver *pari passu* 1st lien replacement security having a value and terms and conditions acceptable to Party A in its sole discretion, or (B) provide Party A with replacement security sufficient in form, amount and for a term acceptable to Party A in its sole discretion (such security including but not limited to providing a standby irrevocable letter of credit, a prepayment, a security interest in an asset, a performance bond or guaranty, or a mutually agreed to Credit Support Annex and Paragraph 13 to this Agreement). In the event that Party B disagrees with the calculation of the Threshold Amount by Party A under this provision, Party A and Party B agree to have a nationally-recognized third party petroleum reserves engineering firm make a determination of the Threshold Amount within thirty days of notice by Party B that it wants such a determination made and under such procedures as dictated by the nationally-recognized third party petroleum reserve engineering firm in accordance with commercially reasonable standards.


**Part 2 - Tax Representations**


(a)     *Payer Tax Representation:* For the purpose of Section 3(e), Party A and Party B will make the following representation:

It is not required by any applicable law, as modified by the practice, application or official interpretation of any relevant governmental revenue authority, of any Relevant Jurisdiction or under any applicable tax treaty between the Relevant Jurisdictions to make any deduction or withholding for or on account of any Tax from any payment (other than interest under Section 9(h) of this Agreement) to be made by it to the other party under this Agreement.  In making this representation, it may rely on:

**DRAFT**

(i)      the accuracy of any representations made by the other party pursuant to Section 3(f) of this Agreement;

(ii)     the satisfaction of the agreement of the other party contained in Section 4(a)(i) or 4(a)(iii) of this Agreement and the accuracy and effectiveness of any document provided by the other party pursuant to Section 4(a)(i) or 4(a)(iii) of this Agreement; and

(iii)    the satisfaction of the agreement of the other party contained in Section 4(d) of this Agreement, *provided* that it shall not be a breach of this representation where reliance is placed on clause (ii) and the other party does not deliver a form or document under Section 4(a)(iii) by reason of material prejudice to its legal or commercial position.

(b)      ***Payee Tax Representations:*** For the purpose of Section 3(f) of this Agreement, Party A and Party B each make the representation(s) specified below:

(1)      For the purpose of Section 3(f) of this Agreement, Party A represents that (i) it is a corporation organized and existing under the laws of the State of Delaware, (ii) it is a U.S. person within the meaning of Section 7701 of the Internal Revenue Code, and (iii) its U.S. taxpayer identification number is 36-3421804.

(2)      For the purpose of Section 3(f) of this Agreement, Party B represents that (i) it is a a limited liability company organized and existing under the laws of the State of Delaware, (ii) it is a U.S. person within the meaning of Section 7701 of the Internal Revenue Code, and (iii) its U.S. taxpayer identification number is 90-1017565.

**Part 3 – Agreement to Deliver Documents**

Each party agrees to deliver the following documents as applicable:

(a)      For the purpose of Section 4(a)(i) of this Agreement, tax forms, documents or certificates to be delivered are:

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered |
|---|---|---|
| Not Applicable | Not Applicable | Not Applicable |

(b)      For the purpose of Section 4(a)(ii) of this Agreement, other documents to be delivered are:

| Party required to deliver document | Form/Document/ Certificate | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| Party A | A certified copy of the resolution of the Board of Directors of Party A of its relevant committee, authorizing such party to enter into this Agreement and each Transaction, and an incumbency certificate. | Upon execution of this Agreement | Yes |
| Party A | Certification of the authenticity of the signature of Party A's signatory certified by Party A's Company Secretary. | Upon execution of this Agreement | Yes |
| Party A | Most recent annual audited financial statements of Party A's Credit Support Provider. | Upon written request, unless publicly available through EDGAR or some other source. | Yes |
| Party A | The guaranty of its Credit Support Provider. | Upon the execution of this Agreement. | No |
| Party B | A certified copy of the resolution of the Board of Directors of Party B of its relevant committee, authorizing such party to enter into this Agreement and each Transaction, and an incumbency certificate. | Upon execution of this Agreement | Yes |
| Party B | Certification of the authenticity of the signature of Party B's signatory certified by Party B's Company Secretary. | Upon execution of this Agreement | Yes |
| Party B | Copies of all documents, notices and/or reports required to be provided by | Upon execution of this Agreement, and thereafter as | Yes |

**DRAFT**

| | | | |
|---|---|---|---|
| | Party B to Collateral Agent and the Holders pursuant to Section 7.1of the Indenture, copies of any compliance certificates, financial covenant certificates, development plans, annual budgets, reserve reports, event of default notices and notification of the quarterly call with Note Holders. | soon as practicable after the receipt of each such report by Party B. | |
| Party B | Executed copies of the Indenture and all Credit Support Documents with respect to Party B. | Upon request, as soon as reasonably practicable. | Yes |

**Part 4 - Miscellaneous**

(a)　　　*Addresses for Notices.*  For the purpose of Section 12(a) of this Agreement:

Address for **Confirmations** to Party A:

|  |  |
|---|---|
| Address: | BP Energy Company |
| | 201 Helios Way |
| | Houston, Texas 77079 |

| | |
|---|---|
| Attention: | Confirmation Department |

Facsimile No.:  281-227-8470
Telephone No.: 713-323-1866

Address for other **notices** or communications to Party A (other than Confirmations):

|  |  |
|---|---|
| Address: | BP Energy Company |
| | 201 Helios Way |
| | Houston, Texas 77079 |

| | |
|---|---|
| Attention: | Contract Services |

Facsimile No.:  713-323-0203
Telephone No.: 713-323-2000

Address for **Invoices** to Party A:

|  |  |
|---|---|
| Address: | BP Energy Company |
| | 201 Helios Way |
| | Houston, Texas 77079 |

| | |
|---|---|
| Attention: | Risk Accounting |

Facsimile No.:  713-323-5935

Telephone No.: 713-323-4919

Wire Payment Instructions:

> For the Account of: BP Energy Company
> JP Morgan Chase Bank, NY
> ABA:  021-000021
> Acct No.:  910-2-548097
> New York, NY 10081-6000

Address for **Confirmations** to Party B:

| | |
|---|---|
| Address: | 9870 Plano Road |
| | Dallas, Texas 75238 |
| Attention: | Jason Gorsuch |

Facsimile No.:  972-681-9687
Telephone No.: 972-681-8047

Address for other **notices** or communications to Party B (other than Confirmations):

| | |
|---|---|
| Address: | 9870 Plano Road |
| | Dallas, Texas 75238 |
| Attention: | Jason Gorsuch |

Facsimile No.:  972-681-9687
Telephone No.: 972-681-8047

Address for **Invoices** to Party B:

| | |
|---|---|
| Address: | 9870 Plano Road |
| | Dallas, Texas 75238 |
| Attention: | Jason Gorsuch |

Facsimile No.:  972-681-9687
Telephone No.: 972-681-8047

Wire Payment Instructions:

> Bank:  [●]
> ABA:  [●]
> Acct No.:  [●] for the account of Cubic Asset, LLC
> City/State/Zip:  [●]

(b)   ***Process Agent.***  For the purpose of Section 13(c) of this Agreement:

Party A appoints as its Process Agent: Not Applicable

Party B appoints as its Process Agent: Not Applicable

(c)   ***Offices.***  The provisions of Section 10(a) will apply to this Agreement.

34

(d)      ***Multibranch Party.***  For the purpose of Section 10(b) of this Agreement:

Party A is not a Multibranch Party.
Party B is not a Multibranch Party.

(e)      ***Calculation Agent.*** The Calculation Agent is Party A, with any calculation or determination made by Party A in such capacity to be binding and conclusive absent manifest error.

(f)      ***Credit Support Document.*** Details of any Credit Support Document:

With respect to Party A, the guaranty of its Credit Support Provider.

With respect to Party B, the First Lien Security Agreement (as defined below).

(g)      ***Credit Support Provider.***

Credit Support Provider means in relation to Party A, BP Corporation North America Inc., an Indiana corporation.

Credit Support Provider means in relation to Party B, each "Guarantor" (as defined in the Indenture).

(h)      ***Governing Law.***  This Agreement will be governed by and construed in accordance with New York law, without reference to its choice of law doctrine other than Section 5-1401 of the New York General Obligations Law.

(i)      ***Jurisdiction.***   Section 13(b) of the Agreement is hereby amended by (i) deleting the word "non-exclusive" appearing in paragraph (i)(1) and (i)(2) thereof and substituting therefor the word "exclusive" and (ii) deleting Section 13(b)(ii) and substituting therefor the following sentence:

"Nothing in this Agreement precludes either party from bringing Proceedings in any other jurisdiction if (A) the courts of the State of New York or the United States District Court located in the Borough of Manhattan in New York City lack jurisdiction over the parties or the subject matter of the Proceedings or declines to accept the Proceedings on the grounds of lacking such jurisdiction; (B) the Proceedings are commenced by a party for the purpose of enforcing against the other party's property, assets or estate any decision or judgment rendered by any court in which Proceedings may be brought as provided hereunder; (C) the Proceedings are commenced to appeal any such court's decision or judgment to any higher court with competent appellate jurisdiction over that court's decisions or judgments if that higher court is located outside the State of New York or Borough of Manhattan, such as a federal court of appeals or the U.S. Supreme Court; or (D) any suit, action or proceeding has been commenced in another jurisdiction by or against the other party or against its property, assets or estate (including, without limitation, any suit, action or proceeding described in Section 5(a)(vii)(4) of this Agreement), and, in order to exercise or protect its rights, interests or remedies under this Agreement, the party (1) joins, files a claim, or takes any other action, in any such suit, action or proceeding, or (2) otherwise commences any Proceeding in that other jurisdiction as the result of that other suit, action or proceeding having commenced in that other jurisdiction."

(j)    ***Netting of Payments.***  "Multiple Transaction Payment Netting" will apply for the purpose of Section 2(c) of this Agreement to all Transactions.

(k)    ***"Affiliate"*** will have the meaning specified in Section 14 of this Agreement; provided that Anchorage Capital Group, L.L.C., and O-CAP Capital Management, L.P. and any of their respective employees, partners, officers, directors, funds or affiliates shall not be deemed Affiliates of Part B or any of its Credit Support Providers.

(l)    ***"Absence of Litigation".***

(a)  Section 3(c) is amended by the inclusion of the word "adversely" before the word "affect" in the third line.

(b)  For the purpose of Section 3(c):

***"Specified Entity"*** means in relation to Party A, Not Applicable.
***"Specified Entity"*** means in relation to Party B, Not Applicable.

(m)    ***No Agency***. The provisions of Section 3(g) will apply to Party A and will apply to Party B.

(n)    ***Additional Representation***. Will apply. For the purpose of Section 3 of this Agreement, the following will each constitute an Additional Representation (which representations will be deemed to be repeated by each party, as appropriate, on each date on which a Transaction is entered into):

(i)    ***Eligible Commercial Entity.***  It constitutes an "eligible commercial entity" as such term is defined in the U.S. Commodity Exchange Act, as amended.

(ii)    ***Eligible Contract Participant***.  It constitutes an "eligible contract participant" as such term is defined in the U.S. Commodity Exchange Act, as amended.

(iii)    ***Swap Agreement.***    This Agreement and any Transaction entered into hereunder constitutes a "swap agreement" within the meaning of the United States Bankruptcy Code (11 USC Sec. 101(53B) (2000)).

(iv)    ***Line of Business.***    It has entered into this Agreement (including each Transaction) in conjunction with its line of business (including financial intermediation services) or the financing of its business.

(v)    ***Relationship Between the Parties.***  In connection with the negotiation of, the entering into, and the confirming of the execution of, this Agreement, any Credit Support Document to which it is a party, and each Transaction: (i) it is acting as principal (and not as agent or in any other capacity, fiduciary or otherwise); (ii) the other party is not acting as a fiduciary or financial or investment advisor for it; (iii) it is not relying upon any representations (whether written or oral) of the other party other than the representations expressly set forth in this Agreement and in such Credit Support Document; (iv) the other party has not given to it (directly or indirectly through any other person) any advice, counsel, assurance, guaranty, or representation whatsoever as to the expected or projected success, profitability, return, performance, result, effect, consequence, or benefit (either legal, regulatory, tax, financial, accounting, or otherwise) of this Agreement, such Credit Support Document, or such Transaction; (v) it has consulted with its own legal, regulatory, tax, business, investment, financial, and accounting advisors to the extent it has deemed necessary,

and it has made its own investment, hedging, and trading decisions based upon its own judgment and upon any advice from such advisors as it has deemed necessary, and not upon any view expressed by the other party; (vi) all trading decisions have been the result of arm's length negotiations between the parties; and (vii) it is entering into this Agreement, such Credit Support Document, and such Transaction with a full understanding of all of the risks hereof and thereof (economic and otherwise), and it is capable of assuming and willing to assume (financially and otherwise) those risks.

(o)    ***Recording of Telephone Conversations.*** To the extent permitted by applicable law, each party: (i) consents to the recording of telephone conversations between the trading, marketing and other relevant personnel of the parties in connection with this Agreement or any potential Transaction, (ii) agrees to obtain prior to entering into any Transaction any necessary consent of, and give any necessary notice of such recording to, its relevant personnel, (iii) agrees that recordings may be submitted in evidence in any Proceedings, and (iv) acknowledges to the other party and consents that such other party may from time to time and without further notice (A) retain electronic transmissions (including telephone conversations, e-mail and instant messaging between the parties' respective representatives in connection with the Agreement, any potential Transaction and any Transaction or other commercial matters between the parties) on central and local databases for their respective legitimate purposes, and (B) monitor electronic transmissions through their internal and external networks for purposes of security and compliance with applicable laws, regulations and internal policies for their legitimate business purposes. Each party further agrees that it will indemnify, defend and hold the other party harmless from any and all damages, losses, claims, liabilities, judgments, costs and expenses, including but not limited to reasonable attorney's fees and costs of court arising directly or indirectly from or out of such party's failure to obtain any consent necessary from a party's trading, marketing and other relevant personnel, agents or representatives or such party's failure to give any notice required to such individuals.

## Part 5 - Other Provisions

(a)    ***General Conditions.*** Section 2(a)(ii) shall be amended by the deletion of the final sentence thereof and the addition of the following in substitution therefor: "The parties agree that all payments under this Agreement shall be made by wire transfer of immediately available funds to the party receiving payment, at the account specified by such party."

(b)    ***Limitation on Condition Precedent.*** With respect to any Transaction entered into under this Agreement, Section 2(a)(iii) of this Agreement is hereby amended by adding the following phrase at the end of clause (1) immediately before the last comma of such phrase:

"(provided, however, that in relation to any Transaction, if an Event of Default or a Potential Event of Default has occurred and is continuing for longer than ten (10) days without an Early Termination Date being designated, then the condition specified in this clause (1) shall cease to be a condition precedent to the obligations under Section 2(a)(i))."

(c)    ***Change of Account.*** Section 2(b) of this Agreement is hereby amended by the insertion of the following at the end thereof after the word "change":

", provided that if such new account shall not be in the same jurisdiction having the same power to tax as the original account, the party not changing its account shall not be obliged to pay any greater amounts and shall not receive less as a result of such change than would have been the case if such change had not taken place."

(d)     **_Deduction or Withholding for Tax_**. Section 2(d)(i)(4) is amended by the addition of "; or" at the end of sub-paragraph (B) and the addition of a new sub-paragraph (C) as follows:

"(C) Y refusing to supply any form or document under Section 4(a)(iii) on grounds of material prejudice to its legal or commercial position."

(e)     **_Representations_**.  The opening paragraph of Section 3 is amended by replacing "in the case of the representations in Section 3(f)" with "in the case of the representations in Sections 3(f) and 3(h)(iv)" and adding the following new sub-section 3(h):

"(h)     **_Dodd Frank Representations_**.

(i)     **_Hedging Transactions_**.  Unless otherwise noted in the applicable Confirmation for any Transaction, such Transaction constitutes for Party B a bona fide hedging transaction as defined in CFTC Regulation 1.3(z) (17 C.F.R. § 1.3(z)).

(ii)     **_End User Clearing Exemption_**.  If with respect to any Transaction Party B has elected an exemption from the clearing requirement under Section 2(h)(7)(A) of the CEA, then as of the date of the execution of such Transaction (and not as of the date of this Agreement) (1) it is not a "financial entity" as defined in Section 2(h)(7)(C)(i) of the CEA, subject to certain exceptions in Sections 2(h)(7)(C)(ii), 2(h)(7)(C)(iii) and 2(h)(7)(D) of the CEA; (2) it is using such Transaction to hedge or mitigate commercial risk; (3) it has reported the information required to be submitted under 17 C.F.R. § 50.50(b)(1)(iii)  in an annual filing made no more than 365 days prior to the Trade Date of such Transaction, pursuant to 17 C.F.R. § 50.50(b)(2), and (4) to the extent it is required to do so under Section 2(j) of the CEA and 17 C.F.R. § 50.50(b)(1)(iii)(D)(2), it has obtained all necessary approvals by the appropriate committee (or equivalent body) of its board of directors to rely on the exception to the clearing requirement under Section 2(h)(7)(A) of the CEA.

(iii)     **_Special Entity Status_**.  Party B  is not a federal agency, state agency, city, county, municipality or other political subdivision of a state, or any instrumentality, department or entity established thereby, or any other Special Entity as defined by the CFTC Regulation 23.401(c).

(iv)     **_DF Protocols_**.  Each of the parties hereby agrees to enter into additional reasonable documentation or modify existing documentation between the parties to satisfy the requirements imposed upon one or both of the parties by the Dodd-Frank Wall Street Reform and Consumer Protection Act, the CEA and/or CFTC Regulations thereunder, including, upon reasonable request, adhering to or entering into such other protocols, suggested amendments, market conventions and other contractual provisions published by ISDA from time to time and intended to enhance one or both party's compliance with the CEA, the Dodd-Frank Wall Street Reform and

Consumer Protection Act, CFTC Regulations and other applicable laws, or to facilitate the orderly processing of Transactions."

(f)     ***Tax Event.*** Section 5(b)(iii) shall be amended by the addition of "or (C)" after the words "or (B)" at the end of the last line.

(g)     ***Set off.*** Section 6(f) is deleted in its entirety and replaced with the following:

"***Set-off***. Without affecting or prejudicing the provisions of this Agreement requiring the calculation and payment of certain net payment amounts on Scheduled Settlement Dates, all payments will be made without Set-off or counterclaim; provided, however, that any Early Termination Amount payable to one party (the "Payee") by the other party (the "Payer") in circumstances where there is a Defaulting Party or where there is one Affected Party in the case where either a Credit Event Upon Merger has occurred or any other Termination Event in respect of which all outstanding Transactions are Affected Transactions has occurred, will, at the sole option of the Non-defaulting Party or the Non-affected Party, as the case may be ("X") (and without prior Notice to the Defaulting Party or the Affected Party, as the case may be), be reduced by its setoff against any other amounts payable by the Payee to the Payer (whether arising under this Agreement, matured or contingent and irrespective of the currency, place of payment or place of booking of the obligation (collectively "Other Amounts"). Additionally, the set-off rights under this section include but are not limited to the following: (i) any Early Termination Amount against any Posted Credit Support held by a party relating to the Agreement; (ii) any Early Termination Amount against any amount(s) (including any excess collateral, security or credit support) owed by or to a party under any other agreement or arrangement between the parties; (iii) any Early Termination Amount owed to the Non-defaulting Party against any amount(s) (including any excess collateral, security or credit support) owed by the Non-defaulting Party or its Affiliates to the Defaulting Party under any other agreement or arrangement; (iv) any Early Termination Amount owed to the Defaulting Party against any amount(s) (including any excess collateral, security or credit support) owed by the Defaulting Party to the Non-defaulting Party or its Affiliates under any other agreement or arrangement; and/or (v) any Early Termination Amount owed to the Defaulting Party against any amount(s) (including any excess collateral, security or credit support) owed by the Defaulting Party or its Affiliates to the Non-defaulting Party under any other agreement or arrangement.

If an obligation is unascertained, X may in good faith estimate that obligation and set off in respect of the estimate subject to the relevant party accounting to the other when the obligation is ascertained.

To the extent that Other Amounts or any other sums otherwise owed by the Non-defaulting Party's Affiliate to the Defaulting Party, have been setoff by the Non-defaulting Party pursuant to this Section 6(f), the Non-defaulting Party's Affiliate shall not be liable to, and shall be released by, the Defaulting Party; provided further that the Defaulting Party shall be forever estopped from asserting that the Non-defaulting Party's Affiliate owes such Other Amounts or other sums to the Defaulting Party. The obligations of the Non-defaulting Party, the Non-defaulting Party's Affiliates, the Defaulting Party and the Defaulting Party's Affiliates under this Agreement or otherwise in respect of such Other Amounts or other sums shall be deemed satisfied and discharged to the extent of any such setoff. For this purpose, the Other Amounts or other sums subject to the setoff may be converted at the applicable prevailing exchange rate into U.S. Dollars by the Non-defaulting Party. The Non-defaulting Party will give the Defaulting Party notice of any setoff effected

under this section provided that failure to give such notice shall not affect the validity of the setoff. Nothing in this paragraph shall be deemed to create a charge or other security interest. "Setoff" as used herein means setoff, offset, combination of accounts, right of retention or withholding or similar right or requirement to which the Non-defaulting Party is entitled or subject to (whether arising under this Agreement, another contract, applicable law or otherwise) that is exercised by, or imposed on, the Non-defaulting Party."

(h)     Party A acknowledges that Party B has granted a security interest in its right, title and interest in, to and under this Agreement pursuant to the Security Agreements, and Party A hereby consents, for purposes of Section 7 of the Agreement, to such grant, as well to any further grant of such a security interest by Party B in connection with any Refinancing of a First Priority Obligation or Second Priority Obligation (each, as defined in the Intercreditor Agreements).

(i)     ***Counterparts and Confirmations***.

(i)     Section 9(e)(i) shall be amended by deleting the words "and by electronic messaging system"; and

(ii)     The second and third sentences of Section 9(e)(ii) shall be deleted and replaced by the following:

"Any Transaction may be effectuated in an EDI transmission or telephone conversation or other electronic means of communication with the offer and acceptance constituting the agreement of the parties. The parties shall be legally bound from the time they so agree to transaction terms and may each rely thereon. Any such Transaction shall be considered a "writing" and to have been "signed". Notwithstanding the foregoing sentence, the parties agree that Party A (the "***Confirming Party***") will promptly send a Confirmation to Party B to confirm a telephonic transaction by any reasonable means, including, without limitation, by facsimile, hand delivery, courier, or certified United States mail (return receipt requested) within three Business Days of a Transaction, provided that the failure to send a Confirmation shall not invalidate the oral agreement of the parties. Confirming Party adopts its confirming letterhead, or the like, as its signature on any Confirmation as the identification and authentication of Confirming Party. If the Confirmation contains any provisions other than those relating to the commercial terms of the transaction (i.e., price, quantity, performance obligation, delivery point, period of delivery and/or transportation/transmission conditions), which modify or supplement the Transaction or the terms of this Master Agreement (e.g., Force Majeure, arbitration or additional representations and warranties), such provisions shall not be deemed to be accepted pursuant to this Section 9(e)(ii) but must be expressly agreed to by both parties; provided that the foregoing shall not invalidate any Transaction agreed to by the parties. If Party A's Confirmation is materially different from Party B's understanding of the Transaction, Party B shall notify the Confirming Party via facsimile, EDI or mutually agreeable electronic means by the Confirm Deadline, unless Party B has previously sent a Confirmation to the Confirming Party. The failure of Party B to so notify the Confirming Party in writing by the Confirm Deadline constitutes Party B's agreement to the terms of the Transaction described in the Confirming Party's Confirmation. If there are any material differences between timely sent Confirmations governing the same Transaction, or if Party B has timely objected to the terms of the Confirming Party's Confirmation, such

**DRAFT**

Transaction remains valid and the parties remain legally bound thereby, however, both parties shall in good faith attempt to resolve such differences. Once such material differences are resolved, the Confirming Party shall transmit a written Confirmation to Party B, and such written Confirmation shall be accepted (or disputed) pursuant to the provisions of this Section 9(e)(ii).  The provisions of this Section 9(e)(ii) may be repeated as many times as necessary to produce a written Confirmation that is accepted or deemed accepted by Party B.  In the event of a conflict among the terms of (i) a binding Confirmation pursuant to this Section 9(e)(ii), (ii) the oral agreement of the parties (which may be evidenced by a recording of such transaction, oral testimony, data in a computer system, trade tickets, and/or notes), and (iii) this Master Agreement, the terms of the items shall govern in the priority listed in this sentence.

"**Confirm Deadline**" shall mean the earlier of (1) 5:00 p.m. in Party B's time zone on the fifth New York Business Day following the New York Business Day a Confirmation is received by Party B; provided, if the Confirmation is received after 5:00 p.m. in Party B's time zone, it shall be deemed received at the opening of the next New York Business Day.  "**New York Business Day**" shall mean any day except for a Saturday, Sunday or a day on which the Federal Reserve Bank of New York is closed, or (2) on and after the effective date of the confirmation rules set forth in CFTC Regulation 23.501, such earlier time as is set forth in the compliance schedule set forth in CFTC Regulation 23.501(a), as modified by CFTC Regulation 23.501(c).

Notwithstanding the provisions of Section 12(a)(iii) of the Agreement, a written Confirmation and any other writing related to or in response to a written Confirmation shall be deemed delivered to the receiving party (i) when actually received by the receiving party or (ii) with respect to a written Confirmation and other writing delivered by facsimile, when the sending party's facsimile machine indicates by an electronic or written facsimile log that the receiving party's facsimile machine received such written Confirmation.

Party A shall not be required to maintain or retain a paper-based version of the written Confirmation delivered to Party B.  In addition to a paper-based version of the written Confirmation delivered to Party B, the following shall constitute a "written Confirmation" for all purposes of this Agreement: (i) an electronic image of a paper-based version of the written Confirmation, and (ii) data in Party A's computer system.

Any document generated by the parties with respect to a Transaction, including this Agreement, may be imaged and stored electronically ("**Imaged Documents**").  Imaged Documents may be introduced as evidence in any proceeding as if such were original business records and neither party shall contest the admissibility of Imaged Documents as evidence in any proceeding."

(iii)    Notwithstanding the foregoing, the Confirming Party will endeavour to send the Confirmation to the other Party as soon as technologically practicable, but in any event will endeavour to do so in accordance with the compliance schedule set forth in CFTC Regulation 23.501(a), as modified by CFTC Regulation 23.501(c).

(j)      *Notices*. The wording of Section 12(a)(iii) shall be replaced in its entirety by the following:

"if sent by facsimile transmission, on receipt by the sender of a valid transmission report."

(k)      ***ISDA Definitions and Inconsistency***.

(i)      This Agreement, each Confirmation and each Transaction between the parties are subject to the 2005 ISDA Commodity Definitions as published by the International Swaps and Derivatives Association, Inc., ("the Definitions"), and will be governed in all relevant respects by the provisions set forth in the Definitions, without regard to any amendment to the Definitions subsequent to the date hereof. The provisions of the Definitions are incorporated by reference and shall be deemed a part of this Agreement, except that sub-annexes B to I inclusive shall not apply.

(ii)      In the event of any inconsistency between the provisions of this Agreement and the Definitions, this Agreement will prevail. In the event of any inconsistency between the provisions of any Credit Support Document and the Definitions, the Credit Support Document will prevail. Subject to Section 1(b) of this Agreement, in the event of any inconsistency between the provisions of any Confirmation and this Agreement or the Definitions, the Confirmation will prevail for the purpose of the relevant Transaction.

(l)      ***Market Disruption Events; Additional Market Disruption Events***.

(i)      The "Market Disruption Events" specified in Section 7.4(c) of the Definitions shall apply; and

(ii)      "Additional Market Disruption Events" shall apply only if specified in the relevant Confirmation.

(m)      ***Disruption Fallbacks***.

The "Disruption Fallbacks" specified in Section 7.5(c) of the Definitions shall apply, except that:

(i)      "Fallback Reference Price" shall not apply;

(ii)      for the purposes of Section 7.6 of the Definitions, the Maximum Days of Disruption will be five (5) Commodity Business Days; and

(iii)      "Reference Dealers" means, with respect to any transaction for which the relevant Commodity Reference Price is "Commodity-Reference Dealers", the four independent leading dealers selected in good faith and jointly agreed upon by the parties satisfying all the criteria that the parties apply generally at the time of deciding whether to offer or to make an extension of credit or to enter into a transaction comparable to this Transaction.  Such dealers will be appointed to make a determination of the Commodity-Reference Price, taking into consideration the latest available quotation for the Commodity-Reference Price and any other information that in good faith they deem relevant. If the parties have not agreed upon the appointment of the dealers on or before the sixth Commodity Business Day following the first Pricing Date on which the

Market Disruption Event occurred or existed, or if a determination of the relevant Commodity-Reference Price cannot be obtained from at least four dealers, the next applicable Disruption Fallback will apply to the Transaction.

(n)     ***Severability.*** In the event any one or more of the provisions contained in this Agreement should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby. The parties shall endeavour, in good faith negotiations, to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

(o)     ***Payment Date During Transfer Period.*** If the parties are required by Section 6(b)(ii) to make efforts to transfer certain obligations under this Agreement in connection with a Termination Event, and a Payment Date (as defined in the related Confirmation) will occur under the relevant Affected Transaction during the period specified in Section 6(b) for those efforts, then the payment(s) due to be made on that Payment Date shall be postponed until the earlier of (i) the Local Business Day following the day on which a transfer is effected in consequence of such efforts; (ii) the Local Business Day following the day on which such period ends, if an Early Termination Date is not designated by a party on such day; and (iii) the Early Termination Date for the relevant Affected Transaction, with such postponed payment(s) then being treated as Unpaid Amounts. In either case, the postponed payment(s) shall bear interest (before as well as after judgment) at the Applicable Deferral Rate from (and including) such Payment Date to (but excluding) the date of actual payment.

(p)     ***Termination Payments by Non-defaulting Party***. Notwithstanding the provisions of Sections 6(d) and 6(e) of the Agreement, if there is a Defaulting Party, the obligations of the Non-defaulting Party to pay to the Defaulting Party any amount under Section 6(e) shall not arise until, and shall be subject to the conditions precedent that, the Non-defaulting Party shall have received confirmation satisfactory to it in its sole discretion that all Transactions are terminated in accordance with Section 6(c); and provided, further, that if under the foregoing provisions it is determined that the Non-defaulting Party is to make a payment to the Defaulting Party, there shall be deducted from the amount of such payment all amounts which the Defaulting Party may be obligated to pay under Section 11.

(q)     ***Confidentiality***. The contents of this Agreement and all other documents relating to this Agreement, and any information (including any financial information) made available by one party or its Credit Support Provider to the other party or its Credit Support Provider with respect to this Agreement is confidential and shall not be disclosed to any third party (nor shall any public announcement relating to this Agreement be made by either party) without the prior written consent of the other party, except for such information (i) as may become generally available to the public, (ii) as may be necessary to enforce this Agreement or implement any Transaction hereunder, (iii) as may be required or appropriate in response to any summons, subpoena, or otherwise in connection with any litigation or to comply with any applicable law, order, regulation, ruling, or accounting disclosure rule or standard, (iv) as may be necessary to comply with a regulatory agency's reporting requirements, including but not limited to gas cost recovery proceedings; (v) as may be delivered to such third party for the sole purpose of calculating a published index; (vi) as may be obtained from a non-confidential source that disclosed such information in a manner that did not violate its obligations to the non-disclosing party or its Credit

Support Provider in making such disclosure, or (vii) as may be furnished to the disclosing party's Affiliates, and to each of such person's auditors, attorneys, advisors, lenders, monitors or prospective purchasers of all or substantially all of a party's assets or any of its rights under this Agreement, provided such persons are required to keep the information that is disclosed in confidence. Notwithstanding the foregoing, (i) if information would be permitted to be disclosed pursuant to DF Supplement Section 2.13, then such disclosure shall be permitted under any other applicable confidentiality provision or agreement, and (ii) information may be disclosed to any regulatory agency (including any governmental authority, swap data repository or other like agency or entity) as a party may determine is advisable in accordance with such party's reporting policies and procedures. Any confidential information received by a party may be used by such party and, to the extent disclosure is not restricted hereunder, may be disclosed and used by such permitted recipients, including in each case use by persons acting in a structuring, sales or trading capacity. With respect to information provided with respect to this Agreement, this obligation shall survive for a period of one (1) year following the expiration or termination of this Agreement, provided, however, that with respect to information provided with respect to a Transaction, this obligation shall only survive for a period of one (1) year following the expiration or termination of such Transaction.

(r)     *LIMITATION OF LIABILITY.*  **NO PARTY SHALL BE REQUIRED TO PAY OR BE LIABLE FOR PUNITIVE, EXEMPLARY, CONSEQUENTIAL, SPECIAL, INCIDENTAL OR INDIRECT DAMAGES (WHETHER OR NOT ARISING FROM ITS NEGLIGENCE OR STRICT LIABILITY) TO ANY OTHER PARTY; PROVIDED, HOWEVER, THAT NOTHING IN THIS PROVISION SHALL AFFECT THE ENFORCEABILITY OF SECTION 6(e) OF THIS AGREEMENT OR THE OBLIGATION TO PAY ANY AMOUNT REQUIRED PURSUANT TO SECTION 6(e) OF THIS AGREEMENT.  IF AND TO THE EXTENT ANY PAYMENT REQUIRED TO BE MADE PURSUANT TO THIS AGREEMENT IS DEEMED TO CONSTITUTE LIQUIDATED DAMAGES, THE PARTIES ACKNOWLEDGE AND AGREE THAT SUCH DAMAGES ARE DIFFICULT OR IMPOSSIBLE TO DETERMINE AND THAT SUCH PAYMENT IS INTENDED TO BE A REASONABLE APPROXIMATION OF THE AMOUNT OF SUCH DAMAGES AND NOT A PENALTY.**

(s)     *Definitions.*  Section 14 shall be amended to add the following definition:

*"EDI"* shall mean an electronic data interchange pursuant to an agreement entered into by the parties, specifically relating to the communication of a Transaction.

*"Indenture"* shall mean that certain Indenture, dated as of [    ], 2016, among Cubic Energy, LLC., Party B and the other guarantors identified therein, the note holders identified therein and Wilmington Trust, National Association ("**Wilmington Trust**"), as the noteholder agent (the "**Noteholder Agent**"), and the other parties named therein, as amended or otherwise modified from time to time.

"*Intercreditor Agreements*" shall have the meaning set forth in the Indenture.

"*Security Agreements*" means, collectively, (i) the Security Agreement, dated [    ], 2016, among Party B, Cubic Energy, LLC and Wilmington Trust, as collateral agent ("**First Lien Security Agreement**") and (ii) the Security Agreement, dated [    ], 2016,

among Party B, Cubic Energy, LLC,  Party A and Wilmington Trust, as collateral agent ("***Second Lien Security Agreement***"), in each case as amended or therwise modified from time to time.

(t)     ***2002 Master Agreement Protocol.***  The parties agree that, with effect from the date of this Agreement, the terms of each Annex to the 2002 Master Agreement Protocol published by the International Swaps and Derivatives Association Inc. on July 15, 2003 (the "Protocol"), shall apply to this Agreement as if the parties had adhered to the Protocol without amendment.

(u)     **WAIVER OF RIGHT TO TRIAL BY JURY.  EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO A TRIAL BY JURY WITH RESPECT TO ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY TRANSACTION.**

(v)     ***Right to Clear and Choose DCO***.  Notwithstanding anything in DF Supplement Section 2.24, if a Transaction is subject to mandatory clearing requirements under Section 2(h) of the CEA, and the party other than BP Energy Company fails to designate a DCO in connection with the execution of the Transaction, then BP Energy Company may select a DCO to which the other party has transaction rights to be the DCO for such Transaction on behalf of such other party.

(w)     Party B's CFTC Interim Compliant Identifier ("CICI") is 549300FLOZN6PPXI0984.

(x)     Party B covenants to Party A that it will ensure that its payment obligations hereunder rank at all times *pari passu* with any and all of Party B's payments obligations under the Indenture (subject, however, to the Intercreditor Agreements).

(y)     Party B acknowledges, agrees and covenants to Party A that this Agreement is a "Permitted Hedging Agreement", and Party A is a "Permitted Hedging Provider", in each case as such term is defined in the Indenture, and that Party B is authorized to enter into this Agreement pursuant to the Indenture.


## Part 6. ISDA North American Gas Annex

(a)     **ISDA North American Gas Annex.**  The North American Gas Annex to the ISDA Master Agreement published by ISDA (attached hereto as <u>Attachment A</u>), as amended, supplemented, replaced or modified from time to time, (the "Gas Annex") is incorporated by reference in this Agreement and in the relevant Confirmations with respect to "Transactions," as defined by the Commodity Definitions, in physical gas, except as otherwise specifically provided in the relevant Confirmation.   The Commodity Definitions and the provisions of Part 6 are incorporated in this Gas Annex for all purposes.  All terms used in this Part 6 that are not otherwise defined shall have the meanings given to them in the Gas Annex.

(b)     The following shall amend and replace clause (l) of the Gas Annex:

**(l)     Elective Provisions**

**1.     (a)(ii) – Outstanding Gas Transactions.**  This Gas Annex shall apply to the following pre-existing Gas Transactions pursuant to clause (a)(ii):

___ Option A:  All Gas Transactions outstanding between the parties as of the date this Gas Annex becomes effective.

___ Option B:  The Gas Transactions listed in Schedule 1 to this Gas Annex.

X___ Option C:  None of the Gas Transactions between the parties that were executed prior to the date this Gas Annex becomes effective.

If none of the above options is selected, Option A shall apply.

**2.     (a)(iii) – Outstanding Gas Credit Support**

___ Outstanding Gas Credit Support held by a party in connection with Outstanding Gas Transactions shall be deemed to have been delivered under and in connection with this Agreement pursuant to clause (a)(iii).

If not checked, not applicable.

**3.     (b)(ii) – Performance Obligation** (remedy for breach of Firm obligation)

_X_ Option A:  Cover Standard

___ Option B:  Spot Price Standard

If neither option is selected, Option A shall apply.

**4.     (e) – Taxes**

_X___ Option A: Buyer Pays At and After Delivery Point

___ Option B: Seller Pays Before and At Deliver Point

If neither option is selected, Option A shall apply.

**5.     (f)(ii) – Payment Date**

_X_ Option A: the later of the 25th Day of Month following Month of delivery or 10 Days after receipt of the invoice by Buyer (provided that if the Payment Date is not a Local Business Day, payment is due on the next Local Business Day following that date).

____ Option B: the later of the ___ Day of Month following Month of delivery or 10 Days after receipt of the invoice by Buyer (provided that if the Payment Date is not a Local Business Day, payment is due on the next Local Business Day following that date).

____ Option C: Notwithstanding anything to the contrary in the Schedule, payments with respect to both Gas Transactions and Power Transactions (as defined separately in the Schedule) will be netted and payable on or before the later of the 20th Day of Month following Month of delivery or 10 Days after receipt of the invoice by Buyer (provided that if the Payment Date is not a Local Business Day, payment is due on the next Local Business Day following that date).

DRAFT

_____ Option D: Notwithstanding anything to the contrary in the Schedule, payments with respect to both Gas Transactions and Power Transactions (as defined separately in the Schedule) will be netted and payable on or before the later of the 25th Day of Month following Month of delivery or 10 Days after receipt of the invoice by Buyer (provided that if the Payment Date is not a Local Business Day, payment is due on the next Local Business Day following that date).

If none of the above options is selected, Option A shall apply.

**6.      (k)(xxii) – Alternative to Spot Price Index.**  The parties have selected the following alternative index as the Spot Price Index: _____.  If no index is specified, the Spot Price Index specified in clause (k)(xxii) applies.

(c)      The following shall amend and replace clause (m) of the Gas Annex:

**(m)      Notices for Gas Transactions**

| PARTY A | PARTY B |
|---|---|
| **Invoices:** | **Invoices:** |
| As set forth in Part 4 of the Schedule unless otherwise set forth below: | As set forth in Part 4 of the Schedule unless otherwise set forth below: |
| Address:  P.O. Box 3092            Houston, TX  77253-3092 | Address: |
| Attn:  Gas Accounting | Attn: |
| Phone:  (713) 323-2000 | Phone: |
| Facsimile:  (713) 323-5313 | Facsimile: |
| **Nominations:** | **Nominations:** |
| As set forth in Part 4 of the Schedule  unless otherwise set forth below: | As set forth in Part 4 of the Schedule unless otherwise set forth below: |
| Attn:  Gas Scheduling | Attn: |
| Phone:  (713) 323-2000 | Phone: |
|  | Facsimile: |
| **Confirmations:** | **Confirmations:** |
| As set forth in Part 4 of the Schedule unless otherwise set forth below: | As set forth in Part 4 of the Schedule unless otherwise set forth below: |
| Address:  BP Energy Company P.O. Box 3092 Houston, Texas 77253-3092 | Address: |
| Attn: Confirmations Dept. | Attn: |
| Phone: (713) 323-2000 | Phone: |
| Facsimile: (281) 227-8470 | Facsimile: |
| **Option Exercise:** | **Option Exercise:** |

| | |
|---|---|
| As set forth in Part 4 of the Schedule unless otherwise set forth below: | As set forth in Part 4 of the Schedule unless otherwise set forth below: |
| | |
| Attn: | Attn: |
| Phone: | Phone: |
| Facsimile: | Facsimile: |

| ☐Wire Transfer - or -  ACH (check one box): | ☐Wire Transfer - or - ☐ACH (check one box): |
|---|---|
| As set forth in Part 4 of the Schedule unless otherwise set forth below:<br>Bank:  JP Morgan Chase Bank, NY<br>ABA:  021000021<br>Account:  910-2-548097<br>Other Details: For the account of BP Energy Company | As set forth in Part 4 of the Schedule unless otherwise set forth below:<br>Bank: [●]<br>ABA: [●]<br>Account: [●]<br>Other Details: for the account of Cubic Asset, LLC |

(d)      The following shall amend and replace clause (n) of the Gas Annex:

**(n)      Other Provisions/Modifications to this Gas Annex.**

1.      Clause (a)(i) is amended by deleting the phrase "North America" in the first (1st) sentence therein and replacing it with the phrase "the United States".

2.      Clause (a)(iii)(A) is amended by adding the following language immediately at the end of the first (1st) paragraph thereof:

"Concurrently with the execution of this Agreement, to the extent that any Outstanding Credit Support is in the form of a letter of credit, the party arranging the letter of credit shall have a new letter of credit issued by the issuing bank in a form acceptable to the other party that references the obligations of the arranging party under the terms of this Agreement effective as of the effective date of this Agreement.  If the arranging party fails to have a letter of credit issued pursuant to the terms and conditions of this clause (a)(iii)(A), such failure shall constitute an Event of Default under Section 5(a)(iii) of this Agreement."

3.      Clause (b)(i) is amended by adding the following at the end thereof:

"Unless expressly agreed to by the parties under a Confirmation, Seller is under no obligation to source the Gas being sold to Buyer from storage."

4.      Clause (b) is amended by adding the following provision as a new clause (b)(iv):

"(iv)      In the event that the Contract Price for a Transaction is a Fixed Price (as defined below), and such Transaction (a) has a Firm performance obligation, and (b) a Delivery Period of at least one Month, then,

notwithstanding anything to the contrary in this Contract, including, without limitation, anything in clause (b)(ii) or clause (h) of this Gas Annex:

(i)       if, upon the occurrence of an event of Force Majeure, and as a result of the event of Force Majeure (a) Seller is unable to sell and deliver or (b) Buyer is unable to purchase and receive, the Contract Quantity of Fixed Price Gas, either in whole or in part, for such Transaction,

(ii)       then, for the duration of the event of Force Majeure, for each Day that Seller is unable to sell and deliver, or Buyer is unable to purchase and receive, such Fixed Price Gas, as set out in clause (b)(iv)(i) above, the following settlement obligations between the parties shall apply:

a.       if the FOM Price (as defined below) exceeds the Fixed Price, Seller shall pay Buyer the difference between the FOM Price and the Fixed Price for each MMBtu of such Gas not delivered and/or received on that Day, or

b.       if the Fixed Price exceeds the FOM Price, Buyer shall pay Seller the difference between the Fixed Price and the FOM Price for each MMBtu of such Gas not delivered and/or received on that Day.

For the purpose of this clause (b)(iv):

"Fixed Price" means, a Contract Price for a Gas Transaction that is expressed as a flat dollar amount for the Month of delivery, excluding any Gas Transactions that have been entered into after the last trading day (as defined by the NYMEX) for the applicable Month.  Subject to the foregoing exclusion, "Fixed Price" also includes any Gas Transaction containing a Contract Price or a component of a Contract Price that has been converted from a floating price mechanism (i.e., a NYMEX/first of the month index basis component and a fixed price or floating price component, or a NYMEX/first of the month index priced component with a fixed basis component) to a flat dollar amount for any Month of delivery, either upon the mutual agreement of the parties or as a result of a party exercising a pricing "trigger" option in the relevant Gas Transaction.

"FOM Price" means the price per MMBtu, stated in the same currency as the Gas Transaction subject to such event of Force Majeure, for the first of the Month delivery, either as the NYMEX settlement price or as an index price published in the first issue of a publication commonly accepted by the natural gas industry (selected by the Seller in a commercially reasonable manner) for the Month of such event of Force Majeure for the geographic location closest in proximity to the Delivery Point(s) for the relevant Day, adjusted for the basis differential between the Delivery Point(s) and the NYMEX or such published geographic location as determined by the Seller in a commercially reasonable manner."

5.       Clause (b)(ii) is amended by:

(i) deleting the last sentence in Option A, and replacing it with the following:

"Any amount owed by a Party under this Section shall be invoiced and payable in the Month following the date that such amount was incurred due to such Party's failure to deliver or take Gas, all in accordance with the terms of Section 7, and such invoice shall set forth the basis upon which such amount was calculated."

(ii) add the following at the end of Option A:

"Notwithstanding the foregoing cover damage formula, if Buyer fails to take Gas to the Seller on any Day during a Month, the Seller shall be entitled to a payment from Buyer in an amount equivalent to (a) the positive difference between the Baseload Amount and the quantity of Gas actually taken by Buyer on such Day, times (b) the positive difference, if any, between the (I) the applicable Baseload Amount Contract Price, and (II) the Average GDD Price."

6.    Clause (b)(iv) shall be added as follows:

"(iv)    For the purposes of this Section, "Regulatory Event" means a government action requiring compliance, a court order, ruling, law, statute, ordinance, regulation or policy having the effect of law promulgated after the Effective Date of any transaction under this Contract, whether on a local, state or federal level, including but not limited to market rate caps (whether temporary or permanent), regulatory market requirements or the imposition of New Taxes. In the event a Regulatory Event occurs which renders a Party unable to continue to perform, either in whole or in part, under any transaction, or a Regulatory Event has a material adverse economic impact under this Contract on a Party (the "Affected Party") and the Affected Party is unable, after using commercially reasonable efforts, to avoid the inability to perform or the material economic impact, the Affected Party or other Party (the "Non-Affected Party"), shall be entitled to terminate and liquidate the transactions affected by such Regulatory Event (the "Affected Transactions") in accordance with Section 10, subject to the following conditions:

"(iv)(a) The Affected Party must give the Non-Affected Party at least twenty (20) Business Days prior written notice of its intent to terminate and liquidate the Affected Transaction(s). To the extent the Affected Party does not issue a Regulatory Event Notice to Terminate, the Non-Affected Party shall be entitled to provide at least twenty (20) Business Days notice to the Affected Party of its desire to terminate and liquidate the Affected Transactions under which performance by the Affected Party has been suspended, with such Notice being provided within five (5) Business Days from the date performance was suspended by the Affected Party. The Notice provided by the Affected Party, or the Non-Affected Party, as the case may be, shall be the "Regulatory Event Notice to Terminate". During the twenty (20) Business Day period following the Regulatory Event Notice to Terminate, the Parties shall attempt to reach mutual agreement, using the negotiation process set forth in Section 15.17., to resolve the material adverse economic impact on the Affected Party or the inability of the Affected Party to continue to perform.

"(iv)(b)        If a mutual agreement using the negotiation process is not reached within the referenced twenty (20) Business Days notice period, the Affected Party or the Non-Affected Party, as the case may be, shall by written notice to the other Party

specify an Early Termination Date (which must be a Business Day and which date shall be no more than ten (10) Days after the date of such notice) and on such Early Termination Date shall determine damages in accordance with  Section10 of the Contract; provided however, that for purposes of determining the amounts owed with respect to the liquidation and termination of each Affected Transaction under Section 10, any and all costs otherwise allowed under Section 10.3.1. shall be excluded from the calculation, and provided further that for purposes of determining the resulting amount(s) owed for the termination and liquidation of each Affected Transaction, the Market Value for each Terminated Transaction shall be determined by using the mid-point, as it may be estimated, between the bid price and the ask price for each Terminated Transaction to reflect that neither Party is a Defaulting Party and accordingly the intent of the Parties is not to ascertain liquidated damages from a Non-Defaulting Party's perspective.  The respective Parties shall have the same rights and remedies related to the calculation and dispute of the resulting Net Settlement Amount(s) owed with respect to the termination and liquidation of the Affected Transactions as those set forth in Section 10.

"(iv)(c) The Party owing the Net Settlement Amount shall pay the Net Settlement Amount to the other Party as provided under Section 10, provided that a Party shall not be entitled to receive a Net Settlement Amount if it initiated or supported the Regulatory Event.

"(iv)(d) For the purposes of this clause (b)(iv), "New Tax" or "New Taxes" means any or all governmental charges, licenses, fees, permits and assessments, or increases therein, that are imposed on a Party that (i) were not in effect on the date the Affected Transaction was entered into by the Parties, or (ii) were not imposed on a the Affected Transaction on the date the Affected Transaction was entered into by the Parties."

7.      Clause (e) is amended as follows:

(i)      Add "(i)" before the first sentence.

(ii)      Add the following at the end of clause (e):

"(ii) <u>Protest and Payment.</u>  If a Party is required to remit or pay Taxes that are the other Party's responsibility hereunder, the Party responsible for such Taxes shall promptly reimburse the other Party for such Taxes, except to the extent either Party has filed, or provides prior notice to the other Party that it will timely file, a good faith protest, contest, dispute or complaint with the taxing authority or applicable court with jurisdiction, which tolls the requirement to pay such Taxes.  Any Party is entitled to make such good faith protests, contests, disputes or complaints with the applicable taxing authority or applicable court with jurisdiction or to file for a request for refund for such Taxes already paid in a timely manner as to any Taxes that it is responsible to pay or remit or for which it is responsible to pay or reimburse the other Party.  In the event either Party makes such filings, the other Party shall cooperate with such filing Party by providing any relevant information within that Party's possession, which will support the filing Party's filing upon request by and as specified by the filing Party. Upon the issuance by the taxing authority or court of a final, non-appealable order, which lifts the tolling of an obligation to pay and requires

payment of the applicable Taxes, and absent a stay of such order, the responsible Party shall either pay directly to the applicable taxing authority, or reimburse the other Party for, such Taxes and any other amounts (including interest) required by such order.  Any Party entitled to an exemption from any such Taxes or charges shall furnish the other Party any necessary documentation thereof."

8.      Clause (f) is amended by deleting the last sentence of clause (f)(iv) and replacing it with the following:

"If the Parties are unable to resolve the dispute within ten (10) Days of delivery and receipt of such supporting documentation, the Parties shall use the negotiation process, failing which the arbitration process set forth in clauses (n)(18) and (n)(19), respectively."

9.      Claues (h)(ii) is amended as follows:

(i) delete the "and" in front of "(v)";

(ii) insert the following before the period at the end of the first sentence:

"and, (F) the occurrence of a Regulatory Event that renders a Party unable to continue to perform, either in whole or in part, under any transaction, or the occurrence of a Regulatory Event that has a material adverse economic impact on a Party.  If a Party declares an event of Force Majeure based upon the event described in (F), the event of Force Majeure shall terminate upon the earlier to occur of (a) the time a Party liquidates and terminates the affected transactions on the Early Termination Date in accordance with clause (b)(iv), or (b) the expiration of six (6) Business Days after the Notice of the event of Force Majeure is provided by the claiming Party unless a Regulatory Event Notice to Terminate has been declared by either Party in accordance with clause (b)(iv)."; and

(iii)    insert the following at the end of the clause:

"To the extent an event of Force Majeure occurs,:

(a)     prior to curtailing or interrupting any transaction for a Firm obligation, Seller/Buyer shall first curtail or interrupt its interruptible delivery or purchase obligations, as applicable, and

(b)     Seller or Buyer will treat all similarly situated Firm customers in a fair and reasonable manner by allocating the supply or purchase of Firm Gas, as applicable, on a pro rata basis."

10.     Clause (h)(iii) is amended by deleting the word "or" located between the semicolon (";") and "(C)" on the fifth (5th) line therein, and inserting the word "or" between the semicolon (";") and "(E)" on the eleventh (11th) line therein.

11.     Clause (h)(iv) is hereby deleted in its entirety and replaced with the following provision:

"Notwithstanding anything to the contrary in this clause (h), the parties agree that the settlement of strikes, lockouts, or other industrial disturbances shall

be within the sole discretion of the party experiencing such disturbance, and further agree that upon the occurrence and continuance of any event of Force Majeure, neither party shall be obligated to purchase or sell Gas hereunder if such purchase or sale would result in material economic impact to such party under this Gas Annex to the Agreement."

12.     Clause (h) is amended by adding the following provision as a new clause (h)(vii):

"Without restricting the generality of Section 9(f) of the Agreement, if an event of Force Majeure occurs, the party affected may, in its sole discretion and without notice to the other party, determine not to make a claim of Force Majeure and to waive its rights hereunder as they would apply to such event. Such determination or waiver shall not preclude the affected party from claiming Force Majeure in respect of any subsequent event, including any event that is substantially similar to the event in respect of which such determination or waiver is made."

13.     Clause (h) is amended by adding the following provision as a new clause (h)(ix):

"(ix) If an event of Force Majeure impairs or prevents Seller from delivering or Buyer from purchasing Gas under this Contract and such event of Force Majeure continues (i) for a continuous period of time greater than ninety (90) Days or (ii) for more than one hundred and eighty (180) cumulative Days during any calendar year, the Party not claiming the event of Force Majeure may terminate and liquidate the transactions affected by such event of Force Majeure utilizing the same methodology (including rights and remedies) set forth under clause (b)(iv) for terminating and liquidating Affected Transactions with respect to Regulatory Events."

14.     Clause (i) is deleted in its entirety.

15.     Clause (k)(i) is amended by inserting the phrase "that there is an unexcused failure of" between the words "event" and "either" therein and deleting the word "fails" after the word "Buyer".

16. Clause k(xxii) is amended by deleting the last sentence

17. _Illegality and Tax Event_.   With respect to any Gas Transaction, Sections 5(b)(i) and 5(b)(iii) of this Agreement are of no force and effect, and the concepts of "Illegality" and "Tax Event" as used elsewhere in this Agreement shall not apply to any Gas Transaction.

18. _Additional Representations_.   With respect to Gas Transactions entered into under this Agreement, the following representations shall apply with respect to each party:

a.      _Utility Disclaimer_.  Each party represents and agrees that it is not a "utility" as such term is used in 11 U.S.C. Section 366 of the Bankruptcy Code, and each party agrees to waive and not to assert the applicability of the provisions of 11 U.S.C. Section 366 in any bankruptcy proceeding involving such party, and further agrees that the other party is not a provider of last resort.

b.      _Commodity Trade Option_.  As of the date of the Agreement, with respect to any Transaction (including any other commodity option Transaction entered between the parties that is governed by the Agreement) that is a "Commodity Trade Option" (meaning a

"commodity option" as defined in CFTC Regulation 1.3(hh) entered into pursuant to CFTC Regulation 32.3(a)):

> (i) the party that is the offeree represents that it is: (a) a producer, processor, commercial user of, or a merchant handling, the commodity that is the subject of the Commodity Trade Option, or the products or by-products thereof; and (b) entering into the Commodity Trade Option solely for purposes related to its business as such; and

> (ii) each party represents to the other that the Commodity Trade Option, if exercised, contains a binding obligation for immediate or deferred shipment or delivery of the subject commodity.

19.     Mobile-Sierra.  To the extent, if any, that a transaction does not qualify as a "first sale" as defined by the Natural Gas Act and §§ 2 and 601 of the Natural Gas Policy Act, each party irrevocably waives its rights, including its rights under §§ 4-5 of the Natural Gas Act, unilaterally to seek or support a change to any terms and conditions of the Contract, including but not limited to the rate(s), charges, or classifications set forth therein.  By this provision, each party expressly waives its right to seek or support, either directly or indirectly, and by whatever means: (i) an order from the U.S. Federal Energy Regulatory Commission ("FERC") seeking to change any of the terms and conditions of the Contract agreed to by the parties; and (ii) any refund from the other party with respect to the Contract.  Each party further agrees that this waiver and covenant shall be binding upon it notwithstanding any regulatory or market changes that may occur after the date of the Base Contract or any transaction entered into between the parties.  Absent the agreement of both parties to the proposed change, the standard of review for changes to any terms and conditions of the Contract proposed by (a) a party, to the extent that the waiver set forth in this Section 12 is unenforceable or ineffective as to such party due to a final determination being made under applicable law that precludes the party from waiving its rights to seek or support changes from the FERC to the terms and conditions of this Contract, (b) a non-party, or (c) the FERC acting sua sponte, shall solely be the "public interest" application of the "just and reasonable" standard of review set forth in United Gas Pipe Line Co. v. Mobile Gas Service Corp., 350 U.S. 332 (1956) and Federal Power Commission v. Sierra Pacific Power Co., 350 U.S. 348 (1956) (the "Mobile-Sierra Doctrine"), as such Mobile-Sierra Doctrine has been clarified by Morgan Stanley Capital Group, Inc. v. Public Util. Dist. No. 1 of Snohomish 128 S.Ct. 2733 (2008).

20.    Market Disruption. If a Market Disruption Event has occurred in respect of any Gas Transaction then the Parties shall negotiate in good faith to agree on a replacement price for the Floating Price (or on a method for determining a replacement price for the Floating Price) for the affected Day, and if the Parties have not so agreed on or before the second Business Day following the affected Day then the replacement price for the Floating Price shall be determined within the next two following Business Days with each Party attempting to obtain, in good faith and from non-affiliated market participants in the relevant market, at least four quotes for prices of Gas for the affected Day of a similar quality and quantity in the geographical location closest in proximity to the Delivery Point and averaging the four quotes. Once the Parties obtain the quotes, the following methodology shall be used to determine the replacement price for the Floating Price:  (i) if each Party obtains four or more quotes, the arithmetic mean of the quotations, excluding the highest and lowest values, shall be utilized; (ii) if one Party obtains four or more quotes and the other Party obtains less than

four, the highest and lowest values of all obtained quotes shall be excluded and the arithmetic mean of the remaining quotations shall be utilized; or (iii) if both Parties obtain less than three quotes, the Parties shall resort to the negotiation process set out in clause (i)(ii) to resolve the dispute with the quotes being only indicative of an illiquid market which shall allow both Parties to utilize other industry information, including internal valuations to resolve the dispute. For purposes of the foregoing sentence, if more than one quotation is the same as another quotation, and such quotations are the highest and/or lowest values, only one of the quotations shall be excluded.  "Floating Price" means the price or a factor of the price agreed to in the transaction as being based upon a specified index.  "Market Disruption Event" means, with respect to an index specified for a transaction, any of the following events: (a) the failure of the index to announce or publish information necessary for determining the Floating Price; (b) the failure of trading to commence or the permanent discontinuation or material suspension of trading on the exchange or market acting as the index; (c) the temporary or permanent discontinuance or unavailability of the index; (d) the temporary or permanent closing of any exchange acting as the index; or (e) a material change in the formula for or the method of determining the Floating Price has occurred. For the purposes of the calculation of a replacement price for the Floating Price, all numbers shall be rounded to three decimal places.  If the fourth decimal number is five or greater, then the third decimal number shall be increased by one and if the fourth  decimal number is less than five, then the third  decimal number shall remain unchanged.

21. Where the negotiation process is specifically prescribed to resolve a dispute under this Gas Annex, the Parties shall seek to resolve the dispute by negotiations between senior executives who have authority to settle the controversy.  Either Party may initiate this negotiation process by written Notice to the other Party outlining that Party's position regarding the dispute ("Negotiation Notice").  The senior executives shall meet at a mutually acceptable time and date within fifteen (15) Business Days after the date of the Negotiation Notice to exchange relevant information concerning the dispute and to attempt to resolve the dispute.  If a senior executive intends to be accompanied at a meeting by an attorney, the other Party's senior executive shall be given at least three Business Days' Notice of such intention and may also be accompanied by an attorney.  All negotiations are confidential and shall be treated as compromise and settlement negotiations under the Federal Rules of Evidence or any similar applicable rules of evidence.

22. Party B acknowledges that Party A is engaged, and will continue to be engaged, in the business of buying and selling Gas for its own account and for the account of others, in contracting with pipelines and others for transportation of Gas for its own account and for the account of others, and in contracting with pipelines and others for services the same or similar to one or more of the services furnished to Seller hereunder.  Nothing in this Gas Annex shall be construed to restrict Party A's ability to engage in the foregoing business activities even to the extent such activities directly or indirectly compete with Party B.  Nothing is this section shall be construed as detracting from the warranties, covenants and obligations of Party A in this Gas Annex.

**DRAFT**

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

**BP Energy Company**                             **Cubic Asset, LLC**
**("Party A")**                                    **("Party B")**

By: __**DRAFT**_____         By: __**DRAFT**_____

Name:_____          Name:_____

Title:_____        Title:_____

Date:_____         Date:_____

**DRAFT**

**Attachment A**
North American Gas Annex to the
ISDA Master Agreement published by ISDA

[*Attached separately.*]

**ISDA® NORTH AMERICAN GAS ANNEX**
**to the Schedule to the**
**ISDA Master Agreement**
**dated as of [●], 2016**
**between**
**BP Energy Company ("Party A")  and  Cubic Asset, LLC (Party "B")**

This Gas Annex supplements, forms part of, and is subject to the above-referenced Agreement and is part of the Schedule thereto.

**(a)     Physical Gas Transactions under this Agreement; Credit Support Documents**

       (i)     ***Physical Gas Transactions under this Agreement***.  The provisions of this Gas Annex shall apply solely to transactions between the parties for the purchase or sale of physical Gas with delivery points in North America on a Firm or Interruptible basis on a spot or forward basis or as an option to purchase or sell Gas (collectively, "Gas Transactions").  All Gas Transactions will be deemed to have been entered into in accordance with the terms of this Agreement and shall be Transactions for all purposes of this Agreement. A subsequent agreement between the parties to settle a Gas Transaction without involving a physical delivery of Gas shall not affect such Gas Transaction's status as a Gas Transaction under this Gas Annex.  In the event of any inconsistency among or between the other provisions of this Agreement and this Gas Annex, this Gas Annex will govern with respect to Gas Transactions.  In the event of any inconsistency between the Confirmation for a Gas Transaction and this Gas Annex, the Confirmation will govern with respect to such Gas Transaction, except as provided in clause (a)(ii) with respect to Outstanding Gas Transactions.

       (ii)     ***Applicability to Outstanding Gas Transactions***.  Gas Transactions executed by the parties prior to the effectiveness of this Gas Annex and selected under clause (l)(1) ("Outstanding Gas Transactions") shall be Transactions and shall be subject to the terms and conditions of this Agreement upon effectiveness of this Gas Annex, unless otherwise agreed in writing by the parties with respect to one or more specific Outstanding Gas Transactions.  All confirmations evidencing such Outstanding Gas Transactions shall constitute "Confirmations" within the meaning of this Agreement that supplement, form part of and are subject to this Agreement. If any confirmation issued or entered into with respect to one or more Outstanding Gas Transactions pursuant to the terms of a master agreement or in a form that contains provisions that are not directly related to the commercial terms of the Transaction and that are inconsistent with or duplicative of the terms and conditions of this Agreement (such master agreement or the portion of such Confirmation containing such non-commercial terms being referred to herein as the "Prior Master Agreement"), then, notwithstanding any provision of this Agreement to the contrary, the terms of the Schedule and the pre-printed form of this Agreement shall automatically supersede such Prior Master Agreement effective upon the effectiveness of this Gas Annex.

       (iii)     ***Credit Support Documents***.  If elected under clause (l) as being applicable:

    (A) *Outstanding Gas Credit Support.*  The parties agree that to the extent any collateral, margin, security or other similar form of credit support (such credit support, excluding guarantees, being referred to herein as "Outstanding Gas Credit Support") is held by a party in connection with the obligations of the other party under Outstanding Gas Transactions, such Outstanding Gas Credit Support shall be deemed to have been delivered in respect of the obligations of the other party under and in connection with this Agreement.

    The parties further agree that with respect to any Outstanding Gas Credit Support that (x) if the parties have entered into a Credit Support Document in connection with this Agreement that governs the provision of collateral, margin, security or other similar form of credit support (such Credit Support Document, an "Existing ISDA Credit Support Document") then the Outstanding Gas Credit Support shall be deemed to constitute credit support provided under such Existing ISDA Credit Support Document and such Existing ISDA Credit Support Document shall automatically supersede any agreement between the parties pursuant to which the Outstanding Gas Credit Support was provided (the "Outstanding Gas Credit Support Document") effective as of the date agreed by the parties and (y) if the parties have not entered into an Existing ISDA Credit Support Document, then the Outstanding Gas Credit Support Document constitutes a Credit Support Document with respect to the party that provided such credit support.

- 1 -

Copyright © 2004 by International Swaps and Derivatives Association, Inc.

(B)        *Amendments/Guaranties*.  The parties agree that they will enter into such amendments to any Outstanding Gas Credit Support Document as may be necessary to give effect to the terms of this clause (a)(iii).  To the extent that a guaranty was delivered in connection with a party's obligations under Outstanding Gas Transactions or a Prior Master Agreement, that party represents and warrants that any amendments necessary to ensure that the guaranty would extend to Transactions subject to this Agreement have been made prior to the effectiveness of this Gas Annex and agrees (x) that such guaranty constitutes a Credit Support Document with respect to the obligations of such party and (y) the guarantor under such guaranty constitutes a Credit Support Provider with respect to the obligations of such party.

## (b)        Performance Obligation

(i)        Seller agrees to sell and deliver, and Buyer agrees to receive and purchase, the Contract Quantity for a particular Gas Transaction in accordance with the terms of this Gas Annex.  Sales and purchases will be on a Firm or Interruptible basis, as agreed to by the parties in a Gas Transaction.

(ii)        The remedy for the breach of a Firm obligation by a party shall be determined pursuant to the option below that the parties select in clause (l)(3):

Option A        *Cover Standard*:  The sole and exclusive remedy of the parties in the event of a breach of a Firm obligation to deliver or receive Gas shall be recovery of the following: (i) in the event of a breach by Seller on any Day(s), payment by Seller to Buyer in an amount equal to the positive difference, if any, between the purchase price paid by Buyer utilizing the Cover Standard and the Contract Price, adjusted for commercially reasonable differences in transportation costs to or from the Delivery Point(s), multiplied by the difference between the Contract Quantity and the quantity actually delivered by Seller for such Day(s); or (ii) in the event of a breach by Buyer on any Day(s), payment by Buyer to Seller in an amount equal to the positive difference, if any, between the Contract Price and the price received by Seller utilizing the Cover Standard for the resale of such Gas, adjusted for commercially reasonable differences in transportation costs to or from the Delivery Point(s), multiplied by the difference between the Contract Quantity and the quantity actually taken by Buyer for such Day(s); or (iii) in the event that Buyer has used commercially reasonable efforts to replace the Gas or Seller has used commercially reasonable efforts to sell the Gas to a third party, and no such replacement or sale is available, then the sole and exclusive remedy of the performing party shall be any unfavorable difference between the Contract Price and the Spot Price, adjusted for such transportation to the applicable Delivery Point, multiplied by the difference between the Contract Quantity and the quantity actually delivered by Seller and received by Buyer for such Day(s).  Imbalance Charges shall not be recovered under this clause (b)(ii), but Seller and/or Buyer shall be responsible for Imbalance Charges, if any, as provided in clause (c)(iii) of this Gas Annex.  The amount of such unfavorable difference shall be payable five Local Business Days after presentation of the performing party's invoice, which shall set forth the basis upon which such amount was calculated.

Option B        *Spot Price Standard*:  The sole and exclusive remedy of the parties in the event of a breach of a Firm obligation to deliver or receive Gas shall be recovery of the following: (i) in the event of a breach by Seller on any Day(s), payment by Seller to Buyer in an amount equal to the difference between the Contract Quantity and the actual quantity delivered by Seller and received by Buyer for such Day(s), multiplied by the positive difference, if any, obtained by subtracting the Contract Price from the Spot Price; or (ii) in the event of a breach by Buyer on any Day(s), payment by Buyer to Seller in an amount equal to the difference between the Contract Quantity and the actual quantity delivered by Seller and received by Buyer for such Day(s), multiplied by the positive difference, if any, obtained by subtracting the applicable Spot Price from the Contract Price.  Imbalance Charges shall not be recovered under this clause (b)(ii), but Seller and/or Buyer shall be responsible for Imbalance Charges, if any, as provided in clause (c)(iii) of this Gas Annex.  The amount of such unfavorable difference shall be payable five Local Business Days after presentation of the performing party's invoice, which shall set forth the basis upon which such amount was calculated.

(iii)        Notwithstanding clause (b)(ii) of this Gas Annex, the parties may agree to Alternative Damages in a Confirmation executed in writing by both parties.

**(c)        Transportation, Nominations and Imbalances**

(i)        Seller shall have the sole responsibility for transporting the Gas to the Delivery Point(s).  Buyer shall have the sole responsibility for transporting the Gas from the Delivery Point(s).

(ii)        The parties shall coordinate their nomination activities, giving sufficient time to meet the deadlines of the affected Transporter(s).  Each party shall give the other party timely prior notice, sufficient to meet the requirements of all Transporter(s) involved in the Gas Transaction, of the quantities of Gas to be delivered and purchased each Day.  Should either party become aware that actual deliveries at the Delivery Point(s) are greater or lesser than the Scheduled Gas, such party shall promptly notify the other party.

(iii)        The parties shall use commercially reasonable efforts to avoid imposition of any Imbalance Charges.  If Buyer or Seller receives an invoice from a Transporter that includes Imbalance Charges, the parties shall determine the validity as well as the cause of such Imbalance Charges.  If the Imbalance Charges were incurred as a result of Buyer's receipt of quantities of Gas greater than or less than the Scheduled Gas, then Buyer shall pay for such Imbalance Charges or reimburse Seller for such Imbalance Charges paid by Seller.  If the Imbalance Charges were incurred as a result of Seller's delivery of quantities of Gas greater than or less than the Scheduled Gas, then Seller shall pay for such Imbalance Charges or reimburse Buyer for such Imbalance Charges paid by Buyer.  "Unpaid Amounts" as defined in Section 14 of this Agreement shall include unpaid Imbalance Charges, if any.

**(d)        Quality and Measurement**

All Gas delivered by Seller shall meet the pressure, quality and heat content requirements of the Receiving Transporter.  The unit of quantity measurement for purposes of Gas Transactions shall be one MMBtu dry.  Measurement of Gas quantities hereunder shall be in accordance with the established procedures of the Receiving Transporter.

**(e)        Taxes**

The Taxes payable by a party shall be determined pursuant to the option below that the parties select in clause (l)(4):

Option A: ***Buyer Pays At and After Delivery Point***:  Seller shall pay or cause to be paid all taxes, fees, levies, penalties, licenses or charges imposed by any government authority ("Taxes") on or with respect to the Gas prior to the Delivery Point(s).  Buyer shall pay or cause to be paid all Taxes on or with respect to the Gas at the Delivery Point(s) and all Taxes after the Delivery Point(s).  If a party is required to remit or pay Taxes that are the other party's responsibility hereunder, the party responsible for such Taxes shall promptly reimburse the other party for such Taxes.  Any party entitled to an exemption from any such Taxes or charges shall furnish the other party any necessary documentation thereof.

Option B: ***Seller Pays Before and At Delivery Point***.  Seller shall pay or cause to be paid all taxes, fees, levies, penalties, licenses or charges imposed by any government authority ("Taxes") on or with respect to the Gas prior to the Delivery Point(s) and all Taxes at the Delivery Point(s).  Buyer shall pay or cause to be paid all Taxes on or with respect to the Gas after the Delivery Point(s).  If a party is required to remit or pay Taxes that are the other party's responsibility hereunder, the party responsible for such Taxes shall promptly reimburse the other party for such Taxes.  Any party entitled to an exemption from any such Taxes or charges shall furnish the other party any necessary documentation thereof.

**(f)        Billing, Payment and Audit**

(i)        Seller shall invoice Buyer for Gas delivered and received in the preceding Month and for any other applicable charges, providing supporting documentation acceptable in industry practice to support the amount charged.  If the actual quantity delivered is not known by the billing date, billing will be prepared based on the quantity of Scheduled Gas.  The invoiced quantity will then be adjusted to the actual quantity on the following Month's billing or as soon thereafter as actual delivery information is available.

(ii)      Buyer shall remit the amount due under clause (f)(i) of this Gas Annex, in immediately available funds to the account specified from time to time by Seller, on or before the Payment Date elected in clause (l)(5) of this Gas Annex. In the event any payments are due Buyer hereunder, payment to Buyer shall be made in accordance with this clause (f)(ii).

(iii)     In the event payments become due pursuant to clauses (b)(ii) or (b)(iii) of this Gas Annex, the performing party may submit an invoice to the nonperforming party for an accelerated payment setting forth the basis upon which the invoiced amount was calculated.  Payment from the nonperforming party will be due five Local Business Days after receipt of invoice.

(iv)     If the invoiced party, in good faith, disputes the amount of any such invoice or any part thereof, such invoiced party will pay such amount as it concedes to be correct; provided, however, if the invoiced party disputes the amount due, it must provide supporting documentation acceptable in industry practice to support the amount paid or disputed.  In the event the parties are unable to resolve such dispute, either party may pursue any remedy available at law or in equity to enforce its rights pursuant to this clause (f).

(v)      A party shall have the right, at its own expense, upon reasonable notice and at reasonable times, to examine and audit and to obtain copies of the relevant portion of the books, records, and telephone recordings of the other party only to the extent reasonably necessary to verify the accuracy of any statement, charge, payment, or computation made under this Gas Annex.  This right to examine, audit, and to obtain copies shall not be available with respect to proprietary information not directly relevant to Gas Transactions under this Gas Annex.  All invoices and billings shall be conclusively presumed final and accurate and all associated claims for under- or overpayments shall be deemed waived unless such invoices or billings are objected to in writing, with adequate explanation and/or documentation, within two years after the Month of Gas delivery.  All retroactive adjustments under clause (f) of this Gas Annex shall be paid in full by the party owing payment within 30 Days of notice and substantiation of such inaccuracy.

**(g)      Title, Warranty and Indemnity**

(i)      Unless otherwise specifically agreed, title to the Gas shall pass from Seller to Buyer at the Delivery Point(s). Seller shall have responsibility for and assume any liability with respect to the Gas prior to its delivery to Buyer at the specified Delivery Point(s).  Buyer shall have responsibility for and assume any liability with respect to said Gas after its delivery to Buyer at the Delivery Point(s).

(ii)     Seller warrants that it will have the right to convey and will transfer good and merchantable title to all Gas sold hereunder and delivered by it to Buyer, free and clear of all liens, encumbrances, and claims.  EXCEPT AS PROVIDED IN THIS CLAUSE (g)(ii), ALL OTHER WARRANTIES WITH RESPECT TO GAS, EXPRESS OR IMPLIED, INCLUDING ANY WARRANTY OF MERCHANTABILITY OR OF FITNESS FOR ANY PARTICULAR PURPOSE, ARE DISCLAIMED.

(iii)    Seller agrees to indemnify Buyer and save it harmless from all losses, liabilities or claims including reasonable attorneys' fees and costs of court ("Claims"), from any and all persons, arising from or out of claims of title, personal injury or property damage from said Gas or other charges thereon which attach before title passes to Buyer.  Buyer agrees to indemnify Seller and save it harmless from all Claims, from any and all persons, arising from or out of claims regarding payment, personal injury or property damage from said Gas or other charges thereon which attach after title passes to Buyer.

(iv)     Notwithstanding the other provisions of this clause (g) of this Gas Annex, as between Seller and Buyer, Seller will be liable for all Claims to the extent that such arise from the failure of Gas delivered by Seller to meet the quality requirements of clause (d) of this Gas Annex.

**(h)      Force Majeure**

(i)      Except with regard to a party's obligation to make payment(s) due under clause (f) of this Gas Annex, Section 6 (e) of this Agreement and Imbalance Charges under clause (c)(iii) of this Gas Annex, neither party shall be liable to the

other for failure to perform a Firm obligation, to the extent such failure was caused by Force Majeure. The term "Force Majeure" as employed herein means any cause not reasonably within the control of the party claiming suspension, as further defined in clause (h)(ii) of this Gas Annex.

(ii)       Force Majeure shall include, but not be limited to, the following: (A) physical events such as acts of God, landslides, lightning, earthquakes, fires, storms or storm warnings, such as hurricanes, which result in evacuation of the affected area, floods, washouts, explosions, breakage or accident or necessity of repairs to machinery or equipment or lines of pipe; (B) weather related events affecting an entire geographic region, such as low temperatures which cause freezing or failure of wells or lines of pipe; (C) interruption and/or curtailment of Firm transportation and/or storage by Transporters; (D) acts of others such as strikes, lockouts or other industrial disturbances, riots, sabotage, insurrections or wars; and (E) governmental actions such as necessity for compliance with any court order, law, statute, ordinance, regulation, or policy having the effect of law promulgated by a governmental authority having jurisdiction. Seller and Buyer shall make reasonable efforts to avoid the adverse impacts of a Force Majeure and to resolve the event or occurrence once it has occurred in order to resume performance.

(iii)       Neither party shall be entitled to the benefit of the provisions of Force Majeure to the extent performance is affected by any or all of the following circumstances: (A) the curtailment of interruptible or secondary Firm transportation unless primary, in-path, Firm transportation is also curtailed; (B) the party claiming excuse failed to remedy the condition and to resume the performance of such covenants or obligations with reasonable dispatch; or (C) economic hardship, to include, without limitation, Seller's ability to sell Gas at a higher or more advantageous price than the Contract Price, Buyer's ability to purchase Gas at a lower or more advantageous price than the Contract Price, or a regulatory agency disallowing, in whole or in part, the pass through of costs resulting from this Agreement; (D) the loss of Buyer's market(s) or Buyer's inability to use or resell Gas purchased hereunder, except, in either case, as provided in clause (h)(ii) of this Gas Annex; (E) the loss or failure of Seller's gas supply or depletion of reserves, except, in either case, as provided in clause (h)(ii) of this Gas Annex. The party claiming Force Majeure shall not be excused from its responsibility for Imbalance Charges.

(iv)       Notwithstanding anything to the contrary herein, the parties agree that the settlement of strikes, lockouts or other industrial disturbances shall be within the sole discretion of the party experiencing such disturbance.

(v)       The party whose performance is prevented by Force Majeure must provide notice to the other party. Initial notice may be given orally; however, written notice with reasonably full particulars of the event or occurrence is required as soon as reasonably possible. Upon providing written notice of Force Majeure to the other party, the affected party will be relieved of its obligation, from the onset of the Force Majeure event, to make or accept delivery of Gas, as applicable, to the extent and for the duration of Force Majeure, and neither party shall be deemed to have failed in such obligations to the other during such occurrence or event.

(vi)       Notwithstanding clauses (h)(ii) and (h)(iii) of this Gas Annex, the parties may agree to alternative Force Majeure provisions in a Confirmation executed in writing by both parties.

If the pre-printed form portion of this Agreement is the 2002 ISDA Master Agreement form, Section 5(b)(ii) of this Agreement shall not apply to any Gas Transaction.

**(i)       Limitation of Liability**

FOR BREACH OF ANY PROVISION FOR WHICH AN EXPRESS REMEDY OR MEASURE OF DAMAGES IS PROVIDED, SUCH EXPRESS REMEDY OR MEASURE OF DAMAGES SHALL BE THE SOLE AND EXCLUSIVE REMEDY. A PARTY'S LIABILITY HEREUNDER SHALL BE LIMITED AS SET FORTH IN SUCH PROVISION, AND ALL OTHER REMEDIES OR DAMAGES AT LAW OR IN EQUITY ARE WAIVED. IF NO REMEDY OR MEASURE OF DAMAGES IS EXPRESSLY PROVIDED HEREIN OR IN A GAS TRANSACTION, A PARTY'S LIABILITY SHALL BE LIMITED TO DIRECT ACTUAL DAMAGES ONLY. SUCH DIRECT ACTUAL DAMAGES SHALL BE THE SOLE AND EXCLUSIVE REMEDY, AND ALL OTHER REMEDIES OR DAMAGES AT LAW OR IN EQUITY ARE WAIVED. UNLESS EXPRESSLY HEREIN PROVIDED, NEITHER PARTY SHALL BE LIABLE FOR CONSEQUENTIAL, INCIDENTAL, PUNITIVE, EXEMPLARY OR INDIRECT DAMAGES, LOST PROFITS

OR OTHER BUSINESS INTERRUPTION DAMAGES, BY STATUTE, IN TORT OR CONTRACT, UNDER ANY INDEMNITY PROVISION OR OTHERWISE.  IT IS THE INTENT OF THE PARTIES THAT THE LIMITATIONS HEREIN IMPOSED ON REMEDIES AND THE MEASURE OF DAMAGES BE WITHOUT REGARD TO THE CAUSE OR CAUSES RELATED THERETO, INCLUDING THE NEGLIGENCE OF ANY PARTY, WHETHER SUCH NEGLIGENCE BE SOLE, JOINT OR CONCURRENT, OR ACTIVE OR PASSIVE.  TO THE EXTENT ANY DAMAGES REQUIRED TO BE PAID HEREUNDER ARE LIQUIDATED, THE PARTIES ACKNOWLEDGE THAT THE DAMAGES ARE DIFFICULT OR IMPOSSIBLE TO DETERMINE, OR OTHERWISE OBTAINING AN ADEQUATE REMEDY IS INCONVENIENT AND THE DAMAGES CALCULATED HEREUNDER CONSTITUTE A REASONABLE APPROXIMATION OF THE HARM OR LOSS.

**(j)**      **Certain Amendments to this Agreement for Gas Transactions**

(i)      *Section 5(a)(i).*  With respect to all Gas Transactions, the words "or delivery under Section 2(a)(i) or 2(e)" in the second line of Section 5(a)(i) of this Agreement and, if the pre-printed form portion of this Agreement is the 2002 ISDA Master Agreement form, the words "or the first Local Delivery Day in the case of any such delivery" and ", in each case," in the third and fourth lines of Section 5(a)(i) of this Agreement, are hereby deleted.

(ii)     *Section 5(a)(ii).*  With respect to all Gas Transactions, the words "or delivery under Section 2(a)(i) or 2(e)" in the second line of Section 5(a)(ii) are hereby deleted and the words "or to deliver or receive Gas, the exclusive remedy for which is provided in clause (b)(ii) of the Gas Annex to the Schedule" are hereby added at the end of the parenthetical of Section 5(a)(ii) if the pre-printed form portion of this Agreement is the 1992 ISDA Master Agreement form or Section 5(a)(ii)(1) if the pre-printed form portion of this Agreement is the 2002 ISDA Master Agreement form.

(iii)    *Section 5(a)(v).*  With respect to all Gas Transactions, (A) if the pre-printed form portion of this Agreement is the 1992 ISDA Master Agreement, the parenthetical "(other than by failing to make a delivery)" is inserted after the word "defaults" in clause (1) of Section 5(a)(v) and the words "or delivery" in clause (2) of Section 5(a)(v) of this Agreement are deleted; and (B) if the pre-printed form portion of this Agreement is the 2002 ISDA Master Agreement, the words "(including any delivery due on the last delivery or exchange date of) a Specified Transaction or" in clause (3) of Section 5(a)(v) of this Agreement are deleted.

**(k)**      **Definitions.**  For purposes of this Gas Annex, the following definitions apply:

(i)      "Alternative Damages" shall mean such damages, expressed in dollars or dollars per MMBtu, as the parties shall agree upon in the Transaction Confirmation, in the event either Seller or Buyer fails to perform a Firm obligation to deliver Gas in the case of Seller or to receive Gas in the case of Buyer.

(ii)     "British thermal unit" or "Btu" shall mean the International BTU, which is also called the Btu (IT).

(iii)    "Buyer" shall mean the party receiving Gas under a Gas Transaction.

(iv)     "Contract Price" shall mean the amount expressed in U.S. Dollars per MMBtu to be paid by Buyer to Seller for the purchase of Gas as agreed to by the parties in a Gas Transaction.

(v)      "Contract Quantity" shall mean the quantity of Gas to be delivered and taken as agreed to by the parties in a Gas Transaction.

(vi)     "Cover Standard" shall mean that if there is an unexcused failure to take or deliver any quantity of Gas pursuant to this Gas Annex, then the performing party shall use commercially reasonable efforts to (i) if Buyer is the performing party, obtain Gas, (or an alternate fuel if elected by Buyer and replacement Gas is not available),or (ii) if Seller is the performing party, sell Gas, in either case, at a price reasonable for the delivery or production area, as applicable, consistent with:  the amount of notice provided by the nonperforming party; the immediacy of the Buyer's Gas consumption needs or Seller's Gas sales requirements, as applicable; the quantities involved; and the anticipated length of failure by the nonperforming party.

(vii) "Day" shall mean a period of 24 consecutive hours, coextensive with a "day" as defined by the Receiving Transporter in a particular transaction.

(viii) "Delivery Period" shall be the period during which deliveries are to be made as agreed to by the parties in a Gas Transaction.

(ix) "Delivery Point(s)" shall mean such point(s) as are agreed to by the parties in a Gas Transaction.

(x) "EFP" shall mean, when used in a Confirmation of a Gas Transaction, the purchase, sale or exchange of natural Gas as the "physical" side of an exchange for physical transaction involving gas futures contracts. EFP shall incorporate the meaning and remedies of "Firm", provided that a party's excuse for nonperformance of its obligations to deliver or receive Gas will be governed by the rules of the relevant futures exchange regulated under the U.S. Commodity Exchange Act (7 U.S. Code 1, as amended).

(xi) "Firm" shall mean that either party may interrupt its performance without liability only to the extent that such performance is prevented for reasons of Force Majeure; provided, however, that during Force Majeure interruptions, the party invoking Force Majeure may be responsible for any Imbalance Charges as set forth in clause (c)(iii) of this Gas Annex related to its interruption after the nomination is made to the Transporter and until the change in deliveries and/or receipts is confirmed by the Transporter.

(xii) "Gas" shall mean any mixture of hydrocarbons and noncombustible gases in a gaseous state consisting primarily of methane.

(xiii) "Imbalance Charges" shall mean any fees, penalties, costs or charges (in cash or in kind) assessed by a Transporter for failure to satisfy the Transporter's balance and/or nomination requirements.

(xiv) "Interruptible" shall mean that either party may interrupt its performance at any time for any reason, whether or not caused by an event of Force Majeure, with no liability, except such interrupting party may be responsible for any Imbalance Charges as set forth in clause (c)(iii) of this Gas Annex related to its interruption after the nomination is made to the Transporter and until the change in deliveries and/or receipts is confirmed by Transporter.

(xv) "MMBtu" shall mean one million British thermal units, which is equivalent to one dekatherm.

(xvi) "Month" shall mean the period beginning on the first Day of the calendar month and ending immediately prior to the commencement of the first Day of the next calendar month.

(xvii) "Payment Date" shall mean the payment date for Gas Transactions under this Gas Annex, as specified in clause (l)(5) of this Gas Annex.

(xviii) "Receiving Transporter" shall mean the Transporter receiving Gas at a Delivery Point, or absent such receiving Transporter, the Transporter delivering Gas at a Delivery Point.

(xix) "Scheduled Gas" shall mean the quantity of Gas confirmed by Transporter(s) for movement, transportation or management.

(xx) "Seller" means the party delivering Gas under a Gas Transaction.

(xxi) "Spot Price" as referred to in clause (b)(ii) of this Gas Annex shall mean the price published as the Spot Price Index for the relevant Day; provided, if there is no single price published as the Spot Price Index for such location for such Day, but there is published a range of prices, then the Spot Price shall be the average of such high and low prices. If no price or range of prices is published for such Day, then the Spot Price shall be the average of the following: (i) the price (determined as stated above) for the first Day for which a price or range of prices is published that next precedes the relevant Day; and (ii) the price (determined as stated above) for the first Day for which a price or range of prices is published that next follows the relevant Day.

(xxii) "Spot Price Index" shall mean, with respect to a Gas Transaction, unless otherwise specified in the Confirmation for that Transaction, the "Daily Midpoint" price set forth in Gas Daily (published by Platts), or any successor publication, in the column "Daily Price Survey" under the listing applicable to the geographic location closest in proximity to the Delivery Point(s) for the relevant Day or, if an alternative index or price is specified in clause (l)(6) below, such alternative index or price.

(xxiii) "Transporter(s)" shall mean all Gas gathering or pipeline companies, or local distribution companies, acting in the capacity of a transporter, transporting Gas for Seller or Buyer upstream or downstream, respectively, of the Delivery Point pursuant to a particular Gas Transaction.

**(l)**      **Elective Provisions**

**1.   (a)(ii) – Outstanding Gas Transactions.**   This Gas Annex shall apply to the following pre-existing Gas Transactions pursuant to clause (a)(ii):

___ Option A:  All Gas Transactions outstanding between the parties as of the date this Gas Annex becomes effective.

___ Option B:  The Gas Transactions listed in Schedule 1 to this Gas Annex.

___ Option C:   None of the Gas Transactions between the parties that were executed prior to the date this Gas Annex becomes effective.

If none of the above options is selected, Option A shall apply.

**2.   (a)(iii) – Outstanding Gas Credit Support**

___ Outstanding Gas Credit Support held by a party in connection with Outstanding Gas Transactions shall be deemed to have been delivered under and in connection with this Agreement pursuant to clause (a)(iii).

If not checked, not applicable.

**3.   (b)(ii) – Performance Obligation** (remedy for breach of Firm obligation)

___ Option A:  Cover Standard

___ Option B:  Spot Price Standard

If neither option is selected, Option A shall apply.

**4.   (e) – Taxes**

___   Option A: Buyer Pays At and After Delivery Point

___   Option B: Seller Pays Before and At Deliver Point

If neither option is selected, Option A shall apply.

**5.   (f)(ii) – Payment Date**

____ Option A: the later of the 25th Day of Month following Month of delivery or 10 Days after receipt of the invoice by Buyer (provided that if the Payment Date is not a Local Business Day, payment is due on the next Local Business Day following that date).

____ Option B: the later of the ___ Day of Month following Month of delivery or 10 Days after receipt of the invoice by Buyer (provided that if the Payment Date is not a Local Business Day, payment is due on the next Local Business Day following that date).

____ Option C: Notwithstanding anything to the contrary in the Schedule, payments with respect to both Gas Transactions and Power Transactions (as defined separately in the Schedule) will be netted and payable on or before the later of the 20th Day of Month following Month of delivery or 10 Days after receipt of the invoice by Buyer (provided that if the Payment Date is not a Local Business Day, payment is due on the next Local Business Day following that date).

____ Option D: Notwithstanding anything to the contrary in the Schedule, payments with respect to both Gas Transactions and Power Transactions (as defined separately in the Schedule) will be netted and payable on or before the

later of the 25th Day of Month following Month of delivery or 10 Days after receipt of the invoice by Buyer (provided that if the Payment Date is not a Local Business Day, payment is due on the next Local Business Day following that date).

If none of the above options is selected, Option A shall apply.

**6.    (k)(xxii) – Alternative to Spot Price Index.**  The parties have selected the following alternative index as the Spot Price Index: _____.  If no index is specified, the Spot Price Index specified in clause (l)(xxi) applies.

**(m)    Notices for Gas Transactions**

| **PARTY A** | **PARTY B** |
|---|---|
| **Invoices:** | **Invoices:** |
| As set forth in Part 4 of the Schedule unless otherwise set forth below: | As set forth in Part 4 of the Schedule unless otherwise set forth below: |
| Attn: | Attn: |
| _____ | _____ |
| Phone: | Phone: |
| _____ | _____ |
| Facsimile: | Facsimile: |
| _____ | _____ |
| **Nominations:** | **Nominations:** |
| As set forth in Part 4 of the Schedule  unless otherwise set forth below: | As set forth in Part 4 of the Schedule unless otherwise set forth below: |
| Attn: | Attn: |
| _____ | _____ |
| Phone: | Phone: |
| _____ | _____ |
| Facsimile: | Facsimile: |
| _____ | _____ |
| **Confirmations:** | **Confirmations:** |
| As set forth in Part 4 of the Schedule unless otherwise set forth below: | As set forth in Part 4 of the Schedule unless otherwise set forth below: |
| Attn: | Attn: |
| _____ | _____ |
| Phone: | Phone: |
| _____ | _____ |
| Facsimile: | Facsimile: |
| _____ | _____ |

**Option Exercise:**

As set forth in Part 4 of the Schedule unless otherwise set forth below:

Attn:

_____

Phone:

_____

Facsimile:

_____

**□Wire Transfer - or - □ACH (check one box):**

As set forth in Part 4 of the Schedule unless otherwise set forth below:

Bank:        _____
ABA:        _____
Account: _____
Other Details: _____

**Option Exercise:**

As set forth in Part 4 of the Schedule unless otherwise set forth below:

Attn:

_____

Phone:

_____

Facsimile:

_____

**□Wire Transfer - or - □ACH (check one box):**

As set forth in Part 4 of the Schedule unless otherwise set forth below:

Bank:        _____
ABA:        _____
Account: _____
Other Details: _____

**(n)        Other Provisions/Modifications to this Gas Annex.**

DRAFT

### AMENDED AND RESTATED OPERATIONAL AGENCY AGREEMENT

This Agency Agreement (the "Agreement") is made and entered into this [●], 2016, (the "Effective Date") by and among Cubic Asset, LLC ("Counterparty"), a Delaware limited liability company, and BP Energy Company ("BP"), a Delaware corporation.  Counterparty and BP are sometimes referred to herein individually as a "Party" or collectively as the "Parties".  This Agreement supersedes and replaces in its entirety that Agency Agreement made and entered into on October 2, 2013 by and among Counterparty and BP.

## ARTICLE I.  DEFINITIONS AND INTERPRETATION

**1.1 Definitions**.  The following terms when used herein shall have the meanings set forth below.

"Bankruptcy" means with respect to any Party, (i) the filing by such Party of a petition or the commencement of, or the acquiescence in the commencement of, a proceeding or cause of action under any bankruptcy, insolvency or similar law providing for the protection from its creditors, or a Party having any such proceeding or cause of action filed or commenced against it and such proceeding shall continue undismissed for fifteen (15) days or an order or decree approving or ordering any of the foregoing shall be entered; (ii) the seeking by such Party of the appointment of a trustee, receiver, liquidator, custodian or other similar official over it or any substantial part of its property, or consenting to any such relief or to the appointment of or taking possession by any such official in an involuntary case or other proceeding commenced against it; (iii) the making of an assignment or any general arrangement for the benefit of its creditors, (iv) such Party admitting its inability to pay its debts as they fall due, or (v) such Party becoming bankrupt or insolvent (however documented or evidenced), or (vi) such Party making an general assignment for the benefit of its creditors.

"Business Day" means all Days except Saturdays, Sundays or Federal Reserve Bank holidays.

"Commodity Charges" shall mean all commodity charges, ACA surcharges, GRI surcharges and other tariff charges assessed by a Pipeline pursuant to the approved tariff or governing documents of such Pipelines as a result of the actual transportation of Gas.

"Day" means a period of 24 consecutive hours, starting at 9:00 a.m. central prevailing time on any calendar day.

"Delivery Point(s)" shall mean the delivery point(s) specified in the Transportation Agreements.

"Demand Charges" shall mean any and all demand/reservation charges assessed by a Pipeline pursuant to the approved tariff of such Pipeline.

"Fuel" means the quantity of Gas consumed by a Pipeline in transporting Gas and includes any provision by such pipeline for lost and unaccounted for Gas, as determined in accordance with the approved tariff or governing documents of such Pipeline.

"Gas" means any mixture of hydrocarbons and non-combustible gases in a gaseous state consisting primarily of methane.

 "Gas Supply Contract(s)" means the contract for the sale of Gas from Counterparty to BP; as such contracts are identified on Exhibit A.

"Gas Supply Obligations" means any Gas purchased by BP from the Counterparty under the Gas Supply Contract(s).

"Imbalance Charges" means any fees, penalties, costs or charges, (in cash or in kind) assessed by a Pipeline as a result of any differences between the actual measured quantities and scheduled quantities at a receipt or delivery point on any Day, whether as a result of a failure to satisfy the Pipeline's balance and/or nomination requirements, a violation of a volumetric condition imposed by the Pipeline on any point, or any other conditions/restraints allowing for any such assessment under the applicable tariff or governing documents.

"Month" means the period beginning on the first Day of the calendar month and ending immediately prior to the commencement of the first Day of the next calendar month.

"Pipelines" means any one, as applicable, of the pipelines (or storage facilities), including local distribution companies (LDCs), identified in the applicable Transportation Agreement(s).

"Pipeline Capacity" means the capacity on the applicable Pipeline as contracted for by Counterparty pursuant to the applicable Transportation Agreement(s).

"Receipt Point(s)" shall mean the receipt point(s) identified in the Transportation Agreements where the Counterparty delivers Gas under the Gas Supply Contracts.

"Term" shall have the meaning as set out in Section 6.1 of this Agreement.

"Transportation Agreements" means a contract for transportation or storage service to be entered into by and between Counterparty and each Pipeline, the details of which are to be provided by Counterparty to BP in accordance with Section 3.2(h).

## ARTICLE II.  APPOINTMENT OF AGENT

**2.1 BP as Agent**.  Counterparty hereby appoints BP to serve as its exclusive agent to manage and administer the Gas Supply Contracts and the Transportation Agreements with respect to the specific duties set forth in Article III throughout the Term of this Agreement.  BP shall have no authority to undertake actions on behalf of the Counterparty that are beyond the scope of the authorizations stated in this Agreement.  Counterparty does not appoint BP to act as its general agent, or as an agent for any other purpose other than the express authorizations granted in this Agreement.  In no event shall BP, in its capacity as agent or otherwise, take title to the Gas being transported under the Transportation Agreements.

**2.2 Implementing Notices**.  Counterparty shall provide each Pipeline with notices under the applicable Transportation Agreement of the appointment of BP as agent in time for BP to administer and manage the contracts for which it has been given responsibility.  Counterparty further agrees to take any and all actions necessary to facilitate such appointment, including but not limited to executing documents required by the Pipeline.

**2.3 Governmental Requirements.**  The Parties agree that BP's services under this Agreement may be subject to local, state, or Federal laws, rules, and regulations ("Governmental Requirements").  The Parties agree to comply with all Governmental Requirements applicable to this Agreement, and Counterparty agrees that it shall not require or request BP to perform any

action, or to omit to perform any action, that BP reasonably believes is required under applicable Governmental Requirements.

**2.4 <u>Standard of Care.</u>** BP will perform its duties under this Agreement with the same standard of care that a similarly situated reasonably prudent party would perform the same duties for a similarly situated counterparty.

**2.5 <u>Fiduciary Obligation Disclaimer and Waiver</u>. Notwithstanding the designation of BP as Counterparty's agent under the terms of this Agreement, Counterparty agrees that BP is not acting in a fiduciary capacity on Counterparty's behalf and accordingly the Parties do not have a relationship that imposes a higher duty of trust or confidence on BP than the standard imposed with respect to two parties engaged in an arms length agreement, and accordingly Counterparty expressly waives any and all claims that BP owes a fiduciary obligation to the Counterparty. In furtherance of the foregoing, Counterparty acknowledges that BP currently engages in substantially similar agency activities for other counterparties, and nothing herein shall in any manner be deemed to limit or prohibit BP's performance of such agency practices on behalf of such other parties, even to the extent that the Counterparty and any such other party may be involved in a business agreement with BP acting as agent for both parties.**

## ARTICLE III.  PERFORMANCE OBLIGATIONS

**3.1 <u>BP's Specific Responsibilities</u>**.  BP shall satisfy the following responsibilities under the terms of this Agreement:

(a) based on the timely instructions received from the Counterparty with respect to the Gas Supply Obligations, prepare and submit daily and monthly nominations, as applicable, to facilitate the transport of Counterparty's Gas using the Pipeline Capacity from the Receipt Point(s), less Fuel, to the Delivery Point(s);

(b) on each Day, manage the applicable Pipeline Capacity on the Pipelines so as to minimize Imbalance Charges, if possible, related to the receipt and delivery of the Gas; and

(c) balance gas transportation activities in accordance with the election, if any, set forth in Section 3.3 of this Agreement, and provide daily, weekly or monthly reports of such activities as requested by the Counterparty.

**3.2 <u>Counterparty's Responsibilities</u>**.  In order to enable BP to perform its duties and obligations under this Agreement, Counterparty shall:

(a) timely provide information to BP to facilitate BP's nomination and scheduling obligations and other obligations under Sections 3.1 and 3.3 such that BP may timely nominate and schedule delivery of the Gas from the Receipt Point(s) to the Delivery Point(s);

(b) take all actions in a timely manner required to effectuate BP's responsibilities, such as executing applicable agency agreements with the  Pipelines, in order to enable BP to provide the services provided for under this Agreement;

(c) provide any relevant information, contracts or related documentation in respect of the Transportation Agreements as necessary;

(d) on each Day, take any action not expressly the responsibility of BP under this Agreement to receive or cause to be received at the applicable Receipt Point(s) under the Transportation Agreements, quantities of Gas in the aggregate equivalent to the timely instructions provided to BP regarding such quantity of Gas scheduled for delivery to BP under the Gas Supply Contracts at the Delivery Point(s) to ensure that Imbalances will not occur, such as updating and notifying BP of any operational changes or circumstances, if applicable, that may impact Counterparty's Gas requirements as soon as possible;

(e) maintain in full force and effect during the Term, without suspension, the Gas Supply Contracts and the Transportation Agreements;

(f) communicate to BP any applicable Federal or state regulatory matters of which the Counterparty becomes aware which may impact the Gas Supply Contracts or the Transportation Agreements;

(g) hold title at all times during the Term of this Agreement to any Gas made the subject of BP's agency services under this Agreement; and

(h) if such information has not otherwise previously been provided or communicated, provide to BP a complete and accurate Exhibit A detailing the Transportation Agreements in writing on or before [●], 2016.

**3.3 <u>Balancing Services.</u>** "Balancing" shall mean the agency service provided by BP for balancing as an individual counterparty as set forth below, with respect to managing the Counterparty's Gas requirements and resulting financial outcome related to Gas nominations and actual deliveries. The financial outcome is the economic measure of excess or deficient Gas positions and the financial gains or losses generated from such Gas positions.

1. Counterparty agrees that BP shall balance Counterparty's Gas requirements on an individual basis and will not combine Counterparty's daily Gas activities with those of any other BP counterparties.

2. When Counterparty has deficient Gas to meet the Minimum Baseload Amount requirement as set forth in the Transaction Confirmation pursuant to the Gas Supply Contract, the financial outcome of such deficient Gas shall be determined according to the Cover Standard as set forth in the Gas Supply Contract.

3. Economic gains and losses from Balancing Gas requirements shall be quantified for the Counterparty's account and shall be invoiced to the Counterparty, with any payments being made by, or credit provided to, as the case may be, the Counterparty, with all of the foregoing being done in accordance with the terms of the Gas Supply Contract by and between BP and the Counterparty.

**3.4 <u>Risk Allocation</u>.** Notwithstanding Section 3.3, Counterparty assumes all risk of (i) the curtailment, interruption or the unavailability of the Pipeline Capacity due to an event of force majeure or otherwise, either in whole or in part, on any of the Pipelines, and (ii) the failure of the Gas to be transported and delivered to the Delivery Point(s) for any reason whatsoever not attributable to BP's failure to nominate and schedule in accordance with its duties under this Agreement.

**3.5 <u>Responsibility for Charges</u>**.  BP shall reimburse Counterparty for any liabilities, costs, damages, Imbalance Charges, Demand Charges and/or Commodity Charges actually incurred by Counterparty solely as a result of BP's negligent or willful failure to perform its obligations under Sections 3.1 or 3.3 (if applicable).  Notwithstanding the preceding sentence, BP shall not be responsible for any of the foregoing if BP's failure to perform was caused in whole or in part by (i) Counterparty's failure to perform its obligations under Section 3.2, (ii) BP's adherence to instructions received from the Counterparty, or (iii) as a result of BP enforcing its rights and remedies due to a breach of this Agreement by Counterparty.  Counterparty shall be responsible for any and all liabilities, costs, damages, Imbalance Charges, Demand Charges and/or Commodity Charges incurred by Counterparty which are not the express responsibility of BP under this Agreement.

**3.6 <u>Timely Instructions</u>**.  The timeliness of the instructions provided by the Counterparty for purposes of Sections 3.1 and 3.2 shall be determined by ascertaining whether BP was given a commercially reasonable amount of time from BP's receipt of the nomination and scheduling instructions from the Counterparty prior to the nominating and scheduling deadlines established by the applicable Pipeline.

## ARTICLE IV.  CONSIDERATION

**4.1 <u>Agent's Compensation.</u>**  In consideration of BP's performance of the agency services set forth under this Agreement, the Counterparty and BP shall enter into the Gas Supply Contract and the Transaction Confirmation and no additional direct consideration shall be payable to BP for the agency services rendered.

**4.2 <u>Audit Rights.</u>**   A Party shall have the right, at its own expense, upon reasonable written notice to the other Party and at reasonable times on any Business Day, to examine and audit and to obtain copies of the relevant portion of the books, records, and telephone recordings of the other Party only to the extent reasonably necessary to verify the accuracy of any statement, charge, payment, or computation made under this Agreement.  This right to examine, audit, and to obtain copies shall not be available with respect to proprietary information not directly relevant to this Agreement.  All invoices and billings shall be conclusively presumed final and accurate and all associated claims for under or overpayments shall be deemed waived unless such invoices or billings are objected to in writing, with adequate explanation and/or documentation, within one year after the Month that the service activities made the subject of the invoices or billings is performed.  All retroactive adjustments under this section shall be paid in full by the Party owing payment within thirty (30) Days of the written notice after the substantiation of such inaccuracy.

## ARTICLE V.  ACCOUNT STATEMENTS

On or before the 10th Day of each Month, BP shall deliver to Counterparty a statement that sets out for the previous Month a detailed calculation showing the amounts owed under this Agreement whether for the reimbursement of transportation services paid to the Pipelines by BP on the Counterparty's behalf or otherwise.  On or before the later of the 20th Day of the Month or ten (10) Days subsequent to the date that the statement is delivered by BP, the net amount of

each statement shall be paid by the Party owing such amount to the Party owed such amount.  In the event that the payment date is not a Business Day, the payment shall be due on the next Business Day.  If the invoiced party disputes an invoice in good faith, it shall nevertheless submit any undisputed portion of the invoice to the other Party.  Provided further, that the disputing Party must, prior to disputing any invoice, provide supporting documentation for the dispute in accordance with industry practice to the other Party.  The Parties shall attempt to resolve the dispute, and in the event they cannot, the Parties may exercise any and all rights and remedies available to such Party under this Agreement, at law or in equity.  In addition to any such rights and remedies, if the disputing Party does not prevail in any subsequent litigation or proceeding with respect to such dispute, it shall also owe the other Party interest at a rate equal to the lower of (i) the then-effective prime rate of interest published under "Money Rates" by The Wall Street Journal, plus two percent (2%) per annum, or (ii) the maximum applicable interest rate allowed by law.  All payments or reconciliations under this Agreement shall be made in United States currency.  Payments under this Agreement shall be effected by wire transfer remittance as set forth in the Gas Supply Contract.

## ARTICLE VI.  TERM.

6.1 **Term**.  Subject to any other applicable provision of this Agreement, the services to be provided under this Agreement shall commence on [●], 2016 and shall terminate on August 31, 2017 (the "Term"), unless otherwise extended by the Parties.  Each Party's obligations regarding payment and indemnification hereunder shall survive the termination or expiration of this Agreement for a period of time equal to the time for which the applicable statute of limitations applies.

6.2 **Condition Subsequent**.  Notwithstanding anything else to the contrary set forth in this Agreement, this Agreement is subject to the Counterparty providing, if such information has not otherwise previously been provided or communicated, a complete and accurate Exhibit A hereto in accordance with Section 3.2(h). If the foregoing condition has not been satisfied, modified or unconditionally waived by BP in writing on or before the date set forth in Section 3.2(h), this Agreement shall thereupon terminate and shall thereafter be of no further force and effect.  If this Agreement is terminated pursuant to this Section 6.2, neither Party shall have any liability to the other Party in respect of any rights or obligations under this Agreement.

## ARTICLE VII.  TAXES

7.1 **Tax Matters**.  Each Party is responsible for the economic benefits and burdens related to the consideration received by such Party under this Agreement.  Accordingly, each Party shall report to the Internal Revenue Service or any other applicable taxing authority, all information relevant to the economic benefits and burdens related to this Agreement and shall maintain the necessary records for such tax reporting.  Each Party shall indemnify, defend and hold the other Party harmless as to any costs or liabilities claimed against or incurred by such other Party in connection with claims for Taxes made by third parties or entities, including governmental entities, arising out of the activities made the subject of this Agreement to the extent that such costs or liabilities arise from or relate to all or any portion of the obligations attributable to such Party.  References to "costs" in connection with this section shall include all reasonable and

DRAFT

necessary attorneys' fees and expenses, consultants' fees, travel expenses, and court costs, including costs incurred to enforce the indemnity obligations.

**7.2 Responsibility for Sales and Similar Taxes**.  Counterparty shall be solely responsible for all taxes, fees, levies, penalties, licenses or charges imposed by any government authority (collectively "Taxes") that are currently imposed on the purchase and delivery of the Gas Supply Obligations, including any Taxes attributable to the Counterparty's capacity on each of the Pipelines under the Transportation Agreements, and any new Taxes that might be imposed on such continued purchases and deliveries. With respect to BP's compensation under this Agreement, BP shall be responsible for any Taxes associated with such consideration.

## ARTICLE VIII.  DEFAULT AND REMEDIES

**8.1 Events of Default**.  The following actions or inactions by a Party shall constitute an "Event of Default" under this Agreement:

(a) breach of any obligation under this Agreement (save and except for any breach by Counterparty of Sections 3.2(e) which is addressed hereinafter in subsections (c)-(f) or any breach by BP addressed in Section 3.4), if such breach is not cured by the Party in breach within ten (10) Business Days after written notice of such breach from the non-defaulting Party;

(b) the Bankruptcy of a Party;

(c) Counterparty allows a Gas Supply Contract or a Transportation Agreement to be suspended, for any reason other than force majeure, in whole or in part, for a period of greater than five (5) consecutive Days;

(d) Counterparty allows any Gas Supply Contract with BP to be terminated without having a replacement contract with BP for substantially the same quantity on the same material terms and conditions within three (3) Business Days after the original Gas Supply Contract with BP was terminated; or

(f) Counterparty allows any of the Transportation Agreements to be terminated without having a replacement agreement on substantially the same material terms and conditions within three (3) Business Days after the original Transportation Agreement was terminated, provided however that BP may suspend performance on written notice at any time following termination of the original Transportation Agreement, but agrees to resume performance if a new Transportation Agreement on substantially the same material terms and conditions is executed within three (3) Business Days after the original Transportation Agreement was terminated..

**8.2 Remedies**.  If an Event of Default has occurred and is continuing, the non-defaulting Party may suspend performance on written notice to the defaulting Party and, at its election, terminate this Agreement on written notice to the defaulting Party.  The non-defaulting Party must elect to terminate this Agreement within twenty (20) Business Days of the Event of Default or re-commence performance.  During any time that BP suspends performance in accordance with this Section, it shall have no obligation to perform any services of any nature under this Agreement, until such time as the Counterparty has remedied the breach and provided notice thereof to BP.  During any suspension hereunder, Counterparty may notify the Pipelines under the Transportation Agreements that a third party other than BP will handle daily nominations and scheduling of Gas until further notice.  In the event BP resumes performance either as a result of not electing to terminate this Agreement or by informing the Counterparty in writing that it

rescinds its suspension of performance, Counterparty shall take all necessary steps with the Pipelines under the Transportation Agreements to facilitate BP's performance under this Agreement. Termination of this Agreement shall not preclude or limit the non-defaulting Party from pursuing any other remedy available at law or in equity in respect of the Event of Default under this Agreement, including the pursuit of damages.

## ARTICLE IX.  MISCELLANEOUS

**9.1 <u>No Partnership or Joint Venture.</u>** The obligations and liabilities of the Parties are intended to be several and not joint, and nothing contained in this Agreement shall be construed to create an association, trust, partnership or joint venture between the Parties, and each Party shall be liable individually and severally for its own obligations under this Agreement. Both Parties agree that their relationship is strictly as one of principal and agent, as limited by this Agreement and to the express purposes set forth in this Agreement.

**9.2 <u>Compliance with Governmental Requirements</u>**. BP and Counterparty shall comply with (i) the nomination and scheduling requirements on the terms and conditions set forth in this Agreement, as such requirements are provided in writing, orally or otherwise to BP by Counterparty, (ii) the Transportation Agreements covering the Pipeline Capacity, and the applicable tariffs or governing documents, and (iii) all applicable Governmental Requirements affecting the transportation and sale of Gas that are related to this Agreement. Without limiting the generality of the foregoing, if during the term of this Agreement any governmental agency of competent jurisdiction should determine that the obligations and duties contemplated in this Agreement cannot be performed in accordance with applicable Governmental Requirements, wholly or in part, the Parties shall immediately suspend performance under this Agreement. BP and Counterparty shall, within ten Days of such a determination, meet to determine whether this Agreement can be revised so that the transactions contemplated herein can be performed fully in accordance with applicable Governmental Requirements. In the absence of a superseding written agreement between the Parties following such event and following such meeting, this Agreement shall terminate with no damages being owed by either Party to the other.

**9.3 <u>Further Assurances</u>**. The Parties agree to execute and deliver such additional instruments or documents as may be necessary to carry out the purposes of this Agreement.

**9.4 <u>Assignment</u>**. Neither Party may assign this Agreement to any third party without the express written consent of the other Party, which consent may not be unreasonably withheld. Any attempted assignment of this Agreement in violation of this Section shall be void and of no force and effect. This Agreement shall inure to the benefit of and bind the respective successors, heirs, representatives and permitted assigns of the Parties.

**9.5 <u>Governing Law and Jurisdiction</u>**. This Agreement shall be governed by and interpreted in accordance with the laws of the State of Texas, without regard to its conflicts of laws rules or principles. The Parties hereby submit to the jurisdiction and venue of the courts in the State of Texas for purposes of any litigation related to the Agreement.

**9.6 <u>Notices</u>**.  Any communications between the Parties hereto or notices provided herein to be delivered may be delivered to the following addresses:

| **If to Counterparty:** | **If to BP:** |
| --- | --- |
| 9870 Plano Road<br>Dallas, Texas 75238 | BP Energy Company<br>201 Helios Way<br>Houston, TX 77079 |
| Attention: Jason Gorsuch | Attention: Senior Attorney – Gas |
| Phone:  972 681 8047<br>Fax:     972 681 9687 | Phone:  713 323 2304<br>Fax:     713 323 7472 |

All notices and communications required or permitted to be delivered hereunder shall be in writing and shall be considered as properly delivered (i) when delivered in person, (ii) on the next delivery Day after placed with an overnight delivery service (including Federal Express, Emery, DHL, Air Borne and other similar overnight delivery services) and designated for next-Day service with proof of delivery, or (iii) if delivered by facsimile, upon the sending Party's transmission of such notice or communication with proof of successful transmission, provided that the Day on which such facsimile is transmitted is a Business Day.  If the Day on which the facsimile is transmitted is not a Business Day or the transmission is made after 5:00 p.m. on a Business Day at the recipient's location, then such facsimile shall be deemed to have been delivered and received on the next following Business Day.  Any Party shall have the right to change its address for notices hereunder to any other location within the continental United States or Canada by giving thirty (30) Days notice to the other Parties in the manner set forth hereinabove.

**9.7 <u>Release and Indemnity.</u>**  BP agrees to fully indemnify, defend and hold Counterparty harmless, including its respective directors, officers, employees, agents and representatives, from and against any and all claims, causes of action, disputes, demands, threats of litigation or arbitration, costs, expenses, damages, injuries, obligations, liabilities, losses, liens, encumbrances, judgments, settlements, interests, awards of every kind and character without limitation, including any and all reasonable attorney's fees and expenses as well as costs of court or arbitration, arising from, under or as a result of claims related to title, personal injury (including death), and property damage, whether created by law, contract, strict liability, tort, judgment, voluntary settlement or in equity (collectively all of the foregoing being "<u>Claims</u>"), made by all persons or entities to the extent that such Claims are attributable to the negligence or willful misconduct of BP in performing its duties under this Agreement, unless BP is being indemnified for such Claims by Counterparty under this Agreement.  Similarly, Counterparty agrees to fully indemnify, defend and hold BP harmless, including its respective directors, officers, employees, agents and representatives, from and against any and all Claims made by all persons or entities to the extent that such Claims are related in any manner to the Transportation Agreements or the Gas Supply Contracts, unless the Counterparty is being indemnified for such Claims by BP under this Agreement.

**9.8** <u>Limitation on Damages</u>.  **Save and except to the extent it is related to any Party's indemnity obligations under this Agreement, no Party, nor its directors, trustees, agents, officers, or employees, shall be liable to any other Party, its directors, trustees, agents, officers, or employees, for any punitive, consequential, incidental, indirect, exemplary or special damages arising out of a claim related to this Agreement, whether as a result of breach of contract, breach of warranty, tort liability (including both negligence and strict liability), strict liability or otherwise**.

**9.9** <u>Authority to Execute</u>.  Each of the Parties to this Agreement represents and warrants that, as of the Effective Date, (i) it has full and complete authority to enter into and perform this Agreement; (ii) the person who executes this Agreement on its behalf has full and complete authority to do so and is empowered to bind it thereby; and (iii) it is not insolvent and has not sought protection from its creditors in Bankruptcy or is otherwise the subject of Bankruptcy.

**9.10** <u>Miscellaneous</u>.  This Agreement may be executed in multiple counterparts, each of which shall constitute an original and all of which together shall constitute one and the same instrument.  The headings and subheadings contained in this Agreement are used solely for convenience and do not constitute a part of this Agreement between the Parties and shall not be used to construe or interpret the provisions of this Agreement.  Each provision of this Agreement is intended to be severable.  If any provision of this Agreement is determined to be illegal, invalid or unenforceable, for any reason, then, insofar as is practical and feasible, the remaining portions of this Agreement shall be deemed to be in full force and effect as if such invalid provision was not contained herein.  Except as expressly otherwise provided in this Agreement, all covenants, indemnities, representations, warranties, acknowledgments, agreements, rights and obligations of the Parties under this Agreement, that are capable of having effect after the termination of this Agreement for any reason, shall survive and remain in full force and effect beyond, and not be affected by, the termination of this Agreement.

**9.11** <u>Waiver.</u>  One or more waivers of any provision of this Agreement by a Party shall not be construed as a waiver of a subsequent breach or requirement of the same provision, and the consent by a Party to or approval of any act or omission by a Party requiring the other Party's consent or approval shall not be deemed to waive or render unnecessary such other Party's consent to or approval of any subsequent similar act or omission by such Party.  Any and all waivers of this Agreement shall only be binding on a Party to the extent that the waiver is in writing.

**9.12** <u>Entirety and Amendments</u>.  This Agreement constitutes the entire agreement between the Parties regarding the services to be provided under this Agreement, and supersedes and replaces any prior and contemporaneous communications, understandings and agreements between Counterparty and BP related to such subject matter, whether written or verbal, express or implied.  No modification, amendment, supplementation or alteration of the terms and provisions of this Agreement shall be or become effective except by written amendment executed by the duly authorized representative of the Parties.

DRAFT

**9.13    Definitions.**    To the extent that any defined terms used in this Agreement are not otherwise defined herein, they shall have the definition set forth in the Gas Supply Contract by and between BP and the Counterparty.

IN WITNESS WHEREOF, and with the intent to be legally bound, the Parties hereto have caused this Agreement to be executed by their duly authorized officers or representatives as of the Effective Date.

**CUBIC ASSET LLC**                                    **BP ENERGY COMPANY**

By: _DRAFT_____                    By: _DRAFT_____

_____                         _____

Name: _____                         Name: _____

_____                         _____

Title: _____                         Title: _____

_____                         _____

Date: _____                         Date: _____

_____                         _____

**DRAFT**

## Exhibit A

Gas Supply Contract(s)

1. ISDA Master Agreement with ISDA North American Gas Annex as Part 6 to the Schedule thereto dated as of [●], 2016 between BP and Counterparty.

Transportation Agreements

1. Agency Agreement, dated September 1, 2007, between and among ETF Texas Pipeline, Ltd., ETC Katy Pipeline, Ltd and Oasis Pipeline, L.P. and, individually each a "Transporter" and collectively the "Transporters," and Gastar Exploration Texas, L.P., the "Shipper".

2. Gas Gathering Agreement, dated November 16, 2009, by and between (i) Hilltop Resort GS, LLC, a Delaware limited liability company and (ii) Gastar Exploration Texas, LP, a Delaware limited partnership.

3. Letter from Cubic Asset, LLC to Paul McPheeters, Energy Transfer, dated October 21, 2013; and Letter Agreement between Cubic Asset, LLC and ETC Texas Pipeline, LTD. dated October 21, 2013.

4. Assignment, Bill of Sale & Conveyance, dated October 23, 2013, but effective as of 7:00 a.m. Houston time on January 1, 2013, between Gastar Exploration Texas, LP, a Delaware limited partnership, and Cubic Asset, LLC, a Delaware limited liability company.

5. Amendment to Gas Gathering Agreement, entered into and effective June 26, 2015, by and between Cubic Energy, Inc., and Monarch Natural Gas, LLC.

**<u>Exhibit 1-a</u>**

**Modified Cubic Asset BP Hedges (Changed Pages Only Blackline)**

(see attached)

**DRAFT**

Telephone No.: 713-323-4919

Wire Payment Instructions:

For the Account of: BP Energy Company
JP Morgan Chase Bank, NY
ABA: 021-000021
Acct No.: 910-2-548097
New York, NY 10081-6000

Address for **Confirmations** to Party B:

Address:        [•]9870 Plano Road
                Dallas, Texas 75238

Attention:      [•]Jason Gorsuch

Facsimile No.: [•]972-681-9687
Telephone No.: [•]972-681-8047

Address for other **notices** or communications to Party B (other than Confirmations):

Address:        [•]9870 Plano Road
                [•]

                        Dallas, Texas 75238

Attention:      [•]Jason Gorsuch

Facsimile No.: [•]972-681-9687
Telephone No.: [•]972-681-8047

Address for **Invoices** to Party B:

Address:        [•]9870 Plano Road
                [•]

                        Dallas, Texas 75238

Attention:      [•]Jason Gorsuch

Facsimile No.: [•]972-681-9687
Telephone No.: [•]972-681-8047

Wire Payment Instructions:

Bank:  [•]
ABA:  [•]
Acct No.:  [•] for the account of Cubic Asset, LLC
City/State/Zip:  [•]

(b)     ***Process Agent.***  For the purpose of Section 13(c) of this Agreement:

Party A appoints as its Process Agent: Not Applicable

Telephone No.: 713-323-4919

Wire Payment Instructions:

> For the Account of: BP Energy Company
> JP Morgan Chase Bank, NY
> ABA:  021-000021
> Acct No.:  910-2-548097
> New York, NY 10081-6000

Address for **Confirmations** to Party B:

| | |
|---|---|
| Address: | [●]9870 Plano Road |
| | Dallas, Texas 75238 |
| Attention: | [●]Jason Gorsuch |
| Facsimile No.: | [●]972-681-9687 |
| Telephone No.: | [●]972-681-8047 |

Address for other **notices** or communications to Party B (other than Confirmations):

| | |
|---|---|
| Address: | [●]9870 Plano Road |
| | [●] |
| | Dallas, Texas 75238 |
| Attention: | [●]Jason Gorsuch |
| Facsimile No.: | [●]972-681-9687 |
| Telephone No.: | [●]972-681-8047 |

Address for **Invoices** to Party B:

| | |
|---|---|
| Address: | [●]9870 Plano Road |
| | [●] |
| | Dallas, Texas 75238 |
| Attention: | [●]Jason Gorsuch |
| Facsimile No.: | [●]972-681-9687 |
| Telephone No.: | [●]972-681-8047 |

Wire Payment Instructions:

> Bank:  [●]
> ABA:  [●]
> Acct No.:  [●] for the account of Cubic Asset, LLC
> City/State/Zip:  [●]

(b)    *Process Agent.*  For the purpose of Section 13(c) of this Agreement:

**DRAFT**

a Local Business Day, payment is due on the next Local Business Day following that date).

_____ Option D: Notwithstanding anything to the contrary in the Schedule, payments with respect to both Gas Transactions and Power Transactions (as defined separately in the Schedule) will be netted and payable on or before the later of the 25th Day of Month following Month of delivery or 10 Days after receipt of the invoice by Buyer (provided that if the Payment Date is not a Local Business Day, payment is due on the next Local Business Day following that date).

If none of the above options is selected, Option A shall apply.

6. **(k)(xxii) – Alternative to Spot Price Index.** The parties have selected the following alternative index as the Spot Price Index: _____. If no index is specified, the Spot Price Index specified in clause (k)(xxii) applies.

(c)   The following shall amend and replace clause (m) of the Gas Annex:

**(m)   Notices for Gas Transactions**

| PARTY A | PARTY B |
|---|---|
| **Invoices:** | **Invoices:** |
| | |
| As set forth in Part 4 of the Schedule unless otherwise set forth below: | As set forth in Part 4 of the Schedule unless otherwise set forth below: |
| | |
| Address:  P.O. Box 3092              Houston, TX  77253-3092 | Address: [●] |
| Attn:  Gas Accounting | Attn: [●] |
| | |
| Phone:  (713) 323-2000 | Phone: [●] |
| Facsimile:  (713) 323-5313 | Facsimile: [●] |
| | |
| **Nominations:** | **Nominations:** |
| | |
| As set forth in Part 4 of the Schedule  unless otherwise set forth below: | As set forth in Part 4 of the Schedule unless otherwise set forth below: |
| | |
| Attn:  Gas Scheduling | Attn: [●] |
| Phone:  (713) 323-2000 | Phone: [●] |
| | Facsimile: [●] |
| | |
| **Confirmations:** | **Confirmations:** |
| | |
| As set forth in Part 4 of the Schedule unless otherwise set forth below: | As set forth in Part 4 of the Schedule unless otherwise set forth below: |
| | |
| Address:  BP Energy Company P.O. Box 3092 Houston, Texas 77253-3092 | Address: [●] |
| Attn: Confirmations Dept. | Attn:  [●] |
| Phone: (713) 323-2000 | Phone: [●] |

**DRAFT**

| Facsimile: (281) 227-8470 | Facsimile: [●] |
|---|---|

| **Option Exercise:** | **Option Exercise:** |
|---|---|
| As set forth in Part 4 of the Schedule unless otherwise set forth below: | As set forth in Part 4 of the Schedule unless otherwise set forth below: |
| | |
| Attn: | Attn: |
| Phone: | Phone: |
| Facsimile: | Facsimile: |

| □Wire Transfer - or -  ACH (check one box): | □Wire Transfer - or - □ACH (check one box): |
|---|---|
| As set forth in Part 4 of the Schedule unless otherwise set forth below:<br>Bank:  JP Morgan Chase Bank, NY<br>ABA:  021000021<br>Account:  910-2-548097<br>Other Details: For the account of BP Energy Company | As set forth in Part 4 of the Schedule unless otherwise set forth below:<br>Bank: [●]<br>ABA: [●]<br>Account: [●]<br>Other Details: for the account of Cubic Asset, LLC |

(d)     The following shall amend and replace clause (n) of the Gas Annex:

**(n)     Other Provisions/Modifications to this Gas Annex.**

1.     Clause (a)(i) is amended by deleting the phrase "North America" in the first (1st) sentence therein and replacing it with the phrase "the United States".

2.     Clause (a)(iii)(A) is amended by adding the following language immediately at the end of the first (1st) paragraph thereof:

"Concurrently with the execution of this Agreement, to the extent that any Outstanding Credit Support is in the form of a letter of credit, the party arranging the letter of credit shall have a new letter of credit issued by the issuing bank in a form acceptable to the other party that references the obligations of the arranging party under the terms of this Agreement effective as of the effective date of this Agreement.  If the arranging party fails to have a letter of credit issued pursuant to the terms and conditions of this clause (a)(iii)(A), such failure shall constitute an Event of Default under Section 5(a)(iii) of this Agreement."

3.     Clause (b)(i) is amended by adding the following at the end thereof:

"Unless expressly agreed to by the parties under a Confirmation, Seller is under no obligation to source the Gas being sold to Buyer from storage."

4.     Clause (b) is amended by adding the following provision as a new clause (b)(iv):

**DRAFT**

**9.6 Notices**.  Any communications between the Parties hereto or notices provided herein to be delivered may be delivered to the following addresses:

|  **If to Counterparty:** | **If to BP:** |
|---|---|

[●]   9870 Plano Road                             BP Energy Company

Dallas, Texas 75238                          201   Helios Way

Attention: Jason Gorsuch

Houston, TX 77079

Attention: Senior Attorney – Gas

|  |  |
|---|---|
| Phone:  [●]  972 681 8047 | Phone:  713 323 2304 |
| Fax:     [●]  972 681 9687 | Fax:     713 323 7472 |

All notices and communications required or permitted to be delivered hereunder shall be in writing and shall be considered as properly delivered (i) when delivered in person, (ii) on the next delivery Day after placed with an overnight delivery service (including Federal Express, Emery, DHL, Air Borne and other similar overnight delivery services) and designated for next-Day service with proof of delivery, or (iii) if delivered by facsimile, upon the sending Party's transmission of such notice or communication with proof of successful transmission, provided that the Day on which such facsimile is transmitted is a Business Day.  If the Day on which the facsimile is transmitted is not a Business Day or the transmission is made after 5:00 p.m. on a Business Day at the recipient's location, then such facsimile shall be deemed to have been delivered and received on the next following Business Day.  Any Party shall have the right to change its address for notices hereunder to any other location within the continental United States or Canada by giving thirty (30) Days notice to the other Parties in the manner set forth hereinabove.

**9.7 Release and Indemnity.**  BP agrees to fully indemnify, defend and hold Counterparty harmless, including its respective directors, officers, employees, agents and representatives, from and against any and all claims, causes of action, disputes, demands, threats of litigation or arbitration, costs, expenses, damages, injuries, obligations, liabilities, losses, liens, encumbrances, judgments, settlements, interests, awards of every kind and character without limitation, including any and all reasonable attorney's fees and expenses as well as costs of court or arbitration, arising from, under or as a result of claims related to title, personal injury (including death), and property damage, whether created by law, contract, strict liability, tort, judgment, voluntary settlement or in equity (collectively all of the foregoing being "Claims"), made by all persons or entities to the extent that such Claims are attributable to the negligence or willful misconduct of BP in performing its duties under this Agreement, unless BP is being indemnified for such Claims by Counterparty under this Agreement.  Similarly, Counterparty agrees to fully indemnify, defend and hold BP harmless, including its respective directors, officers, employees, agents and representatives, from and against any and all Claims made by all persons or entities to the extent that such Claims are related in any manner to the Transportation

**<u>Exhibit 2</u>**

**New Cubic Energy Senior Secured Notes**

(see attached)

#39085665

**DRAFT**

**CUBIC ENERGY, LLC**

**14% Senior Secured Notes due 2021**

**$30,000,000**

_____

**INDENTURE**

_____

**Dated as of [●], 2016**

# TABLE OF CONTENTS

**Page**

**DRAFT**

ARTICLE I DEFINITIONS .............................................................................................. 2

ARTICLE II ISSUANCE OF NOTES ............................................................................. 2

    2.1    Authorization of the Notes. ............................................................................ 2

    2.2    The Closing. ..................................................................................................... 2

    2.3    Interest Payments. .......................................................................................... 2

ARTICLE III CLOSING CONDITIONS ........................................................................ 3

    3.1    Representations and Warranties. ................................................................. 3

    3.2    Compliance with the Note Documents; No Default. ............................... 3

    3.3    Closing Documents. ...................................................................................... 3

    3.4    Issuance of the Notes. .................................................................................. 4

    3.5    Plan Support Agreement. ............................................................................. 4

    3.6    Consummation of Plan of Reorganization. ............................................... 4

    3.7    Oil and Gas Properties. ................................................................................ 4

    3.8    Leasehold Property. ...................................................................................... 5

    3.9    Personal Property Collateral. ...................................................................... 5

    3.10    Evidence of Insurance. ................................................................................. 5

    3.11    Fees. ................................................................................................................. 6

    3.12    KYC/AML. ..................................................................................................... 6

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF THE COMPANY .................. 6

    4.1    Organization; Requisite Power and Authority. ........................................ 6

    4.2    Qualification and Good Standing. .............................................................. 6

    4.3    Capitalization. ................................................................................................ 6

    4.4    Due Authorization. ....................................................................................... 6

    4.5    No Conflict. ..................................................................................................... 6

    4.6    Governmental Consents. .............................................................................. 7

    4.7    Binding Obligations. ..................................................................................... 7

    4.8    Material Contracts. ....................................................................................... 7

    4.9    Title to Collateral; Properties; Liens. ....................................................... 7

    4.10    Intellectual Property .................................................................................... 8

-i-

**DRAFT**

| | | |
|---|---|---|
| 4.11 | Litigation; Adverse Facts. | 9 |
| 4.12 | Payment of Taxes. | 9 |
| 4.13 | Insurance. | 9 |
| 4.14 | Investment Company Act. | 10 |
| 4.15 | Securities Activities. | 10 |
| 4.16 | Certain Fees. | 10 |
| 4.17 | Environmental Matters. | 10 |
| 4.18 | Employee Matters. | 10 |
| 4.19 | Solvency. | 11 |
| 4.20 | Indebtedness. | 11 |
| 4.21 | No Violation of Regulations of Board of Governors of Federal Reserve System. | 11 |
| 4.22 | Creation, Perfection and Priority of Liens. | 11 |
| 4.23 | Money Laundering. | 11 |
| 4.24 | ERISA. | 12 |
| 4.25 | Maintenance of Oil and Gas Properties. | 12 |
| ARTICLE V [RESERVED] | | 13 |
| ARTICLE VI PAYMENTS | | 13 |
| 6.1 | Maturity. | 13 |
| 6.2 | Optional Redemption. | 13 |
| 6.3 | Mandatory Redemption. | 13 |
| ARTICLE VII AFFIRMATIVE COVENANTS | | 14 |
| 7.1 | Financial Statements and Other Reports. | 14 |
| 7.2 | Noteholder Calls. | 16 |
| 7.3 | Payment of Notes. | 16 |
| 7.4 | Satisfaction of Obligations; Taxes. | 16 |
| 7.5 | Maintenance of Property; Insurance. | 16 |
| 7.6 | Corporate Existence. | 17 |
| 7.7 | Books and Records. | 17 |
| 7.8 | Compliance with Law. | 17 |
| 7.9 | Inspections. | 17 |
| 7.10 | Change in Accounting Policies. | 17 |
| 7.11 | Additional Guarantors; Additional Collateral. | 17 |

**DRAFT**

7.12    Undated Letter Transfer Orders. ................................................ 20

ARTICLE VIII NEGATIVE COVENANTS ............................................ 20

8.1    Limitation on Restricted Payments. ............................................ 20

8.2    Limitation on Liens. ................................................................ 20

8.3    No Negative Pledges. ............................................................. 20

8.4    Limitation on Indebtedness. .................................................... 20

8.5    Limitation on Asset Sales. ...................................................... 20

8.6    No Subordination of Debt. ...................................................... 20

8.7    Limitation on Transactions With Affiliates. ................................ 21

8.8    Permitted Business. ............................................................... 21

8.9    Investment Company Act. ...................................................... 21

8.10    Waiver of Stay, Extension or Usury Laws. ................................ 21

8.11    Amendments of Organizational Documents. .............................. 21

8.12    OFAC. ................................................................................ 21

8.13    Pro Rata Payments. .............................................................. 22

8.14    Hedging Agreements. ............................................................ 22

ARTICLE IX [RESERVED] ............................................................. 22

ARTICLE X EXPENSES; INDEMNIFICATION; REGISTRATION; AND TAX
         MATTERS .................................................................. 22

10.1    Expenses. ........................................................................... 22

10.2    Indemnification. ................................................................... 23

10.3    Registration of Notes; etc. ..................................................... 25

10.4    Place of Payment. ................................................................. 26

10.5    Tax Matters. ........................................................................ 26

ARTICLE XI DEFAULTS AND REMEDIES ......................................... 30

11.1    Event of Default. .................................................................. 30

11.2    Acceleration. ....................................................................... 32

11.3    Other Remedies. ................................................................... 32

11.4    Waiver of Past Defaults; Rescission. ........................................ 33

11.5    Rights of Holders of Notes to Receive Payment. ......................... 33

ARTICLE XII [RESERVED] ............................................................ 33

ARTICLE XIII MISCELLANEOUS ..................................................... 33

13.1    Notices. .............................................................................. 33

**DRAFT**

13.2    Successors and Assigns; Assignments. ................................................................ 34

13.3    Amendment and Waiver. ..................................................................................... 35

13.4    Release of Security Interest or Guaranty; Release of Guarantor. ....................... 36

13.5    Interest Rate Limitation. ..................................................................................... 37

13.6    Counterparts. ....................................................................................................... 37

13.7    Headings. ............................................................................................................. 37

13.8    GOVERNING LAW ........................................................................................... 37

13.9    CONSENT TO JURISDICTION. ....................................................................... 37

13.10   WAIVER OF JURY TRIAL. ............................................................................. 38

13.11   Survival of Warranties and Certain Agreements. .............................................. 38

13.12   Failure or Indulgence Not Waiver; Remedies Cumulative. ............................... 38

13.13   Independence of Covenants. ............................................................................... 39

13.14   Marshaling; Payments Set Aside. ...................................................................... 39

13.15   Set-Off. ................................................................................................................ 39

13.16   Classification of Transaction. ............................................................................ 39

13.17   Exculpation. ........................................................................................................ 39

13.18   Entire Agreement. .............................................................................................. 40

13.19   Severability. ........................................................................................................ 40

13.20   Confidentiality. ................................................................................................... 40

13.21   Ratable Sharing. ................................................................................................. 41

13.22   Independent Nature of Initial Holders' Obligations and Rights. ....................... 41

13.23   No Strict Construction. ...................................................................................... 42

13.24   No Advisory or Fiduciary Relationships. .......................................................... 42

13.25   Intercreditor Agreement. .................................................................................... 42

13.26   Accounting Terms and Determinations. ............................................................ 42

ARTICLE XIV NOTEHOLDER AGENT AND COLLATERAL AGENT ............................. 43

14.2    Delegation of Duties ........................................................................................... 43

14.3    Exculpatory Provisions ....................................................................................... 43

14.4    Reliance by Agents ............................................................................................. 44

14.5    Notice of Default ................................................................................................. 44

14.6    Non-Reliance on the Agents and Other Lenders ................................................ 44

14.7    Indemnification ................................................................................................... 45

-iv-

**DRAFT**

14.8    Agents in Their Individual Capacity ...................................................... 45

14.9    Successor Agents ................................................................................... 45

14.10  Agents under Security Documents ......................................................... 46

14.11  Agent's Duties ....................................................................................... 46

14.12  Financial Liability ................................................................................. 46

SC1:3958837.9

**DRAFT**

## ANNEXES, SCHEDULES AND EXHIBITS

| | |
|---|---|
| Annex I | Definitions |
| | |
| Schedule I | Guarantors |
| Schedule 4.3 | Capitalization |
| Schedule 4.8 | Material Contracts |
| Schedule 4.9 | Leasehold Property |
| Schedule 4.10 | Intellectual Property |
| Schedule 4.11 | Litigation; Adverse Facts |
| Schedule 4.16 | Certain Fees |
| Schedule 4.20 | Indebtedness |
| Schedule 4.22 | Creation, Perfection and Priority of Liens |
| Schedule 8.2 | Liens |
| | |
| Exhibit A | Form of Note |
| Exhibit B | Form of Guaranty |
| Exhibit C | Form of Holder Joinder |
| Exhibit D | Form of Permitted Hedging Agreement Notice |

SC1:3958837.9

DRAFT

# INDENTURE

**INDENTURE** (as amended, supplemented or otherwise modified from time to time in accordance with the terms hereof, this "**Agreement**"), dated as of [●], 2016, among Cubic Energy, LLC, a limited liability company organized under the laws of the state of Delaware (the "**Company**"), each guarantor listed on <u>Schedule I</u> and each other guarantor from time to time party hereto (each, a "**Guarantor**" and collectively, the "**Guarantors**"), Anchorage Illiquid Opportunities III, L.P., Anchorage Illiquid Opportunities III (B), L.P., AIO III AIV, L.P., Corbin Opportunity Fund, L.P., O-CAP Partners, L.P. and O-CAP Offshore Master Fund, L.P. (collectively, the "**Initial Holders**" and each, an "**Initial Holder**"), Wilmington Trust, National Association, as noteholder agent (in such capacity, the "**Noteholder Agent**") and as the Collateral Agent.

# PREAMBLE

**WHEREAS**, on December 11, 2015, the Company and its direct and indirect Subsidiaries (collectively, the "**Debtors**"), as debtors and debtors-in-possession, commenced voluntary cases under chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"), which cases are being jointly administered  under Case No. 15-12500(CSS) (the "**Chapter 11 Cases**");

**WHEREAS**, in connection with the Chapter 11 Cases, the Company, the Initial Holders (or affiliates thereof) and certain other parties entered into the Plan Support Agreement on December 10, 2015, which provides for the implementation of a restructuring involving the Company and its Subsidiaries on the terms set forth in the Prepackaged Plan of Reorganization of the Company and its Subsidiaries filed with the Bankruptcy Court on December 11, 2015 (as may be amended, modified or supplemented from time to time in accordance with the terms thereof, the "**Prepackaged Plan**");

**WHEREAS**, on [●], 2016, the Bankruptcy Court entered the Confirmation Order confirming the Prepackaged Plan and authorizing the Restructuring Transactions; and

**WHEREAS**, substantially concurrently with the Effective Date and pursuant to the Prepackaged Plan, among other things, in exchange for the release and discharge of their prepetition claims, the Initial Holders and their affiliates are receiving in the aggregate 100% of the equity interests in the Company and the Notes issued by the Company pursuant to this Agreement.

**NOW, THEREFORE**, in consideration of the foregoing, the parties hereto agree as follows:

1

DRAFT

# ARTICLE I
## DEFINITIONS

Defined terms in this Agreement, which may be identified by the capitalization of the first letter of each principal word thereof, have the meanings assigned to them in Annex I to this Agreement. The term "including" shall be read to mean "including, without limitation".

# ARTICLE II
## ISSUANCE OF NOTES

**2.1    Authorization of the Notes.**  On or before the Closing, the Company will authorize the issuance of $30,000,000 aggregate principal amount of 14% Senior Secured Notes due [●], 2021 (the "**Notes**").  The Notes shall be substantially in the form annexed hereto as <u>Exhibit A</u>.  The Notes shall at all times be irrevocably and unconditionally guaranteed as to payment of principal, interest and Make-Whole Premium, if any, on a secured basis by each Guarantor.  The Notes and Guarantees shall be secured at all times pursuant to, and in accordance with the terms of, the Collateral Documents.

**2.2    The Closing.**   The issuance of the Notes (the "**Closing**") shall take place at the offices of Sullivan & Cromwell LLP at 125 Broad Street, New York, NY 10004, as soon as practicable on the Effective Date, after the satisfaction or waiver of all of the conditions precedent set forth in <u>Article III</u> (except for those conditions that by their nature are to be satisfied at, or substantially concurrently with, the Closing) (the "**Closing Date**").

**2.3    Interest Payments.**

(a)    Interest will accrue on the Notes at a rate of 14% per annum (as may be adjusted pursuant to <u>Section 2.3(c)</u>, the "**Interest Rate**") payable quarterly in arrears on December 31, March 31, June 30 and September 30 to the Record Holders (each date, an "**Interest Payment Date**").  If any Interest Payment Date falls on a date that is not a Business Day, interest shall be paid on the immediately preceding Business Day.  Interest will accrue from the date of original issuance of the Notes.  All computations of interest shall be made on the basis of a 360-day year and actual days elapsed (which results in more interest being paid than if computed on the basis of a 365-day year).

(b)    Interest will be paid on each Interest Payment Date, at the Company's option, (i) entirely in cash in U.S. Dollars or (ii) entirely in the form of additional Notes ("**PIK Interest**").  The Company shall pay PIK Interest by issuing on the applicable Interest Payment Date to each Record Holder an additional Note ("**PIK Interest Note**").  The principal amount of each PIK Interest Note shall equal the amount of interest that accrued on the Note since the immediately preceding Interest Payment Date.  Each PIK Interest Note shall be deemed a "Note" for all purposes hereunder.

(c)    At any time when a Default or Event of Default exists and is continuing or any payment of principal, interest or Make-Whole Premium, if any, is due on the Notes and has not been paid, the Interest Rate will be adjusted so that during such period the Interest Rate will

2

equal 16% ("**Default Interest**").  For the avoidance of doubt, such Default Interest shall continue to accrue (including on the Make-Whole Premium) after the filing of any petition in bankruptcy or the commencement of any insolvency, reorganization or similar proceeding, whether or not a claim for post-filing or post-petition interest is allowed in any such proceeding.  Notwithstanding Section 2.3(b), Default Interest shall be payable in cash upon demand by any Holder.

# ARTICLE III
# CLOSING CONDITIONS

The Closing is subject to the satisfaction or waiver by each Initial Holder of the following conditions on or before the Closing:

**3.1**    **Representations and Warranties.**  The representations and warranties contained herein and in the other Note Documents shall be true and correct in all material respects on and as of the date hereof and the Closing Date to the same extent as though made on and as of such date, except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects on and as of such earlier date; provided that, in each case, such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by "materiality", "material", "material adverse effect" or any similar derivations in the text thereof.

**3.2**    **Compliance with the Note Documents; No Default.**  The Company and the Guarantors shall have performed and complied with all agreements, covenants and conditions contained in the Note Documents to be performed or complied with by the Company or the Guarantors on or before the Closing Date, and after giving effect to the Transactions, no Default or Event of Default shall have occurred and be continuing.

**3.3**    **Closing Documents.**  Each Initial Holder, the Noteholder Agent and the Collateral Agent shall have received from the Company and each Guarantor, as applicable, dated as of the Closing Date and in sufficient number requested by such Initial Holder, the Noteholder Agent or the Collateral Agent:

(a)    Note Documents.  Copies of the Note Documents originally executed and delivered by each party thereto.

(b)    Officer's Certificate.  A certificate signed by a Responsible Officer of the Company certifying that the conditions set forth in this Article III have been satisfied on and as of such date.

(c)    Secretary's Certificate.  A certificate signed by the manager, Secretary or other authorized signatory of the Company and each Guarantor, certifying as to the board and other resolutions and its Organizational Documents attached thereto and as to all other corporate or other organizational proceedings relating to the authorization, execution and delivery of this Agreement, the Notes and the other Note Documents to which it is party.

(d)    Evidence of Good Standing.  Evidence of good standing of the Company and each Guarantor in the state of Delaware and in each jurisdiction in which the Company and

each Guarantor is qualified as a foreign corporation or other entity to do business, each dated the Closing Date or a recent date prior thereto.

(e)    Incumbency Certificates.  Signature and incumbency certificates with respect to the officers or other authorized signatories of the Company and each Guarantor executing the Note Documents, and any other documents, instruments and certificates required to be executed by such persons in connection herewith or therewith.

(f)    Other Documents.  Such other documents, instruments or certificates as any Initial Holder may reasonably request.

**3.4    Issuance of the Notes.**  The Company shall have issued and delivered $30,000,000 in aggregate principal amount of Notes to the Initial Holders.

**3.5    Plan Support Agreement.**  The Plan Support Agreement shall be in full force and effect, the Debtors shall be in compliance with the Plan Support Agreement in all material respects, and each of the conditions set forth in the Plan Support Agreement shall have been satisfied by the Debtors.

**3.6    Consummation of Plan of Reorganization.**  All conditions precedent set forth in the Prepackaged Plan shall have been satisfied or waived by the parties thereto, the Effective Date under the Prepackaged Plan shall have occurred (and all conditions precedent thereto as set forth therein shall have been satisfied (or shall be concurrently satisfied) or waived by the parties thereto, substantial consummation under the Prepackaged Plan shall have occurred, the Bankruptcy Court shall have entered the Confirmation Order, which shall be valid, subsisting and continuing as a final order as to which the time to appeal, petition for certiorari, or move for a new trial, stay, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or motion for new trial, stay, reargument, or rehearing shall then be pending, and no motion, action or proceeding by any creditor or other party-in-interest to the Chapter 11 Cases which could materially adversely affect the Prepackaged Plan, the consummation of the Prepackaged Plan, the business or operations of Company or the transactions contemplated by the Note Documents shall be pending.

**3.7    Oil and Gas Properties.**  In order to create in favor of the Collateral Agent, for the benefit of the Holders, a valid and, subject to any filing and/or recording referred to herein, perfected First Priority Lien in each Oil and Gas Property, the Collateral Agent shall have received with respect to each such Oil and Gas Property:

(a)    fully executed and notarized Mortgages, in proper form for recording in all appropriate places in all applicable jurisdictions, encumbering, and such financing statements and any other instruments necessary to grant a mortgage lien under the laws of the applicable jurisdiction;

(b)    evidence reasonably acceptable to the Collateral Agent that the Company has arranged for the payment of all mortgage recording fees, charges, costs and expenses required for the recording of the Mortgages referred to above (which payment shall be made promptly and, in any event, no later than three (3) Business Days following the Closing); and

(c)     an opinion of counsel in each state in which a Mortgage is to be recorded with respect to the enforceability of the form(s) of mortgages to be recorded in such state and such other matters as each Initial Holder may reasonably request, in each case in form and substance reasonably satisfactory to each Initial Holder ((a) through (c), the "**Mortgage Related Documents**").

**3.8     Leasehold Property.**  The Collateral Agent shall have received in the case of any Leasehold Property (other than an Oil and Gas Property) a Landlord Consent.

**3.9     Personal Property Collateral.**  In order to create in favor of the Collateral Agent, for the benefit of the Holders, a valid, perfected First Priority security interest in the personal property Collateral, the Company shall have delivered or caused its Subsidiaries to deliver to the Collateral Agent and each Initial Holder:

(a)     the results of a search of the UCC (or equivalent, if any) filings made with respect to the Note Parties in the jurisdiction of organization of each Note Party and copies of the financing statements (or similar documents, if any) disclosed by such search and evidence reasonably satisfactory to each Initial Holder and the Collateral Agent that the Liens indicated by such financing statements (or similar documents) are permitted hereunder or have been or will contemporaneously with the issuance of the Notes on the Closing Date be released or terminated;

(b)     evidence reasonably satisfactory to each Initial Holder and the Collateral Agent of the compliance by each Note Party of its obligations under the Security Agreement and the other Collateral Documents (including its obligation to execute or authorize, as applicable, and deliver UCC financing statements, originals of securities, instruments and chattel paper and any agreements governing deposit and/or securities accounts as provided therein);

(c)     a fully executed and notarized Intellectual Property Security Agreement, in proper form for filing or recording in all appropriate places in all applicable jurisdictions, memorializing and recording the encumbrance of the intellectual property assets listed in Schedule 5.2(II) to the Security Agreement; and

(d)     evidence that the Company and each Guarantor shall have taken or caused to be taken any other action, executed and delivered or caused to be executed and delivered any other agreement, document and instrument and made or caused to be made any other filing and recording (other than as set forth herein) as requested by any Initial Holder.

**3.10     Evidence of Insurance.**  The Collateral Agent and each Initial Holder shall have received a certificate from the Company's insurance broker or other evidence reasonably satisfactory to it that all insurance required to be maintained pursuant to <u>Section 4.13</u> is in full force and effect, together with endorsements (including notification endorsements) naming the Collateral Agent, for the benefit of the Holders, as an additional insured and loss payee thereunder to the extent required under <u>Section 7.5(b)</u>.

SC1:3958837.9

**3.11    Fees.**  The Company shall have paid to the Noteholder Agent and the Collateral Agent the fees payable on or before the Closing Date referred to in Section 10.1(b).

**3.12    KYC/AML.**  Prior to the Closing Date, the Noteholder Agent, the Collateral Agent and each Initial Holder shall have received all documentation and other information required by bank regulatory authorities under applicable "know-your-customer" and anti-money laundering rules and regulations, including the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001) the "**PATRIOT Act**").

**ARTICLE IV**
**REPRESENTATIONS AND WARRANTIES OF THE COMPANY**

The Company and each Guarantor hereby represents and warrants on and as of the date of this Agreement and as of the Closing, immediately after giving effect to the Transactions that:

**4.1    Organization; Requisite Power and Authority.**  Each Note Party is a limited liability company duly organized, validly existing and in good standing under the laws of the state of Delaware.  Each Note Party has all requisite limited liability company power and authority to own and operate its properties and to carry on its business as now conducted and as proposed to be conducted, to enter into this Agreement and the other Note Documents, to carry out the Transactions, to issue and deliver the Notes and to pay the obligations incurred under the Note Documents, in each case, to which it is party.

**4.2    Qualification and Good Standing.**  Each Note Party is qualified, licensed or authorized to do business and is in good standing in the state of Delaware and in every other jurisdiction where its assets are located or wherever necessary or required to carry out its business and operations, except where the failure to be so qualified could not reasonably be expected to have a Material Adverse Effect.

**4.3    Capitalization.**  The Company has the number of limited liability company interests as set forth on Schedule 4.3 annexed hereto.

**4.4    Due Authorization.**  The execution, delivery and performance of the Note Documents, the issuance and delivery of the Notes and the consummation of the Transactions have been duly authorized by all necessary limited liability company action on the part of each Note Party or its members, as applicable, in each case to which such Note Party is party.

**4.5    No Conflict.**  The execution, delivery and performance by each Note Party of the Note Documents to which it is party, including the issuance and delivery of the Notes and the Guarantees and the consummation of the Transactions, do not and will not (i) violate any Applicable Law or violate any Organizational Documents of such Note Party, (ii) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any Material Contract of such Note Party, (iii) result in or require the creation or imposition of any Lien upon any of the properties or assets of any Note Party (except pursuant to the Note Documents, the BP Call Options and related security documents), (iv) require any approval of

6

stockholders, partners or members or any approval or consent of any Person under any contractual obligation of any Note Party, except for such approvals or consents obtained on or before the date hereof or (v) give rise to any preemptive rights, rights of first refusal or other similar rights on behalf of any Person under any Applicable Law or any provision of the Organizational Documents of the Company or any Material Contract.

**4.6    Governmental Consents.**  The execution, delivery and performance by each Note Party of the Note Documents to which it is a party, the issuance and delivery of the Notes and the consummation of the Transactions, as applicable, do not and will not require any Governmental Authorization by any Governmental Authority except to the extent obtained on or prior to the date hereof.

**4.7    Binding Obligations.**

(a)    On and as of the date hereof with respect to this Agreement, and on and as of the Closing Date with respect to all Note Documents required to be delivered on or prior to such date, each Note Document has been duly executed and delivered by each Note Party that is party thereto and is the legally valid and binding obligation of such Note Party, enforceable against such Note Party in accordance with its terms, except as may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability, whether considered at law or equity.

(b)    The Notes have been duly authorized by the Company and when executed, the Holders and the Agents will be entitled to the benefits of this Agreement and will constitute the legally valid and binding obligations of the Company, enforceable against the Company in accordance with their terms, except as may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability, whether considered at law or equity.

(c)    Each Guaranty has been duly authorized by each Guarantor listed on Schedule I and when executed, the Holders and the Agents will be entitled to the benefits of such Guaranty and will constitute the legally valid and binding obligation of such Guarantor, enforceable against such Guarantor in accordance with its terms, except as may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability, whether considered at law or equity.

**4.8    Material Contracts**.  Schedule 4.8 sets forth a complete list of each Material Contract (including all amendments or modifications thereto) other than the Material Contracts contemplated by the Transactions.

**4.9    Title to Collateral; Properties; Liens.**

(a)    Each Note Party has good title to or valid leasehold interests in all of its personal property, except where the failure to have such title or interests could not reasonably be expected to have a Material Adverse Effect.  Each Note Party has good title to, or valid leasehold

interests in (or in the case of Oil and Gas Properties, good and defensible title to, or valid leasehold interests in), all property that is material to its business, free and clear of all Liens except for Permitted Liens and minor irregularities or deficiencies in title that, individually or in the aggregate, do not materially interfere with its ability to conduct its business as currently conducted or to utilize such property for its intended purpose.

(b)    Schedule 4.9 annexed hereto contains a true and complete (i) list of each Leasehold Property (other than the Oil and Gas Properties) (A) owned by a Note Party as of the date hereof and (B) leased, subleased or otherwise occupied or utilized by the Note Parties, as lessee, sublessee, franchisee or licensee, as of the date hereof and describes the type of interest therein held by such Note Party and (ii) list of each Oil and Gas Property of each Note Party and the jurisdiction where such Oil and Gas Property is located.  As of the date hereof, except as described on Schedule 4.9 annexed hereto, with respect to each Leasehold Property owned, leased, subleased or otherwise occupied by a Note Party, there are no Leases in which any Note Party holds the lessor's interest.  As of the date hereof, no part of the Note Parties' Leasehold Property has been materially damaged, destroyed, condemned or abandoned and no part of such Leasehold Property is the subject of condemnation proceedings.  The Note Parties do not own any real property in fee simple.

(c)    Upon the completion of the Transactions, the Collateral Agent will have and shall continue to have a First Priority Lien in and on all Collateral.

(d)    No Mortgage encumbers a building or mobile home that is located in a Flood Zone unless flood insurance for such property has been obtained in an amount sufficient to comply with law.

**4.10    Intellectual Property**.  Schedule 4.10 annexed hereto sets forth a complete and accurate list of all Company Intellectual Property that is Registered, indicating for each item (i) the name of the applicant/registrant and current owner; (ii) the jurisdiction where the application/registration is located (or, for domain names, the applicable registrar); (iii) the application or registration number; and (iv) the filing date, issuance/registration/grant date and expiration date (collectively, the "**Scheduled Intellectual Property**").  All Scheduled Intellectual Property (other than any pending patent applications, other applications for registration and domain names) is subsisting, in full force and effect, and is valid and enforceable. All of the Company Intellectual Property is solely and exclusively owned by the Company free and clear of all Liens, other than Permitted Liens.  None of the Company Intellectual Property is subject to any outstanding order, ruling decree, judgment, or stipulation to which any Note Party is or has been made a party or to any agreement adversely affecting any Note Party's use of, or its rights in or to, such Company Intellectual Property. There are no agreements or arrangements (including covenants not to sue, non-assertion, settlement or similar agreements or consents) to which any Note Party is a party (i) pursuant to which any Note Party licenses Intellectual Property that is material to its respective business to or from a third party, other than (1) licenses of commercial business software and (2) non-exclusive licenses of Intellectual Property incidental to the sale or purchase of products or services in the ordinary course of business; or (ii) that restrict the rights of any Note Party to use or enforce any material Company Intellectual Property. To the knowledge of each Note Party, no Note Party has infringed, misappropriated or otherwise violated, or infringes, misappropriates or otherwise

SC1:3958837.9

violates the Intellectual Property rights of any other Person in the conduct of its respective business.  No claim or demand of any Person against any Note Party has been made, nor is there any proceeding that is pending or, to the knowledge of any Note Party threatened, which (in any such case) (i) challenges the rights of any Note Party in respect of any Company Intellectual Property or (ii) asserts that any Note Party is infringing, misappropriating or otherwise violating, or is required to pay any royalty, license fee, charge or other amount with regard to, any Intellectual Property.  To the knowledge of each Note Party, no Person is infringing, misappropriating or otherwise violating, or has infringed, misappropriated or otherwise violated any material Company Intellectual Property, and no claim of any such infringement, misappropriation or violation is pending or threatened against any Person by any Note Party.  To the knowledge of each Note Party, each Note Party has sufficient rights to use all Intellectual Property material to its respective business as presently conducted, all of which rights shall survive unchanged the consummation of the transactions contemplated by this Agreement.  The IT Assets owned, used or held for use by the Note Parties operate and perform in all material respects in accordance with their documentation and functional specifications and otherwise as required by the Note Parties in connection with the practices of their respective businesses as currently conducted and have not materially malfunctioned or failed in the twelve (12) months preceding the date hereof.  To the knowledge of each Note Party, no person has gained unauthorized access to such IT Assets.  Each Note Party has taken and will continue to take all reasonable measures to protect the confidentiality, integrity and security of its software, databases, systems, networks and Internet sites and all information stored or contained therein or transmitted thereby from any unauthorized use, access, interruption or modification by third parties.  Each Note Party has implemented and maintains backup, security and disaster recovery technology and procedures consistent with generally accepted industry standards.

**4.11    Litigation; Adverse Facts.**  Except for the Chapter 11 Cases or as set forth on Schedule 4.11, there is no action, suit, proceeding, arbitration or governmental investigation at law or in equity or before or by any Governmental Authority pending or, to the knowledge of any Note Party, threatened, in writing against or affecting any Note Party or any property of any Note Party.

**4.12    Payment of Taxes.**  All material returns and reports of the Note Parties required to be filed by any Note Party with respect to Taxes have been timely filed (or extended), and all material Taxes imposed upon any Note Party and upon its respective properties, assets, income, businesses and franchises which are due and payable have been timely paid other than those which are being contested by the applicable Note Party in good faith and by appropriate proceedings promptly instituted and diligently conducted and for which reserves or other appropriate provisions, if any, as may be required in conformity with GAAP, shall have been made or provided therefor.  There is no audit or assessment of a material Tax proposed against the Note Parties other than those which are being contested by the applicable Note Party in good faith and by appropriate proceedings and for which reserves or other appropriate provisions, if any, as may be required in conformity with GAAP shall have been made therefor.

**4.13    Insurance.**  The Note Parties are insured by insurers of recognized financial responsibility against such losses and risks and in such amounts and with such deductibles as is

customary in the business in which the Note Parties are engaged.  All policies for such insurance are in full force and effect and all premiums due thereon have been paid.

**4.14    Investment Company Act.**  No Note Party is now or, immediately after issuance of the Notes and the consummation of the Transactions will be, an "investment company" registered or required to be registered under the Investment Company Act of 1940, as amended.

**4.15    Securities Activities.**  No Note Party is engaged principally or as one of its important activities in the business of extending credit for the purpose of purchasing or carrying any Margin Stock.

**4.16    Certain Fees.**  Except as set forth on Schedule 4.16 annexed hereto, no Note Party nor any Person acting on behalf of any Note Party has entered into any agreement or arrangement as a result of which any broker's or finder's fee or commission will be payable by the Company with respect to the Note Documents or the Transactions.

**4.17    Environmental Matters.**  No Note Party nor any of its respective Facilities or operations is subject to any outstanding written order, consent decree or settlement agreement with any Person relating to any Environmental Law, any Environmental Claim, or the Release or threatened Release of any Hazardous Materials.  No Note Party has received any request for information under Section 104 of the Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. § 9604) or any comparable law.  There are not and have not been any violations of Environmental Laws or Release of Hazardous Materials which could reasonably be expected to form the basis of an Environmental Claim against any Note Party that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect. No Note Party nor, to the knowledge of any Note Party, any predecessor of any Note Party has filed any notice under any Environmental Law indicating past or present treatment of Hazardous Materials at any Facility, and none of the Note Parties' operations involves the generation, transportation, treatment, storage or disposal of hazardous waste, as defined under 40 C.F.R. Parts 260-270 or any state equivalent, except for any such activity conducted in material compliance with Environmental Laws.  As of the date hereof, compliance with all current requirements pursuant to or under Environmental Laws could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  As of the date hereof, no event or condition has occurred or is occurring with respect to any Note Party relating to any Environmental Law, any Release or threatened Release of Hazardous Materials, or any other Hazardous Materials Activity which individually or in the aggregate has had, or could reasonably be expected to have, a Material Adverse Effect.

**4.18    Employee Matters.**  There is no strike or work stoppage in existence or, to the knowledge of any Note Party, threatened in writing involving any Note Party.  The hours worked by and payments made to employees of any Note Party have not been in violation of the United States Fair Labor Standards Act or any other Applicable Law.  There is (i) no collective bargaining or similar agreement with any union, labor organization, works council or similar representative covering any employee of any Note Party, (ii) no petition for certification or election of any such representative is existing or pending with respect to any employee of any Note Party and (iii) no such representative has sought certification or recognition with respect to any employee of any Note Party.  The consummation of the Transactions will not give rise to any

right of termination or right of renegotiation on the part of any union, labor organization, works council or similar representative under any collective bargaining agreement or similar agreement to which any Note Party is bound.

**4.19    Solvency.**  The Note Parties (on a consolidated basis) are, and after giving effect to the consummation of the Transactions, will be, Solvent.

**4.20    Indebtedness.**  The capitalization table on Schedule 4.20 annexed hereto sets forth and identifies in reasonable detail all outstanding short-term and long-term Indebtedness of the Note Parties, after giving effect to the Transactions.

**4.21    No Violation of Regulations of Board of Governors of Federal Reserve System.**  None of the transactions contemplated by this Agreement will violate or result in a violation of Section 7 of the Exchange Act or any regulation issued pursuant thereto, including, without limitation, Regulations T, U and X of the Board of Governors of the Federal Reserve System.

**4.22    Creation, Perfection and Priority of Liens.**

(a)    The execution, delivery and recording of the Collateral Documents by the Note Parties, together with the actions taken on or prior to the date hereof pursuant to Sections 3.7 and 3.9, will be effective to create in favor of the Collateral Agent for the benefit of the Holders, as security for the obligations under the Note Documents, a valid First Priority Lien on all of the Collateral, and all filings and other actions necessary or desirable to perfect and maintain the perfection and First Priority status of such Lien have been duly made or taken (other than as set forth on Schedule 4.22), and will remain in full force and effect, other than the periodic filing of UCC continuation statements in respect of UCC financing statements (including any fixture filings) filed by or on behalf of the Holders.

(b)    The execution, delivery and recording of each Mortgage will be effective to create, in favor of the Collateral Agent for the benefit of the Holders, as security for the obligations under the Note Documents, legal, valid and enforceable First Priority Liens on, and security interests in, all of the Note Parties' right, title and interest in and to the Oil and Gas Properties securing such Mortgage (including fixtures) and the proceeds thereof, subject only to Permitted Liens, and when the Mortgages are filed in the offices specified on Schedule 4.22, the Mortgages shall constitute fully perfected First Priority Liens on, and security interests in, all right, title and interest of the Note Parties in the Oil and Gas Properties securing such Mortgages and the proceeds thereof, in each case prior and superior in right to any other Person, other than Permitted Liens.

**4.23    Money Laundering.**  Each Note Party is in compliance with, and has not previously violated, the PATRIOT Act and all other applicable U.S. and non-U.S. anti-money laundering laws and regulations, including, but not limited to the laws, regulations and executive orders and sanctions programs administered by OFAC, including, but not limited, to (i) Executive Order 13224 of September 23, 2001 entitled, "Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism" (66 Fed. Reg. 49079 (2001)), and (ii) any regulations contained in 31 CFR, Subtitle B, Chapter V.

11

4.24    **ERISA.**

(a)    Each Note Party has complied in all material respects with ERISA and, where applicable, the Code regarding each Plan. Each Plan is, and has been, maintained in substantial compliance with ERISA and, where applicable, the Code.

(b)    There are no existing or pending (or to the knowledge of any Note Party, threatened) material claims (other than routine claims for benefits in the normal course), sanctions, actions, lawsuits or other proceedings or investigations involving any Plan to which any Note Party or any of its ERISA Affiliates incurs or otherwise has or could have a material obligation or any material liability. No ERISA Event with respect to any Plan has occurred or is expected to occur.

(c)    Full payment when due has been made of all amounts which any Note Party is required under the terms of each Plan or Applicable Law to have paid as contributions to such Plan, and no accumulated funding deficiency (as defined in Section 302 of ERISA and Section 412 of the Code), whether or not waived, exists with respect to any Pension Plan.

(d)    No Note Party sponsors, maintains or contributes to an employee welfare benefit plan, as defined in Section 3(l) of ERISA, including, without limitation, any such plan maintained to provide benefits to former employees of such entities that may not be terminated by any Note Party in its sole discretion at any time without any material liability.

(e)    No Note Party sponsors, maintains or contributes to, or has at any time in the preceding six calendar years, sponsored, maintained or contributed to, any Multiemployer Plan.

(f)    No Note Party and none of its ERISA Affiliates sponsors, maintains or contributes to any employee benefit or compensation arrangement governed by non-United States law.

4.25    **Maintenance of Oil and Gas Properties.** The Oil and Gas Properties of the Note Parties operated by a Note Party or an Affiliate of any Note Party and, to the knowledge of each Note Party, Oil and Gas Properties of the Note Parties operated by a third party and other Oil and Gas Properties unitized with such Oil and Gas Properties, have been maintained, operated and developed in a good and workmanlike manner and in conformity with Applicable Law and in conformity with the provisions of all leases, subleases or other contracts comprising a part of the Hydrocarbon Interests and other contracts and agreements forming a part of such Oil and Gas Properties. All pipelines, wells, gas processing plants, platforms and other material improvements, fixtures and equipment owned in whole or in part by a Note Party that are necessary to conduct normal operations and which are operated by a Note Party or an Affiliate of any Note Party and, to the knowledge of any Note Party, operated by a third party and other operations unitized with such operations are being maintained in a state adequate to conduct normal operations, in a manner consistent with the Company's past practices.

SC1:3958837.9

ARTICLE V
[RESERVED]


ARTICLE VI
PAYMENTS

**6.1    Maturity.**  The entire unpaid principal amount of the Notes, together with any accrued and unpaid interest to and including the Maturity Date shall be due and payable in cash on the Maturity Date.

**6.2    Optional Redemption.**

(a)    Redemption.  The Company, may at its option, upon notice as provided below, redeem at any time all, or from time to time any part of, the Notes on a *pro rata* basis at 100% of the principal amount redeemed, plus the Make-Whole Premium, plus all accrued and unpaid interest up to and including the redemption date.  Any redemption made pursuant to this Section 6.2 shall be in aggregate principal amount of not less than $3.0 million and in an integral multiple of $1.0 million thereof.  The Company will give each Holder written notice of any optional redemption under this Section 6.2 of not less than five (5) Business Days and not more than ten Business Days prior to the date of each redemption.  Each such notice shall specify the date of redemption (which shall be a Business Day), the aggregate principal amount of the Notes to be redeemed on such date, the principal amount of each Note held by such Holder to be redeemed, and the interest and Make-Whole Premium to be redeemed on such date.  The notice of redemption shall be irrevocable.  On the redemption date, the Holders will deliver the Notes to the Company for cancellation and, to the extent only a portion of the Notes are being redeemed by the Company, the Company will deliver a new Note to each Holder reflecting the remaining principal amount of the Notes.

(b)    No Other Optional Redemption.  Other than as set forth in this Section 6.2, the Company may not redeem the Notes at its option prior to the Maturity Date.

**6.3    Mandatory Redemption.**

(a)    Asset Sales. Not later than five (5) Business Days following the receipt by the Company or any of its Subsidiaries of any Net Asset Sale Proceeds, the Company shall apply 100% of such proceeds to redeem the Notes in accordance with Section 6.3(c); provided, so long as no Event of Default shall have occurred and be continuing, the Company shall have the option, directly or through one or more of its Subsidiaries, to invest Net Asset Sale Proceeds within 12 months after receipt thereof (or, if the Company shall have entered into a legally binding commitment within 12 months of receipt, within 18 months of receipt) in assets used or useful in the business of the Company and its Subsidiaries, in which case the amount of such Net Asset Sale Proceeds invested shall not be required to be applied to redeem the Notes pursuant to this Section 6.3; provided, however, that if any Net Asset Sale Proceeds have not been so reinvested prior to the expiration of the 12-month period (or the 18-month period), the Company shall promptly redeem the Notes in an amount equal to the amount of the Net Asset Sale Proceeds not so reinvested in accordance with this Section 6.3; provided, further, that the

13

Company shall not be required to apply Net Asset Sale Proceeds in accordance with Section 6.3(c) if the aggregate Net Asset Sale Proceeds in any Fiscal Year in respect of all Asset Sales do not exceed $10,000,000.

(b)     Insurance/Condemnation Proceeds. Not later than five (5) Business Days following the receipt by the Company or any of its Subsidiaries of any Net Insurance/Condemnation Proceeds, the Company shall apply 100% of such proceeds to redeem the Notes in accordance with this Section 6.3; provided, so long as no Event of Default shall have occurred and be continuing, the Company shall have the option, directly or through one or more of its Subsidiaries, to invest Net Insurance/Condemnation Proceeds within 12 months after receipt thereof (or, if the Company shall have entered into a legally binding commitment within 12 months of receipt, within 18 months of receipt) in assets used or useful in the business of the Company and its Subsidiaries, in which case the amount of such Net Insurance/Condemnation Proceeds invested shall not be required to be applied to redeem the Notes pursuant to Section 6.3(c); provided, however, that if any Net Insurance/Condemnation Proceeds have not been so reinvested prior to the expiration of the 12-month period (or the 18-month period), the Company shall promptly redeem the Notes in an amount equal to the amount of the Net Insurance/Condemnation Proceeds not so reinvested in accordance with this Section 6.3.

(c)     The Company shall give each Holder written notice of any mandatory redemption no later than two (2) Business Days after the receipt of any Net Asset Sale Proceeds or Net Insurance/Condemnation Proceeds, unless the Company has notified the Holders in writing of its intention to reinvest such proceeds. Each such notice shall specify the redemption date (which shall be a Business Day no later than the fifth Business Day after the receipt of proceeds), the aggregate principal amount of the Notes to be redeemed on such date and the interest to be redeemed on such date and a reasonably detailed calculation of the amount of the Make-Whole Premium. Any mandatory redemption of the Notes shall be applied to the Holders on a *pro rata* basis at 100% of the principal amount redeemed, plus Make-Whole Premium, plus all accrued and unpaid interest up to and including the redemption date. On the redemption date, the Holders will deliver Notes to the Company for cancellation and, to the extent only a portion of the Notes are being redeemed by the Company, the Company will deliver a new Note to each Holder reflecting the remaining principal amount of the Notes.

## ARTICLE VII
## AFFIRMATIVE COVENANTS

So long as any of the Notes, or any payment obligation, remain unpaid and outstanding, the Company and each Guarantor, as applicable, covenants to each Holder as follows:

**7.1     Financial Statements and Other Reports.**  The Company shall maintain, and cause each of its Subsidiaries, if any, to maintain, a system of accounting established and administered in accordance with sound business practices to permit preparation of financial statements in conformity with GAAP, and the Company shall deliver to each Holder:

(a)     Financial Statements:  to the extent prepared by the Company, (i) after the end of each of the first three (3) Fiscal Quarters of each Fiscal Year, the consolidated balance

sheet and related statements of operations, members' equity and cash flows of the Company and its subsidiaries as of the end of and for such Fiscal Quarter and then elapsed portion of the Fiscal Year, setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous Fiscal Year; and (ii) after the end of each Fiscal Year, the audited consolidated balance sheet and related statements of operations, members' equity and cash flows as of the end of and for such Fiscal Year, setting forth in each case in comparative form the figures for the previous Fiscal Year, accompanied by an opinion of a nationally recognized public accounting firm, in the case of each of clauses (i) and (ii), prepared in accordance with the generally accepted accounting principles in the United States as in effect from time to time;

(b)    <u>Compliance Certificates</u>:  within sixty (60) days after the end of each Fiscal Quarter, an Officer's Certificate of the Company stating that the signer has reviewed the terms of this Agreement and has made, or caused to be made under his or her supervision, a review in reasonable detail of the transactions and condition of the Company and its Subsidiaries during such Fiscal Quarter and that such review has not disclosed the existence during or at the end of such Fiscal Quarter, and that the signer does not have knowledge of the existence as at the date of such Officer's Certificate, of any condition or event that constitutes a Default or an Event of Default, or, if any such condition or event exists, specifying the nature and period of existence thereof and what action the Company or other Note Party has taken, is taking and proposes to take with respect thereto;

(c)    <u>Annual Budget</u>: no later than September 30 of each year, an annual budget for the succeeding year;

(d)    <u>Events of Default, etc.</u>:  promptly (and no later than two (2) Business Days) upon any officer of any Note Party obtaining knowledge of (A) any condition or event that constitutes a Default or an Event of Default, or the delivery by any Holder or any other Person of notice with respect to a claimed Default or Event of Default, (B) any violation of any law, statute, rule, regulation or ordinance of any Governmental Authority, or of any agency thereof, binding on the Company or any of its Subsidiaries which has had or could reasonably be expected to have a Material Adverse Effect, (C) any litigation, investigation or proceeding that if determined adversely could reasonably be expected to have a Material Adverse Effect or (D) the occurrence of any event or change that has caused or evidences, either individually or in the aggregate, a Material Adverse Effect, an Officer's Certificate specifying the nature and period of existence of such condition, event or change, or specifying the notice given or action taken by any such Person and the nature of such claimed Default, Event of Default, default, event or condition, and what action the Note Party has taken, is taking and proposes to take with respect thereto; and

(e)    <u>ERISA Events and Notices</u>:  promptly (and no later than five (5) Business Days) upon becoming aware of the occurrence of or forthcoming occurrence of any ERISA Event, a written notice specifying the nature thereof, what action the Company and any of its Subsidiaries or any of their respective ERISA Affiliates, has taken, is taking or proposes to take with respect thereto, and copies of (A) all notices received by the Company and any of its Subsidiaries or any of their respective ERISA Affiliates from a Multiemployer Plan sponsor

**DRAFT**

concerning an ERISA Event; and (B) such other documents or governmental reports or filings relating to any Plan as the Holders shall reasonably request.

**7.2    Noteholder Calls.**  The Company shall (A) within 120 days following the end of each Fiscal Year, hold a conference call open to all Holders to discuss the Company's results of operations for such Fiscal Year; and (B) issue a notice to the Holders, no fewer than three Business Days prior to the date of any conference call required to be held in accordance with clause (A) above, announcing the time and date of such conference call and including all information necessary to access such conference call.

**7.3    Payment of Notes.**  The Company shall promptly pay or cause to be paid the principal amount of, Make-Whole Premium, if any, and interest on the Notes on the dates and in the manner provided for in this Agreement and the Notes.

**7.4    Satisfaction of Obligations; Taxes.**

(a)    Each Note Party shall, and shall cause each of its Subsidiaries to, perform all obligations under any contractual obligation to which such Note Party or any of its Subsidiaries is bound, or to which any of their properties is subject, except where the failure to perform would not reasonably be expected to have a Material Adverse Effect.

(b)    Each Note Party shall, and shall cause each of its Subsidiaries to, pay all material Taxes imposed upon it or any of its properties or assets or in respect of any of its income, businesses or franchises, and all lawful claims (including, without limitation, claims for labor, services, materials and supplies) for sums that have become due and payable before the same shall become a Lien; <u>provided</u> that no such material Tax or claims need be paid (i) if being contested in good faith by appropriate proceedings diligently conducted and if a reserve or other appropriate provision, if any, as shall be required in conformity with GAAP, shall have been made therefor or (ii) to the extent failure to do so would reasonably be expected to have a Material Adverse Effect.

**7.5    Maintenance of Property; Insurance.**

(a)    Each Note Party shall, and shall cause each of its Subsidiaries to, maintain or cause to be maintained in good repair, working order and condition in all material respects, ordinary wear and tear and accidental or unforeseen circumstances excepted, all properties necessary in the business of such Note Party and each of its Subsidiaries, and all Collateral, and from time to time will make or cause to be made all necessary and commercially reasonable repairs, renewals and replacements thereof, consistent with industry practice, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect.

(b)    The Company shall, and shall cause each of its Subsidiaries to, maintain or cause to be maintained such public liability insurance, third party property damage insurance, business interruption insurance and casualty insurance with respect to liabilities, losses or damage in respect of the assets, properties and businesses of the Company and its Subsidiaries (i) as may customarily be carried or maintained under similar circumstances by similarly situated companies engaged in similar businesses, in each case in such amounts (giving effect to self-

16

insurance), with such deductibles, covering such risks and otherwise on such terms and conditions as shall be customary for similarly situated companies in the industry and (ii) as otherwise required by law.  The Company shall use commercially reasonable efforts to cause each such policy of insurance to (A) name the Collateral Agent for the benefit of Holders as an additional insured thereunder as its interests may appear and (B) in the case of each business interruption and casualty insurance policy, contain a loss payable clause or endorsement that names the Collateral Agent for the benefit of Holders as the loss payee thereunder.

   **7.6    Corporate Existence.**  Except as otherwise permitted pursuant to the terms of this Agreement, each Note Party shall, and shall cause each of its Subsidiaries to, (a) at all times preserve and keep in full force and effect its corporate existence and (b) take all reasonable action to maintain all rights, privileges, permits, licenses and franchises necessary in the normal conduct of its business, except in the case of clause (b) where the failure to do so would not reasonably be expected to have a Material Adverse Effect.

   **7.7    Books and Records.**  Each Note Party shall, and shall cause each of its Subsidiaries to, keep complete and accurate books and records in conformity with GAAP in all material respects.

   **7.8    Compliance with Law.**  Each Note Party shall, and shall cause each of its Subsidiaries to:

          (a)    comply in all material respects with all Applicable Laws; and

          (b)    maintain and comply in all material respects with all Governmental Authorizations necessary or desirable to conduct its business as conducted on the date hereof,

in each case, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect.

   **7.9    Inspections.**  Each Note Party shall, and shall cause each of its Subsidiaries to, upon the request of the Required Holders, permit the Collateral Agent, any Holder and any representatives designated by any Holder, upon reasonable prior notice and during normal business hours at times to be mutually agreed, to visit and inspect its properties, up to once a year (or, if an Event of Default shall have occurred and be continuing, such visit and inspection may occur from time to time), to examine its records and to make copies of such records and extracts thereof, and to discuss its affairs, finances and condition with its officers, subject to reasonable requirements of confidentiality, including requirements imposed by law or by contract.

   **7.10    Change in Accounting Policies.**  The Company shall promptly notify each Holder in writing of any material change (including the details of such change) in accounting policies or financial reporting by the Company or any of its Subsidiaries or any change in its Fiscal Year end from June 30.

   **7.11    Additional Guarantors; Additional Collateral.**

          (a)    In the event that the Company or any of its Subsidiaries forms or acquires any Subsidiary after the date hereof, the Company shall promptly (and no later than three

17

Business Days after) notify the Collateral Agent and the Holders of that fact and promptly cause each such Subsidiary (no later than thirty (30) days after its formation or acquisition) to become a Guarantor and to execute and deliver to the Collateral Agent counterparts of each of this Agreement, the Guaranty and the Security Agreement, and all such further documents and instruments as may be necessary or, in the opinion of the Required Holders or the Collateral Agent, desirable to create a valid and perfected Lien on all of the assets of such Subsidiary, as well as a pledge of all of the Subsidiary's Capital Stock in favor of the Collateral Agent for the benefit of the Holders.  For so long as the Secured Obligations are outstanding, such Lien and pledge in favor of the Holders shall be a First Priority Lien and pledge.  The Company shall also deliver to the Collateral Agent and the Holders, together with such counterparts of this Agreement, the Guaranty and the Security Agreement and other documents and instruments, (A) certified copies of such Subsidiary's Organizational Documents, together with evidence of such Subsidiary's good standing in the jurisdiction of its organization or formation, each to be dated as of a recent date prior to their delivery to the Holders, (B) a certificate executed by the secretary or an assistant secretary of such Subsidiary as to (i) the incumbency and signatures of the officers of such Subsidiary executing the counterparts of this Agreement, the Guaranty and the Security Agreement and such other documents and instruments executed in connection therewith and (ii) the resolutions of the Board of Directors of such Subsidiary authorizing the execution, delivery and performance of the counterparts of this Agreement, the Guaranty and the Security Agreement and such other documents and instruments (which resolutions shall be attached to such certificate) being in full force and effect and not having been modified or rescinded, and (C) a customary opinion of counsel to the Company and such Subsidiary.  In no event shall any Subsidiary of the Company incur or guaranty any Indebtedness or other obligations of any Person if such Subsidiary has not become a Guarantor and executed and delivered to the Collateral Agent counterparts of each of this Agreement, the Guaranty and the Security Agreement, and all such further documents and instruments as may be necessary or, in the opinion of the Required Holders or the Collateral Agent, desirable to create a valid and perfected Lien on all of the assets of such Subsidiary, as well as a pledge of all of the Subsidiary's Capital Stock in favor of the Collateral Agent for the benefit of the Holders.

(b)    The Company and each of the Guarantors shall (i) cause the Collateral to be subject at all times to a Lien perfected in favor of the Collateral Agent to secure the obligations pursuant to the terms and conditions of the Collateral Documents or, with respect to any such property acquired subsequent to the date hereof, such other additional security documents as the Required Holders shall reasonably request, subject in any case to Liens permitted hereunder and (ii) deliver such other documentation as may be necessary or as the Required Holders or the Collateral Agent may reasonably request in connection with the foregoing, including, without limitation, appropriate UCC financing statements, UCC termination statements and other items of the types required to be delivered pursuant to Sections 3.7 and 3.9, duly executed by all applicable Persons and/or filed in all jurisdictions necessary or, in the opinion of the Required Holders, desirable to perfect the security interests created in such Collateral pursuant to the Collateral Documents.  Without limiting the generality of the foregoing, the Company and the Guarantors shall cause 100% of the issued and outstanding Capital Stock of each of its Subsidiaries to be subject at all times to a perfected First Priority Lien and pledge in favor of the Collateral Agent.

(c)     Without limitation of <u>Section 7.11(b)</u>, upon the lease, license, sublicense or other acquisition by a Note Party after the date hereof of any Oil and Gas Property, then the Company shall, or shall cause the applicable Note Party to, grant, within forty-five (45) days of the effective date of such lease, license, sublicense or other acquisition (or such longer period as shall be reasonably acceptable to the Required Holders), to the Collateral Agent to secure the obligations under the Note Documents, a valid First Priority Lien (provided that Permitted Liens or other Liens acceptable to the Collateral Agent and the Required Holders may exist) on such additional Oil and Gas Property together with each of the Mortgage Related Documents related to such Oil and Gas Property in form and substance reasonably satisfactory to the Collateral Agent (acting at the direction of the Required Holders). The Mortgages or instruments related thereto shall be duly recorded or filed in such manner and in such places as are required by law to establish and perfect the Liens in favor of the Collateral Agent required to be granted pursuant to the Mortgages, and all taxes, fees and other charges payable in connection therewith shall be paid in full by such Note Party.

(d)     Without limitation of <u>Section 7.11(b)</u>, upon the purchase, lease, license, sublicense or other acquisition by a Note Party after the date hereof of any fee or leasehold interest in real property (other than an Oil and Gas Property), then the Company shall, or shall cause the applicable Note Party to, grant, within forty-five (45) days of the effective date of such purchase, lease, license, sublicense or other acquisition (or such longer period as shall be acceptable to the Required Holders), to the Collateral Agent to secure the obligations under the Note Documents, a valid First Priority Lien (provided that Permitted Liens may exist) on such additional real property asset, together with (i) each of the Mortgage Related Documents related to such real property, in each case in form and substance reasonably satisfactory to the Collateral Agent (acting at the direction of the Required Holders), (ii) ALTA mortgagee title insurance policies or unconditional commitments therefor with respect to such real property, in amounts not less than the fair market value of such real property, together with a title report issued by a title company with respect thereto, dated not more than forty-five (45) days prior to the effective date of such purchase, lease, license, sublicense or other acquisition and copies of all recorded documents listed as exceptions to title or otherwise referred to therein, and evidence that the Company has paid to the title company or to the appropriate Governmental Authorities all expenses and premiums of the title company and all other sums required in connection with the issuance of the title policy, (iii) a completed Flood Certificate, (A) which Flood Certificate shall (x) be addressed to the Collateral Agent and (y) otherwise comply with the Flood Program; and (B) if such real property is located in a Flood Zone and is located in a community that participates in the Flood Program, evidence that the applicable Note Party has obtained a policy of flood insurance that is in compliance with all applicable requirements of the Flood Program; (iv) if such real property is acquired by a Note Party in fee simple, ALTA surveys certified to the Collateral Agent and dated not more than forty-five (45) days prior to the effective date of such purchase, lease, license, sublicense or other acquisition; and (v) if such real property is a Leasehold Property, a Landlord Consent and evidence that such Leasehold Property is a Recorded Leasehold Interest.  The Mortgages or instruments related thereto shall be duly recorded or filed in such manner and in such places as are required by law to establish and perfect the Liens in favor of the Collateral Agent required to be granted pursuant to the Mortgages, and all taxes, fees and other charges payable in connection therewith shall be paid in full by such Note Party.

**7.12    Undated Letter Transfer Orders.**  With respect to future sales of production from any Oil and Gas Property, the applicable Note Party shall use its commercially reasonable efforts to deliver to the Collateral Agent concurrently with or promptly after any such sale to a first purchaser undated letter transfer orders directed to the party remitting to the applicable Note Party proceeds from the sale of production from such Oil and Gas Property and instructing that such proceeds be remitted to the Collateral Agent, for the account of the applicable Note Party.

## ARTICLE VIII
## NEGATIVE COVENANTS

**8.1    Limitation on Restricted Payments.**  Each Note Party shall not, and shall not permit any of its Subsidiaries to, directly or indirectly, take any of the following actions: (i) declare or pay any dividend or other distribution, direct or indirect, on Capital Stock of the Company, or on Capital Stock of any Subsidiary of the Company that are held by, or declared and paid to, any Person other than a Note Party, other than dividends, distributions or payments permitted to be declared or paid pursuant to the Organizational Documents of the applicable Note Party; and (ii) make any Investment in any Person, other than Investments permitted pursuant to the Organizational Documents of the applicable Note Party.

**8.2    Limitation on Liens.**  Each Note Party shall not, and shall not permit any of its Subsidiaries to, directly or indirectly, create, incur, assume or suffer to exist any Lien on, or with respect to, any property or asset of any kind (including any document or instrument in respect of goods or accounts receivable) of the Company or any of its Subsidiaries, whether now owned or hereafter acquired, or any income or profits therefrom, except for Permitted Liens.

**8.3    No Negative Pledges.**  Each Note Party shall not, and shall not permit any of its Subsidiaries to, enter into any agreement or remain party to any agreement prohibiting the creation or assumption of any Lien upon any of the Collateral, whether now owned or hereafter acquired, to secure obligations under any Note Documents, including this Agreement.

**8.4    Limitation on Indebtedness.**  Each Note Party shall not, and shall not permit any of its Subsidiaries to, directly or indirectly, create, incur, assume, guaranty, suffer to exist or otherwise become or remain directly or indirectly liable with respect to any Indebtedness, except Indebtedness permitted under the Organizational Documents of the applicable Note Party.

**8.5    Limitation on Asset Sales.**  Each Note Party shall not, and shall not permit any of its Subsidiaries to, consummate any Asset Sales in any Fiscal Year in excess of $10,000,000 in the aggregate, unless the Net Asset Sale Proceeds, if any, from such Asset Sale are applied in accordance with Section 6.3.

**8.6    No Subordination of Debt.**  (i) The Company shall not incur, create, issue, assume, guarantee or otherwise become liable for any Indebtedness that is senior in right of payment to the Notes, and (ii) the Company shall not permit and each Guarantor shall not incur, create, issue, assume, guarantee or otherwise become liable for any Indebtedness that is senior in right of payment to such Guarantor's obligations under the Guaranty.

**8.7    Limitation on Transactions With Affiliates.**  Each Note Party shall not, and shall not permit any of its Subsidiaries to, make any payment to, or sell, lease, transfer or otherwise dispose of any of its properties or assets to, or purchase any property or assets from, or enter into or make or amend any transaction, contract, agreement, understanding, loan, advance or guaranty with, or for the benefit of, any Affiliate of the Company, other than (i) any such transactions permitted pursuant to the Organizational Documents of the applicable Note Party or Subsidiary thereof or (ii) on terms and conditions at least as favorable to such Note Party or Subsidiary thereof as would reasonably be obtained by such Note Party or Subsidiary thereof at that time in a comparable arm's-length transaction with a Person other than an Affiliate.

**8.8    Permitted Business.**  Each Note Party shall not, and shall not permit any of its Subsidiaries to, engage in any business that is not reasonably related or ancillary to the businesses engaged in by the Company and its Subsidiaries as of the Closing Date, unless otherwise permitted under the Organizational Documents of the applicable Note Party.

**8.9    Investment Company Act.**  Each Note Party shall not, and shall not permit any of its Subsidiaries to, become an investment company subject to registration under the Investment Company Act of 1940, as amended.

**8.10    Waiver of Stay, Extension or Usury Laws.**  Each Note Party shall not, and shall not permit any of its Subsidiaries to (to the extent that it may lawfully do so), at any time insist upon, or plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay or extension law or any usury law or other law which prohibit or forgive the Company or such Subsidiary from paying all or any portion of the principal amount of, Make-Whole Premium, if any, or interest on the Notes or Guaranty as contemplated herein or therein, wherever enacted, now or at any time hereafter in force, or which may affect the covenants or the performance of this Agreement; and (to the extent that it may lawfully do so) the Company and each Guarantor hereby expressly waives all benefit or advantage of any such law, and covenants that it will not hinder, delay or impede the execution of any power herein granted to the Holders, but will suffer and permit the execution of every such power as though no such law had been enacted.

**8.11    Amendments of Organizational Documents.**  Each Note Party shall not, nor shall it permit any of its Subsidiaries to, amend: their respective Organizational Documents in a manner that is materially adverse to the Holders.

**8.12    OFAC.**  Neither the Company nor any of its Subsidiaries: (i) shall become a person whose property or interests in property are blocked or subject to blocking pursuant to Section 1 of Executive Order 13224 of September 23, 2001 Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit or Support Terrorism (66 Fed. Reg. 49079(2001)), (ii) shall engage in any dealings or transactions prohibited by Section 2 of such executive order, or be otherwise associated with any such person in any manner violative of Section 2 of such order, or (iii) shall otherwise become a person on the list of Specially Designated Nationals and Blocked Persons or subject to the limitations or prohibitions under any other OFAC regulation or executive order.

21

**8.13    Pro Rata Payments.**  No Note Party shall, nor shall any Note Party permit any other Note Party to, make any payment of principal, interest or Make-Whole Premium, if any, on the Notes unless such payment is made on a *pro rata* basis on all of the Notes.

**8.14    Hedging Agreements.**  No Note Party shall, nor shall any Note Party permit any of its Subsidiaries to enter into or become obligated on, or with respect to, any Hedging Agreement or any transaction thereunder or amend or modify any Hedging Agreement or transactions thereunder (or enter into any amendment, modification or supplement thereto), except (i) any Hedging Agreement entered into on or before the Closing Date (including any amendment or modification thereto), (ii) any Hedging Agreement entered into not for a speculative purposes and in the ordinary course of business or (iii) with the prior written consent of the Required Holders (each such Hedging Agreement upon delivery of the notice in the form attached hereto as Exhibit D and the execution of the joinder to the applicable Intercreditor Agreement, a "**Permitted Hedging Agreement**"); provided that the prior written consent of the Required Holders shall not be necessary in connection with the physical delivery of commodities under a Permitted Hedging Agreement.

**ARTICLE IX**
**[RESERVED]**


**ARTICLE X**
**EXPENSES; INDEMNIFICATION; REGISTRATION; AND TAX MATTERS**

**10.1    Expenses.**

(a)    The Company will pay all costs and expenses incurred by the Initial Holders (and subsequent Holders) in connection with the Transactions, including, without limitation:

1.    all out-of-pocket expenses incurred by the Initial Holders in connection with the preparation, negotiation, execution and delivery of the Note Documents, including without limitation due diligence and analysis, examinations and appraisals;

2.    to the extent not specifically included in clause (1) above, the fees and expenses of Sullivan & Cromwell LLP and Jones Walker LLP, who are acting as counsel to one or more Initial Holders in connection with the preparation, negotiation, execution and delivery of the Note Documents;

3.    all out-of-pocket expenses (including the fees and disbursements of counsel) incurred by any Holder in connection with any amendment, modification, waiver, consent (whether or not such amendment, waiver or consent becomes effective), or preservation or enforcement of rights under the Note Documents or any other documents contemplated hereby or thereby after the date hereof; and

4.    such other fees as agreed to by the Company and any Holder.

(b)    The Company will pay all fees, costs and expenses incurred by the Noteholder Agent and the Collateral Agent in connection with the transactions contemplated by this Agreement, including, without limitation:

1.    the fees, costs and expenses outlined in that certain fee letter dated as of [●], 2016;

2.    the reasonable fees and expenses of Shipman & Goodwin LLP, who are acting as counsel to the Noteholder Agent and the Collateral Agent in connection with the preparation, negotiation, execution and delivery of the Note Documents; and

3.    all reasonable fees and expenses (including the fees and disbursements of counsel) incurred by the Noteholder Agent or the Collateral Agent (in such capacity) in connection its participation in the transactions contemplated by this Agreement and the other Note Documents, including without limitation with any amendment, modification, waiver, consent (whether or not such amendment, waiver or consent becomes effective), or preservation or enforcement of rights under the Note Documents or any other documents contemplated hereby or thereby after the date hereof.

(c)    The obligations of the Company under this Section 10.1 shall survive the payment of the Notes, the termination of this Agreement and the other Note Documents and the earlier resignation or removal of the Noteholder Agent or the Collateral Agent.

**10.2    Indemnification.**

(a)    In addition to all rights and remedies available to the Holders, the Noteholder Agent or the Collateral Agent at law or in equity, the Company and the Guarantors (collectively, the "**Indemnifying Parties**") shall jointly and severally indemnify, defend and hold harmless the Initial Holders, the Noteholder Agent, the Collateral Agent, each subsequent Holder and their respective affiliates, stockholders, partners, members, officers, directors, employees, agents, representatives, controlling persons, successors, heirs and assigns (collectively, the "**Indemnified Parties**") and save and hold each of them harmless against and pay on behalf of or reimburse such party as and when incurred for any loss, liability, demand, claim, action (including litigation brought by any Indemnifying Party or to which any Indemnifying Party is a party), cause of action, cost, damage, deficiency, penalty, fine or expense, whether or not arising out of any claims by or on behalf of any Indemnified Party or any third party, including interest, penalties, and attorneys' fees and expenses of any counsel(s) to the Indemnified Parties and all amounts paid in investigation, defense or settlement of any of the foregoing (collectively, "**Losses**") which any such party may suffer, sustain or become subject to, as a result of, in connection with, relating or incidental to or by virtue of:

1.    any misrepresentation or breach of a representation or warranty on the part of any Note Party under any Note Document;

2.    without duplication of Section 10.2(a)(1) above, any misrepresentation in, or omission from, any of the representations, warranties, statements,

Case 15-12500-CSS    Doc 182    Filed 02/17/16    Page 111 of 293

DRAFT

schedules and exhibits hereto, certificates or other instruments or documents furnished to the Holders by or on behalf of any Note Party made in or pursuant to any Note Document;

        3.        any non-fulfillment or breach of any covenant or agreement on the part of any Note Party under any Note Document;

        4.        any Environmental Claim;

        5.        any claim (whenever made) relating in any way to any Note Party and any claim (whenever made) arising out of, relating to, resulting from or caused by any transaction, status, event, condition, occurrence or situation relating to, arising out of or in connection with (A) the execution, delivery and performance of this Agreement, the other Note Documents, the Transactions and the documents and agreements contemplated hereby or thereby or (B) any actions taken by or omitted to be taken by any of the Indemnified Parties in connection with any Note Document; or

        6.        any claim, demand or liability for any broker's or finder's fees or commission alleged to have been incurred by the Company or any of its Subsidiaries or any Person acting on behalf of the Company or any of its Subsidiaries in connection with the Note Documents, or any of the Transactions contemplated hereby or thereby and any expenses (including reasonable fees, expenses and disbursements of counsel) arising in connection with any such claim, demand or liability incurred by the Company or any of its Subsidiaries or any Person acting on behalf of the Company or any of its Subsidiaries;

provided, however, that no Indemnified Party shall be entitled to such rights and remedies to the extent that such Losses occur as a result of the gross negligence or willful misconduct on the part of any Indemnified Party, as determined by a final order of a court of competent jurisdiction that is not subject to appeal.

        (b)        All indemnification rights hereunder shall survive the execution and delivery of this Agreement and the consummation of the Transactions without limit, regardless of any investigation, inquiry or examination made for or on behalf of, or any knowledge of the Initial Holders, their advisors and/or any of the Indemnified Parties or the acceptance by the Company or any Guarantor of any certificate or opinion, and shall inure to the benefit of any holder of the Notes in accordance with the terms hereof notwithstanding such Person's assignment or transfer of its Note.

        (c)        If for any reason the indemnity provided for in this Section 10.2 is unavailable to any Indemnified Party or is insufficient to hold each such Indemnified Party harmless from all such Losses arising with respect to the transactions contemplated by this Agreement, then the Note Parties jointly and severally shall contribute to the amount paid or payable for such Losses in such proportion as is appropriate to reflect not only the relative benefits received by the Note Parties on the one hand and such Indemnified Party on the other but also the relative fault of the Note Parties as well as any relevant equitable considerations.  In addition, the Note Parties, jointly and severally, agree to reimburse any Indemnified Party upon demand for all expenses (including legal counsel fees and expenses) incurred by such Indemnified Party in connection with investigating, preparing or defending any such action or

claim.  The indemnity, contribution and expenses reimbursement obligations that the Company and the Guarantors have under this Section 10.2 shall be in addition to any liability that the Company and the Guarantors may otherwise have at law or in equity.  The Note Parties further agree that the indemnification and reimbursement commitments set forth in this Agreement shall apply whether or not the Indemnified Party is a formal party to any such lawsuits, claims or other proceedings.

(d)      Any indemnification or payments in respect of contribution of any Indemnified Party by the Note Parties pursuant to this Section 10.2 shall be effected by wire transfer of immediately available funds from any Note Party to an account designated by such Indemnified Party within ten Business Days after the incurrence of a Loss.

(e)      The obligations of the Company under this Section 10.2 shall survive the payment of the Notes, the termination of this Agreement and the other Note Documents and the earlier resignation or removal of the Noteholder Agent or the Collateral Agent.

**10.3      Registration of Notes; etc.**

(a)      The Company will maintain (and make available for inspection by the Holders upon reasonable prior notice at reasonable times) at its address referred to in Section 13.1(c) a register for the recordation of, and shall record, the names and addresses of Holders (and any changes thereto), the respective amounts of the Notes of each Holder from time to time and the amount that is due and payable, and paid, to each Holder (the "**Register**"). Promptly following the Closing and each subsequent change to the Register, the Company shall provide a copy of the Register to the Noteholder Agent and the Collateral Agent.  The Company shall deem and treat the Persons listed as Holders in the Register as the holders and owners of the corresponding Notes listed therein for all purposes of this Agreement; all amounts owed with respect to any Note shall be owed to the Holder listed in the Register as the owner thereof; and any request, authority or consent of any Person who, at the time of making such request or giving such authority or consent, is listed in the Register as a Holder shall be conclusive and binding on any subsequent holder, assignee or transferee of the corresponding Notes.

(b)      Subject to Section 13.2, a Holder may transfer a Note to a new Holder only by surrendering such Note to the Company duly endorsed for transfer or accompanied by a duly executed instrument of transfer naming the new Holder (or the current Holder if submitted for exchange only).  Any new Holder shall simultaneously with becoming a Holder execute the Holder Joinder substantially in the form attached as Exhibit C.

(c)      Upon surrender for registration of transfer of any Notes, the Company, at its expense, will mark the surrendered Notes as canceled, and execute and deliver, in the name of the designated transferee or transferees, one or more new Notes of the same type, and of a like aggregate principal amount.  Each such new Note shall be payable to such Person as such holder may request and shall be substantially in the form of Exhibit A annexed hereto.  Each such new Note shall be dated and bear interest from the date to which interest shall have been paid on the surrendered Note (provided any outstanding interest shall continue to be owed and shall survive) or dated the date of the surrendered Note if no interest shall have been paid thereon.  Promptly upon the transfer of any Note, the Company shall provide written notice of such transfer to the

Collateral Agent, including the date of such transfer, the amount of Note or Notes transferred and the name of and payment instructions for the transferee.

(d)    Notes may be exchanged at the option of any Holder thereof for Notes of a like aggregate principal amount, as applicable, but in different denominations.  Whenever any Notes are so surrendered for exchange, the Company, at its expense, will mark the surrendered Notes as canceled, and execute and deliver the Notes that the Holder making the exchange is entitled to receive.

(e)    All Notes issued upon any registration of transfer or exchange of such Notes will be the legal and valid obligations of the Company, evidencing the same interests, and entitled to the same benefits, as the Notes surrendered upon such registration of transfer or exchange.

(f)    Every Note presented or surrendered for registration of transfer or exchange will (if so required) be duly endorsed or will be accompanied by a written instrument of transfer in form reasonably satisfactory to the Company, duly executed by the Holder thereof or its attorney duly authorized in writing.

(g)    Upon receipt of a Note pursuant to clause (b) or (d) above and any forms, certificates or other evidence with respect to Tax matters that the new Holder may be required to deliver the Company pursuant to Section 10.5, the Company will record the relevant information in the Register.

(h)    Any transfer of any of the Notes will not be valid unless and until such transfer is recorded in the Register.

**10.4    Place of Payment.**  The Company will pay all sums becoming due on such Note for principal, interest and Make-Whole Premium, if any, by the method and address indicated by such Holder next to its name on the signature page hereof, in the applicable Holder Joinder or as otherwise notified by such Holder to the Company in writing from time to time.

**10.5    Tax Matters.**

(a)    To the extent permitted by Applicable Law, any and all payments by or on behalf of the Company hereunder or under the Notes or other Note Documents that are made to or for the benefit of a Holder shall be made free and clear of and without deduction or withholding on account of any Taxes.  If the Company or any other Person on behalf of the Company shall be required by law to deduct or withhold any Taxes from or in respect of any sum payable hereunder or under any Notes or other Note Documents to a Holder:

1.    the Company shall notify such Holder of any such requirement or any change in any such requirement as soon as it becomes aware of it;

2.    the Company shall timely pay any such Tax to the relevant Governmental Authority when such Tax is due, in accordance with Applicable Law;

3.       unless such Tax is an Excluded Tax, the sum payable shall be increased to the extent necessary to ensure that, after making the required deductions (including deductions applicable to additional sums payable under this clause), each Holder receives on the due date a net sum equal to the sum it would have received had no such deduction been required or made; and

4.       within thirty (30) days after the Company receives a receipt of payment of any Tax which the Company is required by clause (2) above to pay, the Company shall deliver to the applicable Holder the original or a certified copy of an official receipt or other satisfactory evidence of the payment and its remittance to the relevant Governmental Authority.

(b)       In addition, without limiting the provisions of paragraph (a) above, the Company agrees to timely pay any Other Taxes to the relevant Governmental Authority in accordance with Applicable Law and within thirty (30) days after the Company receives a receipt for payment of any such Taxes, the Company shall furnish to the applicable Holder the a copy of such receipt.

(c)       The Company will indemnify each Holder, within ten (10) days after demand therefor, for the full amount of any Covered Taxes or Other Taxes (including for the full amount of any Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section 10.5(c)) paid by such Holder, as the case may be, and any penalties (other than penalties imposed by reason of such Holder's gross negligence or willful misconduct), interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Covered Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A reasonably detailed certificate as to the amount of such payment or liability delivered to the Company by a Holder shall be conclusive absent manifest error.

(d)       If a Holder determines that it has received a refund of any Covered Taxes or Other Taxes as to which it has been indemnified by the Company or with respect to which the Company paid additional amounts pursuant to this Section 10.5, it shall pay to the Company an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by the Company pursuant to this Section 10.5 with respect to the Covered Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such Holder and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), provided, however, that the Company, upon the request of such Holder, agrees to repay the amount paid over to the Company to such Holder in the event that such Holder is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this Section 10.5(d), in no event will a Holder be required to pay any amount to the Company pursuant to this Section 10.5(d) the payment of which would place such Holder in a less favorable net after-Tax position than the Holder would have been in if the Tax subject to indemnification or resulting in the payment of additional amounts and giving rise to such refund had not been deducted, withheld or imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This Section 10.5(d) shall not be construed to require any Holder to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the Company or any other Person.

(e)    Unless not legally entitled to do so:

1.    each Holder shall deliver such forms or other documentation prescribed by Applicable Law or reasonably requested by the Company as will enable the Company to determine whether or not such Holder is subject to withholding, backup withholding or information reporting requirements;

2.    any Holder that is entitled to an exemption from or reduction of any Tax with respect to payments hereunder or under the Notes or any other Note Document shall deliver to the Company, on or prior to the date on which such Holder becomes a Holder under this Agreement (and at the time or times reasonably requested by the Company thereafter), such properly completed and duly executed forms or other documentation prescribed by Applicable Law as will permit such payments to be made without withholding or at a reduced rate of withholding;

3.    without limiting the generality of the foregoing, to the extent it is legally entitled to do so, any Holder shall deliver to the Company (in such number of copies as shall be reasonably requested by the Company) on or prior to the date on which such Holder becomes a Holder under this Agreement (and from time to time thereafter, upon the reasonable request of the Company), whichever of the following is applicable:

(A)    unless such Holder has otherwise established to the reasonable satisfaction of the Company that it is an exempt recipient (as defined in Section 6049(b)(4) of the Code and the United States Treasury Regulations thereunder) properly completed and duly executed copies of Internal Revenue Service Form W-9,

(B)    properly completed and duly executed copies of Internal Revenue Service Form W-8BEN or Form W-8BEN-E claiming eligibility for benefits of an income tax treaty to which the United States is a party,

(C)    properly completed and duly executed copies of Internal Revenue Service Form W-8ECI,

(D)    in the case of a Holder claiming the benefits of the exemption for "portfolio interest" under Section 881(c) of the Code, (A) a duly executed certificate to the effect that such Holder is not (i) a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (ii) a "10-percent shareholder" (within the meaning of Sections 881(c)(3)(B) or 871(h)(3)(B) of the Code) of the Company, or (iii) a controlled foreign corporation described in Section 881(c)(3)(C) of the Code and (B) properly completed and duly executed copies of Internal Revenue Service Form W-

28

8BEN or Form W-8BEN-E (and, if applicable, Form W-8IMY),

(E)     properly completed and duly executed copies of Internal Revenue Service Form W-8IMY accompanied by Internal Revenue Service Form W-8BEN, Internal Revenue Service Form W-8BEN-E, Internal Revenue Service Form W-8ECI, Internal Revenue Service Form W-9, and/or other certification documents from each beneficial owner, as applicable, and

(F)     properly completed and duly executed copies of any other form prescribed by Applicable Law as a basis for claiming exemption from or a reduction in any United States federal withholding Tax,

in each case together with such supplementary documentation as may be prescribed by Applicable Law to permit the Company to determine the withholding or deduction required to be made, if any.  Notwithstanding anything to the contrary in Section 10.5(e)(1), the completion, execution and submission of such documentation (other than such documentation set forth in Section 10.5(e)(3)(A), (B), (C), (D) or (E)) shall not be required if in the Holder's reasonable judgment such completion, execution or submission would subject such Holder to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Holder.

(f)     Without limiting the generality of the foregoing, each Holder hereby agrees, from time to time after the initial delivery of such forms, whenever a lapse in time or change in circumstances renders such forms, certificates or other evidence so delivered obsolete or inaccurate in any material respect, that such Holder shall promptly (1) deliver to the Company two original copies of renewals, amendments or additional or successor forms, properly completed and duly executed by such Holder, together with any other certificate or statement of exemption required in order to confirm or establish that such Holder is entitled to an exemption from or reduction of any Tax with respect to payments to such Holder under the Note Documents, or (2) notify the Company of its inability to deliver any such forms, certificates or other evidence.

(g)     If a payment made to a Holder under the Notes or the other Note Documents would be subject to U.S. Federal withholding tax imposed by FATCA if such Holder were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Holder shall deliver to the Company and the Collateral Agent at the time or times prescribed by law and at such time or times reasonably requested by the Company or the Collateral Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Company of the Collateral Agent as may be necessary for the Company or the Collateral Agent to comply with its obligations

29

under FATCA, to determine that such Holder has or has not complied with such Holder's obligations under FATCA or to determine the amount to deduct and withhold from such payment.

(h)     The obligations of the Company under this <u>Section 10.5</u> shall survive the payment of the Notes and the termination of this Agreement.

## ARTICLE XI
## DEFAULTS AND REMEDIES

**11.1    Event of Default.**  Each of the following is an "**Event of Default**":

(a)     the Company defaults and such default continues for a period of three (3) days in the payment when due of (i) interest or fees on the Notes or (ii) other fees or payments (other than principal of, or Make-Whole Premium on, the Notes) owed under this Agreement;

(b)     the Company defaults in the payment when due of the principal of, or Make-Whole Premium on, the Notes, including any such amount due pursuant to <u>Article VI</u>;

(c)     any Note Party fails to observe or perform any term, condition or covenant contained in (i) <u>Section 7.1(d)</u>, <u>Section 7.3</u>, <u>Section 7.6(a)</u>, <u>Section 7.11</u> or <u>Article VIII</u> of this Agreement, (ii) the Security Agreement or (iii) any Intercreditor Agreement;

(d)     any Note Party fails to observe or perform any covenant in any Note Document, other than as set forth in <u>Section 11.1(c)</u> or any other covenant a default in the performance of which is covered elsewhere in this <u>Section 11.1</u>, for fifteen (15) days after the earlier of (1) the date such Note Party becomes aware of the default or (2) written notice to the Company by the Required Holders specifying the default and demanding that such default be remedied and stating that such notice is a "Notice of Default";

(e)     (1) a payment default (whether of principal, interest, premium, fees or otherwise) occurs under any mortgage, deed of trust, credit facility, hedging agreement, indenture or instrument under which there may be issued or by which there may be secured or evidenced any Indebtedness (including any hedging obligations) by any Note Party or any of its Subsidiaries in excess of $25,000,000 in the aggregate, whether such Indebtedness now exists, or is created after the date of this Agreement or (2) the occurrence of any other default or event of default under any such mortgage, deed of trust, indenture or instrument, if the effect of such default or event of default is to cause, or to permit the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders) to cause, such Indebtedness to become or be declared due and payable prior to its stated maturity or the stated maturity of any underlying obligation, as the case may be (upon the giving or receiving of notice, lapse of time, both, or otherwise);

(f)     a judgment or judgments for the payment of money are entered by a court or courts of competent jurisdiction against any Note Party or any of its Subsidiaries, which judgment or judgments become final and are not paid, discharged or stayed for a period of thirty (30) days thereafter; <u>provided</u> that the aggregate of all such undischarged judgments (exclusive

of any applicable, independent third party insurance coverage or third party indemnity, on terms and conditions and from indemnitors reasonably acceptable to the Holders) exceeds $25,000,000;

    (g)    any Note Party or any of its Subsidiaries:

    1.    commences a voluntary bankruptcy proceeding;

    2.    consents to the entry of an order for relief against it in an involuntary bankruptcy case;

    3.    consents to the appointment of a custodian of it or for all or substantially all of its property;

    4.    makes a general assignment for the benefit of its creditors; or

    5.    generally is not paying, or admits in writing it cannot pay, its debts as they become due;

    (h)    1.    a court of competent jurisdiction enters an order or decree under any bankruptcy law that:

    (A)    is for relief against any Note Party or any of its Subsidiaries; appoints a custodian for all or substantially all of the property of the Company or any of its Subsidiaries; or orders the liquidation of the Company or any of its Subsidiaries; and

    (B)    the order or decree remains unstayed and in effect for thirty (30) consecutive days; or

    2.    an involuntary bankruptcy proceeding is commenced against any Note Party or any of its Subsidiaries and such proceeding shall continue for thirty (30) consecutive days without being dismissed, bonded or discharged;

    (i)    any Note Document is held in any judicial proceeding to be unenforceable or invalid in any respect or shall cease for any reason (other than the payment in full of the obligations under this Agreement and the Notes or any other termination thereof in accordance with the terms hereof and thereof) to be in full force and effect in any respect or the Company or any Guarantor, or any Person acting on behalf of any such Person, shall deny or disaffirm in writing its obligations under any Note Document or the Notes (other than in accordance with their terms);

    (j)    any representation, warranty, certification or other statement made or furnished to the Holders by or on behalf of the Company or any of its Subsidiaries in this Agreement, any Note Document or any instrument, certificate or financial statement furnished (in compliance with or in reference thereto) proves to be false, incorrect, breached, or misleading in any material respect when made or furnished;

(k)     one or more ERISA Events occur that individually or in the aggregate result in or could reasonably be expected to result in liability of the Company, any of its Subsidiaries or any of their respective ERISA Affiliates in excess of $25,000,000 in the aggregate;

(l)     any Lien purported to be created by any Note Document shall cease to be in full force and effect, or shall cease to give the Collateral Agent, for the benefit of the Holders, the Liens, rights, powers and privileges purported to be created and granted under such Note Document (including a valid, enforceable, perfected First Priority Lien on, all of the Collateral thereunder (except as otherwise expressly provided in the Note Documents)) in favor of the Collateral Agent, or shall be asserted by or on behalf of any Note Party not to be a valid, enforceable, perfected, First Priority Lien on the Collateral; or

(m)     any Note Document or any material provisions of any Note Document shall (except to the extent expressly permitted thereby) for any reason cease to be, or shall be asserted in writing by any Note Party, any Permitted Hedging Counterparty (as defined in the Intercreditor Agreement), BPEC or any other party thereto not to be, a legal, valid and binding obligation of any party thereto.

**11.2    Acceleration.**  Upon the occurrence and continuation of an Event of Default (other than specified in clause (g) or (h) of <u>Section 11.1</u>), the Required Holders may declare all the Notes to be due and payable by notice in writing to the Company (with a copy to the Collateral Agent and the Noteholder Agent) specifying the respective Event of Default and that it is a "Notice of Acceleration", whereupon the principal of the Notes so declared to be due and payable, together with accrued interest thereon and any unpaid accrued fees and Make-Whole Premium and all other obligations of the Note Parties accrued hereunder and under any other Note Documents, shall become forthwith due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Note Parties, anything contained herein or in any other Note Document to the contrary.  Upon the occurrence of an Event of Default specified in clause (g) or (h) of <u>Section 11.1</u>, immediately without further action or notice the principal amount of the Notes shall become due and payable, together with accrued interest thereon and any unpaid accrued fees and Make-Whole Premium and all other obligations of the Note Parties accrued hereunder or under any other Note Documents, shall become forthwith due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Note Parties, anything contained herein or in any other Note Document to the contrary. The Company acknowledges, and the parties hereto agree, that each Holder has the right to maintain its investment in the Notes free from repayment by the Company (except as herein specifically provided for) and that the provision for payment of a Make-Whole Amount by the Company in the event that the Notes are prepaid or are accelerated as a result of an Event of Default is intended to provide compensation for the deprivation of such right under such circumstances.

**11.3    Other Remedies.**

(a)     If an Event of Default occurs and is continuing, the Holders or the Collateral Agent (at the written direction of the Required Holders), as applicable, may pursue any available remedy (i) to collect the payment of principal, interest and Make-Whole Premium

on the Notes, (ii) to enforce the performance of any provision of the Notes, this Agreement or the Guaranty, or (iii) exercise remedies under the Collateral Documents.

(b)     A delay or omission by any Holder, the Noteholder Agent or the Collateral Agent in exercising any right or remedy accruing upon an Event of Default shall not impair the right or remedy or constitute a waiver of or acquiescence in the Event of Default. All remedies are cumulative to the extent permitted by law.

**11.4    Waiver of Past Defaults; Rescission.**

(a)     The Required Holders, by written notice to the Company (with a copy to the Noteholder Agent and the Collateral Agent), may on behalf of the Holders of all of the Notes waive an existing Default or Event of Default and its consequences hereunder, except (i) a continuing Default or Event of Default in the payment of the principal of, Make-Whole Premium, if any, or interest on, the Notes and (ii) a Default or Event of Default arising from the failure to redeem any Note when required pursuant to the terms of this Agreement.

(b)     The Required Holders, by written notice to the Company (with a copy to the Noteholder Agent and the Collateral Agent), may on behalf of all of the Holders rescind an acceleration and its consequences if the rescission would not conflict with any judgment or decree of a Governmental Authority and if all existing Events of Default (except nonpayment of principal, interest or Make-Whole Premium, if any, that have become due solely because of the acceleration) have been cured or waived.

**11.5    Rights of Holders of Notes to Receive Payment.**  Notwithstanding any other provision of this Agreement, the right of any Holder to receive payment of principal, Make-Whole Premium, if any, and interest on such Note, on or after the respective due dates expressed in such Note, or to bring suit for the enforcement of any such payment on or after such respective dates, shall not be impaired or affected without the consent of such Holder.

**ARTICLE XII**
**[RESERVED]**


**ARTICLE XIII**
**MISCELLANEOUS**

**13.1    Notices.**  All notices and other communications provided for or permitted hereunder shall be made by hand-delivery, first-class mail, telecopier, e-mail or overnight air courier guarantying next day delivery:

(a)     if to the Initial Holders or any Holder, to the address set forth on its signature page hereto or as otherwise provided in writing to the Company;

(b)     if to the Noteholder Agent or the Collateral Agent, to the address set forth on its signature page hereto or as otherwise provided in writing to the Company and the Holders; and

33

(c)    if to the Company or any of its Subsidiaries (including the other Note Parties), to it at 9870 Plano Road, Dallas, Texas 75238, Attention: Jason Gorsuch, facsimile: (972) 681-9687, e-mail: jason@cubicenergyinc.com.

All such notices and communications shall be deemed to have been duly given:  at the time delivered by hand, if personally delivered; five (5) Business Days after being deposited in the mail, postage prepaid, if mailed; when receipt acknowledged, if telecopied or e-mailed; and the next business day after timely delivery to the courier, if sent by overnight air courier guarantying next day delivery.  For greater clarity, receipt of an e-mail may be acknowledged by the "return receipt requested" function, return e-mail or other written acknowledgement.  The parties may change the addresses to which notices are to be given by giving prior notice of such change in accordance herewith.

**13.2    Successors and Assigns; Assignments.**

(a)    This Agreement may not be assigned by any Note Party without the consent of all Holders, the Noteholder Agent and the Collateral Agent, and any such assignment in violation of this <u>Section 13.2</u> shall be null and void.

(b)    This Agreement shall inure to the benefit of and be binding upon the successors and registered assigns of each of the parties, including, without limitation and without the need for an express assignment, subsequent Holders of Notes.

(c)    Each Holder may sell, transfer or assign all or any portion of its Note to any Person, at any time in accordance with <u>Section 10.3(b)</u> and such Person shall become a party to this Agreement pursuant to a Holder Joinder in accordance with <u>Section 10.3(b)</u>.  Upon such Transfer, the previous Holder, if it no longer holds any Notes, shall cease to be a Holder hereunder except as provided for purposes of <u>Section 10.2</u>.

(d)    Each Holder may, in the ordinary course of its business and in accordance with the Note Documents and Applicable Law, including applicable securities laws, at any time sell to one or more Persons (each, a "**Participant**") participating interests in all or a portion of its rights and obligations under this Agreement.  Notwithstanding any such sale by such Holder of participating interests to a Participant, such Holder's rights and obligations under this Agreement shall remain unchanged, such Holder shall remain solely responsible for the performance of its obligations hereunder, and the Company, the Noteholder Agent and the Collateral Agent shall continue to deal solely and directly with such Holder and shall have no obligations to deal with any Participant in connection with such Holder's rights and obligations under this Agreement or the Notes.  Any agreement or instrument pursuant to which a Holder sells such a participation shall provide that such Holder shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; <u>provided</u> that such agreement or instrument may provide that such Holder will not, without the consent of the Participant, agree to any amendment, modification or waiver directly affecting (i) an extension of the scheduled final maturity date of any Note allocated to such participation, or (ii) a reduction of the principal amount of or the rate of interest payable on any Note allocated to such participation.  Subject to the further provisions of this <u>Section 13.2(d)</u>, the Company agrees that each Participant shall be entitled to the benefits of <u>Section 10.5</u> to the same extent as if it

34

were a Holder and had acquired its interest by assignment pursuant to this <u>Section 13.2</u>.  A Participant shall not be entitled to receive any greater payment under <u>Section 10.5</u> than the applicable Holder would have been entitled to receive with respect to the participation sold to such Participant unless the sale of the participation to such Participant is made with the Company's prior written consent.

(e)    The Note Parties shall assist any Holder in connection with any transfer, whether by sale or otherwise, assignment or participation permitted under this Agreement as reasonably required to enable the assigning or selling Holder to effect any such transfer, assignment or participation, including the execution and delivery of any and all agreements, notes and other documents and instruments as shall be requested and the preparation of informational materials for, and the participation of management in meetings with, potential assignees or participants.  Each Note Party shall certify the correctness, completeness and accuracy of all descriptions of each of them and their respective affairs contained in any selling materials provided by it and all other information provided by it and included in such materials.

(f)    Any Holder may furnish any information concerning the Note Parties in the possession of such Holder from time to time to transferees, assignees and participants (including prospective transferees, assignees and participants); <u>provided</u> that such Holder shall obtain from actual or potential transferees, assignees or participants confidentiality covenants substantially equivalent to those contained in <u>Section 13.20</u>.

(g)    Notwithstanding anything herein to the contrary, any entity into which the Agents may be merged or converted or with which it may be consolidated or any entity resulting from any merger, conversion or consolidation to which the Agents shall be a party, or any corporation succeeding to the corporate trust business of the Agents, shall be the successor of the Agents, respectively, hereunder without the execution or filing of any paper with any party hereto or any further act on the part of any of the parties hereto except where an instrument of transfer or assignment is required by law to effect such succession; <u>provided</u> that the Agents shall forthwith notify the parties hereto in writing of any such event.

**13.3    Amendment and Waiver.**

(a)    Except as heretofore expressly provided otherwise, this Agreement may be amended, modified or supplemented, and waivers or consents to departures from the provisions hereof may be given; <u>provided</u> that the same are in writing and signed by the Company, the Guarantors and the Required Holders; <u>provided</u>, <u>further</u>, that any amendment, modification or supplement that:

1.    reduces the aggregate principal amount of any Note;

2.    reduces the rate of interest on any Note (including Default Interest) or changes the principal maturity date of any Note or the redemption provisions;

3.    makes any Note payable in money or property other than that stated in the Note;

4.        makes any change in <u>Sections 11.2</u>, <u>11.4</u>, <u>11.5</u> or <u>13.10</u> hereof or this <u>Section 13.3</u> (or any related defined terms) or in the definition of "Required Holders";

5.        releases all or substantially all of the Collateral in any transaction or series of transactions;

6.        changes the definition of "Holder"; or

7.        subjects a Holder to any additional obligations;

shall not be binding unless consented to by each Holder.

(b)        Notwithstanding anything contained in this <u>Section 13.3</u> to the contrary, any amendment, modification, supplement or waiver affecting the rights, duties, liabilities, immunities or obligations of the Noteholder Agent or the Collateral Agent shall require the written consent of such party.  In executing any amendment, modification, supplement or waiver, the Noteholder Agent or the Collateral Agent shall be provided with, and shall be fully protected in relying upon, an Officer's Certificate and an opinion of counsel to the Company in form and substance reasonably satisfactory to the Noteholder Agent or the Collateral Agent, each stating that the execution of such amendment, modification, supplement or waiver is authorized or permitted by the terms of this Agreement and the other Note Documents, and that any conditions contained in this Agreement and the other Note Documents relating to the execution of such amendment, modification, supplement or waiver have been complied with.  The Noteholder Agent or the Collateral Agent may, but shall not be obligated to, enter into any such amendment, modification, supplement or waiver that affects its rights, duties, liabilities, immunities or obligations under this Agreement or any of the other Note Documents.

(c)        The Holders agree not to take any of the following actions without the consent of each affected Holder:

1.        any amendment of the definition of "Secured Parties" in the Security Agreement; or

2.        any amendment of any Intercreditor Agreement that materially and adversely affects the priority of a Holder's liens or payment rights.

**13.4        Release of Security Interest or Guaranty; Release of Guarantor.**  Upon the proposed sale or other disposition of any Collateral to any Person (other than an Affiliate of the Company) that is permitted by this Agreement, the Security Agreement, the Intercreditor Agreements and other Note Documents or the sale or other disposition of all of the Capital Stock of a Guarantor to any Person (other than an Affiliate of the Company) that is permitted by this Agreement, for which the Company or any of the Guarantors desire to obtain a security interest release or a release of the Guaranty from the Holders, the Company or such Guarantor shall deliver an Officer's Certificate to the Holders and the Collateral Agent stating (i) that the Collateral or the Capital Stock subject to such disposition is being sold or otherwise disposed of in compliance with the terms of this Agreement, the Security Agreement, the Intercreditor Agreements and other Note Documents and (ii) whether such disposition constitutes an Asset

SC1:3958837.9

Sale.  Upon the receipt of such Officer's Certificate, the Collateral Agent shall execute and deliver, at the Company's expense and without representation, warranty or recourse, such releases of its security interest in such Collateral or such Guaranty as may be reasonably requested and prepared by the Company or such Guarantor.

**13.5    Interest Rate Limitation.**  Notwithstanding anything to the contrary contained in any Note Document, the interest paid or agreed to be paid under the Note Documents shall not exceed the maximum rate of non-usurious interest permitted by Applicable Laws (the "**Maximum Rate**").  If any Holder shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Notes, or, if it exceeds such unpaid principal, refunded to the Company.  In determining whether the interest contracted for, charged, or received by any Holder exceeds the Maximum Rate, such Person may, to the extent permitted by Applicable Laws, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary redemptions and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Notes hereunder.

**13.6    Counterparts.**  This Agreement may be executed in any number of counterparts and by the parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

**13.7    Headings.**  The headings in this Agreement are for convenience of reference only and shall not limit or otherwise affect the meaning hereof.

**13.8    GOVERNING LAW.  THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER (INCLUDING, WITHOUT LIMITATION, ANY CLAIMS SOUNDING IN CONTRACT LAW OR TORT LAW ARISING OUT OF THE SUBJECT MATTER HEREOF AND ANY DETERMINATIONS WITH RESPECT TO POST-JUDGMENT INTEREST) SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES THEREOF THAT WOULD RESULT IN THE APPLICATION OF ANY LAW OTHER THAN THE LAW OF THE STATE OF NEW YORK.**

**13.9    CONSENT TO JURISDICTION.  SUBJECT TO CLAUSE (E) OF THE FOLLOWING SENTENCE, ALL JUDICIAL PROCEEDINGS BROUGHT AGAINST ANY PARTY ARISING OUT OF OR RELATING HERETO OR ANY OTHER NOTE DOCUMENTS, OR ANY OF THE OBLIGATIONS, SHALL BE BROUGHT SOLELY IN ANY FEDERAL COURT OF THE UNITED STATES OF AMERICA SITTING IN THE BOROUGH OF MANHATTAN OR, IF THAT COURT DOES NOT HAVE SUBJECT MATTER JURISDICTION, IN ANY STATE COURT LOCATED IN THE CITY AND COUNTY OF NEW YORK.  BY EXECUTING AND DELIVERING THIS AGREEMENT, EACH NOTE PARTY, FOR ITSELF AND IN CONNECTION WITH ITS PROPERTIES, IRREVOCABLY (A) ACCEPTS GENERALLY AND UNCONDITIONALLY THE EXCLUSIVE JURISDICTION AND VENUE OF SUCH COURTS (OTHER THAN WITH RESPECT TO ACTIONS BY THE HOLDERS OR**

THE COLLATERAL AGENT IN RESPECT OF RIGHTS UNDER ANY COLLATERAL DOCUMENT GOVERNED BY LAWS OTHER THAN THE LAWS OF THE STATE OF NEW YORK OR WITH RESPECT TO ANY COLLATERAL SUBJECT THERETO); (B) WAIVES ANY DEFENSE OF FORUM NON CONVENIENS; (C) AGREES THAT SERVICE OF ALL PROCESS IN ANY SUCH PROCEEDING IN ANY SUCH COURT MAY BE MADE BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO THE APPLICABLE NOTE PARTY AT ITS ADDRESS PROVIDED IN ACCORDANCE WITH <u>SECTION 13.1</u>; (D) AGREES THAT SERVICE AS PROVIDED IN CLAUSE (C) ABOVE IS SUFFICIENT TO CONFER PERSONAL JURISDICTION OVER THE APPLICABLE NOTE PARTY IN ANY SUCH PROCEEDING IN ANY SUCH COURT, AND OTHERWISE CONSTITUTES EFFECTIVE AND BINDING SERVICE IN EVERY RESPECT; AND (E) AGREES THAT THE COLLATERAL AGENT AND THE HOLDERS RETAIN THE RIGHT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO BRING PROCEEDINGS AGAINST ANY NOTE PARTY IN THE COURTS OF ANY OTHER JURISDICTION IN CONNECTION WITH THE EXERCISE OF ANY RIGHTS UNDER ANY COLLATERAL DOCUMENT OR THE ENFORCEMENT OF ANY JUDGMENT.

13.10   WAIVER OF JURY TRIAL.  EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER NOTE DOCUMENT OR THE TRANSACTIONS (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

13.11   **Survival of Warranties and Certain Agreements.**  All agreements, representations and warranties made herein or in any Note Document shall survive the execution and delivery of this Agreement, the execution and delivery of the Notes and Guarantees hereunder.  Notwithstanding anything in this Agreement or implied by law to the contrary, the agreements of the Company set forth in <u>Sections 10.1</u>, <u>10.2</u> and <u>10.4</u> shall survive repayment of the Notes and Guarantees and termination of this Agreement, and with respect to obligations in favor of the Noteholder Agent and the Collateral Agent, any earlier resignation or removal of such Noteholder Agent or Collateral Agent.

13.12   **Failure or Indulgence Not Waiver; Remedies Cumulative.**  No failure or delay on the part of any Holder or the Collateral Agent in the exercise of any power, right or privilege hereunder or under any Notes shall impair such power, right or privilege or be construed to be a waiver of any default or acquiescence therein, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other right, power or

**DRAFT**

privilege. All rights and remedies existing under this Agreement and the other Note Documents are cumulative to and not exclusive of, any rights or remedies otherwise available.

**13.13    Independence of Covenants.**    Except as otherwise expressly stated in a covenant herein, all covenants hereunder shall be given independent effect so that if a particular action or condition is not permitted by any of such covenants, the fact that it would be permitted by an exception to, or be otherwise within the limitations of, another covenant shall not avoid the occurrence of an Event of Default if such action is taken or condition exists.

**13.14    Marshaling; Payments Set Aside.**    Neither any Holder nor the Collateral Agent shall be under any obligation to marshal any assets in favor of the Company or any other party or against or in payment of any or all of the obligations. To the extent that the Company makes a payment or payments to any Holder (or to the Collateral Agent for the benefit of Holders), or any Holder or the Collateral Agent enforces any security interests or exercises their rights of setoff, and such payment or payments or the proceeds of such enforcement or setoff or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, any other state or federal law, common law or any equitable cause, then, to the extent of such recovery, the obligation or part thereof originally intended to be satisfied, and all Liens, rights and remedies therefor or related thereto, shall be revived and continued in full force and effect as if such payment or payments had not been made or such enforcement or setoff had not occurred.

**13.15    Set-Off.**    In addition to any rights now or hereafter granted under Applicable Law and not by way of limitation of any such rights, upon the occurrence and during the continuance of any Event of Default, the Collateral Agent and each Holder is hereby authorized by the Company at any time or from time to time, without notice to the Company or to any other Person, any such notice being hereby expressly waived, to set off and to appropriate and to apply any and all deposits (general or special, including Indebtedness evidenced by certificates of deposit, whether matured or unmatured, but not including trust accounts) and any other Indebtedness at any time held or owing by the Collateral Agent or that Holder to or for the credit or the account of the Company against and on account of the obligations and liabilities of the Company to the Collateral Agent or that Holder under this Agreement and the other Note Documents, including all claims of any nature or description arising out of or in connection with this Agreement or any other Note Document, irrespective of whether (i) the Collateral Agent or that Holder shall have made any demand hereunder or (ii) the principal of or the interest on the Notes or any other amounts due hereunder shall have become due and payable pursuant to Article VI.

**13.16    Classification of Transaction.**    Notwithstanding anything to the contrary herein contained, none of the Holders, the Noteholder Agent or the Collateral Agent, by entering into this Agreement or by any action pursuant hereto, will be, and none of the Company, Holders, Noteholder Agent or the Collateral Agent intend any Holder, Noteholder Agent or Collateral Agent to be, deemed a partner or joint venturer with the Company.

**13.17    Exculpation.**    The Note Parties acknowledge that none of the Noteholder Agent, the Collateral Agent nor any of their affiliated entities, nor the partners of any Holder nor any investment manager or adviser to any Holder, any investor or participant in the partners of any

Holders, nor any of their respective officers, directors, employees, partners, members or shareholders, assume any personal liability for any of the obligations under the Note Documents.

**13.18  Entire Agreement.**  The Note Documents are intended by the parties as a final expression of their agreement and intended to be a complete and exclusive statement of the agreement and understanding of the parties hereto in respect of the subject matter contained herein and therein.  There are no restrictions, promises, warranties or undertakings, other than those set forth or referred to herein and therein.  The Note Documents supersede all prior agreements and understandings between the parties with respect to such subject matter.  Nothing in any of the Note Documents shall confer upon any other Person other than the parties hereto any right, remedy or claim under this Agreement.

**13.19  Severability.**  In the event that any one or more of the provisions contained herein, or the application thereof in any circumstances, is held invalid, illegal or unenforceable in any respect for any reason, the validity, legality and enforceability of any such provision in every other respect and of the remaining provisions hereof shall not be in any way impaired or affected, it being intended that all of the Holders', Noteholder Agent's and Collateral Agent's rights and privileges shall be enforceable to the fullest extent permitted by law.

**13.20  Confidentiality.**  Each Holder, the Noteholder Agent and the Collateral Agent shall hold all non-public information obtained solely pursuant to the requirements of this Agreement in accordance with such Holder's, the Noteholder Agent's and the Collateral Agent's customary procedures for handling confidential information of this nature, it being understood and agreed by the Company that in any event a Holder, the Noteholder Agent or the Collateral Agent may make disclosures (a) to its and its affiliates' directors, members, managing partners, officers, employees and agents, including accountants, legal counsel, auditors and other advisors, (b) to the extent requested by any Governmental Authority, (c) to the extent required by Applicable Laws or regulations or by any subpoena or similar legal process, (d) to any other party to this Agreement or the other Note Documents, (e) in connection with the exercise of any remedies hereunder or any suit, action or proceeding relating to this Agreement or the enforcement of rights hereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section 13.20, to any assignees of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement, (g) with the consent of the Company, (h) to the extent such information (A) is or becomes publicly available other than as a result of a breach of this Section 13.20 or (B) becomes available to any Holder, the Noteholder Agent or the Collateral Agent on a nonconfidential basis from a source other than the Company, or (i) to any nationally recognized rating agency that requires access to information about a Holder's, the Noteholder Agent's or the Collateral Agent's or their respective Affiliates' investment portfolio in connection with ratings issued with respect to such Holder, the Noteholder Agent, the Collateral Agent or their respective Affiliates; provided that, unless specifically prohibited by Applicable Law or court order, each Holder, the Noteholder Agent and the Collateral Agent shall promptly notify to the extent permissible the Company of any request by any Governmental Authority or representative thereof (other than any such request in connection with any audit, regulatory examination or examination of the financial condition of such Holder, the Noteholder Agent or the Collateral Agent by such Governmental Authority) for disclosure of any such non-public information; and provided, further, that in no event shall any Holder, the Noteholder Agent or the Collateral Agent be obligated or required to

return any materials furnished by the Company or any of its Subsidiaries.  In addition, the Holders, the Noteholder Agent and the Collateral Agent may disclose the existence of the Note Documents and information about the Note Documents to market data collectors, similar service providers to the lending industry, and service providers to the Holders, the Noteholder Agent and the Collateral Agent.

**13.21    Ratable Sharing.**  The Holders hereby agree among themselves that if any of them shall, by realization upon security, through the exercise of any right of set-off or banker's lien, by counterclaim or cross action or by the enforcement of any right under the Note Documents or otherwise, or as adequate protection of a deposit treated as cash collateral under the Bankruptcy Code, receive payment or reduction of a proportion of the aggregate amount of principal, interest, fees and other amounts then due and owing to that Holder hereunder or under the other Note Documents (collectively, the "**Aggregate Amounts Due**" to such Holder) that is greater than the proportion received by any other Holder in respect of the Aggregate Amounts Due to such other Holder, then the Holder receiving such proportionately greater payment shall, unless such proportionately greater payment is required by the terms of this Agreement, (i) notify the Collateral Agent and each other Holder of the receipt of such payment and (ii) apply a portion of such payment to purchase assignments (which it shall be deemed to have purchased from each seller of an assignment simultaneously upon the receipt by such seller of its portion of such payment) of the Aggregate Amounts Due to the other Holders so that all such recoveries of Aggregate Amounts Due shall be shared by all Holders in proportion to the Aggregate Amounts Due to them; provided that (A) if all or part of such proportionately greater payment received by such purchasing Holder is thereafter recovered from such Holder upon the bankruptcy or reorganization of the Company or its Subsidiaries or otherwise, those purchases shall be rescinded and the purchase prices paid for such assignments shall be returned to such purchasing Holder ratably to the extent of such recovery, but without interest and (B) the foregoing provisions shall not apply to (1) any payment made by the Company pursuant to and in accordance with the express terms of this Agreement or (2) any payment obtained by a Holder as consideration for the assignment or transfer (other than an assignment or transfer pursuant to this Section 13.21) of its Note pursuant to Section 13.2.  The Company expressly consents to the foregoing arrangement and agrees that any purchaser of an assignment so purchased may exercise any and all rights of a Holder as to such assignment as fully as if that Holder had complied with the provisions of Section 13.2 with respect to such assignment.  In order to further evidence such assignment (and without prejudice to the effectiveness of the assignment provisions set forth above), each purchasing Holder and each selling Holder agree to comply with the provisions of Section 13.2 at the request of a selling Holder or a purchasing Holder.

**13.22    Independent Nature of Initial Holders' Obligations and Rights.**  The obligations of each Initial Holder under any Note Document are several and not joint with the obligations of any other Initial Holder, and no Initial Holder shall be responsible in any way for the performance of the obligations of any other Initial Holder under any Note Document. Nothing contained herein or in any other Note Document, and no action taken by any Initial Holder pursuant hereto or thereto, shall be deemed to constitute the Initial Holders as a partnership, an association, a joint venture or any other kind of entity, or create a presumption that the Initial Holders are in any way acting in concert or as a group with respect to such obligations or the transactions contemplated by the Note Documents.  Each Initial Holder

41

confirms that it has independently participated in the negotiation of the transaction contemplated hereby with the advice of its own counsel and advisors. Each Initial Holder shall be entitled to independently protect and enforce its rights, including, without limitation, the rights arising out of this Agreement or out of any other Note Documents, and it shall not be necessary for any other Initial Holder to be joined as an additional party in any proceeding for such purpose.

**13.23   No Strict Construction.**   The parties hereto have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement.

**13.24   No Advisory or Fiduciary Relationships.**   In connection with all aspects of each transaction contemplated hereby, each Note Party acknowledges and agrees that (i) it is an arm's-length commercial transaction between the Note Parties, on the one hand, and the Initial Holders, the Noteholder Agent, and the Collateral Agent, on the other hand, as the case may be, and each of the Note Parties is capable of evaluating and understanding and understands and accepts the terms, risks and conditions of the transactions contemplated hereby and by the other Note Documents (including any amendment, waiver or other modification hereof or thereof); (ii) in connection with the Transactions and the process leading to the Transactions, each Note Party is and has been acting solely as a principal and except as otherwise expressly agreed, is not acting as an advisor, agent or fiduciary, for the Note Parties or any of their respective Affiliates, stockholders, creditors or employees or any other Person; and (iii) the Initial Holders have not provided any legal, accounting, regulatory or tax advice with respect to any of the transactions contemplated hereby (including any amendment, waiver or other modification hereof or of any other Note Document) and each of the Note Parties has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate. Each Note Party hereby waives and releases, to the fullest extent permitted by law, any claims that it may have against any Initial Holder, the Noteholder Agent or the Collateral Agent or any of their Affiliates based upon or relating to any allegation that such party owes such Note Party or its Affiliates or representatives (or their respective Affiliates) any fiduciary duty with respect to any of the Transactions, and agrees, to the fullest extent permitted by law, that no Initial Holder, the Noteholder Agent or the Collateral Agent or any of their Affiliates will have any liability (whether direct or indirect) in respect of any claim for breach of fiduciary duty to any such person or any other Person with respect to any of the Transactions, including any stockholders, employees or creditors asserting a claim derivatively, in any such Person's name or otherwise on its behalf.

**13.25   Intercreditor Agreement.**   In the event of any conflict or inconsistency between the provisions of the Intercreditor Agreements and this Agreement, the provisions of the applicable Intercreditor Agreement shall control.

**13.26   Accounting Terms and Determinations.** Except as otherwise expressly provided herein, all accounting terms used herein shall be interpreted, all accounting determinations hereunder shall be made, and all financial statements required to be delivered hereunder shall be prepared in accordance with GAAP.

## ARTICLE XIV
## NOTEHOLDER AGENT AND COLLATERAL AGENT

**14.1      Appointment**.

(a)      Each Holder hereby irrevocably designates and appoints the Noteholder Agent as the agent of such Holder under this Agreement and the other Note Documents to which the Noteholder Agent is a party and each Holder irrevocably authorizes the Noteholder Agent, in such capacity, to enter into and to take such action on its behalf under the provisions of this Agreement and the Pari Passu First Lien (BP) Intercreditor Agreement, and each other Note Document to which it is a party, on behalf of such Holder, binding such Holder to the terms and conditions thereof.

(b)      Each Holder hereby irrevocably designates and appoints the Collateral Agent as the agent of such Holder under this Agreement, the Intercreditor Agreements and the other Note Documents to which the Collateral Agent is a party, and each such Holder irrevocably authorizes the Collateral Agent, in such capacity, to enter into and to take such action on its behalf under the provisions of this Agreement, the Security Agreement, the Intercreditor Agreements, and the other Note Documents to which the Collateral Agent is a party, binding such Holders to the terms and conditions thereof, and to exercise such powers and perform such duties as are expressly delegated to the Collateral Agent by the terms of this Agreement and the other Note Documents, together with such other powers as are reasonably incidental thereto.

(c)      Notwithstanding any provision to the contrary elsewhere in this Agreement or any other Note Document, the Agents shall not have any duties or responsibilities, except those expressly set forth herein or therein, or any fiduciary relationship with any Holder, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Note Document or otherwise exist against any of the Agents.

**14.2      Delegation of Duties**.  Each of the Agents may execute any of its duties under this Agreement and the other Note Documents by or through agents or attorneys-in-fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties.  No Agent shall be responsible for the negligence or misconduct of any agents or attorneys-in-fact selected by it with reasonable care.

**14.3      Exculpatory Provisions**.  None of the Agents nor any of its respective officers, directors, employees, agents, advisors, attorneys-in-fact or affiliates shall be (i) liable for any action taken or omitted to be taken by it or such Person under or in connection with this Agreement or any other Note Document believed to be in its powers (except to the extent that any of the foregoing are found by a final decision of a court of competent jurisdiction that is not subject to appeal to have resulted from its or such Person's own gross negligence or willful misconduct), (ii) responsible in any manner to any of the Holders for any recitals, statements, representations or warranties made by any Note Party or any officer thereof contained in this Agreement or any other Note Document or in any certificate, report, statement or other document referred to or provided for in, or received by such Agent under or in connection with, this Agreement or any other Note Document or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Note Document or for any failure of

43

any Note Party to perform its obligations hereunder or thereunder, (iii) liable to any Person for any action taken pursuant to direction from Required Holders, (iv) liable to any Person for special, punitive, indirect, consequential or incidental loss or damage of any kind whatsoever (including, but not limited to, lost profits), even if such Agent has been advised of the likelihood of such loss or damage, or (v) responsible in any manner for the validity, effectiveness, perfection, priority or enforceability of any security interest granted in the Collateral.  The Agents shall not be under any obligation to any Holder to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Note Document, or to inspect the properties, books or records of any Note Party, or file or record any financing statements, continuation statements, or any other documents to perfect or maintain the perfection of any Agent's Lien. No Agent shall be responsible for the negligence or misconduct of any other Agent.

**14.4    Reliance by Agents**.  Each of the Agents shall be entitled to conclusively rely, and shall be fully protected in relying, upon any instrument, writing, resolution, notice, consent, certificate, affidavit, letter, telecopy or email message, statement, order or other document or conversation believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons and upon advice and statements of legal counsel (including counsel to any Note Party), independent accountants and other experts selected by such Agent.  Each of the Agents may deem and treat the payee of any Note as the owner thereof for all purposes unless a written notice of assignment, negotiation or transfer thereof shall have been filed with the Agents.  Each of the Agents shall be fully justified in failing or refusing to take any action under this Agreement or any other Note Document unless such Agent shall first receive such advice or concurrence of the Required Holders (or, if so specified by this Agreement or such Note Document, all Holders) in the case of the Noteholder Agent, or of the Required Holders, if applicable, in the case of the Collateral Agent, as it deems appropriate or it shall first be indemnified to its satisfaction by the Holders, if applicable, against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action.  The Agents shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement and the other Note Documents in accordance with a request of the Required Holders (or, if so specified by this Agreement, all Holders) in the case of the Noteholder Agent, or of the Required Holders (or all Holders), if applicable, in the case of the Collateral Agent, and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Holders, if applicable, and all future Holders.

**14.5    Notice of Default**.  None of the Agents shall be deemed to have knowledge or notice of the occurrence of any Default or Event of Default unless such Agent has received notice from a Holder referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default".  The Collateral Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Holders (or, if so specified by this Agreement, all Holders).

**14.6    Non-Reliance on the Agents and Other Lenders**.  Each Holder expressly acknowledges that none of the Agents nor any of their respective officers, directors, employees, agents, advisors, attorneys-in-fact or affiliates have made any representations or warranties to it and that no act by the Agents hereafter taken, including any review of the affairs of a Note Party or any of their Affiliates, shall be deemed to constitute any representation or warranty by the

44

Agents to any Holder. Each Holder represents to the Agents that it has, independently and without reliance upon any other Holder or any Agent, and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, operations, property, financial and other condition and creditworthiness of the Note Parties and their Affiliates and made its own decision to acquire the Notes hereunder and enter into this Agreement. Each Holder also represents that it will, independently and without reliance upon the Agents or any other Holder, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Note Documents, and to make such investigation as it deems necessary to inform itself as to the business, operations, property, financial and other condition and creditworthiness of the Note Parties and their Affiliates. The Agents shall not have any duty or responsibility to provide any Holder with any notice, credit or other information concerning the business, operations, property, condition (financial or otherwise), prospects or creditworthiness of any Note Party or any of their Affiliates that may come into the possession of the Agents or any of their officers, directors, employees, agents, advisors, attorneys-in-fact or affiliates.

      **14.7**    **Indemnification**. The Holders agree to indemnify each of the Noteholder Agent, the Collateral Agent and their officers, directors, employees, affiliates, agents, advisors and controlling persons (each, an "Agent Indemnitee") (to the extent not reimbursed by the Company and without limiting the obligation of the Company to do so), ratably according to their respective pro rata share in effect on the date on which indemnification is sought under this Section 14.7 (with such pro rata share calculated as such Holder's pro rata share of the aggregate outstanding Notes), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, claims, including Environmental Claims, expenses or disbursements of any kind whatsoever that may at any time (whether before or after the payment of the Notes) be imposed on, incurred by or asserted against such Agent Indemnitee in any way relating to or arising out of, this Agreement, the Notes or any of the other Note Documents or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or any action taken or omitted by such Agent Indemnitee under or in connection with any of the foregoing; provided that no Holder shall be liable for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements that are found by a final decision of a court of competent jurisdiction not subject to appeal to have resulted from such Agent Indemnitee's gross negligence or willful misconduct. The agreements in this Section 14.7 shall survive the payment of the Notes and all other amounts payable hereunder, and the resignation or removal of any Agent hereunder.

      **14.8**    **Agents in Their Individual Capacity**. Each of the Agents and its affiliates may make loans to, accept deposits from and generally engage in any kind of business with any Note Party as though such Agent were not an Agent.

      **14.9**    **Successor Agents**. Any Agent (i) may resign as Agent upon thirty (30) Business Days' notice to the Holders and Company or (ii) may be removed at the direction of the Required Holders. If any Agent shall resign or be removed under this Agreement and the other Note Documents, then the Required Holders shall appoint a successor agent, which successor agent shall (unless an Event of Default shall have occurred and be continuing) be subject to

45

approval by the Company (which approval shall not be unreasonably withheld or delayed), whereupon such successor agent shall succeed to the rights, powers and duties of the applicable Agent, and the terms "Noteholder Agent", "Collateral Agent" or "Agents", as applicable, shall mean such successor agent effective upon such appointment and approval, and the former Agent's rights, powers and duties as Agent shall be terminated, without any other or further act or deed on the part of such former Agent or any of the parties to this Agreement or any Holders. If no successor Agent shall have been appointed by the Required Holders and shall have accepted such appointment within 25 days after the retiring Agent's giving of notice of resignation or if an Event of Default shall have then occurred and be continuing, then the retiring Agent may apply to a court of competent jurisdiction to appoint a successor Agent reasonably acceptable to the Required Holders.  After any retiring Agent's resignation as Agent, the provisions of this <u>Article 14</u> and of <u>Sections 10.2</u> and <u>10.4</u> shall continue to inure to its benefit.

**14.10    Agents under Security Documents**.  Each Holder hereby authorizes the Noteholder Agent and the Collateral Agent, as applicable, on behalf of and for the benefit of the Holders, to be the agent for and representative of the Holders with respect to the Collateral Documents. Notwithstanding anything herein to the contrary, the Noteholder Agent shall only act pursuant to direction from Required Holders or all Holders, as the context indicates, in exercising any of the rights, remedies and powers of the Noteholder Agent under the applicable Collateral Documents.

**14.11    Agent's Duties**.  Whenever reference is made in this Agreement or any Note Document to any action by, consent, designation, specification, requirement or approval of, notice, request or other communication from, or other direction given or action to be undertaken or to be (or not to be) suffered or omitted by any Agent or to any amendment, waiver or other modification of this Agreement to be executed (or not to be executed) by any Agent or to any election, decision, opinion, acceptance, use of judgment, expression of satisfaction or other exercise of discretion or rights or remedies to be made (or not to be made) by any Agent, it is understood that in all cases such Agent shall be acting, giving, withholding, suffering, omitting, making or otherwise undertaking and exercising the same (or shall not be undertaking and exercising the same) as directed in accordance with this Agreement and the Note Documents. Notwithstanding anything in this Agreement or any Note Document to the contrary, no Agent will in any event be required to take any action which exposes such Agent to personal liability, which is contrary to this Agreement, the Note Documents or law or with respect to which such Agent does not receive instructions or full indemnification satisfactory to it.  In determining whether the requisite Holders have directed any action or granted any approval requiring the direction or consent of the Holders, the Agents may request and rely on written statements from each of the Holders setting forth the outstanding principal amount of its Notes.  No Agent shall be required to take any such action or give any such approval prior to receiving such written statements. This provision is intended solely for the benefit of each Agent and its permitted successors and assigns and is not intended to, and will not, entitle the other parties hereto to any defense, claim or counterclaims under or in relation to any Note Documents, or confer any rights or benefits on any party hereto.

**14.12    Financial Liability**.  No provision of this Agreement or any other Note Document or any agreement or instrument contemplated hereby or thereby, the transactions contemplated hereby or thereby shall require any Agent to (i) expend or risk its own funds or

provide indemnities in the performance of any of its duties hereunder or the exercise of any of its rights or power or (ii) otherwise incur any financial liability in the performance of its duties or the exercise of any of its rights or powers if it shall have reasonable grounds for believing repayment of such funds or adequate indemnity against such risk or liability (including an advance of moneys necessary to take the action requested) is not reasonably assured to it except for such liability, if any, arising out of the gross negligence or willful misconduct in the performance of its duties hereunder as determined by a final judgment of a court of competent jurisdiction that is not subject to appeal.

**[Signature Pages Follow]**

47

**DRAFT**

      **IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed as of the day and year first above written.


<u>**COMPANY**</u>:                    **CUBIC ENERGY, LLC**


By: <u>**DRAFT**</u>_____
      Name:
      Title:

S-1

*Signature Page to Indenture*

**DRAFT**

**GUARANTOR:**          **CUBIC ASSET, LLC**


By: **DRAFT** _____
     Name:
     Title:

S-2

*Signature Page to Indenture*

**DRAFT**

**NOTEHOLDER AGENT:**      **WILMINGTON TRUST, NATIONAL ASSOCIATION**
as Noteholder Agent


By: **DRAFT**_____
Name:
Title:
Address:     50 South Sixth Street, Suite 1290
Minneapolis, Minnesota 55402
Attention: Cubic Energy Administrator
Facsimile: (612) 217-5651

*Signature Page to Indenture*

SC1:3958837

**DRAFT**

**COLLATERAL AGENT:**                    **WILMINGTON TRUST, NATIONAL ASSOCIATION**
as Collateral Agent


By: **DRAFT**                       
Name:
Title:

Address:     50 South Sixth Street, Suite 1290
Minneapolis, Minnesota 55402
Attention: Cubic Energy Administrator
Facsimile: (612) 217-5651

S-4

*Signature Page to Indenture*

**DRAFT**

## <u>INITIAL HOLDERS</u>:

**AIO III AIV, L.P.**

By:    Anchorage Capital Group, L.L.C., its
        Investment Manager

By:**DRAFT**_____
Name:
Title:


Address:  610 Broadway, 6th Floor
           New York, NY 10012
           Attention: Jessica Fainman

Initial Bank Account:

S-5

*Signature Page to Indenture*

**DRAFT**

**ANCHORAGE ILLIQUID
OPPORTUNITIES III, L.P.**

By:     Anchorage Capital Group, L.L.C., its
        Investment Manager

By:**DRAFT**
Name:
Title:

Address:  610 Broadway, 6th Floor
          New York, NY 10012
          Attention: Jessica Fainman

Initial Bank Account:

S-6

*Signature Page to Indenture*

**DRAFT**

**ANCHORAGE ILLIQUID
OPPORTUNITIES III (B), L.P.**

By:     Anchorage Capital Group, L.L.C., its
         Investment Manager

By:**DRAFT**                                      
Name:
Title:

Address:  610 Broadway, 6th Floor
              New York, NY 10012
              Attention: Jessica Fainman

Initial Bank Account:

S-7

*Signature Page to Indenture*

**CORBIN OPPORTUNITY FUND, L.P.**

By:    Corbin Capital Partners Management, LLC,
       Its General Partner

By:  **DRAFT**
      Name:  Daniel Friedman
      Title:   General Counsel

Address:     590 Madison Avenue, 31st Floor
          New York, NY 10022

Initial Bank Account:

*Signature Page to Indenture*

**DRAFT**

**O-CAP PARTNERS, L.P.**

By:    O-CAP Advisors, LLC, Its
      General Partner

By:    **DRAFT** _____
      Name:  Jared Sturdivant
      Title:   Manager

Address:    590 Madison Avenue, 31st
              Floor
              New York, NY 10022

Initial Bank Account:

*Signature Page to Indenture*

**O-CAP OFFSHORE MASTER FUND, L.P.**

By:    O-CAP Advisors, LLC, Its
      General Partner

By:    **DRAFT** _____
      Name:  Jared Sturdivant
      Title:    Manager

Address:    590 Madison Avenue, 31st Floor
          New York, NY 10022

Initial Bank Account:

S-10

*Signature Page to Indenture*

## ANNEX I
## DEFINITIONS

As used in this Agreement, the following terms shall have the following meanings:

"**Affiliate**" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, controls or is controlled by or is under common control with the Person specified; provided that Anchorage Capital Group, L.L.C., AIO III CE, L.P., Anchorage Illiquid Opportunities III, L.P., Anchorage Illiquid Opportunities III (B), L.P., AIO III AIV, L.P., O-CAP Capital Management, L.P., O-CAP Partners, L.P., O-CAP Offshore Master Fund, L.P., Corbin Opportunity Fund, L.P. and any of their respective employees, partners, officers, directors, funds or affiliates shall not be deemed Affiliates of the Company or any of its Subsidiaries for all purposes hereunder. For purposes of this definition, a Person shall be deemed to "**control**" or be "**controlled by**" a Person if such Person possesses, directly or indirectly, power to direct or cause the direction of the management and policies of such Person whether by contract or otherwise.

"**Agent Indemnitee**" has the meaning assigned to such term in Section 14.7.

"**Agents**" means the Collateral Agent and the Noteholder Agent.

"**Aggregate Amounts Due**" has the meaning assigned to such term in Section 13.21.

"**Agreement**" has the meaning assigned to such term in the introductory paragraph of this Agreement.

"**Applicable Law**" means, collectively, all statutes, laws, rules, regulations, ordinances, decisions, writs, judgments, decrees, and injunctions of any Governmental Authority affecting the Company or any of its Subsidiaries or any Collateral or any of their other assets, whether now or hereafter enacted and in force, and all Governmental Authorizations relating thereto.

"**Asset Sale**" means, as to any Person, the sale, lease, sublease, sale and leaseback, assignment, conveyance, transfer, license, sublicense or other disposition (for purposes of this definition, any of the foregoing, a "**disposition**") by such Person to any other Person of any right or interest in or to property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible, including, without limitation, the Capital Stock (including by issuance) of any of such Person's Subsidiaries. The term "Asset Sale" shall exclude:

(a)    disposition of cash or Cash Equivalents in the ordinary course of business;

(b)    disposition of property or assets by a Note Party to another Note Party;

(c)    disposition of production or inventory for cash in the ordinary course of business consistent with past practice for fair market value; and

(d)    dispositions of property in the ordinary course of business consistent with past practice which property the Company has reasonably determined is no longer necessary or useful in its business and such disposition is for cash and for fair market value; provided that the

aggregate amount of property that may be excluded from the definition of "Asset Sale" by this clause (d) shall not in the aggregate exceed $50,000 for all such transactions; provided, further, that dispositions involving any Oil and Gas Properties may not be excluded from the definition of "Asset Sale" pursuant to this clause (d).

"**Bankruptcy Code**" has the meaning assigned to such term in the preamble to this Agreement.

"**Bankruptcy Court**" has the meaning assigned to such term in the preamble to this Agreement.

"**Board of Directors**" shall mean, with respect to any person, (a) in the case of any corporation, the board of directors of such person, (b) in the case of any limited liability company, the board of managers or board of directors, as applicable, of such person, or if such limited liability company does not have a board of managers or board of directors, the functional equivalent of the foregoing, (c) in the case of any partnership, the board of directors or board of managers, as applicable, of the general partner of such person and (d) in any other case, the functional equivalent of the foregoing and, in the case of preceding clauses (a) through (d), any duly authorized committee or functional equivalent of any of the foregoing.

"**BP Call Options**" means the call options sold by Cubic Asset, LLC to BPEC pursuant to the 2002 ISDA Master Agreement, dated as of [●], 2016, among Cubic Asset, LLC and BPEC, as counterparty, together with any schedules and confirmations thereto, and each of the transactions thereunder, in each case, relating solely to the call options transactions entered into on [●], 2016.

"**BP Intercreditor Agreement**" means the Intercreditor Agreement, dated [●], 2016, among the Collateral Agent, BPEC, as Second Priority Secured Party and Second Priority Representative (each as defined therein), Wilmington Trust, National Association, as collateral agent under the Second Lien Security Agreement (as defined therein), and Cubic Asset, LLC and each direct or indirect subsidiary of Cubic Energy, LLC, as amended, supplemented or otherwise modified from time to time in accordance with the terms thereof.

"**BPEC**" means BP Energy Company.

"**Business Day**" means any day other than a Saturday, Sunday or day on which banks and trust companies in New York, New York are not required to be open.

"**Capital Lease**" means, as applied to any Person, any lease of any property (whether real, personal or mixed) by that Person as lessee that, in conformity with GAAP, is required to be accounted for as a capital lease on the balance sheet of that Person.

"**Capital Stock**" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation), including, without limitation, partnership interests and membership interests, and any and all warrants, rights, preemptive rights, conversion rights,

stock appreciation rights, employee stock plans, options to purchase or other similar arrangements or rights to acquire any of the foregoing.

"**Cash Equivalents**" means, as at any date of determination, (i) marketable securities (a) issued or directly and unconditionally guaranteed as to interest and principal by the United States Government or (b) issued by any agency of the United States the obligations of which are backed by the full faith and credit of the United States, in each case maturing within one year after such date; (ii) marketable direct obligations issued by any state of the United States of America or any political subdivision of any such state or any public instrumentality thereof, in each case maturing within one year after such date and having, at the time of the acquisition thereof, the highest rating obtainable from either Standard & Poor's ("**S&P**") or Moody's Investors Service, Inc. ("**Moody's**"); (iii) commercial paper maturing no more than one year from the date of creation thereof and having, at the time of the acquisition thereof, a rating of at least A-1 from S&P or at least P-1 from Moody's; (iv) certificates of deposit or bankers' acceptances maturing within one year after such date and issued or accepted by any commercial bank organized under the laws of the United States of America or any state thereof or the District of Columbia that (a) is at least "adequately capitalized" (as defined in the regulations of its primary Federal banking regulator) and (b) has Tier 1 capital (as defined in such regulations) of not less than $100,000,000; and (v) shares of any money market mutual fund that (a) has at least 95% of its assets invested continuously in the types of investments referred to in clauses (i) through (iv) above, (b) has net assets of not less than $500,000,000, and (c) has the highest rating obtainable from either S&P or Moody's.  For the avoidance of doubt, Cash Equivalents shall not include any auction rate or similar securities where the obligor is not absolutely required to redeem or repay the Indebtedness in question within such one year (or shorter) period.

"**Change in Law**" means the occurrence, after the date of this Agreement, of any of the following: (i) the adoption or taking effect of any law, rule, regulation, treaty or order, (ii) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof by any Governmental Authority, (iii) any determination of a court or other Governmental Authority or (iv) the making or issuance of any request, guideline or directive (whether or not having the force of law) by any Governmental Authority; <u>provided</u> that, notwithstanding anything herein to the contrary, (x) all requests, rules, guidelines or directives thereunder or issued in connection with the Dodd-Frank Wall Street Reform and Consumer Protection Act and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"**Chapter 11 Cases**" has the meaning assigned to such term in the preamble to this Agreement.

"**Closing**" has the meaning assigned to such term in Section 2.2.

"**Closing Date**" has the meaning assigned to such term in Section 2.2.

"**Code**" means the Internal Revenue Code of 1986, as amended to the date hereof from time to time hereafter, and any successor statute.

"**Collateral**" means, collectively, all of the real, personal and mixed property in which Liens are purported to be granted pursuant to the Collateral Documents as security for the Secured Obligations.

"**Collateral Agent**" means Wilmington Trust, National Association, as collateral agent under the Security Agreement.

"**Collateral Documents**" means the Security Agreement, the Intellectual Property Security Agreement, any Mortgage, any Landlord Personal Property Collateral Access Agreement, the BP Intercreditor Agreement, the Pari Passu First Lien (BP) Intercreditor Agreement and all other instruments, agreements or documents delivered by or on behalf of any Note Party pursuant to this Agreement or any of the other Note Documents in order to grant to, or perfect in favor of, the Collateral Agent, on behalf of Holders, a First Priority Lien on any Collateral of such Note Party as security for the Secured Obligations.

"**Company**" has the meaning assigned to such term in the introductory paragraph of this Agreement.

"**Company Intellectual Property**" means all Intellectual Property owned or purported to be owned by the Note Parties.

"**Compliance Certificate**" means an Officer's Certificate delivered in accordance with Section 7.1(b).

"**Confirmation Order**" shall mean the order of the Bankruptcy Court (i) confirming the Prepackaged Plan and (ii) authorizing the Restructuring Transactions pursuant to section 1129 of the Bankruptcy Code, as amended, modified or  supplemented from time to time in accordance with the terms of the Plan Support Agreement.

"**Covered Taxes**" shall mean Taxes other than Excluded Taxes and Other Taxes.

"**Debtors**" has the meaning assigned to such term in the preamble to this Agreement.

"**Default**" means a condition or event that, after notice or after any applicable grace period has lapsed, or both, would constitute an Event of Default.

"**Default Interest**" has the meaning assigned to such term in Section 2.3(c).

"**Effective Date**" has the meaning assigned to such term in the Prepackaged Plan.

"**Environmental Claim**" means any investigation, written notice, notice of violation, claim, action, suit, proceeding, demand, abatement order or other order or directive (conditional or otherwise), by any Governmental Authority or any other Person, arising (i) pursuant to or in connection with any actual or alleged violation of, or liability under, any Environmental Law; (ii) in connection with any Release or threatened Release of or exposure to Hazardous Material; or (iii) in connection with any actual or alleged damage, injury, threat or harm to, natural resources or the environment.

SC1:3958837.9

"**Environmental Laws**" means any and all current or future foreign or domestic, federal or state (or any subdivision of either of them), statutes, ordinances, orders, rules, regulations, judgments, Governmental Authorizations, or any other requirements of Governmental Authorities (i) imposing liability or establishing standards for conduct for the preservation and protection of the environment; (ii) relating to any Hazardous Materials; or (iii) occupational safety and health, industrial hygiene or land use matters, as they relate to protection or preservation of the environment or toxic materials, substances or wastes, in any manner applicable to the Company or any of its Subsidiaries or any Facility.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and regulations promulgated thereunder.

"**ERISA Affiliate**," as applied to any Person, means any trade or business (whether or not incorporated) under common control with that Person or treated as a single employer with that Person within the meaning of Section 414 of the Code or Section 4001 of ERISA.

"**ERISA Event**" means (a) a Reportable Event with respect to a Pension Plan or a Multiemployer Plan; (b) a withdrawal by the Company or any of its Subsidiaries, or any of their respective ERISA Affiliates from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a "substantial employer" (as defined in Section 4001(a)(2) of ERISA); (c) the incurrence by the Company or any of its Subsidiaries, or any of their respective ERISA Affiliates, of any liability under Title IV of ERISA with respect to the termination of any Pension Plan or the withdrawal or partial withdrawal of the Company or any of its Subsidiaries, or any of their respective ERISA Affiliates, from any Pension Plan or Multiemployer Plan, including but not limited to the imposition of any Lien in favor of the PBGC or any Pension Plan; (d) the receipt by the Company or any of its Subsidiaries, or any of their respective ERISA Affiliates, of any notice concerning the imposition of withdrawal liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent (within the meaning of Section 4245 of ERISA), in reorganization (within the meaning of Section 4241 of ERISA) or terminated (within the meaning of Section 4041A of ERISA); (e) the failure of a Plan or any trust thereunder intended to qualify for tax exempt status under Section 401 or 501 of the Code or other Applicable Law; (f) a determination that any Multiemployer Plan is, or is expected to be, in "critical" or "endangered" status (as defined in Section 432 of the Code or Section 305 of ERISA); (g) a failure by the Company or any of its Subsidiaries, or any of their respective ERISA Affiliates to timely make required contributions to a Pension Plan or Multiemployer Plan; (h) an event or condition which could reasonably be expected to constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; (i) the imposition of any liability under Title IV of ERISA, other than PBGC premiums due but not delinquent under Section 4007 of ERISA, upon the Company or any of its Subsidiaries, or any of their respective ERISA Affiliates; (j) the failure to meet the minimum funding standard of Section 412 or 430 of the Code or Section 302 of ERISA, whether or not waived, the failure to make by its due date a required installment under Section 430(j) of the Code with respect to a Pension Plan or the failure by the Company or any of its Subsidiaries, or any of their respective ERISA Affiliates, to make any required contribution to a Multiemployer Plan pursuant to Section 431 or 432 of the Code; (k) a Pension Plan becomes in an at-risk status pursuant to Section 303 of ERISA or Section 430 of the Code; or (l) any other

I-5

event or condition with respect to a Plan or Multiemployer Plan that could result in liability to the Company or any of its Subsidiaries, or any of their respective ERISA Affiliates.

"**Event of Default**" has the meaning assigned to such term in <u>Section 11.1</u>.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended, from time to time, and any successor statute.

"**Excluded Taxes**" means, with respect to any Holder or any other recipient of any payment to be made by or on account of any obligation of the Company hereunder (i) Taxes that are imposed on or measured by net income (however denominated), franchise Taxes and branch profits Taxes, in each case (a) imposed by the United States or by any Governmental Authority under the laws of which such recipient is organized or has its principal office or maintains its applicable lending office or (b) that are imposed as a result of a present or former connection between such recipient and the jurisdiction imposing such Tax (other than any such connection arising solely from such recipient having executed, delivered, become a party to, perfected a security interest in, or performed its obligations or received a payment under, or enforced, any of the Note Documents), (ii) any United States federal withholding Tax that (x) is imposed pursuant to a law in effect on the date on which at the time such recipient becomes a party hereto (or designates a new office), or (y) is attributable to such recipient's failure or inability (other than as a result of a Change in Law after such recipient becomes a party hereto) to comply with its obligations under <u>Sections 10.5(e)</u> and <u>(f)</u>, except, in the case of <u>clause (x)</u>, to the extent that such recipient (or its assignor, if any) was entitled, at the time of designation of a new office (or assignment), to receive additional amounts from the Company with respect to such withholding tax pursuant to <u>Section 10.5</u>, and (iii) any U.S. Federal withholding tax that is imposed under FATCA.

"**Facilities**" means any and all real property (including all buildings, fixtures or other improvements located thereon) now or hereafter owned, leased, subleased, operated or used by any Note Party.

"**FATCA**" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor versions thereof that are substantively and administratively comparable), any current or future regulations or official interpretations thereof, any agreement entered into pursuant to Section 1471(b) of the Code and any fiscal or regulatory rules or practices adopted pursuant to any intergovernmental agreement entered into in connection with the implementation of such sections.

"**Financial Statements**" means the financial statements required by <u>Section 7.1(a)</u>.

"**First Priority**" means, with respect to any Lien purported to be created in any Collateral pursuant to any Collateral Document, that such Lien is perfected and has priority over any other Lien on such Collateral (other than Permitted Liens pursuant to clause (xiii) of the definition thereof or pursuant to clauses (ii) through (vii) and (ix) of the definition thereof that by operation of law have priority over such Lien).

"**Fiscal Quarter**" means a fiscal quarter of a Fiscal Year.

"**Fiscal Year**" means the fiscal year of the Company and its Subsidiaries.

"**Flood Certificate**" means a "Standard Flood Hazard Determination Form" of the Federal Emergency Management Agency and any successor Governmental Authority performing a similar function.

"**Flood Program**" means the National Flood Insurance Program created by the United States Congress pursuant to the National Flood Insurance Act of 1968, the Flood Disaster Protection Act of 1973, the National Flood Insurance Reform Act of 1994 and the Flood Insurance Reform Act of 2004, in each case as amended from time to time, and any successor statutes.

"**Flood Zone**" means areas having special flood hazards as described in the National Flood Insurance Act of 1968, as amended from time to time, and any successor statute.

"**GAAP**" means the generally accepted accounting principles in the United States as in effect as of the Closing Date and from time to time.

"**Governmental Authority**" means (a) the government of the United States of America or any state or other political subdivision thereof, (b) any government or political subdivision of any other jurisdiction in which the Company or any of its Subsidiaries conducts business, or which properly asserts jurisdiction over any Facilities, (c) any entity properly exercising executive, legislative, judicial, regulatory or administrative functions of any such government or (d) any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative functions of or pertaining to government, any securities exchange and any self-regulatory organization.

"**Governmental Authorization**" means any permit, license, authorization, plan, directive, consent order or consent decree of or from any Governmental Authority.

"**Guaranty**" means any Guaranty substantially in the form attached hereto as Exhibit B.

"**Guarantors**" has the meaning assigned to such term in the introductory paragraph of this Agreement.

"**Hazardous Materials**" means any chemical, material or substance, the generation, use, storage, transportation or disposal of which, or the exposure to which, is prohibited, limited or regulated pursuant to an Environmental Law.

"**Hazardous Materials Activity**" means any past, current, proposed or threatened activity, event or occurrence involving any Hazardous Materials, including the use, manufacture, possession, storage, holding, presence, existence, location, Release, threatened Release, discharge, placement, generation, transportation, processing, construction, treatment, abatement, removal, remediation, disposal, disposition or handling of any Hazardous Materials, and any corrective action or response action with respect to any of the foregoing.

"**Hedging Agreement**" shall mean (a) any swap, cap, collar, forward purchase, derivative, option or similar agreements or arrangements designed or entered into in order to

protect against fluctuations in interest rates, currency exchange rates or commodity prices, either generally or under specific contingencies and (b) any transactions of any kind, and the related confirmations that are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Masters Agreement, or any other master agreement to the extent relating to any of the transactions described in the preceding clause (a), in each case, together with any related schedules or confirmations.

"**Holder**" **or** "**Holders**" means the Initial Holders and their respective successors or assignees in whose name a Note is registered.

"**Holder Joinder**" means a joinder substantially in the form attached hereto as <u>Exhibit C</u>.

"**Hydrocarbon Interests**" means all rights, titles, interests and estates now or hereafter acquired in and to oil and gas leases, oil, gas and mineral leases, or other liquid or gaseous hydrocarbon leases, mineral fee interests, overriding royalty and royalty interests, net profit interests and production payment interests, including any reserved or residual interests of whatever nature.

"**Hydrocarbons**" shall mean oil, gas, casinghead gas, drip gasoline, natural gasoline, condensate, distillate, liquid hydrocarbons, gaseous hydrocarbons and all products refined or separated therefrom.

"**Indebtedness**" means, as applied to any Person, (i) all obligations for borrowed money, (ii) that portion of obligations with respect to Capital Leases that is properly classified as a liability on a balance sheet in conformity with GAAP, (iii) any obligation owed for all or any part of the deferred purchase price of property or services (excluding trade payables incurred in the ordinary course of business), (iv) all obligations evidenced by notes, bonds, debentures or other similar instruments, (v) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to any property or assets acquired by such Person (even though the rights and remedies of the seller or the lender under such agreement in the event of default are limited to repossession or sale of such property or assets), (vi) all obligations, contingent or otherwise, as an account party under any letter of credit or banker's acceptance to the extent not reflected as trade liabilities on the balance sheet of such Person in accordance with GAAP, (vii) all contingent obligations in respect of obligations of the kind referred to in clauses (i) through (vi) above, and (viii) all indebtedness secured by any Lien on any property or asset owned or held by that Person regardless of whether the indebtedness secured thereby shall have been assumed by that Person or is nonrecourse to the credit of that Person, (ix) all guaranty obligations of such Person, (x) all debt equivalents of such Person, (xi) all obligations under or in respect of any Hedging Agreement and (xii) the indebtedness of any other Person (including any partnership in which such Person is a general partner and any unincorporated joint venture in which such Person is a joint venturer) to the extent such Person would be liable therefor under applicable law or any agreement or instrument by virtue of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such person shall not be liable therefor.

"**Indemnified Parties**" has the meaning assigned to such term in <u>Section 10.2</u>.

"**Indemnifying Parties**" has the meaning assigned to such term in <u>Section 10.2</u>.

"**Initial Holder" or "Initial Holders"** have the meaning assigned to such terms in the introductory paragraph of this Agreement.

"**Intellectual Property**" means (i) trademarks, service marks, brand names, certification marks, collective marks, d/b/a's, Internet domain names, logos, symbols, trade dress, trade names, and other indicia of origin, all applications and registrations for the foregoing, and all goodwill associated therewith and symbolized thereby, including all renewals of same; (ii) inventions and discoveries, whether patentable or not, and all patents, registrations, invention disclosures and applications therefor, including divisions, continuations, continuations-in-part and renewal applications, and including renewals, extensions, reexaminations and reissues; (iii) confidential information, trade secrets and know-how, including processes, schematics, business methods, formulae, drawings, prototypes, models, designs, customer lists and supplier lists; (iv) published and unpublished works of authorship, whether copyrightable or not (including, without limitation, databases and other compilations of information), copyrights therein and thereto, and registrations and applications therefor, and all renewals, extensions, restorations and reversions thereof; and (v) all other intellectual property or proprietary rights.

"**Intellectual Property Security Agreement**" has the meaning assigned to it in the Security Agreement.

"**Intercreditor Agreements**" mean (i) the BP Intercreditor Agreement, (ii) the Pari Passu First Lien (BP) Intercreditor Agreement and (iii) any other intercreditor agreement entered into from time to time with the consent of the Required Holders.

"**Interest Payment Date**" has the meaning assigned to such term in <u>Section 2.3(a)</u>.

"**Interest Rate**" has the meaning assigned to such term in <u>Section 2.3(a)</u>.

"**Investment**" means (i) the acquisition of assets (other than machinery, equipment and inventory in the ordinary course of business consistent with past practice), leasehold interests, mineral rights, wells, Capital Stock or Indebtedness of any Person, (ii) any deposit with, or advance, loan or extension of credit for the benefit of any Person or (iii) any other capital contribution or investment in any Person, including by way of guarantees, letter of credit support or release, forgiveness or cancellation of any Indebtedness.

"**IT Assets**" means computers, computer software, firmware, middleware, servers, workstations, routers, hubs, switches, data communications lines, and all other information technology equipment, and all associated documentation.

"**Landlord Consent**" means, with respect to any Leasehold Property, a letter, certificate or other instrument in writing from the lessor under the related lease, pursuant to which, among other things, the landlord consents to the granting of a mortgage on such Leasehold Property by the Note Party tenant, such Landlord Consent to be in form and substance reasonably acceptable to the Collateral Agent, but in any event sufficient for Collateral Agent to obtain a title policy with respect to such mortgage.

"**Landlord Personal Property Collateral Access Agreement**" means a Landlord Personal Property Collateral Access Agreement in form and substance reasonably satisfactory to the Collateral Agent (acting at the direction of the Required Holders).

"**Leasehold Property**" means any leasehold interest of any Note Party as lessee under any lease or sublease of real property, but does not include Oil and Gas Properties.

"**Lien**" means any lien, mortgage, deed of trust, pledge, assignment, security interest, hypothecation, fixed or floating charge or encumbrance of any kind (including any conditional sale or other title retention agreement, any financing lease in the nature thereof but not including Operating Leases and any agreement to give any security interest) and any trust or deposit or other preferential arrangement having the practical effect of any of the foregoing.

"**Losses**" has the meaning assigned to such term in Section 10.2.

"**Make-Whole Premium**" means, with respect to any redemption of any Note, whether before or after an Event of Default, the amount of the excess, if any, of (1) the present value at the date of redemption of (i) the principal amount of the Note being redeemed plus (ii) all remaining required interest payments due on such Note through the Maturity Date, computed using a discount rate equal to the Treasury Rate plus 50 basis points, over (2) the principal amount of such Note being redeemed.

"**Margin Stock**" has the meaning assigned to that term in Regulation U of the Board of Governors of the Federal Reserve System as in effect from time to time.

"**Material Adverse Effect**" means a material adverse effect on (a) the ability of the Company and its Subsidiaries to perform, or of the Collateral Agent and Holders to enforce, the obligations under the Note Documents, (b) the business, operations, properties, assets, condition (financial or otherwise) or prospects of the Company and its Subsidiaries (taken as a whole) or (c) the validity or enforceability of this Agreement or any of the other Note Documents or the rights or remedies of any of the Holders or the Collateral Agent hereunder or thereunder.

"**Material Contracts**" means any or all of the following, as the context may require: (i) any indenture, mortgage, deed of trust, agreement or other instrument; (ii) the agreements listed on Schedule 4.8 annexed hereto; and (iii) any other document, agreement or instrument that is material to the operation or business of the Company and its Subsidiaries, taken as a whole.

"**Maturity Date**" means [●], 2021.

"**Maximum Rate**" has the meaning assigned to such term in Section 13.5.

"**Mortgage**" means each agreement, including, but not limited to, a mortgage, deed of trust or any other document, creating and evidencing a Lien in favor of the Collateral Agent on any Oil and Gas Property or other real property asset, in form reasonably satisfactory to the Collateral Agent (acting at the direction of the Required Holders), in each case, with such schedules and including such provisions as shall be necessary to conform such document to applicable local or foreign law.

"**Mortgage Related Documents**" has the meaning assigned to such term in <u>Section 3.7(c)</u>.

"**Multiemployer Plan**" means a "multiemployer plan" (within the meaning of Section 4001(a)(3) of ERISA) to which the Company or any of its respective Subsidiaries, or any of their respective ERISA Affiliates, may have any liability.

"**Net Asset Sale Proceeds**" means, with respect to any Asset Sale, an amount equal to: (a) cash payments (including any cash received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise (including by way of milestone payment), but only as and when so actually received) received by the Company or any of its Subsidiaries from such Asset Sale, <u>minus</u> (b) any actual out-of-pocket costs and expenses incurred by the Company or any of its Subsidiaries in connection with such Asset Sale, including (i) income or gains taxes payable by the seller as a result of any gain recognized in connection with such Asset Sale, (ii) payment of the outstanding principal amount of, premium or penalty, if any, and interest and other amounts on any Indebtedness that is secured by a Lien on the assets in question and that is required to be repaid or otherwise comes due or would be in default under the terms thereof as a result of such Asset Sale and (iii) fees paid for legal, financial advisory, accounting, placement, underwriting or similar services and any printer costs in connection with such Asset Sale.

"**Net Insurance/Condemnation Proceeds**" means an amount equal to: (a) any cash payments or proceeds (including Cash Equivalents) received by the Company or any of its Subsidiaries (i) under any casualty insurance policy in respect of a covered loss thereunder of any assets of the Company or any of its Subsidiaries (for the avoidance of doubt, excluding any third party liability, business interruption or similar claims) or (ii) as a result of the taking of any assets of the Company or any of its Subsidiaries by any Person pursuant to the power of eminent domain, condemnation or otherwise, or pursuant to a sale of any such assets to a purchaser with such power under threat of such a taking, <u>minus</u> (b) any actual out-of-pocket costs and expenses incurred by the Company or any of its Subsidiaries in respect thereof, including (i) income or gains taxes payable as a result of any gain recognized in connection with such loss, taking or sale, (ii) payment of the outstanding principal amount of, premium or penalty, if any, and interest and other amounts on any Indebtedness that is secured by a Lien on the assets in question and that is required to be repaid or otherwise comes due or would be in default under the terms thereof as a result of such loss, taking or sale and (iii) fees paid for legal, financial advisory, accounting, placement, underwriting or similar services and any printer costs in connection with such loss, taking or sale.

"**Note**" and "**Notes**" has the meaning assigned to such term in <u>Section 2.1</u>.

"**Note Documents**" means this Agreement, the Notes, any Guaranty, the Collateral Documents and all certificates, instruments, agreements and other documents made or delivered in connection herewith and therewith.

"**Note Parties**" means, collectively, the Company and the Guarantors. "**Note Party**" means any of them.

I-11

"**Noteholder Agent**" has the meaning assigned to such term in the introductory paragraph of this Agreement.

"**OFAC**" means the Office of Foreign Assets Control of the United States Department of the Treasury, or any successor office or agency.

"**Officer's Certificate**" means a certificate executed by a Responsible Officer in his or her official (and not individual) capacity.

"**Oil and Gas Properties**" means (a) Hydrocarbon Interests; (b) the properties now or hereafter pooled or unitized with Hydrocarbon Interests; (c) all presently existing or future unitization, pooling agreements and declarations of pooled units and the units created thereby (including, without limitation, all units created under orders, regulations and rules of any Governmental Authority) which affect all or any portion of the Hydrocarbon Interests; (d) all operating agreements, contracts and other agreements, including production sharing contracts and agreements, which relate to any of the Hydrocarbon Interests or the production, sale, purchase, exchange or processing of Hydrocarbons from or attributable to such Hydrocarbon Interests; (e) all Hydrocarbons in and under and which may be produced and saved or attributable to the Hydrocarbon Interests, including all oil in tanks, and all rents, issues, profits, proceeds, products, revenues and other incomes from or attributable to the Hydrocarbon Interests; (f) all tenements, hereditaments, appurtenances and properties in any manner appertaining, belonging, affixed or incidental to the Hydrocarbon Interests; and (g) all properties, rights, titles, interests and estates described or referred to above, including any and all property, real or personal, now owned or hereinafter acquired and situated upon, used, held for use or useful in connection with the operating, working or development of any of such Hydrocarbon Interests or properties (excluding drilling rigs, automotive equipment, rental equipment or other personal property which may be on such premises for the purpose of drilling a well or for other similar temporary uses) and including any and all oil wells, gas wells, injection wells or other wells, buildings, structures, fuel separators, liquid extraction plants, plant compressors, pumps, pumping units, field gathering systems, tanks and tank batteries, fixtures, valves, fittings, machinery and parts, engines, boilers, meters, apparatus, equipment, appliances, tools, implements, cables, wires, towers, casing, tubing and rods, surface leases, rights-of-way, easements and servitudes together with all additions, substitutions, replacements, accessions and attachments to any and all of the foregoing.

"**Operating Lease**", as applied to any Person, means any lease (including leases that may be terminated by the lessee at any time) of any property (whether real, personal or mixed) that is not a Capital Lease.

"**Organizational Documents**" means, with respect to any Person, the (i) certificate of incorporation, certificate of formation or other similar or equivalent organizational charter or constitutional agreement or arrangement and (ii) bylaws, partnership agreement, limited liability company agreement, operating agreement, management agreement or other similar or equivalent organizational, charter or constitutional agreement or arrangement.

"**Other Taxes**" means any present or future stamp, documentary, excise, privilege, property, intangible taxes, charges or similar levies arising from any payment made under any

SC1:3958837.9

and all Note Documents or from the execution or delivery by the Company or any of the Guarantors or from the filing or recording or maintenance of, or otherwise with respect to the exercise or enforcement by the Holders of their respective rights under any and all Note Documents.

"**Pari Passu First Lien (BP) Intercreditor Agreement**" means the Pari Passu Intercreditor and Collateral Agency Agreement, dated as of [●], 2016, among Wilmington Trust, National Association, as collateral agent under the First Lien Security Agreement (as defined therein), Wilmington Trust, National Association, as Noteholder Agent under this Agreement, BPEC, as a Permitted Hedging Counterparty, other Permitted Hedging Counterparties party thereto from time to time, Cubic Asset, LLC and the other New Note Parties (as defined therein) party thereto from time to time, as amended, supplemented or otherwise modified from time to time in accordance with the terms thereof.

"**Participant**" has the meaning assigned to such term in <u>Section 13.2</u>.

"**PATRIOT Act**" has the meaning assigned to such term in <u>Section 3.12</u>.

"**PBGC**" means the Pension Benefit Guaranty Corporation established pursuant to Subtitle A of Title IV of ERISA (or any successor).

"**Pension Plan**" means a "pension plan" (as defined in Section 3(2) of ERISA), other than a Multiemployer Plan, subject to Title IV of ERISA that the Company or any of its Subsidiaries, or any of their respective ERISA Affiliates, sponsors or maintains, or at any time during the immediately preceding six years has sponsored or maintained or contributed to, or to which the Company or any of its Subsidiaries, or any of their respective ERISA Affiliates, makes, is making or is obligated to make contributions, or has any potential or outstanding liability.

"**Permitted Hedging Agreement**" has the meaning assigned to such term in <u>Section 8.14</u>; <u>provided</u> that the BP Call Options (and any obligations thereunder) shall not be deemed a Permitted Hedging Agreement for purposes of the Security Agreement and the Intercreditor Agreements.

"**Permitted Hedging Counterparty**" has the meaning assigned to such term in the definition of "Permitted Liens".

"**Permitted Holder**" means each of the Initial Holders and their respective affiliates.

"**Permitted Liens**" means:

        (i)      Liens incurred under any Note Document in favor of the Holders;

        (ii)     Liens securing claims or demands of operators under operating agreements, materialmen, mechanics, carriers, warehousemen, landlords and other like Persons imposed without action of such parties;

      (iii)    Liens incurred or deposits made in the ordinary course of business consistent with past practice in connection with worker's compensation, unemployment insurance, other business-related insurance, social security and other like laws;

      (iv)    leases, subleases, licenses and sublicenses granted to others in the ordinary course of business consistent with past practice not interfering in any material respect with the conduct of the business of the Note Parties, and any interest or title of a lessor, sublessor, licensor or sublicensor or under any lease, sublease, license or sublicense;

      (v)    Liens arising from judgments, decrees or attachments to the extent and only so long as such judgment, decree or attachment does not constitute an Event of Default;

      (vi)    easements, reservations, rights of way, restrictions, minor defects or irregularities in title and other similar liens affecting real property not interfering in any material respect with the ordinary conduct of the business of the Note Parties;

      (vii)    Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of custom duties in connection with the importation of goods;

      (viii)    Liens which constitute the right of set off of a customary nature of banker's lien with respect to amounts on deposit, whether arising by operation of law or by contract, in connection with the arrangements entered into with banks in the ordinary course of business consistent with past practice;

      (ix)    Liens for Taxes the payment of which, at the relevant time, is not required by Section 7.4 hereof or are being contested in good faith;

      (x)    precautionary financing statement filings regarding Operating Leases;

      (xi)    Liens granted in connection with Permitted Hedging Agreements pursuant to the written consent of the Required Holders who have consented to the granting of a Lien in respect thereof; provided that the counterparty to any such Hedging Agreement ("**Permitted Hedging Counterparty**") has entered into an Intercreditor Agreement;

      (xii)    Liens existing on the date hereof and set forth on Schedule 8.2; and

      (xiii)    Liens securing Indebtedness under a revolving facility permitted under the Organizational Documents of the Company; provided that, if such Liens are on the Collateral, such Liens may be secured on a senior basis, on a *pari passu* basis or on a junior basis and shall be subject to an Intercreditor Agreement.

"**Person**" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, governmental authority or other entity.

"**PIK Interest**" has the meaning assigned to such term in Section 2.3(b).

"**PIK Interest Note**" has the meaning assigned to such term in Section 2.3(b).

SC1:3958837.9

"**Plan**" means an employee benefit plan (as defined in Section 3(3) of ERISA) which is subject to ERISA, other than a Multiemployer Plan, and which the Company or any of its Subsidiaries or, maintains or to which the Company or any of its Subsidiaries makes, is making or is obligated to make contributions and includes any Pension Plan.

"**Plan Support Agreement**" means the Plan Support Agreement (including the term sheets and any other attachments thereto), dated as of December 10, 2015, by and among (i) Cubic Energy, Inc., Cubic Asset, LLC, Cubic Asset Holding, LLC, Cubic Louisiana, LLC and Cubic Louisiana Holding, LLC, (ii) each of the Prepetition Noteholders (as defined therein), (iii) BP Products North America, Inc. and BP Energy Company, (iv) Wells Fargo Energy Capital, Inc., and (v) Fossil Operating Inc., as may be amended, modified or supplemented from time to time in accordance with the terms thereof.

"**Prepackaged Plan**" has the meaning assigned to such term in the preamble to this Agreement.

"**Record Document**" means, with respect to any Leasehold Property, (i) the lease evidencing such Leasehold Property or a memorandum thereof, executed and acknowledged by the owner of the affected real property, as lessor, or (ii) if such Leasehold Property was acquired or subleased from the holder of a Recorded Leasehold Interest, the applicable assignment or sublease document, executed and acknowledged by such holder, in each case in form sufficient to give such constructive notice upon recordation and otherwise in form reasonably satisfactory to the Collateral Agent.

"**Record Holders**" means Holders of record of the Notes as of 5:00 P.M. New York City time on December 15, March 15, June 15 and September 15 with respect to the immediately succeeding Interest Payment Date.

"**Recorded Leasehold Interest**" means a Leasehold Property with respect to which a Record Document has been recorded in all places necessary or desirable, in the Collateral Agent's reasonable judgment, to give constructive notice of such Leasehold Property to third party purchasers and encumbrances of the affected real property.

"**Register**" has the meaning assigned to such term in Section 10.3(a).

"**Registered**" means issued by, registered with, renewed by or the subject of a pending application before any Governmental Authority or Internet domain name registrar.

"**Release**" means any release, spill, emission, leaking, pumping, pouring, injection, escaping, deposit, disposal, discharge, dispersal, dumping, leaching or migration of any Hazardous Material into the environment (including the abandonment or disposal of any barrels, containers or other closed receptacles containing any Hazardous Material), including the movement of any Hazardous Material through the air, soil, surface water or groundwater.

"**Reportable Event**" means (a) any of the events set forth in Section 4043 of ERISA or the regulations thereunder, other than any such event for which the thirty day notice requirement

under ERISA has been waived in regulations issued by the PBGC, or (b) a cessation of operations described in Section 4062(e) of ERISA.

"**Required Holders**" means (i) Holders of at least 66.66% of the aggregate principal amount of the outstanding Notes or (ii) at any time the Holders consist of only (A) Anchorage Capital Group, L.L.C. and its Affiliates (including Anchorage Illiquid Opportunities III, L.P., Anchorage Illiquid Opportunities III (B), L.P. and AIO III AIV LP,), on the one hand and (B) Corbin Opportunity Fund, L.P., O-CAP Partners, L.P. and O-CAP Offshore Master Fund, L.P. and their Affiliates on the other hand, with respect to the determination of Required Holders for Sections 7.11(c), 8.14, 11.4(a) (but only to the extent the Default or Event of Default waived is with respect to a Default or Event of Default under Article VIII) and 13.3(a) (to the extent such waiver or amendment relates to Article VIII or any definition related thereto that has the effect of modifying the actions prohibited by Article VIII) and the definition of "Permitted Hedging Agreement", all of the Holders.

"**Responsible Officer**" means the manager, chief executive officer, chief financial officer, president, any executive vice president or chief operating officer of the Company, but with respect to financial matters, means the manager, chief financial officer, treasurer or controller of the Company.

"**Restructuring Transactions**" has the meaning assigned to such term in the Prepackaged Plan.

"**Rule 144**" means Rule 144 as promulgated by the SEC under the Securities Act.

"**Scheduled Intellectual Property**" has the meaning assigned in Section 4.10(a).

"**SEC**" means the Securities and Exchange Commission.

"**Secured Obligations**" means the "Secured Obligations" as defined in the Security Agreement.

"**Securities Act**" means the Securities Act of 1933, as amended from time to time.

"**Security Agreement**" means the Security Agreement, dated as of [●], 2016, among the Company and each of its Subsidiaries party thereto from time to time and the Collateral Agent, as amended, supplemented or otherwise modified from time to time in accordance with the terms thereof.

"**Solvent**" means, with respect to any Person at any point in time, that (i) the sum of the debt and liabilities (including subordinated and contingent liabilities) of such Person and its Subsidiaries, on a consolidated basis, does not exceed the fair value of the present assets of such Person and its Subsidiaries, on a consolidated basis; (ii) the present fair saleable value of the assets of such Person and its Subsidiaries, on a consolidated basis, is greater than the total amount that will be required to pay the probable debt and liabilities (including subordinated and contingent liabilities) of such Person and its Subsidiaries, on a consolidated basis, as they become absolute and matured, (iii) the capital of such Person and its Subsidiaries, on a consolidated basis, is not unreasonably small in relation to the business of such Person and its

Subsidiaries, on a consolidated basis, contemplated as of such date; and (iv) such Person and its Subsidiaries, on a consolidated basis, have not incurred, or believe that they will incur, debts or other liabilities including current obligations beyond their ability to pay such debts or other liabilities as they mature in the ordinary course of business.  For the purposes of this definition, the amount of any contingent liability at any time shall be computed as the amount that, in light of all of the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

"**Subsidiary**" means, with respect to any Person, any corporation, partnership, association, joint venture or other business entity of which more than 50% of the total voting power of shares of stock or other ownership interests entitled (without regard to the occurrence of any contingency) to vote in the election of the Person or Persons (whether directors, managers, trustees or other Persons performing similar functions) having the power to direct or cause the direction of the management and policies thereof is at the time owned or controlled, directly or indirectly, by the Person or one or more of the other Subsidiaries of that Person or a combination thereof.

"**Taxes**" means all present or future taxes, levies, imposts, duties, deductions, withholdings, assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax, penalties and any similar liabilities with respect thereto.

"**Transactions**" means the consummation of the transactions contemplated by this Agreement, the other Note Documents and the Prepackaged Plan.

"**Treasury Rate**" means, as of any date of redemption, the yield to maturity as of such date of United States Treasury securities with a constant maturity (as compiled and published in the most recent Federal Reserve Statistical Release H.15 (519) that has become publicly available at least two (2) Business Days prior to such date (or, if such Statistical Release is no longer published, any publicly available source of similar market data)) most nearly equal to the period from such date to the Maturity Date; provided, however, that if the period from such date to the Maturity Date is less than one year, the weekly average yield on actually traded United States Treasury securities adjusted to a constant maturity of one year will be used.

"**UCC**" means the Uniform Commercial Code, as it exists on the date of this Agreement or as it may hereafter be amended, in the State of New York.

"**USCO**" means the United States Copyright Office (or any successor office).

"**USPTO**" means the United States Patent and Trademark Office (or any successor office).

**DRAFT**

## Exhibit A

## [FORM OF NOTE]

**THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"). THE HOLDER MAY NOT OFFER, SELL, TRANSFER, ASSIGN, PLEDGE, HYPOTHECATE, OR OTHERWISE DISPOSE OF OR ENCUMBER THE SECURITIES REPRESENTED BY THIS CERTIFICATE EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT AND THE RULES AND REGULATIONS PROMULGATED THEREUNDER OR UNLESS SUCH TRANSACTION IS EXEMPT FROM, OR NOT SUBJECT TO, SUCH REGISTRATION. THE ISSUER OF THESE SECURITIES MAY REQUEST AN OPINION OF LEGAL COUNSEL FOR THE HOLDER REASONABLY SATISFACTORY TO THE ISSUER THAT ANY SUCH OFFER, SALE, TRANSFER, ASSIGNMENT, PLEDGE, HYPOTHECATION, OR OTHER DISPOSITION OR ENCUMBRANCE IS EXEMPT FROM THE REGISTRATION PROVISIONS OF THE SECURITIES ACT AND THE RULES AND REGULATIONS PROMULGATED THEREUNDER, IF SUCH OFFER, SALE, TRANSFER, ASSIGNMENT, PLEDGE, HYPOTHECATION OR OTHER DISPOSITION OR ENCUMBRANCE IS NOT PURSUANT TO RULE 144, RULE 144A OR AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT.**

**FOR FURTHER INFORMATION REGARDING THE ISSUE DATE AND THE YIELD TO MATURITY OF THIS NOTE, THE HOLDER OF THIS NOTE SHOULD CONTACT THE OFFICE OF THE MANAGER OF CUBIC ENERGY, LLC AT 9870 PLANO ROAD, DALLAS, TEXAS 75238, WHO WILL PROMPTLY MAKE SUCH INFORMATION AVAILABLE.**

### CUBIC ENERGY, LLC

[Date]

### 14% SENIOR SECURED NOTE
### DUE 2021

No: [  ]

PRINCIPAL AMOUNT
U.S. $[    ]

Cubic Energy, LLC, a Delaware limited liability company (and its permitted successors and assigns, the "**Company**"), for value received, promises to pay to [Holder], or its permitted assigns, on [   ], 2021, the Principal Amount of this Note, <u>plus</u> accrued and unpaid interest hereon to such date of payment and Make-Whole Premium, if any. Interest shall accrue and shall be paid on this Note in accordance with the terms of the Indenture described below.

This Note is a duly authorized issue of 14% Senior Secured Notes Due 2021 of the Company (the "**Notes**"), issued under that certain Indenture, dated as of [●], 2016, by and among the Company, each guarantor party thereto from time to time (the "**Guarantors**"), the Initial Holders named therein, and the Noteholder Agent and Collateral Agent named therein (as amended, restated, supplemented or otherwise modified from time to time, the "**Indenture**"). All capitalized terms used but not defined herein shall have the meanings ascribed to them in the Indenture. This Note shall at all times be secured by the Collateral Documents, guaranteed by the Guarantors pursuant to the Guaranty, and subject to the terms and conditions of the Indenture.

The Company shall treat the Person in whose name this Note is registered as the owner hereof for the purpose of receiving payment and for all other purposes. The Principal Amount, Make-Whole Premium, if any, and interest on this Note (to the extent payable in cash) is payable when due in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts in the manner set forth in the Indenture.

The Holder's determination of the Principal Amount of this Note in accordance with the terms of the Indenture shall be conclusive and binding, absent manifest error.

1.      **Mandatory and Optional Redemption.**

This Note is subject to mandatory redemption and to redemption at the option of the Company, each as provided in Article VI of the Indenture.

2.      **Guaranty.**

Pursuant to the Guaranty, each Guarantor has unconditionally guaranteed the payment of all obligations of the Company under the Notes.

3.      **Collateral Documents.**

Pursuant to the Collateral Documents, the Company has secured its obligations under the Note and the Note Documents and each Guarantor has secured its obligations under the Guaranty by granting to the Holders, a Lien on substantially all of their right, title and interest in and to the "Collateral" (as defined in the Indenture). The Collateral shall be held by the Collateral Agent for the benefit of the Holders pursuant to the terms of the Security Agreement.

4.      **Indenture.**

The Company issued this Note under the Indenture. The terms of this Note include those stated in the Indenture, including, without limitation, the provisions in the Indenture with respect to covenants, Events of Default and remedies.

5.      **Modification of Notes.**

The Notes may be modified as provided in <u>Section 13.3</u> of the Indenture.

6.      **Non-Waiver.**

No course of dealing between the Company and the Holder of this Note or any delay or failure on the part of the Holder hereof in exercising any rights hereunder shall operate as a waiver of any rights of any Holder hereof, except to the extent expressly waived in writing by the Holder hereof.

7.      **Governing Law.**

Exhibit A-2

This Note shall be construed in accordance with and governed by the laws of the State of New York.

**8.       Successors and Assigns.**

All of the covenants, promises and agreements in this Note shall bind the Company's successors and assigns, whether so expressed or not.

**9.       Headings.**

The headings of the sections and paragraphs of this Note are inserted for convenience of reference only and shall not limit or otherwise affect the meaning hereof.

*[Signature Page to Follow]*

Exhibit A-3

**DRAFT**

      **IN WITNESS WHEREOF**, the Company has caused this Note to be signed in its name by a duly authorized officer and to be dated as of the day and year first above written.

**CUBIC ENERGY, LLC**

By:_____
     Name:
     Title:

DRAFT

**EXHIBIT B**

**[FORM OF GUARANTY]**

THIS GUARANTY, dated as of [_____] (this "Guaranty"), is made by each of the undersigned (each, a "Guarantor" and collectively, the "Guarantors") in favor of the Initial Holders (as defined below) and the other holders from time to time of the Notes (as defined below). The Initial Holders and such other holders are herein collectively called the "holders" and individually a "holder."

RECITALS:

WHEREAS, Cubic Energy, LLC (the "Company") has entered into that certain Indenture, dated as of [●], 2016, among Cubic Energy, LLC, each Guarantor from time to time party thereto, the initial holders named therein (the "Initial Holders"), the Noteholder Agent and the Collateral Agent named therein (as amended, restated, amended and restated, extended, supplemented or otherwise modified in writing from time to time, the "Indenture", the capitalized terms defined therein being used herein as therein defined).

WHEREAS, pursuant to the Indenture, the Company has issued $30,000,000 aggregate principal amount of 14% Senior Secured Notes due [●], 2021 (the "Notes");

WHEREAS, the Indenture requires the Company to cause any newly formed or acquired Subsidiary of the Company to execute and deliver this Guaranty to the Collateral Agent; and

WHEREAS, each Guarantor will receive direct and indirect benefits from the financing arrangements contemplated by the Indenture and has determined that entry into this Guaranty is in the best interests of such Guarantor.

NOW, THEREFORE, each Guarantor hereby covenants and agrees with, and represents and warrants to, each of the holders as follows:

1. **Guaranty.**

(a) Each Guarantor hereby irrevocably and unconditionally, jointly and severally, with the other Guarantors, guarantees to each holder, as principal and not merely as surety, the due and punctual payment in full of (i) the principal of, any interest accrued thereon (including, without limitation, interest accruing after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding), Make-Whole Premium and any other amounts due under the Notes when and as the same shall become due and payable (whether at stated maturity or by required or optional redemption or by acceleration or otherwise) and (ii) any other sums which may become due under the terms and provisions of the Notes, the Indenture or any other instrument referred to therein (all such obligations described in clauses (i) and (ii) above are herein called the "Guaranteed Obligations"). The guaranty in the preceding sentence is an absolute, present and continuing guaranty of payment and not of

collectability and is in no way conditioned or contingent upon any attempt to collect from the Company or any other guarantor of the Notes (including, without limitation, any other Guarantor hereunder) or upon any other action, occurrence or circumstance whatsoever. In the event that the Company shall fail so to pay any of such Guaranteed Obligations, each Guarantor agrees to pay the same when due to the holders entitled thereto, without demand, presentment, protest or notice of any kind, in lawful money of the United States of America, pursuant to the requirements for payment specified in the Notes and the Indenture.  To the extent permitted by law, each default in payment of any of the Guaranteed Obligations shall give rise to a separate cause of action hereunder and separate suits may be brought hereunder as each cause of action arises.

(b)      Each Guarantor agrees that the Notes issued in connection with the Indenture may (but need not) make reference to this Guaranty.  Each Guarantor agrees to pay and to indemnify and save each holder harmless from and against any damage, loss, cost or expense (including attorneys' fees) which such holder may incur or be subject to as a consequence, direct or indirect, of (x) any breach by such Guarantor, by any other guarantor or by the Company of any warranty, covenant, term or condition in, or the occurrence of any default under, this Guaranty, the Notes, the Indenture or any other instrument referred to therein, together with all expenses resulting from the compromise or defense of any claims or liabilities arising as a result of any such breach or default, (y) any legal action commenced to challenge the validity or enforceability of this Guaranty, the Notes, the Indenture or any other instrument referred to therein and (z) enforcing or defending (or determining whether or how to enforce or defend) the provisions of this Guaranty.

(c)      Each Guarantor hereby acknowledges and agrees that such Guarantor's liability hereunder is joint and several with the other Guarantors and any other Person(s) who may guarantee the obligations and Indebtedness under and in respect of the Notes and the Indenture.  Notwithstanding the foregoing provisions or any other provision of this Guaranty, the holders (on behalf of themselves and their successors and assigns) and each Guarantor hereby agree that if at any time the Guaranteed Obligations exceed the Maximum Guaranteed Amount (as defined below) determined as of such time with regard to such Guarantor, then this Guaranty shall be automatically amended to reduce the Guaranteed Obligations to the Maximum Guaranteed Amount.  Such amendment shall not require the written consent of any Guarantor or any holder and shall be deemed to have been automatically consented to by each Guarantor and each holder.  Each Guarantor agrees that the Guaranteed Obligations may at any time exceed the Maximum Guaranteed Amount without affecting or impairing the obligation of such Guarantor. "Maximum Guaranteed Amount" means, as of the date of determination with respect to a Guarantor, the lesser of (i) the amount of the Guaranteed Obligations outstanding on such date and (ii) the maximum amount that would not render such Guarantor's liability under this Guaranty subject to avoidance under Section 548 of the Bankruptcy Code (or any successor provision) or any comparable provision of applicable state law.

2.      **Obligations Absolute.**  The obligations of each Guarantor hereunder shall be primary, absolute, irrevocable and unconditional, irrespective of the validity or enforceability of the Notes, the Indenture or any other instrument referred to therein, shall not be subject to any

counterclaim, setoff, deduction or defense based upon any claim such Guarantor may have against the Company or any holder or otherwise, and shall remain in full force and effect without regard to, and shall not be released, discharged or in any way affected by, any circumstance or condition whatsoever (whether or not such Guarantor shall have any knowledge or notice thereof), including, without limitation: (a) any amendment or supplement to or modification or restatement of the Notes, the Indenture or any other instrument referred to therein (it being agreed that the obligations of such Guarantor hereunder shall apply to the Notes, the Indenture and any such other instrument as so amended, supplemented, modified or restated) or any assignment or transfer thereof or of any interest therein, or any furnishing, acceptance or release of any security for the Notes or the addition, substitution or release of any other Guarantor or any other entity or other Person primarily or secondarily liable in respect of the Guaranteed Obligations; (b) any waiver, consent, extension, indulgence or other action or inaction under or in respect of the Notes, the Indenture or any other instrument referred to therein; (c) any bankruptcy, insolvency, arrangement, reorganization, readjustment, composition, liquidation or similar proceeding with respect to the Company or its property; (d) any merger, amalgamation or consolidation of any Guarantor or of the Company into or with any other Person or any sale, lease or transfer of any or all of the assets of any Guarantor or of the Company to any Person; (e) any failure on the part of the Company for any reason to comply with or perform any of the terms of any other agreement with any Guarantor; (f) any failure on the part of any holder to obtain, maintain, register or otherwise perfect any security; or (g) any other event or circumstance which might otherwise constitute a legal or equitable discharge or defense of a Guarantor (whether or not similar to the foregoing), and in any event however material or prejudicial it may be to any Guarantor or to any subrogation, contribution or reimbursement rights any Guarantor may otherwise have.  Each Guarantor covenants that its obligations hereunder will not be discharged except by indefeasible payment in full in cash of all of the Guaranteed Obligations and all other obligations hereunder.

3.    **Waiver.** Each Guarantor unconditionally waives, to the fullest extent permitted by law, (a) notice of acceptance hereof, of any action taken or omitted in reliance hereon, and of any default by the Company in the payment of any amounts due under the Notes, the Indenture or any other instrument referred to therein, and of any of the matters referred to in Section 2 hereof, (b) all notices which may be required by statute, rule of law or otherwise to preserve any of the rights of any holder against such Guarantor, including, without limitation, presentment to or demand for payment from the Company or any Guarantor with respect to any Note, notice to the Company or to any Guarantor of default or protest for nonpayment or dishonor and the filing of claims with a court in the event of the bankruptcy of the Company, (c) any right to require any holder to enforce, assert or exercise any right, power or remedy including, without limitation, any right, power or remedy conferred in the Indenture or the Notes, (d) any requirement for diligence on the part of any holder and (e) any other act or omission or thing or delay in doing any other act or thing which might in any manner or to any extent vary the risk of such Guarantor or otherwise operate as a discharge of such Guarantor or in any manner lessen the obligations of such Guarantor hereunder.

4.    **Obligations Unimpaired.**

(a)    Each Guarantor authorizes the holders, without notice or demand to such Guarantor or any other Guarantor and without affecting its obligations hereunder, from

time to time (i) to renew, compromise, extend, accelerate or otherwise change the time for payment of all or any part of the Notes, the Indenture or any other instrument referred to therein; (ii) to change any of the representations, covenants, events of default or any other terms or conditions of or pertaining to the Notes, the Indenture or any other instrument referred to therein, including, without limitation, decreases or increases in amounts of principal, rates of interest or any other obligation; (iii) to take and hold security for the payment of the amounts due under the Notes, the Indenture or any other instrument referred to therein, for the performance of this Guaranty or otherwise for the Indebtedness guaranteed hereby and to exchange, enforce, waive, subordinate and release any such security; (iv) to apply any such security and to direct the order or manner of sale thereof as the holders in their sole discretion may determine; (v) to obtain additional or substitute endorsers or guarantors or release any Guarantor or any other Person or entity primarily or secondarily liable in respect of the Guaranteed Obligations; (vi) to exercise or refrain from exercising any rights against the Company, any Guarantor or any other Person; and (vii) to apply any sums, by whomsoever paid or however realized, to the payment of the Guaranteed Obligations and all other obligations owed hereunder.  The holders shall have no obligation to proceed against any additional or substitute endorsers or guarantors or to pursue or exhaust any security provided by the Company, such Guarantor, any other Person or any other Person or to pursue any other remedy available to the holders.  No payment by the Company, any Guarantor or any other Person shall modify, reduce, release or otherwise affect the liability of the Company or any Guarantor which shall, notwithstanding such payment, remain liable for the Guaranteed Obligations until such Guaranteed Obligations are paid.

(b)     If an event permitting the acceleration of the maturity of the principal amount of any Notes shall exist and such acceleration shall at such time be prevented or the right of any holder to receive any payment on account of the Guaranteed Obligations shall at such time be delayed or otherwise affected by reason of the pendency against the Company, any Guarantor or any other guarantors of a case or proceeding under a bankruptcy or insolvency law, each Guarantor agrees that, for purposes of this Guaranty and its obligations hereunder, the maturity of such principal amount shall be deemed to have been accelerated with the same effect as if the holder thereof had accelerated the same in accordance with the terms of the Indenture, and each such Guarantor shall forthwith pay such accelerated Guaranteed Obligations.

**5.     Subrogation, Subordination and Contribution.**

(a)     Each Guarantor will not exercise any rights which it may have acquired by way of subrogation under this Guaranty, by any payment made hereunder or otherwise, or accept any payment on account of such subrogation rights, or any rights of reimbursement, contribution or indemnity or any rights or recourse to any security for the Notes or this Guaranty unless and until all of the Guaranteed Obligations shall have been indefeasibly paid in full in cash.

(b)     Each Guarantor hereby subordinates the payment of all Indebtedness and other obligations of the Company or any other guarantor of the Guaranteed Obligations owing to such Guarantor, whether now existing or hereafter arising, including without limitation, all rights and claims described in clause (a) of this Section 5, to the indefeasible payment in full in cash of all of the Guaranteed Obligations.  If the Required Holders so request, any such Indebtedness or

other obligations shall be enforced and performance received by such Guarantor as trustee for the holders and the proceeds thereof shall be paid over to the holders promptly, in the form received (together with any necessary endorsements) to be applied to the Guaranteed Obligations, whether matured or unmatured, as may be directed by the Required Holders, but without reducing or affecting in any manner the liability of any Guarantor under this Guaranty.

(c)        If any amount or other payment is made to or accepted by any Guarantor in violation of either of the preceding clauses (a) and (b) of this Section 5, such amount shalt be deemed to have been paid to such Guarantor, and held in trust, for the benefit of the holders and shall be paid over to the holders promptly, in the form received (together with any necessary endorsements), to be applied to the Guaranteed Obligations, whether matured or unmatured, as may be directed by the Required Holders, but without reducing or affecting in any manner the liability of such Guarantor under this Guaranty.

(d)        Each Guarantor acknowledges that it will receive direct and indirect benefits from the financing arrangements contemplated by the Indenture and that its agreements set forth in this Guaranty (including this Section 5) are knowingly made in contemplation of such benefits.

(e)        Each Guarantor hereby agrees that, to the extent that a Guarantor shall have paid an amount hereunder to any holder that is greater than the net value of the benefits received, directly or indirectly, by such paying Guarantor as a result of the issuance of the Notes (such net value, its "Proportionate Share"), such paying Guarantor shall, subject to Section 5(a) and 5(b), be entitled to contribution from any Guarantor that has not paid its Proportionate Share of the Guaranteed Obligations.  Any amount payable as a contribution under this Section 5(e) shall be determined as of the date on which the related payment is made by such Guarantor seeking contribution and each Guarantor acknowledges that the right to contribution hereunder shall constitute an asset of such Guarantor to which such contribution is owed.  Notwithstanding the foregoing, the provisions of this Section 5(e) shall in no respect limit the obligations and liabilities of any Guarantor to the holders of the Notes hereunder or under the Notes, the Indenture or any other Note Document, and each Guarantor shall remain jointly and severally liable for the full payment and performance of the Guaranteed Obligations.

**6.        Reinstatement of Guaranty.** This Guaranty shall continue to be effective, or be reinstated, as the case may be, if and to the extent at any time payment, in whole or in part, of any of the sums due to any holder on account of the Guaranteed Obligations is rescinded or must otherwise be restored or returned by a holder upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of the Company, any Guarantor or any other guarantors, or upon or as a result of the appointment of a custodian, receiver, trustee or other officer with similar powers with respect to the Company, any Guarantor or any other guarantors or any part of its or their property, or otherwise, all as though such payments had not been made.

**7.        Representation and Warranties of Each Guarantor.**

Each Guarantor represents and warrants to each holder as follows:

(a)        Authorization, Etc. This Guaranty has been duly authorized by all necessary corporate or similar action on the part of such Guarantor, and this Guaranty constitutes a legal,

Exhibit B-5

valid and binding obligation of such Guarantor enforceable against such Guarantor in accordance with its terms, except as such enforceability may be limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally and (ii) general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

(b)     <u>Information Regarding the Company</u>.  Such Guarantor now has and will continue to have independent means of obtaining information concerning the affairs, financial condition and business of the Company.  No holder shall have any duty or responsibility to provide such Guarantor with any credit or other information concerning the affairs, financial condition or business of the Company which may come into possession of the holders.  Such Guarantor has executed and delivered this Guaranty without reliance upon any representation by the holders including, without limitation, with respect to (i) the due execution, validity, effectiveness or enforceability of any instrument, document or agreement evidencing or relating to any of the Guaranteed Obligations or any loan or other financial accommodation made or granted to the Company, (ii) the validity, genuineness, enforceability, existence, value or sufficiency of any property securing any of the Guaranteed Obligations or the creation, perfection or priority of any lien or security interest in such property or (iii) the existence, number, financial condition or creditworthiness of any other guarantors or sureties, if any, with respect to any of the Guaranteed Obligations.

(c)     <u>Solvency</u>.  Upon the execution and delivery hereof, such Guarantor will be Solvent, will be able to pay its debts as they mature, and will have capital sufficient to carry on its business.

**8.     Term of the Guaranty.** This Guaranty and all guarantees, covenants and agreements of the Guarantors contained herein shall continue in full force and effect and shall not be discharged until such time as all of the Guaranteed Obligations and all other obligations hereunder shall be indefeasibly paid in full in cash, and shall be subject to reinstatement pursuant to Section 6.

**9.     Survival; Entire Agreement.** All representations and warranties contained herein shall survive the execution and delivery of this Guaranty and may be relied upon by any subsequent holder, regardless of any investigation made at any time by or on behalf of any Initial Holder or any other holder.  All statements contained in any certificate or other instrument delivered by or on behalf of a Guarantor pursuant to this Guaranty shall be deemed representations and warranties of such Guarantor under this Guaranty.  Subject to the preceding sentence, this Guaranty embodies the entire agreement and understanding between each holder and the Guarantors and supersedes all prior agreements and understandings relating to the subject matter hereof.

**10.    Amendment and Waiver.**

(a)     <u>Requirements</u>.  Except as otherwise provided in the fourth paragraph of Section 1 of this Guaranty, this Guaranty may be amended, and the observance of any term hereof may be waived (either retroactively or prospectively), only in writing and as provided in the Indenture.

**DRAFT**

(b)    <u>Binding Effect</u>.  Any amendment or waiver consented to as provided in this Section 10 applies equally to all holders and is binding upon them and upon each future holder and upon each Guarantor without regard to whether any Note has been marked to indicate such amendment or waiver.  No such amendment or waiver will extend to or affect any obligation, covenant or agreement not expressly amended or waived or impair any right consequent thereon.  No course of dealing between a Guarantor and the holder nor any delay in exercising any rights hereunder or under any Note shall operate as a waiver of any rights of any holder.  As used herein, the term "this Guaranty" and references thereto shall mean this Guaranty as it may be amended, modified, supplemented or restated from time to time.

## 11.    Notices.

All notices and communications provided for hereunder shall be provided in the manner set out in the Indenture.  Any such notice must be sent:

(a)    if to any Guarantor, to the address set out below the signature of such Guarantor to this Guaranty, or such other address as such Guarantor shall have specified to the holders in writing, or

(b)    if to any holder, to such holder at the addresses specified for such communications set forth in the Indenture, or such other address as such holder shall have specified to the Guarantors in writing.

## 12.    Miscellaneous.

(a)    <u>Successors and Assigns</u>.  All covenants and other agreements contained in this Guaranty by or on behalf of any of the parties hereto bind and inure to the benefit of their respective successors and assigns whether so expressed or not.  No Guarantor may assign its rights or obligations under this Guaranty and any such assignment is null and void.  It is agreed and understood that any Person may become a Guarantor hereunder by executing a Guarantor Supplement substantially in the form of Exhibit 1 attached hereto and delivering the same to the holders.  Any such Person shall thereafter be a Guarantor for all purposes under this Guaranty.

(b)    <u>Severability</u>.  Any provision of this Guaranty that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall (to the full extent permitted by law), not invalidate or render unenforceable such provision in any other jurisdiction.

(c)    <u>Construction</u>.  Each covenant contained herein shall be construed (absent an express provision to the contrary) as being independent of each other covenant contained herein, so that compliance with any one covenant shall not (absent such express contrary provision) be deemed to excuse compliance with any other covenant.  Whether any provision herein refers to action to be taken by any Person, or which such Person is prohibited from taking, such provision shall be applicable whether such action is taken directly or indirectly by such Person.

(d)    <u>Headings</u>. The section and subsection headings in this Guaranty are for convenience of reference only and shall neither be deemed to be a part of this Guaranty nor

modify, define, expand or limit any of the terms or provisions hereof. All references herein to numbered sections, unless otherwise indicated, are to sections of this Guaranty. Words and definitions in the singular shall be read and construed as though in the plural and vice versa, and words in the masculine, neuter or feminine gender shall be read and construed as though in either of the other genders where the context so requires.

(e)    <u>Further Assurances</u>.  Each Guarantor agrees to execute and deliver all such instruments and take all such action as the Required Holders may from time to time reasonably request in order to effectuate fully the purposes of this Guaranty.

(f)    <u>**GOVERNING LAW.**</u>  **THIS GUARANTY THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER (INCLUDING, WITHOUT LIMITATION, ANY CLAIMS SOUNDING IN CONTRACT LAW OR TORT LAW ARISING OUT OF THE SUBJECT MATTER HEREOF AND ANY DETERMINATIONS WITH RESPECT TO POST-JUDGMENT INTEREST) SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES THEREOF THAT WOULD RESULT IN THE APPLICATION OF ANY LAW OTHER THAN THE LAW OF THE STATE OF NEW YORK.**

(g)    <u>**CONSENT TO JURISDICTION.**</u>  **SUBJECT TO CLAUSE (E) OF THE FOLLOWING SENTENCE, ALL JUDICIAL PROCEEDINGS BROUGHT AGAINST ANY PARTY ARISING OUT OF OR RELATING HERETO, SHALL BE BROUGHT SOLELY IN ANY FEDERAL COURT OF THE UNITED STATES OF AMERICA SITTING IN THE BOROUGH OF MANHATTAN OR, IF THAT COURT DOES NOT HAVE SUBJECT MATTER JURISDICTION, IN ANY STATE COURT LOCATED IN THE CITY AND COUNTY OF NEW YORK.  BY EXECUTING AND DELIVERING THIS AGREEMENT, THE GUARANTOR, FOR ITSELF AND IN CONNECTION WITH ITS PROPERTIES, IRREVOCABLY (A) ACCEPTS GENERALLY AND UNCONDITIONALLY THE EXCLUSIVE JURISDICTION AND VENUE OF SUCH COURTS (OTHER THAN WITH RESPECT TO ACTIONS BY THE HOLDERS, THE NOTEHOLDER AGENT OR THE COLLATERAL AGENT IN RESPECT OF RIGHTS UNDER ANY COLLATERAL DOCUMENT GOVERNED BY LAWS OTHER THAN THE LAWS OF THE STATE OF NEW YORK OR WITH RESPECT TO ANY COLLATERAL SUBJECT THERETO); (B) WAIVES ANY DEFENSE OF FORUM NON CONVENIENS; (C) AGREES THAT SERVICE OF ALL PROCESS IN ANY SUCH PROCEEDING IN ANY SUCH COURT MAY BE MADE BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO THE APPLICABLE NOTE PARTY AT ITS ADDRESS PROVIDED IN ACCORDANCE WITH SECTION 11; (D) AGREES THAT SERVICE AS PROVIDED IN CLAUSE (C) ABOVE IS SUFFICIENT TO CONFER PERSONAL JURISDICTION OVER ANY GUARANTOR IN ANY SUCH PROCEEDING IN ANY SUCH COURT, AND OTHERWISE CONSTITUTES EFFECTIVE AND BINDING SERVICE IN EVERY RESPECT; AND (E) AGREES THAT THE COLLATERAL AGENT, THE NOTEHOLDER AGENT AND THE HOLDERS RETAIN THE RIGHT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO BRING PROCEEDINGS AGAINST ANY GUARANTOR IN THE COURTS OF ANY OTHER JURISDICTION IN CONNECTION WITH THE**

SC1:3958837.9

EXERCISE OF ANY RIGHTS UNDER ANY COLLATERAL DOCUMENT OR THE ENFORCEMENT OF ANY JUDGMENT.

(h)    <u>WAIVER OF JURY TRIAL</u>.  EACH GUARANTOR HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS GUARANTY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH GUARANTOR (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

[*Remainder of page left intentionally blank; signature page follows*]

**DRAFT**

IN WITNESS WHEREOF, each Guarantor has caused this Guaranty to be duly executed and delivered as of the date and year first above written.

**Guarantors**

[GUARANTOR] [Repeat as necessary]

By _____
    Name:
    Title:

Address for notices:

_____
_____
_____

Exhibit B-10

DRAFT

<u>Exhibit 1 to Guaranty</u>

**[FORM OF GUARANTOR SUPPLEMENT]**

THIS GUARANTOR SUPPLEMENT (this "<u>Guarantor Supplement</u>"), dated [_____], is made by [_____] (the "<u>Additional Guarantor</u>"), in favor of the holders from time to time of the Notes issued pursuant to the Indenture described below.

RECITALS:

WHEREAS, pursuant to that certain Indenture, dated as of [●], 2016 (as amended, restated, amended and restated, extended, supplemented or otherwise modified in writing from time to time, the "<u>Indenture</u>", the capitalized terms defined therein being used herein as therein defined), among Cubic Energy, LLC (the "<u>Company</u>"), each guarantor from time to time party thereto, the initial holders named therein (the "<u>Initial Holders</u>"), the Noteholder Agent and the Collateral Agent named therein, the Company has issued $30,000,000 aggregate principal amount of 14% Senior Secured Notes due [●], 2021 (the "<u>Notes</u>");

WHEREAS, the Company is required pursuant to the Indenture to cause the Additional Guarantor to deliver this Guarantor Supplement in order to cause the Additional Guarantor to become a guarantor under the Guaranty, dated [●], 2016, executed by certain Subsidiaries of the Company (together with each entity that from time to time becomes a party thereto by executing a Guarantor Supplement, collectively, the "<u>Guarantors</u>") in favor of each holder from time to time of any of the Notes (as the same may be amended, restated, supplemented or otherwise modified from time to time, the "<u>Guaranty</u>"); and

WHEREAS, the Additional Guarantor has received and will receive substantial direct and indirect benefits from the Company's compliance with the terms and conditions of the Indenture and the Notes issued thereunder.

NOW THEREFORE, in consideration of the funds advanced to the Company by the Initial Holders under the Indenture and to enable the Company to comply with the terms of the Indenture, the Additional Guarantor hereby covenants, represents and warrants to the holders as follows:

The Additional Guarantor hereby becomes a Guarantor (as defined in the Guaranty) for all purposes of the Guaranty.  Without limiting the foregoing, the Additional Guarantor hereby (a) jointly and severally with the other Guarantors under the Guaranty, guarantees to the holders from time to time of the Notes the prompt payment in full when due (whether at stated maturity, by acceleration or otherwise) and the full and prompt performance and observance of all Guaranteed Obligations (as defined in Section 1 of the Guaranty) in the same manner and to the same extent as is provided in the Guaranty, (b) accepts and agrees to perform and observe all of the covenants set forth therein, (c) waives the rights set forth in Section 3 of the Guaranty, (d) makes the representations and warranties set forth in Section 7 of the Guaranty and (e) waives the rights, submits to jurisdiction, and waives service of process as described in Section 12 of the Guaranty.

Exhibit 1 to Guaranty-1

**DRAFT**

       Notice of acceptance of this Guarantor Supplement and of the Guaranty, as supplemented hereby, is hereby waived by the Additional Guarantor.

       The address for notices and other communications to be delivered to the Additional Guarantor pursuant to Section 11 of the Guaranty is set forth below.

       IN WITNESS WHEREOF, the Additional Guarantor has caused this Guarantor Supplement to be duly executed and delivered as of the date and year first above written.

[ADDITIONAL GUARANTOR]

By _____
      Name:
      Title:

Address for notices:

_____

_____

_____

Exhibit 1 to Guaranty-2

**DRAFT**

## EXHIBIT C
## [FORM OF HOLDER JOINDER]

This Holder Joinder is made this _____ day of _____, 20_____, by and among _____ (the "Transferee"), Cubic Energy, LLC (the "Company"), the Guarantors (as defined below), the Initial Holders (as defined below), the Noteholder Agent (as defined below) and the Collateral Agent (as defined below).  Reference is made to that certain Indenture, dated as of [●], 2016 (as amended, restated, amended and restated, extended, supplemented or otherwise modified in writing from time to time, the "Indenture", the capitalized terms defined therein being used herein as therein defined), among the Company, each guarantor from time to time party thereto (the "Guarantors"), the initial holders named therein (the "Initial Holders"), Wilmington Trust, National Association, as noteholder agent (the "Noteholder Agent") and the collateral agent named therein (the "Collateral Agent").

## RECITALS:

WHEREAS, the Indenture provides that each Holder may sell, transfer or assign all or any portion of its Note to any Person, at any time and such person shall become a party to the Indenture pursuant to a Holder Joinder; and

WHEREAS, the Transferee desires to purchase _____ aggregate principal amount of Notes (the "Transferred Notes") and become a "Holder" under the Indenture.

NOW, THEREFORE, in consideration of the mutual promises of the parties and as a condition of the purchase or receipt by the Transferee of the Transferred Notes, the Transferee acknowledges and agrees as follows:

1.      The Transferee has received and read the Indenture and acknowledges that the Transferee is acquiring the Transferred Notes subject to the terms and conditions of the Indenture.

2.      The Transferee agrees that the Transferred Notes being acquired by the Transferee are bound by and subject to all of the terms and conditions of the Indenture, hereby joins in, agrees to be bound by and shall have the benefit of all of the terms and conditions of the Indenture to the same extent as if the Transferee were an original party to the Indenture.  This Holder Joinder shall be attached to and become a part of the Indenture.

3.      The Transferee hereby makes the following representations and warranties:

        (a) it is specifically understood and agreed that such Transferee is not acquiring its Notes with a view towards the sale or distribution thereof within the meaning of the Securities Act in a transaction that would be in violation of the Securities Act;

Exhibit C-1

SC1:3958837.9

(b) such Transferee understands that the Notes and Guarantees will not be registered under the Securities Act by reason of their issuance by the Company and the Guarantors, respectively, in a transaction exempt from the registration requirements of the Securities Act, and that it must hold the Notes indefinitely unless a subsequent disposition thereof is registered under the Securities Act and applicable state securities laws or is exempt from such registration; and

(c) such Transferee understands that until such time as the same is no longer required under the applicable requirements of the Securities Act, each Note (and all securities issued in exchange therefor or replacement thereof) shall bear the following legend: "THIS NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE SOLD, TRANSFERRED, OR OTHERWISE DISPOSED OF EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER SUCH ACT AND APPLICABLE STATE SECURITIES LAWS OR PURSUANT TO AN APPLICABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF SUCH ACT AND SUCH LAWS".

4.     Any notice required as permitted by the Indenture shall be given to Transferee at the address listed beneath the Transferee's signature below.

IN WITNESS WHEREOF, the undersigned have executed this Holder Joinder as of the date first above written.

_____

[Transferee]

Address for notices:

_____

_____

_____

CUBIC ENERGY, LLC

By    _____
         Name:
         Title:

Exhibit C-2

SC1:3958837.9

**DRAFT**

[*Insert signature blocks for all Initial Holders that will remain after the transfer and all*

*Guarantors*]

Exhibit C-3

SC1:3958837.9

**DRAFT**

# EXHIBIT D

## FORM OF PERMITTED HEDGING AGREEMENT NOTICE

To:   Cubic Energy, LLC
      Wilmington Trust, National Association, as Noteholder Agent and Collateral Agent

     Reference is made to the Indenture, dated as of [●], 2016 (as amended, supplemented or modified from time to time, the "<u>Indenture</u>"), among Cubic Energy, LLC, the guarantors party thereto from time to time, the Initial Holders named therein, Wilmington Trust, National Association, as Noteholder Agent and Collateral Agent.  Capitalized terms used but not defined herein shall have the meanings assigned to such terms in the Indenture.

     Required Holders, pursuant to the [BP Intercreditor Agreement, Pari Passu First Lien (BP) Intercreditor Agreement] and Section 8.14 of the Indenture, hereby confirm that the attached Hedging Agreement is a Permitted Hedging Agreement[,] [and] the party thereto is a Permitted Hedging Counterparty [and the trades specifically described below or within the parameters below are permitted]. The Permitted Hedging Counterparty, the Noteholder Agent and the Collateral Agent may rely on this notice.

     [Describe trades / parameters]

 (Attachment)

                 [HOLDER]


                 By:_____
                    Name:
                    Title:


                 *[Insert additional signature blocks as required]*

DRAFT

# REGISTRATION RIGHTS AGREEMENT

This REGISTRATION RIGHTS AGREEMENT (this "Agreement"), dated as of [●], 2016, is made by and among Cubic Energy, LLC, a Delaware limited liability company (the "Company"), and each of the investors listed on Schedule I hereto (each, together with any Affiliates of such Persons that become a party to this Agreement in accordance with Section 10(e), an "Investor" and collectively, the "Investors").  Capitalized terms used but not otherwise defined herein shall have the meanings set forth in Section 9.

In consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties to this Agreement hereby agree as follows:

1. Piggyback Registrations.

(a) Right to Piggyback.  Whenever the Company proposes to register any of its Equity Securities (including any proposed registration of the Company's Equity Securities by any third party) under the Securities Act (other than pursuant to a registration on Form S-4 or S-8 or any successor or similar forms), whether or not for sale for its own account, and the registration form to be used may be used for the registration of Registrable Securities (a "Piggyback Registration"), the Company shall give written notice within ten (10) Business Days to each Investor holding at least five percent of the then issued and outstanding Interests ("Significant Investor") of its intention to effect such a registration and will include in such registration all Registrable Securities with respect to which the Company has received written requests for inclusion therein from such Significant Investor(s) within ten (10) Business Days after the receipt of the Company's notice.

(b) Piggyback Expenses.  The Registration Expenses (as defined below) of the holders of Registrable Securities shall be paid by the Company in all Piggyback Registrations in accordance with and up to the limits set forth in Section 5 hereof.

(c) Priority on Primary Registrations.  If a Piggyback Registration is an underwritten primary registration on behalf of the Company and the managing underwriters advise the Company in writing that, in their opinion, the number of securities requested to be included in such offering exceeds the number which can be sold in an orderly manner in such offering within a price range acceptable to the Company, then the Company shall include in such registration (i) first, the securities the Company proposes to sell that, in the opinion of such underwriters, can be sold in an orderly manner within such price range, (ii) second, the Registrable Securities requested to be included in such registration, if any, that, in the opinion of such underwriters, can be sold in an orderly manner within such price range, pro rata among the respective holders thereof on the basis of the number of Registrable Securities owned by each such holder, and (iii) third, other securities requested (and permitted) to be included in such registration, if any, that, in the opinion of such underwriters, can be sold in an orderly manner within such price range, pro rata among the holders of such securities on the basis of the number of such securities owned by each such holder.

(d) <u>Priority on Secondary Registrations</u>. If a Piggyback Registration is an underwritten secondary registration on behalf of holders of the Company's securities other than holders of Registrable Securities and the managing underwriters advise the Company in writing that, in their opinion, the number of securities requested to be included in such offering exceeds the number which can be sold in an orderly manner in such offering within a price range acceptable to the holders of a majority of the securities initially requested to be included in such registration, then the Company shall include in such registration (i) <u>first</u>, the securities requested to be included therein by the holders requesting such registration and the Registrable Securities requested to be included in such registration, in each case, that, in the opinion of such underwriters, can be sold in an orderly manner within such price range, pro rata among the holders of such securities and the holders of such Registrable Securities on the basis of the number of securities owned by each such holder, and (ii) <u>second</u>, other securities requested (and permitted) to be included in such registration, if any, that, in the opinion of such underwriters, can be sold in an orderly manner within such price range.

(e) <u>Selection of Underwriters</u>. If any Piggyback Registration is an underwritten offering, the selection of the investment banker(s) and managing underwriter(s) for the offering shall be at the sole discretion of the Company.

2.    <u>S-3 Shelf Registration.</u>

(a) <u>Right to Effect Shelf Takedowns</u>. Any Significant Investor shall be entitled, at any time and from time to time when an S-3 Shelf Registration Statement is effective, to sell such Registrable Securities as are then registered pursuant to such S-3 Shelf Registration Statement (each, a "<u>Shelf Takedown</u>"), but only upon not less than ten Business Days' prior written notice to the Company (if such takedown is to be underwritten). Such Significant Investor shall be entitled to request that a Shelf Takedown be an underwritten offering; <u>provided</u>, <u>however</u>, that the number of Registrable Securities included in each such underwritten Shelf Takedown (i) would reasonably be expected to yield gross proceeds to such Significant Investor of at least $10,000,000 (based on the then-current market prices) or (ii) consists of all Registrable Securities then owned by such Significant Investor. Such Significant Investor shall give the Company prompt written notice of the consummation of each Shelf Takedown (whether or not underwritten).

(b) <u>Priority on Underwritten Shelf Takedowns</u>. The Company may include Interests other than Registrable Securities in an underwritten Shelf Takedown for any accounts on the terms provided below, but only with the consent of the managing underwriters of such offering and whichever of the Significant Investors has requested such Shelf Takedown. If the managing underwriters of the requested underwritten Shelf Takedown advise the Company and the requesting Significant Investor in writing that in their opinion the number of Interests proposed to be included in the underwritten Shelf Takedown exceeds the number of Interests which can be sold in an orderly manner in such offering within a price range acceptable to the Significant Investor requesting such Shelf Takedown, the Company shall include in such underwritten Shelf Takedown (i) <u>first</u>, the number of Interests that the requesting Significant Investor proposes to sell, and (ii) <u>second</u>, the number of Interests proposed to be included therein by any other Persons (including Interests to be sold for the account of the Company) allocated among such other Persons in such manner as the Company may determine. The provisions of this

2

paragraph (b) apply only to a Shelf Takedown that a Significant Investor has requested to be an underwritten offering.

(c) <u>Selection of Underwriters</u>. If any of the Registrable Securities are to be sold in an underwritten Shelf Takedown initiated by a Significant Investor, the Significant Investor requesting the Shelf Takedown shall have the right to select the investment banker(s) and managing underwriter(s) to administer the offering; <u>provided</u> that any investment banker or managing underwriter selected by the Significant Investor shall be selected subject to the approval of the Company, which approval shall not be unreasonably withheld.

3. <u>Holdback Agreements</u>.

(a) Each holder of Registrable Securities, solely so long as such holder of Registrable Securities is a Significant Investor, agrees that, in connection with any Piggyback Registration or Shelf Takedown that is an underwritten public offering of the Company's Equity Securities, it shall not (except as part of such underwritten public offering) (i) offer, sell, contract to sell, pledge or otherwise dispose of (including sales pursuant to Rule 144), directly or indirectly, any Equity Securities of the Company, (ii) enter into a transaction which would have the same effect as described in clause (i) of this <u>Section 3(a)</u>, (iii) enter into any swap, hedge or other arrangement that transfers, in whole or in part, any of the economic consequences or ownership of any Equity Securities of the Company, whether such transaction is to be settled by delivery of such Equity Securities, in cash or otherwise, or (iv) publicly disclose the intention to enter into any transaction described in clause (i), (ii) or (iii) above, in each case of clauses (i)-(iv) above, from the date on which the Company gives notice to the holders of Registrable Securities that a preliminary prospectus has been circulated for the underwritten public offering to the date that is 180 days following the date of the final prospectus for such underwritten public offering, except as otherwise agreed to in writing by the underwriters managing such registered public offering (and such underwriters shall be instructed to not agree to any deviation from the foregoing provisions of this Section 3(a) for the benefit of one Significant Investor unless all Significant Investors are entitled to the same deviation) and the Company (such period, the "<u>Holdback Period</u>").  If (x) the Company issues an earnings release or other material news, or a material event relating to the Company and its Subsidiaries occurs, during the last 17 days of the Holdback Period or (y) prior to the expiration of the Holdback Period, the Company announces that it will release earnings results during the 16-day period beginning upon the expiration of the Holdback Period, then, to the extent necessary for a managing or co-managing underwriter of a registered offering required hereunder to comply with FINRA Rule 2711(f)(4), the Holdback Period shall be extended until 18 days after the earnings release or the occurrence of the material news or event, as the case may be (such extended period, the "<u>Holdback Extension</u>").  The Company may impose stop-transfer instructions with respect to its securities that are subject to the foregoing restriction until the end of such period, including any period of Holdback Extension.

(b) In connection with any Piggyback Registration or Shelf Takedown that is an underwritten public offering of the Company's Equity Securities, each holder of Registrable Securities agrees to enter into any reasonably customary lockup or similar agreement requested by the underwriters managing the registered public offering.  The restrictions contained in any

3

**DRAFT**

such lockup or similar agreement shall be deemed to satisfy and supersede the conditions set forth in <u>Section 3(a)</u>.

(c) The Company (i) agrees not to effect any Public Sale or distribution of its Equity Securities during the seven days prior to and during the 90-day period beginning on the effective date of any underwritten Piggyback Registration or Shelf Takedown (except as part of such underwritten offering or pursuant to registrations on Form S-4 or S-8 or any successor form or, in the event of a Holdback Extension, for such longer period until the end of such period of Holdback Extension), unless the underwriters managing the registered public offering otherwise agree that it will not adversely affect the applicable Piggyback Registration or Shelf Takedown, and (ii) to the extent not inconsistent with applicable law, except as otherwise permitted by the holders of a majority of the Registrable Securities included in such Piggyback Registration or Shelf Takedown, shall cause each holder of its Equity Securities purchased from the Company at any time after the date of this Agreement (other than in a registered public offering) to agree not to effect any Public Sale or distribution (including sales pursuant to Rule 144) of any such securities during such period (as extended by any Holdback Extension) except as part of such underwritten offering, if otherwise permitted, unless the underwriters managing the registered public offering otherwise agree that it will not adversely affect the applicable Piggyback Registration or Shelf Takedown.

(d) Notwithstanding any other provision contained in this Agreement, the Company shall not include in any underwritten Piggyback Registration or Shelf Takedown any portion of Equity Securities held by any officers or employees of the Company or any of its Subsidiaries the inclusion of which the underwriters of such Piggyback Registration or Shelf Takedown, as the case may be, determine is likely to adversely affect such offering.

4.  <u>Registration Procedures</u>.  Whenever the holders of Registrable Securities have requested that any Registrable Securities be registered pursuant to this Agreement, the Company shall use its reasonable best efforts to:

(a) effect the registration and the sale of such Registrable Securities in accordance with the intended method of disposition thereof as expeditiously as possible;

(b) in accordance with the Securities Act, as applicable, and all applicable rules and regulations promulgated thereunder, prepare and (within sixty (60) days after the end of the period within which requests for inclusion in such registration may be given to the Company) file with the Securities and Exchange Commission, a registration statement with respect to such Registrable Securities and thereafter use its commercially reasonable efforts to cause such registration statement to become effective as soon as practicable thereafter (<u>provided</u> that, before filing a registration statement or prospectus or any amendments or supplements thereto, the Company shall furnish to the counsel selected by the holders of a majority of the Registrable Securities covered by such registration statement copies of all such documents proposed to be filed, which documents shall be subject to the review and comment of such counsel);

(c) (i) notify in writing each holder of Registrable Securities of the effectiveness of each registration statement filed hereunder and prepare and file with the Securities and Exchange Commission such amendments and supplements to such registration statement and the

prospectus used in connection therewith as may be necessary to keep such registration statement effective for a period of either (x) not less than six months (subject to extension pursuant to Section 7(b)) or, if such registration statement relates to an underwritten offering, such longer period as in the opinion of counsel for the underwriters a prospectus is required by law to be delivered in connection with sales of Registrable Securities by an underwriter or dealer or (y) such shorter period as will terminate when all of the securities covered by such registration statement have been disposed of in accordance with the intended methods of disposition by the seller or sellers thereof set forth in such registration statement (but in any event not before the expiration of any longer period required under the Securities Act), and (ii) comply with the provisions of the Securities Act with respect to the disposition of all securities covered by such registration statement until such time as all of such securities have been disposed of in accordance with the intended methods of disposition by the seller or sellers thereof set forth in such registration statement;

(d) furnish to each seller of Registrable Securities thereunder such number of copies of such registration statement, each amendment and supplement thereto, the prospectus included in such registration statement (including each preliminary prospectus), each Free Writing Prospectus and such other documents as such seller may reasonably request in order to facilitate the disposition of the Registrable Securities owned by such seller;

(e) use its commercially reasonable efforts to register or qualify such Registrable Securities under such other securities or blue sky laws of such jurisdictions as any seller reasonably requests and do any and all other acts and things which may be reasonably necessary or advisable to enable such seller to consummate the disposition in such jurisdictions of the Registrable Securities owned by such seller (provided that the Company shall not be required to (i) qualify generally to do business in any jurisdiction where it would not otherwise be required to qualify but for this Section 4(e), (ii) subject itself to taxation in any such jurisdiction or (iii) consent to general service of process in any such jurisdiction);

(f) notify in writing each seller of such Registrable Securities (i) as promptly as practicable after it receives notice thereof, of the date and time when such registration statement and each post-effective amendment thereto has become effective or a prospectus or supplement to any prospectus relating to a registration statement has been filed and when any registration or qualification has become effective under a state securities or blue sky law or any exemption thereunder has been obtained, (ii) as promptly as practicable after receipt thereof, of any request by the Securities and Exchange Commission for the amendment or supplementing of such registration statement or prospectus or for additional information, and (iii) at any time when a prospectus relating thereto is required to be delivered under the Securities Act of any event as a result of which the prospectus included in such registration statement (x) contains an untrue statement of a material fact or omits any material fact necessary to make the statements therein not misleading in light of the circumstances under which they were made or (y) is otherwise not legally available to support sales of Registrable Securities;

(g) (i) prepare and file promptly with the Securities and Exchange Commission and notify such holders of Registrable Securities prior to the filing of such amendments or supplements to such registration statement or prospectus as may be necessary to correct any statements or omissions if, at the time when a prospectus relating to such securities is required to

5

be delivered under the Securities Act, any event has occurred as a result of which any such prospectus or any other prospectus as then in effect would include an untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading in light of the circumstances under which they were made, and (ii) in case any of such holders of Registrable Securities or any underwriter for any such holders is required to deliver a prospectus at a time when the prospectus then in circulation is not in compliance with the Securities Act or the rules and regulations promulgated thereunder, use its commercially reasonable efforts to prepare promptly upon the request of any such holder or underwriter such amendments or supplements to such registration statement and prospectus as may be necessary in order for such prospectus to comply with the requirements of the Securities Act and such rules and regulations;

(h)  cause all such Registrable Securities to be listed on each securities exchange on which similar securities issued by the Company are then listed;

(i)  provide a transfer agent and registrar for all such Registrable Securities no later than the effective date of such registration statement;

(j)  enter into and perform such customary agreements (including underwriting agreements in customary form) and use its commercially reasonable efforts to take all such other actions as the holders of a majority of the Registrable Securities included in such registration or the underwriters, if any, reasonably request in order to expedite or facilitate the disposition of such Registrable Securities (including participation in "road shows," investor presentations and marketing events and effecting a share or unit split or a combination of shares or units);

(k)  make available for inspection by any underwriter participating in any disposition pursuant to such registration statement, and any attorney, accountant or other agent retained by any such underwriter, all financial and other records, pertinent corporate documents and properties of the Company, and cause the Company's officers, directors, employees and independent accountants to supply all information reasonably requested by any such underwriter, attorney, accountant or agent in connection with such registration statement and assist and, at the request of any participating underwriter, use its commercially reasonable efforts to cause such officers or directors to participate in presentations to prospective purchasers;

(l)  take all reasonable actions to ensure that any Free Writing Prospectus utilized in  connection with any Piggyback Registration hereunder complies in all material respects with the Securities Act, is filed in accordance with the Securities Act to the extent required thereby, is retained in accordance with the Securities Act to the extent required thereby and, when taken together with the related prospectus, will not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading;

(m) otherwise use its commercially reasonable efforts to comply with all applicable rules and regulations of the Securities and Exchange Commission and make available to its security holders, as soon as reasonably practicable, an earnings statement covering the period of at least 12 months beginning with the first day of the Company's first full calendar

6

quarter after the effective date of the registration statement, which earnings statement shall satisfy the provisions of Section 11(a) of the Securities Act and Rule 158 thereunder;

(n) use its commercially reasonable efforts to prevent the issuance of any stop order suspending the effectiveness of a registration statement or of any other order suspending or preventing the use of any related prospectus or suspending the qualification of any securities included in such registration statement for sale in any jurisdiction, and, in the event of the issuance of any such stop order or such other order, advise such holders of Registrable Securities of such stop order or such other order promptly after the Company receives notice or obtains knowledge thereof and use its commercially reasonable efforts promptly to obtain the withdrawal of such order;

(o) obtain one or more cold comfort letters, dated the effective date of such registration statement (and, if such registration includes an underwritten public offering, dated the date of the closing under the underwriting agreement and addressed to the underwriters), from the Company's independent public accountants in customary form and covering such matters of the type customarily covered by cold comfort letters as the holders of a majority of the Registrable Securities included in such registration reasonably request; and

(p) provide a legal opinion of the Company's outside counsel, dated the effective date of such registration statement (or, if such registration includes an underwritten public offering, dated the date of the closing under the underwriting agreement), with respect to the registration statement, each amendment and supplement thereto, the prospectus included therein (including the preliminary prospectus) and such other documents relating thereto in customary form and covering such matters of the type customarily covered by such opinions, which opinions shall be addressed to the underwriters. The Company may require each seller of Registrable Securities as to which any registration is being effected to furnish the Company such information regarding such seller and the distribution of such securities as the Company may from time to time reasonably request in writing.

5.    Registration Expenses.

(a) All expenses incident to the Company's performance of or compliance with this Agreement, including all registration and filing fees, fees and expenses of compliance with securities or blue sky laws, printing expenses, travel expenses, filing expenses, messenger and delivery expenses, fees and disbursements of custodians, and fees and disbursements of counsel for the Company and of all independent certified public accountants, underwriters (including, if necessary, a "qualified independent underwriter" within the meaning of the rules of the Financial Industry Regulatory Authority (in each case, excluding discounts and commissions) but not including underwriter commissions to be charged on the sale of Registrable Securities) and other Persons retained by the Company or by the holders of Registrable Securities or their affiliates on behalf of the Company (all such expenses, collectively, "Registration Expenses"), shall be borne by the Company and the Company shall, in any event, pay its internal expenses (including all salaries and expenses of its officers and employees performing legal or accounting duties), the expense of any annual audit or quarterly review, the expense of any liability insurance and the expenses and fees for listing the securities to be registered on each securities exchange on which similar securities issued by the Company are then listed. Each Significant Investor that sells

7

Registrable Securities pursuant to a Piggyback Registration or Shelf Takedown hereunder shall bear and pay any underwriting discounts and commissions applicable to the Registrable Securities sold for such Significant Investor's account.

(b) In connection with each Piggyback Registration, the Company shall reimburse the holders of Registrable Securities included in such registration for the reasonable fees and disbursements of one counsel chosen by the holders of a majority of the Registrable Securities included in such registration up to a maximum amount of $75,000 per Piggyback Registration.

(c) To the extent Registration Expenses are not required to be paid by the Company, each holder of securities included in any registration hereunder shall pay those Registration Expenses allocable hereunder to the registration of such holder's securities so included, and any Registration Expenses not so allocable shall be borne by all sellers of securities included in such registration in proportion to the aggregate selling price of each seller's securities to be so registered.

6.   Indemnification.

(a) The Company agrees to indemnify and hold harmless, to the fullest extent permitted by law, each holder of Registrable Securities, its officers, directors, managers, agents, and employees and each Person who controls such holder (each, an "Indemnitee" and, collectively, the "Indemnitees") against any losses, claims, damages or liabilities, joint or several, together with reasonable costs and expenses (including reasonable attorneys' fees), to which such Indemnitee may become subject under the Securities Act or otherwise, insofar as such losses, claims, damages or liabilities (or actions or proceedings, whether commenced or threatened, in respect thereof) arise out of, are based upon, are caused by or result from (i) any untrue or alleged untrue statement of a material fact contained (A) in any registration statement, prospectus or preliminary prospectus or any amendment thereof or supplement thereto or (B) in any application or other document or communication (in this Section 6 collectively called an "application") executed by or on behalf of the Company or based upon written information furnished by or on behalf of the Company filed in any jurisdiction in order to qualify any securities covered by such registration statement under the "blue sky" or securities laws thereof, (ii) any omission or alleged omission of a material fact required to be stated therein or necessary to make the statements therein not misleading in light of the circumstances under which they were made, or (iii) any violation of applicable law or the policy of the Securities and Exchange Commission, and the Company will reimburse each such Indemnitee for any reasonable legal or any other expenses incurred by it in connection with investigating or defending any such loss, claim, damage, expense, liability, action or proceeding; provided, however, that the Company shall not be liable in any such case to any such Person to the extent that any such loss, claim, damage, liability (or action or proceeding in respect thereof) or expense arises out of, is based upon, is caused by or results from an untrue statement or alleged untrue statement, or omission or alleged omission, made in such registration statement, any such prospectus or preliminary prospectus or any amendment or supplement thereto, or in any application, in reliance upon, and in conformity with, written information prepared and furnished to the Company by such Person expressly for use therein.  In connection with an underwritten offering, the Company shall indemnify the underwriters, their officers and directors and each Person who controls such

8

underwriters to the same extent as provided above with respect to the indemnification of the holders of Registrable Securities.

(b) In connection with any registration statement in which a holder of Registrable Securities is participating, each such holder shall furnish to the Company in writing such information and affidavits as the Company reasonably requests for use in connection with any such registration statement or prospectus and, to the fullest extent permitted by law, shall indemnify and hold harmless the other holders of Registrable Securities and the Company, and their respective directors, officers, agents and employees and each other Person who controls the Company against any losses, claims, damages or liabilities, joint or several, together with reasonable costs and expenses (including reasonable attorneys' fees), to which such indemnified party may become subject under the Securities Act or otherwise, insofar as such losses, claims, damages or liabilities (or actions or proceedings, whether commenced or threatened, in respect thereof) arise out of, are based upon, are caused by or result from (i) any untrue or alleged untrue statement of a material fact contained in the registration statement, prospectus or preliminary prospectus or any amendment thereof or supplement thereto or in any application or (ii) any omission or alleged omission of a material fact required to be stated therein or necessary to make the statements therein not misleading in light of the circumstances under which they were made, but only to the extent that such untrue statement or omission is made in such registration statement, any such prospectus or preliminary prospectus or any amendment or supplement thereto, or in any application, in each case, in reliance upon and in conformity with written information prepared and furnished to the Company by such holder expressly for use therein; <u>provided</u>, <u>however</u>, that the obligation to indemnify will be several and not joint as to each holder and will be limited to the net amount of proceeds received by such holder from the sale of Registrable Securities pursuant to such registration statement.

(c) Any Person entitled to indemnification hereunder will (i) give prompt written notice to the indemnifying party of any claim with respect to which it seeks indemnification (<u>provided</u> that the failure to give prompt notice shall not impair any Person's right to indemnification hereunder to the extent such failure has not prejudiced the indemnifying party) and (ii) unless in such indemnified party's reasonable judgment a conflict of interest between such indemnified and indemnifying parties may exist with respect to such claim, permit such indemnifying party to assume the defense of such claim with counsel reasonably satisfactory to the indemnified party.  If such defense is assumed, the indemnifying party will not be subject to any liability for any settlement made by the indemnified party without the indemnifying party's consent (but such consent will not be unreasonably withheld, conditioned or delayed).  An indemnifying party who is not entitled to, or elects not to, assume the defense of a claim will not be obligated to pay the fees and expenses of more than one counsel for all parties indemnified by such indemnifying party with respect to such claim, unless in the reasonable judgment of any indemnified party a conflict of interest may exist between such indemnified party and any other indemnified party with respect to such claim.

(d) The indemnifying party shall not, except with the approval of each indemnified party (which shall not be unreasonably withheld), consent to entry of any judgment or enter into any settlement which does not include as an unconditional term thereof the giving by the claimant or plaintiff to each indemnified party of a release from all liability in respect to

**DRAFT**

such claim or litigation without any payment or consideration provided by such indemnified party.

(e) If the indemnification provided in this Section 6 is unavailable to or is insufficient to hold harmless an indemnified party under the provisions above in respect to any losses, claims, damages or liabilities referred to therein, then each indemnifying party shall contribute to the amount paid or payable by such indemnified party as a result of such losses, claims, damages or liabilities (i) in such proportion as is appropriate to reflect the relative fault of the Company on the one hand and the sellers of Registrable Securities and any other sellers participating in the registration statement on the other hand or (ii) if the allocation provided by clause (i) above is not permitted by applicable law, in such proportion as is appropriate to reflect not only the relative faults referred to in clause (i) above but also the relative benefits of the Company on the one hand and of the sellers of Registrable Securities and any other sellers participating in the registration statement on the other hand in connection with the registration statement or omissions which resulted in such losses, claims, damages or liabilities, as well as any other relevant equitable considerations.  The relative benefits received by the Company on the one hand and the sellers of Registrable Securities and any other sellers participating in the registration statement on the other hand shall be deemed to be in the same proportion as the total net proceeds from the offering (before deducting expenses) to the Company bear to the total net proceeds from the offering (before deducting expenses) to the sellers of Registrable Securities and any other sellers participating in the registration statement.  The relative faults of the Company on the one hand and of the sellers of Registrable Securities and any other sellers participating in the registration statement on the other hand shall be determined by reference to, among other things, whether the untrue or alleged untrue statement, or the omission or alleged omission, of a material fact relates to information supplied by the Company or by the sellers of Registrable Securities or other sellers participating in the registration statement and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission.

The Company and the sellers of Registrable Securities agree that it would not be just and equitable if contribution pursuant to this Section 6 were determined by pro rata allocation (even if the sellers of Registrable Securities were treated as one entity for such purpose) or by any other method of allocation which does not take account of the equitable considerations referred to in the immediately preceding paragraph.  The amount paid or payable by an indemnified party as a result of the losses, claims, damages and liabilities referred to in the immediately preceding paragraph shall be deemed to include, subject to the limitations set forth above, any legal or other expenses reasonably incurred by such indemnified party in connection with investigating or defending any such action or claim.  Notwithstanding the provisions of this Section 6, no seller of Registrable Securities shall be required to contribute any amount in excess of the net proceeds received by such seller from the sale of Registrable Securities pursuant hereto.  No Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation.

(f) The indemnification and contribution by any such party provided under this Agreement shall be in addition to any other rights to indemnification or contribution which any indemnified party may have pursuant to law or contract and will remain in full force and effect

10

regardless of any investigation made or omitted by or on behalf of the indemnified party or any officer, director or controlling Person of such indemnified party and will survive the transfer of securities.

       7.  <u>Participation in Underwritten Registrations</u>.

       (a)  No Person may participate in any registration hereunder which is underwritten unless such Person (i) agrees to sell such Person's securities on the basis provided in any underwriting arrangements approved by the Person or Persons entitled hereunder to approve such arrangements (including pursuant to the terms of any over-allotment or "green shoe" option requested by the managing underwriters, <u>provided</u> that no holder of Registrable Securities will be required to sell more than the number of Registrable Securities that such holder has requested the Company to include in any registration) and (ii) completes and executes all questionnaires, powers of attorney, indemnities, underwriting agreements and other documents reasonably required under the terms of such underwriting arrangements; <u>provided</u> that no holder of Registrable Securities included in any underwritten registration shall be required to undertake any indemnification obligations to the Company or the underwriters with respect thereto, except as otherwise provided in <u>Section 6</u> hereof.

       (b)  Each Person that is participating in any registration hereunder agrees that, upon receipt of any notice from the Company of the happening of any event of the kind described in <u>Section 4(f)(ii)</u>, such Person will forthwith discontinue the disposition of its Registrable Securities pursuant to the registration statement until such Person's receipt of the copies of a supplemented or amended prospectus as contemplated by <u>Section 4(f)(ii)</u>.  In the event the Company shall give any such notice, the applicable time period mentioned in <u>Section 4(c)</u> during which a registration statement is to remain effective shall be extended by the number of days during the period from and including the date of the giving of such notice pursuant to this <u>Section 7</u> to and including the date when each seller of Registrable Securities covered by such registration statement shall have received the copies of the supplemented or amended prospectus contemplated by <u>Section 4(f)(ii)</u>.

       8.  <u>Current Public Information</u>.  At all times after the Company has filed a registration statement with the Securities and Exchange Commission pursuant to the requirements of either the Securities Act or the Securities Exchange Act, the Company shall file all reports required to be filed by it under the Securities Act and the Securities Exchange Act and the rules and regulations thereunder, and will take such further action as any holder or holders of Registrable Securities may reasonably request following effectiveness of such registration statement, all to the extent required to enable such holders to sell Registrable Securities pursuant to Rule 144 adopted by the Securities and Exchange Commission under the Securities Act (as such rule may be amended from time to time) or any similar rule or regulation hereafter adopted by the Securities and Exchange Commission.

       9.  <u>Definitions</u>.

       "<u>Affiliate</u>" means, with respect to any Person, a Person that directly or indirectly controls, is controlled by, or is under direct or indirect common control with, such Person.  For purposes of this definition, "control" when used with respect to any Person means the power to

direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise, and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"Business Day" means a day other than Saturday, Sunday or any day on which banks located in the State of New York are authorized or obligated to close.

"Company" shall have the meaning assigned to it in the introductory paragraph of this Agreement.

"control" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

"Equity Securities" has the meaning given in Rule 405 of the Securities Act or any successor provision under the Securities Act.

"Free Writing Prospectus" means a free-writing prospectus, as defined in Rule 405 of the Securities Act or any successor provision under the Securities Act.

"Initial Public Offering" means the first sale of the common Equity Securities of the Company pursuant to an effective registration statement under the Securities Act filed with the Securities and Exchange Commission.

"Interests" means limited liability company interests in the Company.

"Investor" or "Investors" shall have the meaning assigned to each term in the introductory paragraph of this Agreement.

"Person" means an individual, a partnership, a joint venture, an association, a joint stock company, a corporation, a limited liability company, a trust, an unincorporated organization, an investment fund, any other business entity or a governmental entity or any department, agency or political subdivision thereof.

"Public Sale" means any sale of Registrable Securities (i) to the public pursuant to an offering registered under the Securities Act or (ii) to the public through a broker, dealer or market maker after an Initial Public Offering.

"Registration Expenses" shall have the meaning assigned to it in Section 5(a).

"Registrable Securities" means (i) any Interests of the Company held by any Significant Investor and (ii) any Interests of the Company issued or issuable with respect to the securities referred to in clause (i) above by way of dividend, distribution, split or combination of securities, or any recapitalization, merger, consolidation or other reorganization, so long as such Person is a Significant Investor at the time of the relevant event. As to any particular Registrable Securities, such securities shall cease to be Registrable Securities when they (a) have been distributed to the public pursuant to an offering registered under the Securities Act or sold to the public through a broker, dealer or market maker in compliance with Rule 144 under the

12

Securities Act (or any similar rule then in force) or (b) have been repurchased by the Company or any of its Subsidiaries or otherwise ceased to be outstanding.

"S-3 Shelf Registration Statement" means a registration statement filed under the Securities Act on Form S-3 (or any successor form) covering the resale of the Registrable Securities, and any amendments or supplements to such registration statement, including post-effective amendments, all exhibits and all documents incorporated by reference in such registration statement.

"Securities Act" means the Securities Act of 1933, as amended, or any similar U.S. federal law then in force.

"Securities and Exchange Commission" means the United States Securities and Exchange Commission and includes any governmental body or agency succeeding to the functions thereof.

"Securities Exchange Act" means the Securities Exchange Act of 1934, as amended, or any similar U.S. federal law then in force.

"Significant Investor" has the meaning assigned to it in Section 1(a).

"Subsidiary" means, with respect to any Person, any corporation, limited liability company, partnership, association or business entity of which (i) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (ii) if a limited liability company, partnership, association or other business entity (other than a corporation), a majority of limited liability company, partnership or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by any Person or one or more of the other Subsidiaries of that Person or a combination thereof.  For purposes hereof, a Person or Persons shall be deemed to have a majority ownership interest in a limited liability company, partnership, association or other business entity (other than a corporation) if such Person or Persons shall be allocated a majority of limited liability company, partnership, association or other business entity gains or losses or shall be or control any managing director or general partner or a majority of the members of the governing body of such limited liability company, partnership, association or other business entity.

10. Miscellaneous.

(a) Notices.  All notices, demands or other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed to have been given or made when (a) delivered personally to the recipient, (b) facsimiled to the recipient (with hard copy sent to the recipient by reputable overnight courier service (charges prepaid) that same day) if facsimiled before 5:00 p.m. local time of the recipient on a Business Day, and otherwise on the next Business Day, or (c) one Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid).  Such notices, demands

and other communications shall be sent to the Company at the address set forth below and to any other recipient at the address set forth in the Company's books and records (which shall initially be the addresses set forth on Schedule I attached hereto), or to such other address or to the attention of such other Person as the recipient party has specified by prior written notice to the sending party.  The Company's address is as follows:

> Cubic Energy, LLC
> 9870 Plano Road
> Dallas, Texas 75238
> Facsimile: (972) 681-9687
> Attention: Jason Gorsuch

> with copies (which shall not constitute notice) to:

> Sullivan & Cromwell LLP
> 125 Broad Street
> New York, NY 10004
> Attention: Ari B. Blaut

(b) <u>No Inconsistent Agreements</u>.  The Company will not hereafter enter into any agreement with respect to its securities which is inconsistent with or violates the rights granted to the holders of Registrable Securities in this Agreement.

(c)  <u>Remedies</u>.  Any Person having rights under any provision of this Agreement shall be entitled to enforce such rights specifically to recover damages caused by reason of any breach of any provision of this Agreement and to exercise all other rights granted by law.  The parties hereto agree and acknowledge that money damages may not be an adequate remedy for any breach of the provisions of this Agreement and that any party may in its sole discretion apply to any court of law or equity of competent jurisdiction (without posting any bond or other security) for specific performance and for other injunctive relief in order to enforce or prevent violation of the provisions of this Agreement.

(d) <u>Amendments and Waivers</u>.  Except as otherwise provided herein, no modification, amendment or waiver of any provision of this Agreement shall be effective against the Company or the holders of Registrable Securities unless such modification, amendment or waiver is approved in writing by the Company and the holders of a majority of the Registrable Securities.  No failure by any party to insist upon the strict performance of any covenant, duty, agreement or condition of this Agreement or to exercise any right or remedy consequent upon a breach thereof shall constitute a waiver of any such breach or any other covenant, duty, agreement or condition.  The failure of any party to enforce any of the provisions of this Agreement shall in no way be construed as a waiver of such provisions and shall not affect the right of such party thereafter to enforce each and every provision in accordance with its terms.

(e) <u>Transfer</u>.  If any Significant Investor transfers any Registrable Securities to an Affiliate of such Significant Investor, the rights of such Significant Investor under this Agreement will be transferred to such Affiliate upon the execution and delivery by the transferee to the Company of a joinder to this Agreement pursuant to which such transferee agrees to be

SC1:3961273.8

bound by this Agreement to the same extent as the Significant Investor transferring such Registrable Securities. The Investors may not otherwise transfer any of their rights under this Agreement.

(f) <u>Severability</u>.  Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision or the effectiveness or validity of any provision in any other jurisdiction, and this Agreement shall be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision had never been contained herein.

(g) <u>Entire Agreement</u>.  This Agreement embodies the complete agreement and understanding among the parties hereto with respect to the subject matter hereof and supersedes and preempts any prior understandings, agreements or representations by or among the parties, written or oral, which may have related to the subject matter hereof in any way.

(h) <u>Counterparts; Facsimile Signature</u>.  This Agreement may be executed in counterparts, any one of which need not contain the signatures of more than one party, but all such counterparts taken together will constitute one and the same Agreement.  This Agreement may be executed by facsimile or electronic signature.

(i) <u>Descriptive Headings</u>.  The descriptive headings of this Agreement are inserted for convenience only and do not constitute a part of this Agreement.

(j) <u>Governing Law; Selection of Forum</u>.  All issues and questions concerning the relative rights and obligations of the Company and the Investors under this Agreement and the construction, validity, interpretation and enforceability of this Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of New York or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York.  Each party agrees that it shall bring any action, suit, demand or proceeding (including counterclaims) in respect of any claim arising out of or related to this Agreement or the transactions contemplated hereby, exclusively in the United States District Court for the Southern District of New York or any New York State court, in each case, sitting in New York County (the "<u>Chosen Courts</u>"), and solely in connection with claims arising under this Agreement or the transactions contemplated hereby (i) irrevocably submits to the exclusive jurisdiction of the Chosen Courts, (ii) waives any objection to laying venue in any such action, suit, demand or proceeding in the Chosen Courts, (iii) waives any objection that the Chosen Courts are an inconvenient forum or do not have jurisdiction over any party and (iv) agrees that service of process upon such party in any such action, suit, demand or proceeding shall be effective if notice is given in accordance with <u>Section 10(a)</u>.

(k) <u>MUTUAL WAIVER OF JURY TRIAL</u>.  THE PARTIES HEREBY WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY, WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER

**DRAFT**

SOUNDING IN CONTRACT, TORT OR OTHERWISE.  THE PARTIES AGREE THAT ANY OF THEM MAY FILE A COPY OF THIS PARAGRAPH WITH ANY COURT AS WRITTEN EVIDENCE OF THE KNOWING, VOLUNTARY AND BARGAINED-FOR AGREEMENT AMONG THE PARTIES IRREVOCABLY TO WAIVE TRIAL BY JURY AND THAT ANY ACTION OR PROCEEDING WHATSOEVER BETWEEN THEM RELATING TO THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY SHALL INSTEAD BE TRIED IN A COURT OF COMPETENT JURISDICTION BY A JUDGE SITTING WITHOUT A JURY.

(l)  <u>Business Days</u>.  If any time period for giving notice or taking action hereunder expires on a day which is not a Business Day, the time period shall automatically be extended to the next following Business Day.

\* \* \* \* \*

16

**DRAFT**

IN WITNESS WHEREOF, the parties hereto have executed this Registration Rights Agreement as of the day and year first written above.

**CUBIC ENERGY, LLC**

By: **DRAFT** _____
    Name:
    Title:

**DRAFT**

**AIO III CE, L.P.**

By:     Anchorage Capital Group, L.L.C., its
        Investment Manager

        By: **DRAFT** _____
        Name:
        Title:

**DRAFT**

**CORBIN OPPORTUNITY FUND, L.P.**

By:    Corbin Capital Partners Management, LLC,
       its General Partner

       By: **DRAFT**_____
       Name:
       Title:

**DRAFT**

**O-CAP PARTNERS, L.P.**

By:    O-CAP Advisors, LLC, its General Partner

By: **DRAFT**           
Name:
Title:

*Signature Page - Registration Rights Agreement*

**DRAFT**

**O-CAP OFFSHORE MASTER FUND, L.P.**

By:    O-CAP Advisors, LLC, its General Partner

       By: **DRAFT** _____

       Name:

       Title:

## SCHEDULE I

## SCHEDULE OF INVESTORS

**AIO III CE, L.P.**
Anchorage Capital Group, L.L.C.
610 Broadway, 6th Floor
New York, NY 10012

**CORBIN OPPORTUNITY FUND, L.P.**
Corbin Capital Partners Management, LLC
590 Madison Avenue, 31st Fl
New York, NY 10022

**O-CAP PARTNERS, L.P.**
O-CAP Advisors, LLC
600 Madison Avenue, 14th FL
New York, NY 10022
Attention: Lloyd Jagai

**O-CAP OFFSHORE MASTER FUND, L.P.**
O-CAP Advisors, LLC
600 Madison Avenue, 14th FL
New York, NY 10022
Attention: Lloyd Jagai

**<u>Exhibit 2-a</u>**

**New Cubic Energy Senior Secured Notes (Changed Pages Only Blackline)**

(see attached)

**DRAFT**

**CUBIC ENERGY, LLC**

**14% Senior Secured Notes due 2021**

**$30,000,000**

———————————————————

**INDENTURE**

———————————————————

**Dated as of [●], 2016**

# TABLE OF CONTENTS

**Page**

**DRAFT**

ARTICLE I DEFINITIONS ...........................................................................................................2

ARTICLE II ISSUANCE OF NOTES ........................................................................................2

    2.1    Authorization of the Notes. ..........................................................................2

    2.2    The Closing. .....................................................................................................2

    2.3    Interest Payments. ..........................................................................................2

ARTICLE III CLOSING CONDITIONS. ..................................................................................3

    3.1    Representations and Warranties. .................................................................3

    3.2    Compliance with the Note Documents; No Default. ...............................3

    3.3    Closing Documents. .......................................................................................3

    3.4    Issuance of the Notes. ...................................................................................4

    3.5    Plan Support Agreement. ..............................................................................4

    3.6    Consummation of Plan of Reorganization. ...............................................4

    3.7    Oil and Gas Properties. .................................................................................4

    3.8    Leasehold Property. ........................................................................................5

    3.9    Personal Property Collateral. .......................................................................5

    3.10    Evidence of Insurance. ...............................................................................5

    3.11    Fees. ...............................................................................................................6

    3.12    KYC/AML. ...................................................................................................6

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF THE COMPANY .................6

    4.1    Organization; Requisite Power and Authority. .......................................6

    4.2    Qualification and Good Standing. ..............................................................6

    4.3    Capitalization. .................................................................................................6

    4.4    Due Authorization. ........................................................................................6

    4.5    No Conflict. .....................................................................................................6

    4.6    Governmental Consents. ...............................................................................7

    4.7    Binding Obligations. ......................................................................................7

    4.8    Material Contracts ..........................................................................................7

    4.9    Title to Collateral; Properties; Liens. ........................................................7

    4.10    Intellectual Property ..................................................................................8

-i-

**DRAFT**

4.11   Litigation; Adverse Facts. ........................................................9

4.12   Payment of Taxes. ...............................................................9

4.13   Insurance. ............................................................................9

4.14   Investment Company Act. ...................................................10

4.15   Securities Activities. ..........................................................10

4.16   Certain Fees. ......................................................................10

4.17   Environmental Matters. ......................................................10

4.18   Employee Matters. .............................................................10

4.19   Solvency. ............................................................................11

4.20   Indebtedness. ......................................................................11

4.21   No Violation of Regulations of Board of Governors of Federal Reserve System. .......................................................................11

4.22   Creation, Perfection and Priority of Liens. ........................11

4.23   Money Laundering. ............................................................11

4.24   ERISA. ...............................................................................12

4.25   Maintenance of Oil and Gas Properties. ...........................12

ARTICLE V [RESERVED] ...........................................................................13

ARTICLE VI PAYMENTS ............................................................................13

6.1   Maturity. ............................................................................13

6.2   Optional Redemption. .........................................................13

6.3   Mandatory Redemption. .....................................................13

ARTICLE VII AFFIRMATIVE COVENANTS ...........................................14

7.1   Financial Statements and Other Reports. ..........................14

7.2   Noteholder Calls. ...............................................................16

7.3   Payment of Notes. ..............................................................16

7.4   Satisfaction of Obligations; Taxes. ....................................16

7.5   Maintenance of Property; Insurance. .................................16

7.6   Corporate Existence. ..........................................................17

7.7   Books and Records. ............................................................17

7.8   Compliance with Law. .......................................................17

7.9   Inspections. ........................................................................17

7.10   Change in Accounting Policies. ........................................17

7.11   Additional Guarantors; Additional Collateral. ................17

## ANNEXES, SCHEDULES AND EXHIBITS

Annex I              Definitions

Schedule I           Guarantors
Schedule 4.3         Capitalization
Schedule 4.8         Material Contracts
Schedule 4.9         Leasehold Property
Schedule 4.10        Intellectual Property
Schedule 4.11        Litigation; Adverse Facts
Schedule 4.16        Certain Fees
Schedule 4.20        Indebtedness
Schedule 4.22        Creation, Perfection and Priority of Liens
Schedule 8.2         Liens

Exhibit A            Form of Note
Exhibit B            Form of Guaranty
Exhibit C            Form of Holder Joinder
Exhibit D            Form of Permitted Hedging Agreement Notice

SC1:3958837.69

# INDENTURE

     **INDENTURE** (as amended, supplemented or otherwise modified from time to time in accordance with the terms hereof, this "**Agreement**"), dated as of [●], 2016, among Cubic Energy, LLC, a limited liability company organized under the laws of the state of Delaware (the "**Company**"), each guarantor listed on Schedule I and each other guarantor from time to time party hereto (each, a "**Guarantor**" and collectively, the "**Guarantors**"), Anchorage Illiquid Opportunities III, L.P., Anchorage Illiquid Opportunities III (B), L.P., AIO III AIV, L.P., Corbin Opportunity Fund, L.P., O-CAP Partners, L.P. and O-CAP Offshore Master Fund, L.P. (collectively, the "**Initial Holders**" and each, an "**Initial Holder**"), Wilmington Trust, National Association, as noteholder agent (in such capacity, the **"Noteholder Agent"**) and as the Collateral Agent.

# PREAMBLE

     **WHEREAS**, on December 11, 2015, the Company and its direct and indirect Subsidiaries (collectively, the "**Debtors**"), as debtors and debtors-in-possession, commenced voluntary cases under chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"), which cases are being jointly administered  under Case No. 15-12500(CSS) (the "**Chapter 11 Cases**");

     **WHEREAS**, in connection with the Chapter 11 Cases, the Company, the Initial Holders (or affiliates thereof) and certain other parties entered into the Plan Support Agreement on December 10, 2015, which provides for the implementation of a restructuring involving the Company and its Subsidiaries on the terms set forth in the Prepackaged Plan of Reorganization of the Company and its Subsidiaries filed with the Bankruptcy Court on December 11, 2015 (as may be amended, modified or supplemented from time to time in accordance with the terms thereof, the "**Prepackaged Plan**");

     **WHEREAS**, on [●], 2016, the Bankruptcy Court entered the Confirmation Order confirming the Prepackaged Plan and authorizing the Restructuring Transactions; and

     **WHEREAS**, substantially concurrently with the Effective Date and pursuant to the Prepackaged Plan, among other things, in exchange for the release and discharge of their prepetition claims, the Initial Holders and their affiliates are receiving in the aggregate 100% of the equity interests in the Company and the Notes issued by the Company pursuant to this Agreement.

     **NOW, THEREFORE**, in consideration of the foregoing, the parties hereto agree as follows:

SC1:3958837.69

# ARTICLE I
## DEFINITIONS

Defined terms in this Agreement, which may be identified by the capitalization of the first letter of each principal word thereof, have the meanings assigned to them in Annex I to this Agreement. The term "including" shall be read to mean "including, without limitation".

# ARTICLE II
## ISSUANCE OF NOTES

**2.1    Authorization of the Notes.**    On or before the Closing, the Company will authorize the issuance of $30,000,000 aggregate principal amount of 14% Senior Secured Notes due [●], 2021 (the "**Notes**").  The Notes shall be substantially in the form annexed hereto as Exhibit A.  The Notes shall at all times be irrevocably and unconditionally guaranteed as to payment of principal, interest and Make-Whole Premium, if any, on a secured basis by each Guarantor.  The Notes and Guarantees shall be secured at all times pursuant to, and in accordance with the terms of, the Collateral Documents.

**2.2    The Closing.**    The issuance of the Notes (the "**Closing**") shall take place at the offices of Sullivan & Cromwell LLP at 125 Broad Street, New York, NY 10004, as soon as practicable on the Effective Date, after the satisfaction or waiver of all of the conditions precedent set forth in Article III (except for those conditions that by their nature are to be satisfied at, or substantially concurrently with, the Closing) (the "**Closing Date**").

**2.3    Interest Payments.**

(a)    Interest will accrue on the Notes at a rate of 14% per annum (as may be adjusted pursuant to Section 2.3(c), the "**Interest Rate**") payable quarterly in arrears on December 31, March 31, June 30 and September 30 to the Record Holders (each date, an "**Interest Payment Date**").  If any Interest Payment Date falls on a date that is not a Business Day, interest shall be paid on the immediately preceding Business Day.  Interest will accrue from the date of original issuance of the Notes.  All computations of interest shall be made on the basis of a 360-day year and actual days elapsed (which results in more interest being paid than if computed on the basis of a 365-day year).

(b)    Interest will be paid on each Interest Payment Date, at the Company's option, (i) entirely in cash in U.S. Dollars or (ii) entirely in the form of additional Notes ("**PIK Interest**").  The Company shall pay PIK Interest by issuing on the applicable Interest Payment Date to each Record Holder an additional Note ("**PIK Interest Note**").  The principal amount of each PIK Interest Note shall equal the amount of interest that accrued on the Note since the immediately preceding Interest Payment Date.  Each PIK Interest Note shall be deemed a "Note" for all purposes hereunder.

(c)    At any time when a Default or Event of Default exists and is continuing or any payment of principal, interest or Make-Whole Premium, if any, is due on the Notes and has not been paid, the Interest Rate will be adjusted so that during such period the Interest Rate will

2

equal 16% ("**Default Interest**").  For the avoidance of doubt, such Default Interest shall continue to accrue (including on the Make-Whole Premium) after the filing of any petition in bankruptcy or the commencement of any insolvency, reorganization or similar proceeding, whether or not a claim for post-filing or post-petition interest is allowed in any such proceeding.  Notwithstanding Section 2.3(b), Default Interest shall be payable in cash upon demand by any Holder.

**ARTICLE III**
**CLOSING CONDITIONS**

The Closing is subject to the satisfaction or waiver by each Initial Holder of the following conditions on or before the Closing:

**3.1    Representations and Warranties.**  The representations and warranties contained herein and in the other Note Documents shall be true and correct in all material respects on and as of the date hereof and the Closing Date to the same extent as though made on and as of such date, except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects on and as of such earlier date; provided that, in each case, such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by "materiality", "material", "material adverse effect" or any similar derivations in the text thereof.

**3.2    Compliance with the Note Documents; No Default.**  The Company and the Guarantors shall have performed and complied with all agreements, covenants and conditions contained in the Note Documents to be performed or complied with by the Company or the Guarantors on or before the Closing Date, and after giving effect to the Transactions, no Default or Event of Default shall have occurred and be continuing.

**3.3    Closing Documents.**  Each Initial Holder, the Noteholder Agent and the Collateral Agent shall have received from the Company and each Guarantor, as applicable, dated as of the Closing Date and in sufficient number requested by such Initial Holder, the Noteholder Agent or the Collateral Agent:

(a)    Note Documents.  Copies of the Note Documents originally executed and delivered by each party thereto.

(b)    Officer's Certificate.  A certificate signed by a Responsible Officer of the Company certifying that the conditions set forth in this Article III have been satisfied on and as of such date.

(c)    Secretary's Certificate.  A certificate signed by the manager, Secretary or other authorized signatory of the Company and each Guarantor, certifying as to the board and other resolutions and its Organizational Documents attached thereto and as to all other corporate or other organizational proceedings relating to the authorization, execution and delivery of this Agreement, the Notes and the other Note Documents to which it is party.

(d)    Evidence of Good Standing.  Evidence of good standing of the Company and each Guarantor in the state of Delaware and in each jurisdiction in which the Company and

3

each Guarantor is qualified as a foreign corporation or other entity to do business, each dated the Closing Date or a recent date prior thereto.

(e)    <u>Incumbency Certificates</u>.  Signature and incumbency certificates with respect to the officers or other authorized signatories of the Company and each Guarantor executing the Note Documents, and any other documents, instruments and certificates required to be executed by such persons in connection herewith or therewith.

(f)    <u>Other Documents</u>.  Such other documents, instruments or certificates as any Initial Holder may reasonably request.

**3.4    Issuance of the Notes.**  The Company shall have issued and delivered $30,000,000 in aggregate principal amount of Notes to the Initial Holders.

**3.5    Plan Support Agreement.**  The Plan Support Agreement shall be in full force and effect, the Debtors shall be in compliance with the Plan Support Agreement in all material respects, and each of the conditions set forth in the Plan Support Agreement shall have been satisfied by the Debtors.

**3.6    Consummation of Plan of Reorganization.**  All conditions precedent set forth in the Prepackaged Plan shall have been satisfied or waived by the parties thereto, the Effective Date under the Prepackaged Plan shall have occurred (and all conditions precedent thereto as set forth therein shall have been satisfied (or shall be concurrently satisfied) or waived by the parties thereto, substantial consummation under the Prepackaged Plan shall have occurred, the Bankruptcy Court shall have entered the Confirmation Order, which shall be valid, subsisting and continuing as a final order as to which the time to appeal, petition for certiorari, or move for a new trial, stay, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or motion for new trial, stay, reargument, or rehearing shall then be pending, and no motion, action or proceeding by any creditor or other party-in-interest to the Chapter 11 Cases which could materially adversely affect the Prepackaged Plan, the consummation of the Prepackaged Plan, the business or operations of Company or the transactions contemplated by the Note Documents shall be pending.

**3.7    Oil and Gas Properties.**  In order to create in favor of the Collateral Agent, for the benefit of the Holders, a valid and, subject to any filing and/or recording referred to herein, perfected First Priority Lien in each Oil and Gas Property, the Collateral Agent shall have received ~~from the Company~~ with respect to each such Oil and Gas Property:

(a)    fully executed and notarized Mortgages, in proper form for recording in all appropriate places in all applicable jurisdictions, encumbering, and such financing statements and any other instruments necessary to grant a mortgage lien under the laws of the applicable jurisdiction;

(b)    evidence reasonably acceptable to the Collateral Agent that the Company has arranged for the payment of all mortgage recording fees, charges, costs and expenses required for the recording of the Mortgages referred to above (which payment shall be made promptly and, in any event, no later than three (3) Business Days following the Closing); and

4

(c)     if to the Company or any of its Subsidiaries (including the other Note Parties), to it at [●], 9870 Plano Road, Dallas, Texas 75238, Attention: Jason Gorsuch, facsimile: [●], (972) 681-9687, e-mail: [●]. jason@cubicenergyinc.com.

All such notices and communications shall be deemed to have been duly given:  at the time delivered by hand, if personally delivered; five (5) Business Days after being deposited in the mail, postage prepaid, if mailed; when receipt acknowledged, if telecopied or e-mailed; and the next business day after timely delivery to the courier, if sent by overnight air courier guarantying next day delivery.  For greater clarity, receipt of an e-mail may be acknowledged by the "return receipt requested" function, return e-mail or other written acknowledgement.  The parties may change the addresses to which notices are to be given by giving prior notice of such change in accordance herewith.

**13.2    Successors and Assigns; Assignments.**

(a)     This Agreement may not be assigned by any Note Party without the consent of all Holders, the Noteholder Agent and the Collateral Agent, and any such assignment in violation of this Section 13.2 shall be null and void.

(b)     This Agreement shall inure to the benefit of and be binding upon the successors and registered assigns of each of the parties, including, without limitation and without the need for an express assignment, subsequent Holders of Notes.

(c)     Each Holder may sell, transfer or assign all or any portion of its Note to any Person, at any time in accordance with Section 10.3(b) and such Person shall become a party to this Agreement pursuant to a Holder Joinder in accordance with Section 10.3(b).  Upon such Transfer, the previous Holder, if it no longer holds any Notes, shall cease to be a Holder hereunder except as provided for purposes of Section 10.2.

(d)     Each Holder may, in the ordinary course of its business and in accordance with the Note Documents and Applicable Law, including applicable securities laws, at any time sell to one or more Persons (each, a "**Participant**") participating interests in all or a portion of its rights and obligations under this Agreement.  Notwithstanding any such sale by such Holder of participating interests to a Participant, such Holder's rights and obligations under this Agreement shall remain unchanged, such Holder shall remain solely responsible for the performance of its obligations hereunder, and the Company, the Noteholder Agent and the Collateral Agent shall continue to deal solely and directly with such Holder and shall have no obligations to deal with any Participant in connection with such Holder's rights and obligations under this Agreement or the Notes.  Any agreement or instrument pursuant to which a Holder sells such a participation shall provide that such Holder shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Holder will not, without the consent of the Participant, agree to any amendment, modification or waiver directly affecting (i) an extension of the scheduled final maturity date of any Note allocated to such participation, or (ii) a reduction of the principal amount of or the rate of interest payable on any Note allocated to such participation.  Subject to the further provisions of this Section 13.2(d), the Company agrees that each Participant shall be entitled to the benefits of Section 10.5 to the same extent as if it

34

 

 

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

 

<u>**COMPANY**</u>:                              **CUBIC ENERGY, LLC**

 

By: <u>**DRAFT**</u>_____
     Name:
     Title:

*Signature Page to Indenture*

**DRAFT**

**GUARANTOR:**                         **CUBIC ASSET, LLC**


By:  <u>**DRAFT**</u>
     Name:
     Title:

S-2

## ANNEX I
## DEFINITIONS

As used in this Agreement, the following terms shall have the following meanings:

"**Affiliate**" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, controls or is controlled by or is under common control with the Person specified; provided that Anchorage Capital Group, L.L.C., AIO III CE, L.P., Anchorage Illiquid Opportunities III, L.P., Anchorage Illiquid Opportunities III (B), L.P., AIO III AIV, L.P., O-CAP Capital Management, L.P., O-CAP Partners, L.P., O-CAP Offshore Master Fund, L.P., Corbin Opportunity Fund, L.P. and any of their respective employees, partners, officers, directors, funds or affiliates shall not be deemed Affiliates of the Company or any of its Subsidiaries for all purposes hereunder.  For purposes of this definition, a Person shall be deemed to "**control**" or be "**controlled by**" a Person if such Person possesses, directly or indirectly, power to direct or cause the direction of the management and policies of such Person whether by contract or otherwise.

"**Agent Indemnitee**" has the meaning assigned to such term in Section 14.7.

"**Agents**" means the Collateral Agent and the Noteholder Agent.

"**Aggregate Amounts Due**" has the meaning assigned to such term in Section 13.21.

"**Agreement**" has the meaning assigned to such term in the introductory paragraph of this Agreement.

"**Applicable Law**" means, collectively, all statutes, laws, rules, regulations, ordinances, decisions, writs, judgments, decrees, and injunctions of any Governmental Authority affecting the Company or any of its Subsidiaries or any Collateral or any of their other assets, whether now or hereafter enacted and in force, and all Governmental Authorizations relating thereto.

"**Asset Sale**" means, as to any Person, the sale, lease, sublease, sale and leaseback, assignment, conveyance, transfer, license, sublicense or other disposition (for purposes of this definition, any of the foregoing, a "**disposition**") by such Person to any other Person of any right or interest in or to property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible, including, without limitation, the Capital Stock (including by issuance) of any of such Person's Subsidiaries.  The term "Asset Sale" shall exclude:

(a)    disposition of cash or Cash Equivalents in the ordinary course of business;

(b)    disposition of property or assets by a Note Party to another Note Party;

(c)    disposition of production or inventory for cash in the ordinary course of business consistent with past practice for fair market value; and

(d)    dispositions of property in the ordinary course of business consistent with past practice which property the Company has reasonably determined is no longer necessary or useful in its business and such disposition is for cash and for fair market value; provided that the

aggregate amount of property that may be excluded from the definition of "Asset Sale" by this clause (d) shall not in the aggregate exceed $50,000 for all such transactions; provided, further, that dispositions involving any Oil and Gas Properties may not be excluded from the definition of "Asset Sale" pursuant to this clause (d).

"**Bankruptcy Code**" has the meaning assigned to such term in the preamble to this Agreement.

"**Bankruptcy Court**" has the meaning assigned to such term in the preamble to this Agreement.

"**Board of Directors**" shall mean, with respect to any person, (a) in the case of any corporation, the board of directors of such person, (b) in the case of any limited liability company, the board of managers or board of directors, as applicable, of such person, or if such limited liability company does not have a board of managers or board of directors, the functional equivalent of the foregoing, (c) in the case of any partnership, the board of directors or board of managers, as applicable, of the general partner of such person and (d) in any other case, the functional equivalent of the foregoing and, in the case of preceding clauses (a) through (d), any duly authorized committee or functional equivalent of any of the foregoing.

"**BP Call Options**" means the call options sold by Cubic Asset, LLC to BPEC pursuant to the 2002 ISDA Master Agreement, dated as of [●], 2016, among Cubic Asset, LLC and BPEC, as counterparty, together with any schedules and confirmations thereto, and each of the transactions thereunder, in each case, relating solely to the call options transactions entered into on [●], 2016.

"**BP Intercreditor Agreement**" means the Intercreditor Agreement, dated [●], 2016, among the Collateral Agent, BPEC, as Second Priority Secured Party and Second Priority Representative (each as defined therein), Wilmington Trust, National Association, as collateral agent under the Second Lien Security Agreement (as defined therein), and Cubic Asset, LLC and each direct or indirect subsidiary of Cubic Energy, LLC, as amended, supplemented or otherwise modified from time to time in accordance with the terms thereof.

"**BPEC**" means BP Energy Company.

"**Business Day**" means any day other than a Saturday, Sunday or day on which banks and trust companies in New York, New York are not required to be open.

"**Capital Lease**" means, as applied to any Person, any lease of any property (whether real, personal or mixed) by that Person as lessee that, in conformity with GAAP, is required to be accounted for as a capital lease on the balance sheet of that Person.

"**Capital Stock**" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation), including, without limitation, partnership interests and membership interests, and any and all warrants, rights, preemptive rights, conversion rights,

under ERISA has been waived in regulations issued by the PBGC, or (b) a cessation of operations described in Section 4062(e) of ERISA.

"**Required Holders**" means (i) Holders of at least 66.66% of the aggregate principal amount of the outstanding Notes or (ii) at any time the Holders consist of only (A) Anchorage Capital Group, L.L.C. and its Affiliates (including Anchorage Illiquid Opportunities III, L.P., Anchorage Illiquid Opportunities III (B), L.P. and AIO III AIV LP,), on the one hand and (B) Corbin Opportunity Fund, L.P., O-CAP Partners, L.P. and O-CAP Offshore Master Fund, L.P. and their Affiliates on the other hand, with respect to the determination of Required Holders for Sections 7.11(c), 8.14, 11.4(a) (but only to the extent the Default or Event of Default waived is with respect to a Default or Event of Default under Article VIII) and 13.3(a) (to the extent such waiver or amendment relates to Article VIII or any definition related thereto that has the effect of modifying the actions prohibited by Article VIII) and the definition of "Permitted Hedging Agreement", all of the Holders.

"**Responsible Officer**" means the manager, chief executive officer, chief financial officer, president, any executive vice president or chief operating officer of the Company, but with respect to financial matters, means the manager, chief financial officer, treasurer or controller of the Company.

"**Restructuring Transactions**" has the meaning assigned to such term in the Prepackaged Plan.

"**Rule 144**" means Rule 144 as promulgated by the SEC under the Securities Act.

"**Scheduled Intellectual Property**" has the meaning assigned in Section 4.10(a).

"**SEC**" means the Securities and Exchange Commission.

"**Secured Obligations**" means the "Secured Obligations" as defined in the Security Agreement.

"**Securities Act**" means the Securities Act of 1933, as amended from time to time.

"**Security Agreement**" means the Security Agreement, dated as of [●], 2016, among the Company and each of its Subsidiaries party thereto from time to time and the Collateral Agent, as amended, supplemented or otherwise modified from time to time in accordance with the terms thereof.

"**Solvent**" means, with respect to any Person at any point in time, that (i) the sum of the debt and liabilities (including subordinated and contingent liabilities) of such Person and its Subsidiaries, on a consolidated basis, does not exceed the fair value of the present assets of such Person and its Subsidiaries, on a consolidated basis; (ii) the present fair saleable value of the assets of such Person and its Subsidiaries, on a consolidated basis, is greater than the total amount that will be required to pay the probable debt and liabilities (including subordinated and contingent liabilities) of such Person and its Subsidiaries, on a consolidated basis, as they become absolute and matured, (iii) the capital of such Person and its Subsidiaries, on a consolidated basis, is not unreasonably small in relation to the business of such Person and its

**DRAFT**

**EXHIBIT A**

**[FORM OF NOTE]**

**THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"). THE HOLDER MAY NOT OFFER, SELL, TRANSFER, ASSIGN, PLEDGE, HYPOTHECATE, OR OTHERWISE DISPOSE OF OR ENCUMBER THE SECURITIES REPRESENTED BY THIS CERTIFICATE EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT AND THE RULES AND REGULATIONS PROMULGATED THEREUNDER OR UNLESS SUCH TRANSACTION IS EXEMPT FROM, OR NOT SUBJECT TO, SUCH REGISTRATION. THE ISSUER OF THESE SECURITIES MAY REQUEST AN OPINION OF LEGAL COUNSEL FOR THE HOLDER REASONABLY SATISFACTORY TO THE ISSUER THAT ANY SUCH OFFER, SALE, TRANSFER, ASSIGNMENT, PLEDGE, HYPOTHECATION, OR OTHER DISPOSITION OR ENCUMBRANCE IS EXEMPT FROM THE REGISTRATION PROVISIONS OF THE SECURITIES ACT AND THE RULES AND REGULATIONS PROMULGATED THEREUNDER, IF SUCH OFFER, SALE, TRANSFER, ASSIGNMENT, PLEDGE, HYPOTHECATION OR OTHER DISPOSITION OR ENCUMBRANCE IS NOT PURSUANT TO RULE 144, RULE 144A OR AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT.**

**FOR FURTHER INFORMATION REGARDING THE ISSUE DATE AND THE YIELD TO MATURITY OF THIS NOTE, THE HOLDER OF THIS NOTE SHOULD CONTACT THE OFFICE OF THE [●]MANAGER OF CUBIC ENERGY, LLC AT [●]9870 PLANO ROAD, DALLAS, TEXAS 75238, WHO WILL PROMPTLY MAKE SUCH INFORMATION AVAILABLE.**

**CUBIC ENERGY, LLC**

[Date]

**14% SENIOR SECURED NOTE
DUE 2021**

No: [  ]                                                          PRINCIPAL AMOUNT
                                                                       U.S. $[    ]

Cubic Energy, LLC, a Delaware limited liability company (and its permitted successors and assigns, the "**Company**"), for value received, promises to pay to [Holder], or its permitted assigns, on [   ], 2021, the Principal Amount of this Note, plus accrued and unpaid interest hereon to such date of payment and Make-Whole Premium, if any. Interest shall accrue and shall be paid on this Note in accordance with the terms of the Indenture described below.

This Note is a duly authorized issue of 14% Senior Secured Notes Due 2021 of the Company (the "**Notes**"), issued under that certain Indenture, dated as of [●], 2016, by and among the Company, each guarantor party thereto from time to time (the "**Guarantors**"), the Initial Holders named therein, and the Noteholder Agent and Collateral Agent named therein (as amended, restated, supplemented or otherwise modified from time to time, the "**Indenture**"). All capitalized terms used but not defined herein shall have the meanings ascribed to them in the Indenture. This Note shall at all times be secured by the Collateral Documents, guaranteed by the Guarantors pursuant to the Guaranty, and subject to the terms and conditions of the Indenture.

The Company shall treat the Person in whose name this Note is registered as the owner hereof for the purpose of receiving payment and for all other purposes.  The Principal Amount, Make-Whole Premium, if any, and interest on this Note (to the extent payable in cash) is payable when due in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts in the manner set forth in the Indenture.

The Holder's determination of the Principal Amount of this Note in accordance with the terms of the Indenture shall be conclusive and binding, absent manifest error.

1.      **Mandatory and Optional Redemption.**

This Note is subject to mandatory redemption and to redemption at the option of the Company, each as provided in Article VI of the Indenture.

2.      **Guaranty.**

Pursuant to the Guaranty, each Guarantor has unconditionally guaranteed the payment of all obligations of the Company under the Notes.

3.      **Collateral Documents.**

Pursuant to the Collateral Documents, the Company has secured its obligations under the Note and the Note Documents and each Guarantor has secured its obligations under the Guaranty by granting to the Holders, a Lien on substantially all of their right, title and interest in and to the "Collateral" (as defined in the Indenture).  The Collateral shall be held by the Collateral Agent for the benefit of the Holders pursuant to the terms of the Security Agreement.

4.      **Indenture.**

The Company issued this Note under the Indenture.  The terms of this Note include those stated in the Indenture, including, without limitation, the provisions in the Indenture with respect to covenants, Events of Default and remedies.

5.      **Modification of Notes.**

The Notes may be modified as provided in Section 13.3 of the Indenture.

6.      **Non-Waiver.**

No course of dealing between the Company and the Holder of this Note or any delay or failure on the part of the Holder hereof in exercising any rights hereunder shall operate as a waiver of any rights of any Holder hereof, except to the extent expressly waived in writing by the Holder hereof.

7.      **Governing Law.**

Exhibit A-2

**DRAFT**

      **IN WITNESS WHEREOF**, the Company has caused this Note to be signed in its name by a duly authorized officer and to be dated as of the day and year first above written.

**CUBIC ENERGY, LLC**

By:_____
    Name:
    Title:

**DRAFT**

**EXHIBIT B**

**[FORM OF GUARANTY]**

THIS GUARANTY, dated as of [_____] (this "<u>Guaranty</u>"), is made by each of the undersigned (each, a "<u>Guarantor</u>" and collectively, the "<u>Guarantors</u>") in favor of the Initial Holders (as defined below) and the other holders from time to time of the Notes (as defined below). The Initial Holders and such other holders are herein collectively called the "holders" and individually a "holder."

RECITALS:

WHEREAS, Cubic Energy, LLC (the "<u>Company</u>") has entered into that certain Indenture, dated as of [●], 2016, among Cubic Energy, LLC, each Guarantor from time to time party thereto, the initial holders named therein (the "<u>Initial Holders</u>"), the Noteholder Agent and the Collateral Agent named therein (as amended, restated, amended and restated, extended, supplemented or otherwise modified in writing from time to time, the "<u>Indenture</u>", the capitalized terms defined therein being used herein as therein defined).

WHEREAS, pursuant to the Indenture, the Company has issued $30,000,000 aggregate principal amount of 14% Senior Secured Notes due [●], 2021 (the "<u>Notes</u>");

WHEREAS, the Indenture requires the Company to cause any newly formed or acquired Subsidiary of the Company to execute and deliver this Guaranty to the Collateral Agent; and

WHEREAS, each Guarantor will receive direct and indirect benefits from the financing arrangements contemplated by the Indenture and has determined that entry into this Guaranty is in the best interests of such Guarantor.

NOW, THEREFORE, each Guarantor hereby covenants and agrees with, and represents and warrants to, each of the holders as follows:

1. **Guaranty.**

(a) Each Guarantor hereby irrevocably and unconditionally, jointly and severally, with the other Guarantors, guarantees to each holder, as principal and not merely as surety, the due and punctual payment in full of (i) the principal of, any interest accrued thereon (including, without limitation, interest accruing after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding), Make-Whole Premium and any other amounts due under the Notes when and as the same shall become due and payable (whether at stated maturity or by required or optional redemption or by acceleration or otherwise) and (ii) any other sums which may become due under the terms and provisions of the Notes, the Indenture or any other instrument referred to therein (all such obligations described in clauses (i) and (ii) above are herein called the "<u>Guaranteed Obligations</u>"). The guaranty in the preceding sentence is an absolute, present and continuing guaranty of payment and not of

**DRAFT**

<u>Exhibit 1 to Guaranty</u>

**[FORM OF GUARANTOR SUPPLEMENT]**

THIS GUARANTOR SUPPLEMENT (this "<u>Guarantor Supplement</u>"), dated [_____], is made by [_____] (the "<u>Additional Guarantor</u>"), in favor of the holders from time to time of the Notes issued pursuant to the Indenture described below.

RECITALS:

WHEREAS, pursuant to that certain Indenture, dated as of [●], 2016 (as amended, restated, amended and restated, extended, supplemented or otherwise modified in writing from time to time, the "<u>Indenture</u>", the capitalized terms defined therein being used herein as therein defined), among Cubic Energy, LLC (the "<u>Company</u>"), each guarantor from time to time party thereto, the initial holders named therein (the "<u>Initial Holders</u>"), the Noteholder Agent and the Collateral Agent named therein, the Company has issued $30,000,000 aggregate principal amount of 14% Senior Secured Notes due [●], 2021 (the "<u>Notes</u>");

WHEREAS, the Company is required pursuant to the Indenture to cause the Additional Guarantor to deliver this Guarantor Supplement in order to cause the Additional Guarantor to become a guarantor under the Guaranty, dated [●], 2016, executed by certain Subsidiaries of the Company (together with each entity that from time to time becomes a party thereto by executing a Guarantor Supplement, collectively, the "<u>Guarantors</u>") in favor of each holder from time to time of any of the Notes (as the same may be amended, restated, supplemented or otherwise modified from time to time, the "<u>Guaranty</u>"); and

WHEREAS, the Additional Guarantor has received and will receive substantial direct and indirect benefits from the Company's compliance with the terms and conditions of the Indenture and the Notes issued thereunder.

NOW THEREFORE, in consideration of the funds advanced to the Company by the Initial Holders under the Indenture and to enable the Company to comply with the terms of the Indenture, the Additional Guarantor hereby covenants, represents and warrants to the holders as follows:

The Additional Guarantor hereby becomes a Guarantor (as defined in the Guaranty) for all purposes of the Guaranty.  Without limiting the foregoing, the Additional Guarantor hereby (a) jointly and severally with the other Guarantors under the Guaranty, guarantees to the holders from time to time of the Notes the prompt payment in full when due (whether at stated maturity, by acceleration or otherwise) and the full and prompt performance and observance of all Guaranteed Obligations (as defined in Section 1 of the Guaranty) in the same manner and to the same extent as is provided in the Guaranty, (b) accepts and agrees to perform and observe all of the covenants set forth therein, (c) waives the rights set forth in Section 3 of the Guaranty, (d) makes the representations and warranties set forth in Section 7 of the Guaranty and (e) waives the rights, submits to jurisdiction, and waives service of process as described in Section 12 of the Guaranty.

Exhibit 1 to Guaranty-1

**DRAFT**

## EXHIBIT C
## [FORM OF HOLDER JOINDER]

This Holder Joinder is made this ____ day of _____, 20____, by and among _____ (the "Transferee"), Cubic Energy, LLC (the "Company"), the Guarantors (as defined below), the Initial Holders (as defined below), the Noteholder Agent (as defined below) and the Collateral Agent (as defined below).  Reference is made to that certain Indenture, dated as of [●], 2016 (as amended, restated, amended and restated, extended, supplemented or otherwise modified in writing from time to time, the "Indenture", the capitalized terms defined therein being used herein as therein defined), among the Company, each guarantor from time to time party thereto (the "Guarantors"), the initial holders named therein (the "Initial Holders"), Wilmington Trust, National Association, as noteholder agent (the "Noteholder Agent") and the collateral agent named therein (the "Collateral Agent").

RECITALS:

WHEREAS, the Indenture provides that each Holder may sell, transfer or assign all or any portion of its Note to any Person, at any time and such person shall become a party to the Indenture pursuant to a Holder Joinder; and

WHEREAS, the Transferee desires to purchase _____ aggregate principal amount of Notes (the "Transferred Notes") and become a "Holder" under the Indenture.

NOW, THEREFORE, in consideration of the mutual promises of the parties and as a condition of the purchase or receipt by the Transferee of the Transferred Notes, the Transferee acknowledges and agrees as follows:

1.	The Transferee has received and read the Indenture and acknowledges that the Transferee is acquiring the Transferred Notes subject to the terms and conditions of the Indenture.

2.	The Transferee agrees that the Transferred Notes being acquired by the Transferee are bound by and subject to all of the terms and conditions of the Indenture, hereby joins in, agrees to be bound by and shall have the benefit of all of the terms and conditions of the Indenture to the same extent as if the Transferee were an original party to the Indenture.  This Holder Joinder shall be attached to and become a part of the Indenture.

3.	The Transferee hereby makes the following representations and warranties:

(a)	it is specifically understood and agreed that such Transferee is not acquiring its Notes with a view towards the sale or distribution thereof within the meaning of the Securities Act in a transaction that would be in violation of the Securities Act;

Exhibit C-1

SC1:3958837.69

**DRAFT**

## EXHIBIT D

**FORM OF PERMITTED HEDGING AGREEMENT NOTICE**

To:    Cubic Energy, LLC
        Wilmington Trust, National Association, as Noteholder Agent and Collateral Agent

      Reference is made to the Indenture, dated as of [●], 2016 (as amended, supplemented or modified from time to time, the "<u>Indenture</u>"), among Cubic Energy, LLC, the guarantors party thereto from time to time, the Initial Holders named therein, Wilmington Trust, National Association, as Noteholder Agent and Collateral Agent.  Capitalized terms used but not defined herein shall have the meanings assigned to such terms in the Indenture.

      Required Holders, pursuant to the [BP Intercreditor Agreement, Pari Passu First Lien (BP) Intercreditor Agreement] and Section 8.14 of the Indenture, hereby confirm that the attached Hedging Agreement is a Permitted Hedging Agreement[,] [and] the party thereto is a Permitted Hedging Counterparty [and the trades specifically described below or within the parameters below are permitted]. The Permitted Hedging Counterparty, the Noteholder Agent and the Collateral Agent may rely on this notice.

      [Describe trades / parameters]

 (Attachment)

                  [HOLDER]


                  By:_____
                     Name:
                     Title:

                  *[Insert additional signature blocks as required]*

# REGISTRATION RIGHTS AGREEMENT

This REGISTRATION RIGHTS AGREEMENT (this "Agreement"), dated as of [●], 2016, is made by and among Cubic Energy, LLC, a Delaware limited liability company (the "Company"), and each of the investors listed on Schedule I hereto (each, together with any Affiliates of such Persons that become a party to this Agreement in accordance with Section 10(e), an "Investor" and collectively, the "Investors").  Capitalized terms used but not otherwise defined herein shall have the meanings set forth in Section 9.

In consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties to this Agreement hereby agree as follows:

1.  Piggyback Registrations.

(a) Right to Piggyback.  Whenever the Company proposes to register any of its Equity Securities (including any proposed registration of the Company's Equity Securities by any third party) under the Securities Act (other than pursuant to a registration on Form S-4 or S-8 or any successor or similar forms), whether or not for sale for its own account, and the registration form to be used may be used for the registration of Registrable Securities (a "Piggyback Registration"), the Company shall give written notice within ten (10) Business Days to each Investor holding at least five percent of the then issued and outstanding Interests ("Significant Investor") of its intention to effect such a registration and will include in such registration all Registrable Securities with respect to which the Company has received written requests for inclusion therein from such Significant Investor(s) within ten (10) Business Days after the receipt of the Company's notice.

(b) Piggyback Expenses.  The Registration Expenses (as defined below) of the holders of Registrable Securities shall be paid by the Company in all Piggyback Registrations in accordance with and up to the limits set forth in Section 5 hereof.

(c) Priority on Primary Registrations.  If a Piggyback Registration is an underwritten primary registration on behalf of the Company and the managing underwriters advise the Company in writing that, in their opinion, the number of securities requested to be included in such offering exceeds the number which can be sold in an orderly manner in such offering within a price range acceptable to the Company, then the Company shall include in such registration (i) first, the securities the Company proposes to sell that, in the opinion of such underwriters, can be sold in an orderly manner within such price range, (ii) second, the Registrable Securities requested to be included in such registration, if any, that, in the opinion of such underwriters, can be sold in an orderly manner within such price range, pro rata among the respective holders thereof on the basis of the number of Registrable Securities owned by each such holder, and (iii) third, other securities requested (and permitted) to be included in such registration, if any, that, in the opinion of such underwriters, can be sold in an orderly manner within such price range, pro rata among the holders of such securities on the basis of the number of such securities owned by each such holder.

(d) <u>Priority on Secondary Registrations</u>.  If a Piggyback Registration is an underwritten secondary registration on behalf of holders of the Company's securities other than holders of Registrable Securities and the managing underwriters advise the Company in writing that, in their opinion, the number of securities requested to be included in such offering exceeds the number which can be sold in an orderly manner in such offering within a price range acceptable to the holders of a majority of the securities initially requested to be included in such registration, then the Company shall include in such registration (i) <u>first</u>, the securities requested to be included therein by the holders requesting such registration and the Registrable Securities requested to be included in such registration, in each case, that, in the opinion of such underwriters, can be sold in an orderly manner within such price range, pro rata among the holders of such securities and the holders of such Registrable Securities on the basis of the number of securities owned by each such holder, and (ii) <u>second</u>, other securities requested (and permitted) to be included in such registration, if any, that, in the opinion of such underwriters, can be sold in an orderly manner within such price range.

(e) <u>Selection of Underwriters</u>.  If any Piggyback Registration is an underwritten offering, the selection of the investment banker(s) and managing underwriter(s) for the offering shall be at the sole discretion of the Company.

2.    <u>S-3 Shelf Registration.</u>

(a) <u>Right to Effect Shelf Takedowns</u>.  Any Significant Investor shall be entitled, at any time and from time to time when an S-3 Shelf Registration Statement is effective, to sell such Registrable Securities as are then registered pursuant to such S-3 Shelf Registration Statement (each, a "<u>Shelf Takedown</u>"), but only upon not less than ten Business Days' prior written notice to the Company (if such takedown is to be underwritten). Such Significant Investor shall be entitled to request that a Shelf Takedown be an underwritten offering; <u>provided</u>, <u>however</u>, that the number of Registrable Securities included in each such underwritten Shelf Takedown (i) would reasonably be expected to yield gross proceeds to such Significant Investor of at least $10,000,000 (based on the then-current market prices) or (ii) consists of all Registrable Securities then owned by such Significant Investor. Such Significant Investor shall give the Company prompt written notice of the consummation of each Shelf Takedown (whether or not underwritten).

(b) <u>Priority on Underwritten Shelf Takedowns</u>. The Company may include Interests other than Registrable Securities in an underwritten Shelf Takedown for any accounts on the terms provided below, but only with the consent of the managing underwriters of such offering and whichever of the Significant Investors has requested such Shelf Takedown. If the managing underwriters of the requested underwritten Shelf Takedown advise the Company and the requesting Significant Investor in writing that in their opinion the number of Interests proposed to be included in the underwritten Shelf Takedown exceeds the number of Interests which can be sold in an orderly manner in such offering within a price range acceptable to the Significant Investor requesting such Shelf Takedown, the Company shall include in such underwritten Shelf Takedown (i) <u>first</u>, the number of Interests that the requesting Significant Investor proposes to sell, and (ii) <u>second</u>, the number of Interests proposed to be included therein by any other Persons (including Interests to be sold for the account of the Company) allocated among such other Persons in such manner as the Company may determine. The provisions of this

2

**DRAFT**

and other communications shall be sent to the Company at the address set forth below and to any other recipient at the address set forth in the Company's books and records (which shall initially be the addresses set forth on Schedule I attached hereto), or to such other address or to the attention of such other Person as the recipient party has specified by prior written notice to the sending party.  The Company's address is as follows:

> Cubic Energy, LLC
> [●]
> 9870 Plano Road
> Dallas, Texas 75238
> Facsimile: [●](972) 681-9687
> Attention: [●]Jason Gorsuch
>
> with copies (which shall not constitute notice) to:
>
> Sullivan & Cromwell LLP
> 125 Broad Street
> New York, NY 10004
> Attention: Ari B. Blaut

(b)  <u>No Inconsistent Agreements</u>.  The Company will not hereafter enter into any agreement with respect to its securities which is inconsistent with or violates the rights granted to the holders of Registrable Securities in this Agreement.

(c)  <u>Remedies</u>.  Any Person having rights under any provision of this Agreement shall be entitled to enforce such rights specifically to recover damages caused by reason of any breach of any provision of this Agreement and to exercise all other rights granted by law.  The parties hereto agree and acknowledge that money damages may not be an adequate remedy for any breach of the provisions of this Agreement and that any party may in its sole discretion apply to any court of law or equity of competent jurisdiction (without posting any bond or other security) for specific performance and for other injunctive relief in order to enforce or prevent violation of the provisions of this Agreement.

(d)  <u>Amendments and Waivers</u>.  Except as otherwise provided herein, no modification, amendment or waiver of any provision of this Agreement shall be effective against the Company or the holders of Registrable Securities unless such modification, amendment or waiver is approved in writing by the Company and the holders of a majority of the Registrable Securities.  No failure by any party to insist upon the strict performance of any covenant, duty, agreement or condition of this Agreement or to exercise any right or remedy consequent upon a breach thereof shall constitute a waiver of any such breach or any other covenant, duty, agreement or condition. The failure of any party to enforce any of the provisions of this Agreement shall in no way be construed as a waiver of such provisions and shall not affect the right of such party thereafter to enforce each and every provision in accordance with its terms.

(e)  <u>Transfer</u>.  If any Significant Investor transfers any Registrable Securities to an Affiliate of such Significant Investor, the rights of such Significant Investor under this Agreement will be transferred to such Affiliate upon the execution and delivery by the transferee

14

**DRAFT**

IN WITNESS WHEREOF, the parties hereto have executed this Registration Rights Agreement as of the day and year first written above.

**CUBIC ENERGY, LLC**

By: **DRAFT**‎_____

    Name:

    Title:

**AIO III CE, L.P.**

By:     Anchorage Capital Group, L.L.C., its
Investment Manager

By: **DRAFT**              
Name:
Title:

*Signature Page - Registration Rights Agreement*

**DRAFT**

## SCHEDULE I

## SCHEDULE OF INVESTORS

**AIO III CE, L.P.**
Anchorage Capital Group, L.L.C.
610 Broadway, 6th Floor
New York, NY 10012

**CORBIN OPPORTUNITY FUND, L.P.**
Corbin Capital Partners Management, LLC
590 Madison Avenue, 31st Fl
New York, NY 10022

**O-CAP PARTNERS, L.P.**
O-CAP Advisors, LLC
600 Madison Avenue, 14th FL
New York, NY 10022
Attention: Lloyd Jagai

**O-CAP OFFSHORE MASTER FUND, L.P.**
O-CAP Advisors, LLC
600 Madison Avenue, 14th FL
New York, NY 10022
Attention: Lloyd Jagai

**Exhibit 3**

**Reorganized Cubic Energy Certificate of Formation**

(see attached)

**DRAFT**

## CERTIFICATE OF FORMATION

### OF

### CUBIC ENERGY, LLC

On December 11, 2015, Cubic Energy, Inc., a Texas corporation and the predecessor to Cubic Energy, LLC ("Cubic Energy"), and Cubic Energy's direct and indirect subsidiaries, Cubic Asset, LLC, Cubic Asset Holding, LLC, Cubic Louisiana, LLC, and Cubic Louisiana Holding, LLC (collectively with Cubic Energy, the "Debtors"), filed voluntary petitions in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") seeking relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). The Chapter 11 cases are being jointly administered under the caption "In re Cubic Energy, Inc. *et. al.*" Case No. 15-12500. This Certificate of Formation of Cubic Energy, LLC (the "LLC"), dated as of [●], 2016 is being duly executed and filed by [●], as an authorized person, to form a limited liability company under the Delaware Limited Liability Company Act (6 Del. C. §18-101, et seq). Provision for the filing of this Certificate of Formation is contained in the Third Amended Prepackaged Plan of Reorganization of Cubic Energy, Inc., et al., Pursuant to Chapter 11 of the Bankruptcy Code dated as of February 15, 2016 (as may be further amended, modified, or supplemented from time to time, the "Prepackaged Plan"), as confirmed on [●], 2016 by order of the Bankruptcy Court having jurisdiction under the Bankruptcy Code for the liquidation of the Company under Chapter 11 of the Bankruptcy Code.

1.      Name.  The name of the limited liability company formed hereby is Cubic Energy, LLC (the "LLC").

2.      Registered Office.  The address of the registered office of the LLC is National Corporate Research, Ltd., 615 South DuPont Highway, in the City of Dover, County of Kent, Delaware 19901.

3.      Registered Agent.  The name and address of the registered agent for service of process on the LLC in the State of Delaware is National Corporate Research, Ltd., 615 South DuPont Highway, in the City of Dover, County of Kent, Delaware 19901.

4.      Prohibition on Non-Voting Securities. From and after the effective date of the Prepackaged Plan (the "Effective Date"), the LLC shall not be authorized to issue non-voting equity securities to the extent prohibited by Section 1123(a)(6) of the Bankruptcy Code; provided that the foregoing restriction shall (i) have no further force and effect beyond that required under Section 1123(a)(6) of the Bankruptcy Code, (ii) only have such force and effect for so long as Section 1123 of the Bankruptcy Code is in effect and applicable to the LLC and (iii) in all events may be amended or eliminated in accordance with applicable law as from time to time may be in effect.

[Signature page follows]

**DRAFT**

IN WITNESS WHEREOF, the undersigned has executed this Certificate of Formation as of the date first-above written.

**DRAFT**                        

Name:  [•]
Title:   Authorized Person

**<u>Exhibit 3-a</u>**

**Reorganized Cubic Energy Certificate of Formation**
**(Changed Pages Only Blackline)**

(see attached)

**DRAFT**

# CERTIFICATE OF FORMATION

## OF

## CUBIC ENERGY, LLC

On December 11, 2015, Cubic Energy, Inc., a Texas corporation and the predecessor to Cubic Energy, LLC ("Cubic Energy"), and Cubic Energy's direct and indirect subsidiaries, Cubic Asset, LLC, Cubic Asset Holding, LLC, Cubic Louisiana, LLC, and Cubic Louisiana Holding, LLC (collectively with Cubic Energy, the "Debtors"), filed voluntary petitions in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") seeking relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). The Chapter 11 cases are being jointly administered under the caption "In re Cubic Energy, Inc. *et. al.*" Case No. 15-12500. This Certificate of Formation of Cubic Energy, LLC (the "LLC"), dated as of [●], 2016 is being duly executed and filed by [●], as an authorized person, to form a limited liability company under the Delaware Limited Liability Company Act (6 Del. C. §18-101, et seq). Provision for the filing of this Certificate of Formation is contained in the Third Amended Prepackaged Plan of Reorganization of Cubic Energy, Inc., et al., Pursuant to Chapter 11 of the Bankruptcy Code dated as of ~~December 11, 2015 (~~February 15, 2016 (as may be further amended, modified, or supplemented from time to time, the "Prepackaged Plan"), as confirmed on [●], 2016 by order of the Bankruptcy Court having jurisdiction under the Bankruptcy Code for the liquidation of the Company under Chapter 11 of the Bankruptcy Code.

1.    <u>Name</u>.   The name of the limited liability company formed hereby is Cubic Energy, LLC (the "LLC").

2.    <u>Registered Office</u>.   The address of the registered office of the LLC is ~~[●]~~ National Corporate Research, Ltd., 615 South DuPont Highway, in the City of Dover, County of Kent, Delaware 19901.

3.    <u>Registered Agent</u>.   The name and address of the registered agent for service of process on the LLC in the State of Delaware is ~~[●]~~ National Corporate Research, Ltd., 615 South DuPont Highway, in the City of Dover, County of Kent, Delaware 19901.

4.    <u>Prohibition on Non-Voting Securities</u>. From and after the effective date of the Prepackaged Plan (the "Effective Date"), the LLC shall not be authorized to issue non-voting equity securities to the extent prohibited by Section 1123(a)(6) of the Bankruptcy Code; provided that the foregoing restriction shall (i) have no further force and effect beyond that required under Section 1123(a)(6) of the Bankruptcy Code, (ii) only have such force and effect for so long as Section 1123 of the Bankruptcy Code is in effect and applicable to the LLC and (iii) in all events may be amended or eliminated in accordance with applicable law as from time to time may be in effect.

[Signature page follows]

**DRAFT**

IN WITNESS WHEREOF, the undersigned has executed this Certificate of Formation as of the date first-above written.

**DRAFT** _____

Name:  [•]
Title:   Authorized Person

**<u>Exhibit 4</u>**

**Reorganized Cubic Energy Operating Agreement**

(see attached)

DRAFT

## LIMITED LIABILITY COMPANY AGREEMENT

## OF

## CUBIC ENERGY, LLC

LIMITED LIABILITY COMPANY INTERESTS IN CUBIC ENERGY, LLC, A DELAWARE LIMITED LIABILITY COMPANY, HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY STATE SECURITIES LAWS AND ARE ISSUED IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND SUCH LAWS.  SUCH LIMITED LIABILITY COMPANY INTERESTS MAY NOT BE TRANSFERRED WITHOUT (A) REGISTRATION UNDER THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS, UNLESS AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT AND SUCH LAWS IS THEN AVAILABLE, AND (B) COMPLIANCE WITH ALL OTHER RESTRICTIONS ON TRANSFER CONTAINED IN THIS LIMITED LIABILITY COMPANY AGREEMENT.

# TABLE OF CONTENTS

**Page**

**ARTICLE 1 DEFINITIONS** ................................................................2

**ARTICLE 2 ORGANIZATIONAL MATTERS** ................................................5
    2.1    Formation ................................................................5
    2.2    Name ................................................................5
    2.3    Principal Place of Business; Other Places of Business ................5
    2.4    Business Purpose ................................................................5
    2.5    Designated Agent for Service of Process ................................6
    2.6    Term ................................................................6

**ARTICLE 3 CAPITAL STRUCTURE; TAX TREATMENT** ................................6
    3.1    Capital Structure. ................................................................6
    3.2    Capital Contributions ................................................................7
    3.3    Loans by Third Parties ................................................................7
    3.4    Limited Liability of the Members ................................................7
    3.5    Tax Treatment ................................................................7

**ARTICLE 4 DISTRIBUTIONS** ................................................................7
    4.1    Distributions Generally ................................................................7
    4.2    Limitations on Distributions ................................................................7
    4.3    Withholding ................................................................8

**ARTICLE 5 VOTING AND MANAGEMENT** ................................................8
    5.1    Member Voting ................................................................8
    5.2    Manager. ................................................................8
    5.3    Manager Powers and Obligations. ................................................9
    5.4    Manager Reimbursements ................................................................11
    5.5    Manager and Member Indemnification ................................11
    5.6    No Member Management ................................................................13

**ARTICLE 6 BOOKS AND RECORDS AND REPORTING** ................................13
    6.1    Books and Records ................................................................13
    6.2    Information Rights ................................................................13
    6.3    Third Party Valuation ................................................................13
    6.4    Company Tax Elections, Tax Controversies ................................14
    6.5    Confidentiality of Information ................................................14
    6.6    Withholding Documentation ................................................14

**ARTICLE 7 TRANSFERS OF INTERESTS** ................................................15
    7.1    Member Transfers ................................................................15
    7.2    Transfer Restrictions ................................................................15
    7.3    Admissions, Withdrawals and Removals ................................16
    7.4    Withdrawal of Certain Members ................................16

SC1:3965072.11

**ARTICLE 8 CERTAIN AGREEMENTS** ..........................................................................**16**
    8.1    Drag-Along Rights..................................................................................16
    8.2    Tag-Along Rights...................................................................................17
    8.3    Preemptive Rights .................................................................................18

**ARTICLE 9 DISSOLUTION, LIMITATION, AND TERMINATION OF THE
COMPANY**...........................................................................................................**20**
    9.1    Limitations ...........................................................................................20
    9.2    Exclusive Dissolution Causes ..............................................................20
    9.3    Effect of Dissolution............................................................................20
    9.4    Liquidation and Final Distribution Proceeds .......................................20

**ARTICLE 10 REPRESENTATIONS AND WARRANTIES**...................................**21**
    10.1    Representations and Warranties of the Members .................................21

**ARTICLE 11 MISCELLANEOUS** ..........................................................................**22**
    11.1    Appointment of Company as Attorney-in-Fact ...................................22
    11.2    Amendments .........................................................................................22
    11.3    Accounting ...........................................................................................23
    11.4    Entire Agreement..................................................................................23
    11.5    Further Assurances................................................................................23
    11.6    Notices .................................................................................................23
    11.7    Governing Law .....................................................................................24
    11.8    Binding Effect......................................................................................24
    11.9    Confidentiality .....................................................................................24
    11.10    Counterparts .........................................................................................24
    11.11    Waivers ................................................................................................24
    11.12    Preservation of Intent...........................................................................25
    11.13    Certain Rules of Construction...............................................................25
    11.14    Jurisdiction...........................................................................................25
    11.15    No Third Party Beneficiaries ...............................................................26

Exhibit A: Schedule of Members
Exhibit B: Initial Manager

DRAFT

## LIMITED LIABILITY COMPANY AGREEMENT

## OF

## CUBIC ENERGY, LLC

THIS LIMITED LIABILITY COMPANY AGREEMENT (including all exhibits and schedules attached hereto and made a part hereof, this "Agreement") is made and entered into as of the [●] day of [●], 2016, by and among the Persons executing this Agreement on the signature pages hereto as members (each, a "Member" and, together with such other Persons that may hereafter become members as provided herein, referred to collectively as the "Members").

## RECITALS

WHEREAS, the Company was initially formed as a Texas corporation with the name Cubic Energy, Inc., whose articles of incorporation were filed with the Secretary of State of the State of Texas on August 30, 1999;

WHEREAS, on December 11, 2015, the Company, together with each of its subsidiaries, filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code (as defined herein) in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

WHEREAS, on [●], 2016, the Bankruptcy Court entered an order confirming that certain Third Amended Prepackaged Plan of Reorganization of Cubic Energy, Inc., *et al.*, pursuant to Chapter 11 of the Bankruptcy Code (as may be further amended, modified, or supplemented from time to time, the "Cubic Plan");

WHEREAS, on the date hereof (the "Effective Date"), the Cubic Plan became effective;

WHEREAS, pursuant to the Cubic Plan, on the Effective Date, all equity interests in the Company existing as of the Effective Date were cancelled and annulled, and the Company filed a certificate of conversion to limited liability company and a Certificate of Formation (as defined herein) of the Company with the Secretary of State of the State of Delaware, thereby converting the Company from a Texas corporation to a Delaware limited liability company under the Act (as defined herein);

WHEREAS, pursuant to the Cubic Plan, on the Effective Date, Limited Liability Company Interests (as defined herein) in the Company were issued to the Members in the amounts listed in Exhibit A hereto;

WHEREAS, the Members intend that the Company will be treated as a corporation for U.S. federal and state income tax purposes; and

WHEREAS, the parties desire to set forth their understanding with respect to their relationship and the operation of the Company, effective as of the Effective Date.

NOW, THEREFORE, in consideration of the mutual covenants and promises contained herein and for other good and valuable consideration the receipt and adequacy of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE 1
## DEFINITIONS

As used herein, the following terms have the meaning set forth below:

"Act" means the Delaware Limited Liability Company Act, 6 Del. C. § 18-101, et seq., as amended.

"Affiliate" means, with respect to any Person, a Person that directly or indirectly controls, is controlled by, or is under direct or indirect common control with, such Person.  For purposes of this definition, "control" when used with respect to any Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise, and the terms "controlling" and "controlled" have meanings correlative to the foregoing.  None of the Members, nor any of their Affiliates (other than the Company and its subsidiaries), nor any of their respective employees, partners, officers, managers or directors shall be deemed Affiliates of the Company or any of its subsidiaries for any purpose hereunder.

"Agreement" has the meaning specified in the preamble hereto.

"Anchorage" means, collectively, AIO III CE, L.P., and any Affiliate thereof that has been admitted to the Company as a Member pursuant to Section 7.1.3 or Section 7.2.

"Bankruptcy Code" means Title 11 of the United States Code, as amended.

"Bankruptcy Court" has the meaning set forth in the Recitals.

"Business Day" means any day other than a Saturday, Sunday or other day on which banks in the State of New York or the State of Texas are not required to be open.

"Certificate of Cancellation" means a certificate filed in accordance with 6 Del. C. § 18-203.

"Certificate of Formation" means the certificate of formation of the Company filed with the Secretary of State of the State of Delaware on [●], 2016, as amended, modified, supplemented or restated from time to time.

"Code" means the Internal Revenue Code of 1986, as amended.

"Company" means Cubic Energy, LLC, a Delaware limited liability company.

"Company Assets" means all assets owned by the Company from time to time, including tangible property, intangible property and cash.

"<u>Corbin</u>" means, collectively, Corbin Opportunity Fund, L.P., and any Affiliate thereof that has been admitted to the Company as a Member pursuant to <u>Section 7.1.3</u> or <u>Section 7.2</u>.

"<u>Cubic Plan</u>" has the meaning set forth in the Recitals.

"<u>Drag-Along Member</u>" has the meaning specified in <u>Section 8.1.1</u>.

"<u>Drag-Along Notice</u>" has the meaning specified in <u>Section 8.1.1</u>.

"<u>Drag-Along Sale</u>" has the meaning specified in <u>Section 8.1.1</u>.

"<u>Effective Date</u>" has the meaning set forth in the Recitals.

"<u>Encumbrance</u>" means a pledge, alienation, mortgage, hypothecation, encumbrance or similar collateral assignment by any other means, whether for value or no value and whether voluntary or involuntary (including, without limitation, by operation of law or by judgment, levy, attachment, garnishment, bankruptcy or other legal or equitable proceedings).

"<u>Fiscal Year</u>" means any twelve-month period commencing on July 1 and ending on June 30 of the following year.

"<u>Hedging Transaction</u>" means any (i) transaction that is a commodity interest transaction, as defined by the U.S. Commodity Futures Trading Commission, including any futures, option, or swap transaction or (ii) agreement, contract or transaction for the forward purchase or sale of a commodity for physical delivery at some future date, in either case that is entered into for the purpose of hedging, mitigating or otherwise offsetting the Company's long (or short) position in a physical commodity, currency or interest rate exposure.

"<u>Indemnified Person</u>" has the meaning specified in <u>Section 5.5.1</u>.

"<u>Initial Member</u>" means each of Anchorage, Corbin and O-CAP.

"<u>IPO</u>" means a *bona fide* underwritten initial public offering of equity securities of the Company pursuant to an effective registration statement filed under the Securities Act (excluding registration statements filed on Form S-8).

"<u>Limited Liability Company Interest</u>" means the ownership interest of a Member in the Company at any particular time, including without limitation, such Member's right to receive distributions from the Company, any and all rights to vote, and the rights to any and all benefits to which such Member is entitled as provided in this Agreement and the Act, together with the obligations of such Member to comply with all of the terms and provisions of this Agreement and the Act. The Limited Liability Company Interests of each Member as of the Effective Date are listed on <u>Exhibit A</u> hereto, and are subject to adjustment as set forth in <u>Section 3.1</u>.

"<u>Liquidation Event</u>" has the meaning specified in <u>Section 9.2</u>.

"<u>Majority in Interest</u>" means at any time Members whose aggregate Ownership Percentage is greater than fifty percent (50%).

"<u>Manager</u>" means any Person who is listed on <u>Exhibit B</u> hereto as an initial Manager of the Company or elected by the Members in accordance with <u>Article 5</u> hereof, and who has not resigned, been removed, or otherwise been replaced in accordance with <u>Article 5</u>.  Each Manager of the Company shall constitute a "Manager" of the Company within the meaning of Section 18-101(10) of the Act.

"<u>Member</u>" has the meaning specified in the preamble hereto.  For the avoidance of doubt, "Member" includes any Person admitted to the Company as a Member pursuant to <u>Section 7.3</u>.

"<u>New Cubic Energy Senior Secured Notes</u>" means the 14% senior secured notes due 2020 issued by the Company pursuant to that certain indenture, dated as of the Effective Date, among the Company, the guarantors party thereto, the holders party thereto and Wilmington Trust National Association, as noteholder agent and collateral agent.

"<u>New Issue Instruments</u>" has the meaning specified in <u>Section 8.3(a)</u>.

"<u>Notice of Acceptance</u>" has the meaning specified in <u>Section 8.3(b)</u>.

"<u>Notice of Transfer</u>" has the meaning specified in <u>Section 8.2.1</u>.

"<u>O-CAP</u>" means, collectively, O-CAP Partners, L.P., O-CAP Offshore Master Fund, L.P., and any Affiliate of either O-CAP Partners, L.P. or O-CAP Offshore Master Fund, L.P. that has been admitted to the Company as a Member pursuant to <u>Section 7.1.3</u> or <u>Section 7.2</u>.

"<u>Ownership Percentage</u>" means, with respect to any Member, the ratio of such Member's Limited Liability Company Interests to all Limited Liability Company Interests then outstanding. The aggregate Ownership Percentages of the Members shall at all times equal one hundred percent (100%).

"<u>Person</u>" means and includes an individual, a partnership, a limited liability company, a joint venture, a corporation, a trust, an unincorporated organization, a government or any department or agency thereof or any entity similar to any of the foregoing.

"<u>Preemptive Period</u>" has the meaning specified in <u>Section 8.3(a)(iii)</u>.

"<u>Preemptive Rights Member</u>" has the meaning specified in <u>Section 8.3(a)</u>.

"<u>Preemptive Rights Offer</u>" has the meaning specified in <u>Section 8.3(a)</u>.

"<u>Preemptive Share</u>" has the meaning specified in <u>Section 8.3(a)(ii)</u>.

"<u>Records</u>" has the meaning specified in <u>Section 6.1</u>.

"<u>Sale</u>" means a Transfer of Limited Liability Company Interests for value.  The terms "<u>Sell</u>" and "<u>Sold</u>" have corresponding meanings.

"<u>Securities Act</u>" has the meaning specified in <u>Section 10.1(c)</u>.

"<u>Significant Action</u>" has the meaning specified in <u>Section 5.3.6</u>.

"Significant Member" means, at any time, a Member whose aggregate Ownership Percentage is equal to at least five percent (5%).

"Tag-Along Member" has the meaning specified in Section 8.2.1.

"Tag-Along Sale" has the meaning specified in Section 8.2.1.

"Transfer" means, with respect to any Limited Liability Company Interest, a direct or indirect sale, transfer, gift, grant, conveyance, assignment, bequest, or disposition by any other means, whether for value or no value and whether voluntary or involuntary (including, without limitation, by realization upon any Encumbrance or by operation of law or by judgment, levy, attachment, garnishment, bankruptcy or other legal or equitable proceedings).

"Transfer Restriction Date" means [●], 2018[1].

"Valuation Agent" has the meaning specified in Section 6.3.

## ARTICLE 2
## ORGANIZATIONAL MATTERS

2.1     Formation.  The Members hereby confirm the formation of the Company as a Texas corporation on August 30, 1999 and the conversion of the Company from a Texas corporation to a Delaware limited liability company pursuant to the Cubic Plan, the terms of this Agreement and the Act.  Pursuant to Section 18-201(d) of the Act, this Agreement shall be effective as of the time of the filing of the Certificate of Formation.  The Manager may approve and cause to be executed and filed any duly authorized amendments to the Certificate of Formation from time to time in a form prescribed by the Act.  The Manager shall also cause to be made, on behalf of the Company, such additional filings and recordings as the Manager shall deem necessary or advisable.  The rights and liabilities of the Members shall be as provided in the Act, except as otherwise expressly provided herein.  In the event of any inconsistency between any terms and conditions contained in this Agreement and any non-mandatory provisions of the Act, the terms and conditions contained in this Agreement shall govern.

2.2     Name.  The name of the Company is "Cubic Energy, LLC".  The Manager may change the name of the Company from time to time, in accordance with applicable law.

2.3     Principal Place of Business; Other Places of Business.  The principal place of business of the Company is located at 9870 Plano Road, Dallas, Texas 75238, or such other place within or outside the State of Delaware as the Manager may from time to time designate. The Company may maintain offices and places of business at such other place or places within or outside the State of Delaware as the Manager deems advisable.

2.4     Business Purpose.  The Company has been formed for the purpose of engaging in any lawful business determined by the Manager and permitted by the Act.

---

[1]      To be the second anniversary of the Effective Date.

2.5    <u>Designated Agent for Service of Process</u>.  So long as is required by the Act, the Company shall continuously maintain a registered office and a designated and duly qualified agent for service of process on the Company in the State of Delaware.  As of the date of this Agreement, the address of the registered office of the Company in the State of Delaware is 615 South DuPont Highway, in the City of Dover, County of Kent, Delaware 19901.  The Company's registered agent for service of process at such address is National Corporate Research, Ltd.

2.6    <u>Term</u>.  The Company commenced as a Texas corporation on August 30, 1999 and converted to a Delaware limited liability company on the Effective Date, and shall continue until the completion of a Liquidation Event.

**ARTICLE 3**
**CAPITAL STRUCTURE; TAX TREATMENT**

3.1    <u>Capital Structure</u>.

3.1.1    <u>Limited Liability Company Interests</u>.  As of the date of this Agreement, the Company has one class of Limited Liability Company Interests.  The Limited Liability Company Interests issued and the Ownership Percentages of the Members, as of the Effective Date, including each Member's name and address, are set forth on <u>Exhibit A</u> hereto.  The Manager (without the consent of or notice to any party hereto)  shall update <u>Exhibit A</u> from time to time to reflect the withdrawal of Members and admission of Members pursuant to <u>Section 7.3</u>, as well as to reflect the issuance of equity interests, including Limited Liability Company Interests, or any changes in the Members' respective Limited Liability Company Interests, pursuant to the terms of this Agreement or as otherwise permitted by this Agreement.  The Limited Liability Company Interests issued and the Ownership Percentages set forth on <u>Exhibit A</u> shall be conclusive absent manifest error.  The Company may issue Limited Liability Company Interests in fractional amounts.  Unless and until the Manager shall determine otherwise, Limited Liability Company Interests shall be uncertificated.

3.1.2    <u>Additional Members</u>.  Except as otherwise provided in this Agreement and subject to <u>Sections 5.3.6</u>, <u>8.3</u> and <u>11.2</u>, the Company may issue additional equity interests, including Limited Liability Company Interests, to such Persons as the Manager determines to be in the best interests of the Company, and any such additional issuance may result in a dilution of the Ownership Percentage (or other measure of participation) of any previously issued Limited Liability Company Interests. The Company shall admit the holder of any Limited Liability Company Interests issued by the Company to such Person as an additional Member of the Company upon the execution and delivery by such Person of a joinder to this Agreement and other documents reasonably requested by the Manager, in each case, in form and substance satisfactory to the Manager and the Manager shall update <u>Exhibit A</u> to reflect the issuance of additional equity interests.

3.1.3    <u>Prohibition on Non-Voting Equity Securities</u>.  Notwithstanding anything herein to the contrary, the Company shall not be authorized to issue non-voting equity

securities to the extent prohibited by Section 1123(a)(6) of the Bankruptcy Code; provided that the foregoing restriction shall (i) have no further force and effect beyond that required under Section 1123(a)(6) of the Bankruptcy Code, (ii) only have such force and effect for so long as Section 1123 of the Bankruptcy Code is in effect and applicable to the Company and (iii) in all events may be amended or eliminated in accordance with applicable law as from time to time may be in effect.

3.2    Capital Contributions.  Except as otherwise agreed by a Member, no Member, in its capacity as such, shall have any obligation to the Company, to any other Member or to any creditor of the Company, to make any capital contribution to, or other investments in, the Company.

3.3    Loans by Third Parties.  Subject to Section 5.3, the Company, and the Manager on behalf of the Company, may borrow funds or enter into other similar credit, guarantee, financing or refinancing arrangements with any Person for any purpose.

3.4    Limited Liability of the Members.  Notwithstanding anything to the contrary contained in this Agreement and except as otherwise required by law (including, without limitation, Section 18-607 of the Act), no Member shall have any liability for the obligations or liabilities of the Company, whether arising in contract, tort or otherwise, solely by reason of being a Member.

3.5    Tax Treatment.  The Members intend that the Company shall be treated as a corporation for U.S. federal and state income tax purposes, and each Member and the Company shall file all tax returns and shall otherwise take all tax and financial reporting positions in a manner consistent with such treatment and shall exercise commercially reasonable efforts to cause the Company to take positions in a manner consistent with such treatment and shall exercise commercially reasonable efforts to cause the Company to remain classified as a corporation for U.S. federal and state income tax purposes. The Company shall elect to be treated as a corporation for U.S. federal income tax purposes, effective as of the Effective Date.  All other tax elections required or permitted to be made by the Company under any applicable tax law shall be made in the discretion of the Manager as described in Section 6.4.

# ARTICLE 4
## DISTRIBUTIONS

4.1    Distributions Generally.  Except as otherwise provided in Article 9 hereof relating to liquidating distributions, and subject to Section 5.3.6, all distributions shall be made at such times and in such amounts as the Manager may determine in his or her sole discretion and shall be distributed pro rata to the Members in accordance with each Member's respective Ownership Percentage.

4.2    Limitations on Distributions.  Notwithstanding anything to the contrary in this Agreement, no distribution to Members shall be made if such distribution would result in a

violation of the Act, other applicable federal or state law or any agreement to which the Company is a party or by which it is bound.

      4.3    <u>Withholding</u>.  The Company shall withhold distributions or portions thereof in accordance with any applicable rule, regulation, or law, and each Member hereby authorizes the Company to withhold from or pay on behalf of or with respect to such Member any amount of United States federal, state or local or foreign taxes that the Company is required to withhold or pay with respect to any amount distributable or allocable to such Member pursuant to this Agreement  (and the Company shall pay over any such withheld amounts to the appropriate governmental entity in accordance with applicable law as appropriate).  Any amounts withheld pursuant to this Section 4.3 shall be treated as having been distributed to the Member with respect to which the withholding was made.  To the extent that the cumulative amount of such withholding for any period exceeds the distributions to which such Member is entitled for such period hereunder, the amount of such excess shall constitute a recourse loan by the Company to such Member, which recourse loan shall include recourse to the entire Interests of such Member and which recourse loan shall be repaid by such Member within fifteen (15) days after notice from the Company that such payment must be made.    In the event of any claimed over-withholding, a Member shall be limited to an action against tax authorities in the applicable jurisdiction.

# ARTICLE 5
## VOTING AND MANAGEMENT

      5.1    <u>Member Voting</u>.

      5.1.1    <u>Voting Rights</u>.  At all meetings of the Members, a Majority in Interest of the Members, present in person or represented by proxy, shall constitute a quorum for the transaction of business.  Except as otherwise expressly provided herein, any matter for which the Act or this Agreement requires the vote, approval or consent of the Members shall require the vote, approval or consent of a Majority in Interest of the Members.  Such vote, approval or consent may be by written consent. The Members shall have the sole right to elect the Manager in accordance with <u>Sections 5.2.1</u> and <u>5.2.2</u>.

      5.1.2    <u>Voting Procedures</u>.  A meeting of the Members may be called at any time by a Majority in Interest of the Members.  The Manager may establish procedures relating to the notice of the time, place or purpose of any meeting at which any matter is to be voted on by any Members, waiver of any such notice, action by consent without a meeting, the establishment of a record date, quorum requirements, voting in person or by proxy, or any other matter with respect to the exercise of such voting rights as set forth therein.

      5.2    <u>Manager</u>.

      5.2.1    <u>General</u>.  The Manager of the Company shall be such Person as may be appointed to serve as the Manager from time to time by a Majority in Interest of the

Members.  The identity of the initial Manager of the Company as of the Effective Date is set forth on <u>Exhibit B</u> hereto.

      5.2.2  <u>Resignation and Removal</u>.  The Manager may resign as Manager of the Company at any time upon 30 days' prior written notice to the Members.  The Manager may only be removed by the affirmative vote of the Majority in Interest of the Members.  Upon any such resignation or removal, the Majority in Interest of the Members shall appoint a replacement Manager.

5.3    <u>Manager Powers and Obligations</u>.

      5.3.1  <u>Manager Powers</u>.  Subject to the provisions of the Act and any limitations in this Agreement as to action required to be authorized or approved by the Members or with the consent of each Initial Member that is a Significant Member pursuant to <u>Section 5.3.6</u>, the business and affairs of the Company shall be managed and all its powers shall be exercised by the Manager, who shall have complete and absolute control of the affairs and business of the Company, and shall possess all powers necessary, convenient or appropriate to carrying out the purposes and business of the Company, including, without limitation, doing all things and taking all actions necessary to carrying out the terms and provisions of this Agreement.   The Manager is specifically authorized to execute, sign, seal and deliver in the name of and on behalf of the Company any and all agreements, certificates, instruments or other documents requisite to carrying out the intentions and purposes of this Agreement and of the Company.

      5.3.2  <u>Officers; Delegation of Authority</u>.  The Manager shall have the power to appoint officers of the Company in his or her sole discretion, and to delegate authority to such officers, employees, agents and representatives of the Company as he or she may from time to time deem appropriate.

      5.3.3  <u>Manager Liability</u>.  Except as otherwise provided in the Act, the Manager shall not be personally liable under a judgment, decree or order of court, or in any other manner, for any debt, obligation or liability of the Company.

      5.3.4  <u>Limitation of Liability</u>.  This Agreement is not intended to, and does not, create or impose any fiduciary duty on the Manager, any officer of the Company or any Member.   Furthermore, each Member and the Company hereby waives any and all fiduciary duties that, absent such waiver, may be implied by applicable law, and in doing so, acknowledges and agrees that the duties and obligations of the Manager, each officer of the Company, or each Member to each other and to the Company are only as expressly set forth in this Agreement.  The provisions of this Agreement, to the extent that they restrict the duties and liabilities of the Manager or any officer of the Company or any Member otherwise existing at law or in equity, are agreed by the Members to replace such other duties and liabilities of such Manager, officer of the Company or Member.  Neither the Manager nor any officer of the Company or any Member shall be personally liable to the Company or to any Member for monetary damages incurred by reason of any action taken or omitted to be taken by such Manager, officer of the Company or Member in good faith on behalf of the Company and in a manner reasonably believed to be within

the scope of the authority conferred on such Person by this Agreement, except that such Manager, officer of the Company or Member shall be liable for any such monetary damages incurred by reason of such Person's fraud, gross negligence or willful misconduct.

5.3.5    <u>Permitted Activities</u>.  To the fullest extent permitted by law, the Manager, any Member, or any Affiliate of the Manager or of such a Member: (i) is not obligated or required to commit a specific portion of his, her or its time to the business of the Company; (ii) may engage in other business activities in which the Company has no interest; and (iii) is not required to offer business opportunities to the Company and may take advantage of those opportunities for his, her or its own benefit.  Neither the Company nor any Member shall have any right to any income derived by the Manager, any Member, or any Affiliate of the Manager or of such a Member from such business opportunities permitted to be taken under clause (iii) above.

5.3.6    <u>Significant Action</u>.  Notwithstanding anything herein to the contrary, the Manager shall not, and shall not cause the Company or any of its subsidiaries to, take any of the following actions (each such action, a "<u>Significant Action</u>"), without the prior written consent of each Initial Member that is a Significant Member at the time of the approval of such Significant Action:

(a)    repurchase the Limited Liability Company Interests or other equity securities (including warrants, options and other rights to acquire such equity securities) of the Company or pay dividends on the Limited Liability Company Interests or other equity securities of the Company, in each case, in a manner that is not on a <u>pro</u> <u>rata</u> basis among the Members, <u>provided</u> that the following actions shall not constitute a Significant Action: (i) other than repurchases from any Significant Member, repurchases in an aggregate amount not exceeding five hundred thousand dollars ($500,000) and (ii) repurchases from any employee, consultant or officer of the Company or any of its subsidiaries who ceases to be an employee, consultant or officer of the Company or any of its subsidiaries;

(b)    enter into a new line of business which is not reasonably related or ancillary to the businesses engaged in by the Company and its subsidiaries as of the Effective Date;

(c)    enter into any transaction with any Affiliate of any Initial Member, including entry into any management agreement or other agreement to pay management fees to such Affiliate of such Initial Member;

(d)    file any petition seeking bankruptcy protection;

(e)    other than with respect to the incurrence of (i) indebtedness pursuant to the indenture governing the New Cubic Energy Senior Secured Notes (including any interest paid in the form of additional notes thereunder), (ii) intercompany indebtedness and (iii) indebtedness under a revolving facility (which may be secured on a senior basis to, on a *pari passu* basis with, or on a junior basis to, the New Cubic Energy Senior Secured

Notes) in an amount outstanding at any time not exceeding fifteen million dollars ($15,000,000), incur any other indebtedness for borrowed money in an amount outstanding at any time exceeding in the aggregate twenty-five million dollars ($25,000,000);

(f)      other than with respect to (i) Hedging Transactions entered into on or before the Effective Date (including any amendment or modification thereto) and (ii) Hedging Transactions entered into not for a speculative purpose and in the ordinary course of business, enter into any new Hedging Transaction with a net termination value exceeding in the aggregate twenty-five million dollars ($25,000,000);

(g)      amend this Agreement in a manner that adversely and disproportionately affects any Initial Member that is a Significant Member compared to the other Initial Members that are Significant Members; or

(h)      at any time prior to the Transfer Restriction Date, Transfer, or cause to be Transferred, Limited Liability Company Interests in a manner that would cause an "ownership change" for purposes of Section 382 of the Code or would otherwise impede the ability of the Company to use its federal income tax net operating losses and other tax attributes without any limitations imposed by Section 382 of the Code, consistent with the Initial Members' intention to qualify as a plan of reorganization under Section 382(l)(5) of the Code; provided that a sale of at least a majority of the aggregate outstanding Limited Liability Company Interests of the Company in any single transaction shall not constitute a "Significant Action" for purposes of this clause (h).

5.4    Manager Reimbursements.    The Manager may receive compensation in connection with the performance of his or her duties as Manager hereunder as determined by a Majority in Interest of the Members; provided that if the Manager is an Affiliate of a Member, such Manager shall not receive compensation in connection with the performance of his or her duties as Manager hereunder except in accordance with Section 5.3.6. In any event, the Manager shall be entitled to expense reimbursement as set forth in this Section 5.4.  The Company shall reimburse the Manager for all expenses incurred and paid by it in the authorized conduct of the Company's business, including, without limitation, expenses of maintaining an office, telephones, travel, office equipment and secretarial and other personnel as may reasonably be attributable to the Company.

5.5    Manager and Member Indemnification.

5.5.1    Indemnification.  To the fullest extent permitted by applicable law, the Company (i) shall indemnify and hold harmless each Member, the Manager, and their respective employees, partners and Affiliates (each such person, an "Indemnified Person") for all losses, liabilities, damages, costs and expenses (including attorneys' fees) incurred by reason of any action taken or omitted to be taken by such Indemnified Person in good faith reliance on the provisions of this Agreement and (ii) shall, in any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative, brought by an unaffiliated third party by reason of the fact that an Indemnified Person is or was acting in connection with the business of the

**DRAFT**

Company as the Manager, a Member of the Company or their respective employees, partners or Affiliates, indemnify and hold harmless such Indemnified Person against all losses, liabilities, damages, costs and expenses of any kind or nature whatsoever (including attorneys' fees, costs of investigation, fines, judgments and amounts paid in settlement, actually incurred by any such Indemnified Person in connection with the action, suit or proceeding).

5.5.2    Expenses Payable in Advance.    Expenses incurred by an Indemnified Person in defending or investigating a threatened or pending action, suit or proceeding shall be paid by the Company in advance of the final disposition of such action, suit or proceeding upon receipt of an undertaking by or on behalf of such Indemnified Person to repay such amount if it shall ultimately be determined that he, she or it is not entitled to be indemnified by the Company pursuant to this Section 5.5.

5.5.3    Nonexclusivity of Indemnification and Advancement of Expenses.    The indemnification and advancement of expenses provided by or granted pursuant to this Section 5.5 shall not be deemed exclusive of any other rights to which those seeking indemnification or advancement of expenses may be entitled under any agreement, contract, vote of Members or pursuant to the direction (howsoever embodied) of any court of competent jurisdiction or otherwise, both as to action in his or her official capacity and as to action in another capacity.  The provisions of this Section 5.5 shall not be deemed to preclude the indemnification of any Person who is not specified in Section 5.5.1 but whom the Company has the power or obligation to indemnify under the provisions of the Act or otherwise.

5.5.4    Insurance.    The Company shall purchase and maintain "directors and officers" liability insurance on behalf of the Manager and any other affiliate of the Company (including the Members and their affiliates) against any liability asserted against them and incurred by any of them in any such capacity, or arising out of their status as such, whether or not the Company would have the power or the obligation to indemnify them against such liability under the provisions of this Section 5.5.

5.5.5    Survival of Indemnification and Advancement of Expenses.    The indemnification and advancement of expenses provided by, or granted pursuant to, this Section 5.5 shall continue as to any Person who has ceased to be an Indemnified Person and shall inure to the benefit of the heirs, executors and administrators of such Person. The provisions of this Section 5.5 shall be a contract between the Company, on the one hand, and each Indemnified Person, on the other hand, pursuant to which the Company and each such Indemnified Person intend to be legally bound.  No repeal or modification of this Section 5.5 shall affect any rights or obligations with respect to any state of facts then or theretofore existing or thereafter arising or any action, suit or proceeding theretofore or thereafter brought or threatened based in whole or in part upon such state of facts.

5.5.6    Indemnification of Officers, Employees and Agents.  The Company may, to the extent authorized from time to time by the Manager, provide rights to

indemnification and to the advancement of expenses to officers, employees and agents of the Company similar to those conferred in this Section 5.5 to each Indemnified Person.

5.6    No Member Management.  Except as otherwise provided herein, no Member, in its capacity as such, shall (i) participate in the management of the Company or have any control over the Company business or (ii) have any right or authority to act for or to bind the Company or to vote on or consent to any other matter, act, decision or document involving the Company or its business.

## ARTICLE 6
## BOOKS AND RECORDS AND REPORTING

6.1    Books and Records.  The Company shall keep, at its principal place of business, or at such other location as the Manager shall reasonably deem appropriate, ledgers, other books of account, and financial records of receipts and disbursements, other financial activities, and the internal affairs of the Company (collectively, the "Records").  The Records shall be open to inspection and examination at reasonable times by each Member and its duly authorized representative for any purpose reasonably related to such Member's interest in the Company. Except as otherwise expressly set forth herein, all decisions as to accounting matters shall be made by the Manager in his or her sole judgment and discretion.

6.2    Information Rights.

(a)    To the extent prepared by the Company, the Company shall promptly provide each Significant Member: (i) after the end of each calendar month, a management report providing summary financial information on the Company; (ii) after the end of each of the first three (3) fiscal quarters of each Fiscal Year, the consolidated balance sheet and related statements of operations, Members' equity and cash flows of the Company and its subsidiaries as of the end of and for such fiscal quarter and then elapsed portion of the Fiscal Year, setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous Fiscal Year; and (iii) after the end of each Fiscal Year, the audited consolidated balance sheet and related statements of operations, Members' equity and cash flows as of the end of and for such Fiscal Year, setting forth in each case in comparative form the figures for the previous Fiscal Year, accompanied by an opinion of a nationally recognized public accounting firm, in the case of each of clauses (i) through (iii), prepared in accordance with the generally accepted accounting principles in the United States as in effect from time to time.

(b)    Within 120 days following the end of each Fiscal Year, the Company shall hold an investor conference call open to each Significant Member to discuss the Company's results of operations for such Fiscal Year.

6.3    Third Party Valuation.  The Company shall, on an annual basis, retain a nationally recognized third party valuation firm (the "Valuation Agent"), to be selected by the Manager, to determine the fair market value of the Company's outstanding debt and equity securities,

DRAFT

including Limited Liability Company Interests, as of the end of each Fiscal Year. The Company shall cause the Valuation Agent to produce a valuation report which shall be made available to each Significant Member at the time such final valuation report is distributed to the Company following the end of each Fiscal Year, which shall be no later than 120 days following the end of such Fiscal Year.

6.4    <u>Company Tax Elections, Tax Controversies</u>. Subject to <u>Section 3.5</u>, the Manager shall have the right in his or her sole and absolute discretion to make all elections for the Company provided for in the Code. Except to the extent prohibited by law, each Member hereby waives the right to participate in any administrative or similar proceedings.

6.5    <u>Confidentiality of Information</u>. Except as permitted by the Manager or required by applicable law, each Member shall keep confidential from all Persons (except other Members, potential bona fide transferees of Limited Liability Company Interests or holders of the New Cubic Energy Senior Secured Notes or such Member's partners, members, officers, employees, board members, attorneys, accountants, consultants or other professionals on a need-to-know basis or to the extent necessary to obtain their services in connection with monitoring its investments in the Company, as applicable, which Persons shall be bound by confidentiality obligations that would restrict them in a manner consistent with this <u>Section 6.5</u> as if a Member) all of the information, documents or reports described in this <u>Article 6</u>. A Member shall be responsible for any breach of such confidentiality obligations by any Persons to which it discloses information pursuant to the foregoing provisions of this <u>Section 6.5</u>. Notwithstanding anything in the foregoing or anything else contained in this Agreement, to the extent reasonably necessary to comply with applicable laws (including the Freedom of Information Act and similar laws), each Member (and its employees, representatives or other agents) may disclose to any and all Persons, without limitation of any kind, the tax treatment and tax structure of the sale and ownership of the Limited Liability Company Interests (including the tax treatment and tax structure of any Company transactions) and all materials of any kind (including opinions and other tax analyses) that are provided to each Member with respect to such tax treatment and tax structure.

6.6    <u>Withholding Documentation</u>. Each Member agrees to furnish the Company with (1) any representations (including information with respect to a Member's direct or indirect beneficial owners) and forms as shall reasonably be requested by the Manager or required by applicable law, including where such request is made due to changes in law effective after the Effective Date, (a) to assist the Company or any of its subsidiaries in determining the extent of, and in fulfilling, its withholding, reporting or other tax obligations, (b) as will permit payments by the Company to be made without withholding or at a reduced rate of withholding and (c) in order to reduce the amount of taxes borne by the Company or any of its subsidiaries, and (2) any additional information that the Manager deems necessary to ensure compliance with any laws or regulations applicable to the Company or its business. Each Member (i) represents and warrants that any such information and forms furnished by such Member (except with respect to any such information that was provided to such Member, or that is based upon incorrect information that was provided to such Member, by the Manager) are and at all times shall be true, correct and complete, (ii) agrees to promptly update any such information or forms if at any time the Member becomes aware that such previously provided information or forms are no longer true, correct and complete or upon the expiration, invalidity or obsolescence of any such provided

forms, and (iii) agrees to indemnify the Company and each of the other Members on an after-tax basis from any and all damages, costs and expenses resulting from a breach by such Member of the foregoing representation, warranty and/or agreement.

## ARTICLE 7
## TRANSFERS OF INTERESTS

7.1     Member Transfers.

7.1.1    Prior to the Transfer Restriction Date, no Member may Transfer all or any portion of its Limited Liability Company Interests without the prior written consent of the Manager, which consent may be given or withheld in the Manager's sole and absolute discretion in order to prevent an "ownership change" for purposes of Section 382 of the Code and preserve the ability of the Company to use its federal income tax net operating losses and other tax attributes without any limitations imposed by Section 382 of the Code.

7.1.2    At any time on or after the Transfer Restriction Date and prior to the consummation of an IPO, each Member shall have the right to Transfer all or any portion of its Limited Liability Company Interests to another Person in accordance with and subject to the limitations set forth in Section 7.2 and in Article 8.

7.1.3    Upon and following the consummation of an IPO, each Member shall have the right to Transfer all or any portion of its Limited Liability Company Interests to another Person and such Person shall be admitted as a Member and the Manager shall update Exhibit A to reflect the Transfer.

7.1.4    Any purported Transfer which is not in accordance with, or subsequently violates, this Agreement shall be null and void.

7.2     Transfer Restrictions.  Except when required of a Drag-Along Member pursuant to Section 8.1, unless expressly waived in writing by the Manager, which waiver may be given or withheld in the Manager's sole and absolute discretion, any Transfer prior to, on or after the Transfer Restriction Date and prior to the consummation of an IPO shall be null and void unless each of the following conditions in clauses (a) through (g) below are satisfied:

(a)     other than in connection with a Transfer by an Initial Member to an Affiliate of such Initial Member, the proposed assignee and its Affiliates are reasonably acceptable to the Manager (such Manager consent not to be unreasonably withheld, delayed or conditioned);

(b)     such Transfer would be to an assignee that is either a "qualified institutional buyer" or an "accredited investor" as defined in Rule 501(a) of Regulation D promulgated under the Securities Act;

(c)     such Transfer would not cause the number of record holders of Limited Liability Company Interests to exceed two thousand (2,000) or cause the Company, as a

result of such Transfer, to become subject to the reporting requirements under the Securities Exchange Act of 1934, as amended;

(d)      the Company receives an executed joinder to this Agreement in form and substance satisfactory to the Manager and any other customary documentation required by the Manager;

(e)      such Transfer would not require the registration of such Limited Liability Company Interests pursuant to any applicable federal or state securities laws;

(f)      such Transfer would not cause or constitute a default or event of default under any material agreement to which the Company is a party; and

(g)      such Transfer would not result in a violation of applicable laws.

Upon the Transfer by a Member of Limited Liability Company Interests to an assignee in accordance with this Section 7.2, such assignee shall be admitted as a Member and the Manager shall update Exhibit A to reflect the Transfer.

7.3      Admissions, Withdrawals and Removals.  No Person shall be admitted to the Company as a Member, except in accordance with Section 3.1.2 (with respect to Persons receiving a Limited Liability Company Interest directly from the Company) and Section 7.1.3 or Section 7.2 (with respect to Persons receiving a Limited Liability Company Interests from a Member).  No Member shall be removed or entitled to withdraw from being a Member of the Company, except in accordance with Section 7.4 or pursuant to any separate agreement with the Company.  Except as otherwise provided in Section 9.2, no admission, withdrawal or removal of a Member shall cause the dissolution of the Company.  Any purported admission, withdrawal or removal which is not in accordance with this Agreement shall be null and void.

7.4      Withdrawal of Certain Members.  If a Member has Transferred all of its Limited Liability Company Interests to one or more assignees in accordance with this Article 7, then such Member shall be deemed to have withdrawn from the Company as a Member when all such assignees have been admitted as Members in accordance with Section 7.1.3 or Section 7.2, as applicable. Only a holder of Limited Liability Company Interests may be a Member of the Company.

## ARTICLE 8
## CERTAIN AGREEMENTS

8.1      Drag-Along Rights.

8.1.1      Subject to the limitations set forth in Section 7.1, if Anchorage wishes to Sell (a "Drag-Along Sale") all or a portion of its Limited Liability Company Interests (including, without limitation, a Sale structured as a merger or consolidation with a third party) to any Person which is not an Affiliate of Anchorage, notwithstanding anything to the contrary herein, Anchorage may, by written notice to the other Members (each, a "Drag-Along Member") (such notice being referred to herein as the "Drag-Along

Notice"), which Drag-Along Notice shall be delivered no later than 15 days prior to the proposed consummation of the proposed Drag-Along Sale, cause the Drag-Along Members to Sell, on a pro rata basis, their Limited Liability Company Interests in the Drag-Along Sale on the same terms and conditions, mutatis mutandis, as Anchorage. The Drag-Along Notice shall name the proposed purchaser, specify the purchase price for each Limited Liability Company Interest to be acquired, the total number of Limited Liability Company Interests to be acquired in such Sale, the proposed timing of the transaction, and any other material terms of such proposed Sale, including a form of the agreement proposed to be executed in connection therewith.  If the Drag-Along Sale is structured as a merger or consolidation with a third party or other transaction requiring the consent or approval of the Members, then each Drag-Along Member shall vote all of its Limited Liability Company Interests in favor of such Sale.  The Drag-Along Members shall cooperate with Anchorage to consummate any such Drag-Along Sale in an expeditious and commercially reasonable manner and shall execute the applicable purchase agreement and make or provide the same representations, warranties, covenants and indemnities as Anchorage makes or provides in connection with such Drag-Along Sale; provided that no Drag-Along Member shall be required to enter into a non-compete agreement or similar covenant or restriction on its activities in connection with such Drag-Along Sale; provided, further, that no Drag-Along Member shall be liable for any amount in excess of its pro rata share of the proceeds received in respect its Limited Liability Company Interests in connection with such Drag-Along Sale.

8.1.2    This Section 8.1 shall terminate upon the consummation of an IPO.

8.2    Tag-Along Rights.

8.2.1    Subject to the limitations set forth in Section 7.1, if Anchorage wishes to Sell in the aggregate Limited Liability Company Interests representing more than 10% of all Limited Liability Company Interests outstanding as of the date of this Agreement to any Person which is not an Affiliate of Anchorage and Anchorage has elected not to initiate a Drag-Along Sale pursuant to Section 8.1 (a "Tag-Along Sale"), Anchorage shall give written notice of its intention to do so to the other Members (each, a "Tag-Along Member") (such notice being referred to herein as the "Notice of Transfer") no later than 15 days prior to the proposed consummation of the proposed Tag-Along Sale.  The Notice of Transfer shall name the proposed purchaser, specify the purchase price for each Limited Liability Company Interest to be Sold, the total number of Limited Liability Company Interests to be Sold, the proposed timing of the transaction and any other material terms of such proposed Sale, including a form of the agreement proposed to be executed in connection therewith.

8.2.2    The Notice of Transfer shall constitute an offer by Anchorage to each Tag-Along Member to permit such Tag-Along Member to Sell a pro rata portion of its Limited Liability Company Interests in the proposed Sale, upon the terms and subject to the conditions set forth in the Notice of Transfer, and on the same terms and conditions, mutatis mutandis, as Anchorage.  For a period of ten (10) days following delivery of the Notice of Transfer, each Tag-Along Member may, by delivering to Anchorage written notice of its election, elect irrevocably to Sell a pro rata portion of its Limited Liability

Company Interests in such proposed Sale.  The participating Tag-Along Members shall cooperate with Anchorage to consummate any such Tag-Along Sale in an expeditious and commercially reasonable manner and shall execute the applicable purchase agreement and make or provide the same representations, warranties and covenants as Anchorage makes or provides in connection with such Tag-Along Sale and be subject to the same liability and indemnity provisions as Anchorage with respect to such Tag-Along Sale.

8.2.3    This <u>Section 8.2</u> shall terminate upon the consummation of an IPO.

8.3    <u>Preemptive Rights</u>.

(a)    Notwithstanding anything to the contrary contained in this Agreement, and subject to the exceptions set forth in <u>Section 8.3(d)</u>, the Company and any controlled subsidiary of the Company shall not issue or sell new equity interests, including Limited Liability Company Interests, unless the Company shall have first delivered a written offer to sell such equity interests (the "<u>New Issue Instruments</u>") to each Member (each, a "<u>Preemptive Rights Member</u>"), which such written offer (the "<u>Preemptive Rights Offer</u>") shall:

(i)    set forth all of the terms and conditions of the offering of the New Issue Instruments, including the amount and kind of New Issue Instruments proposed to be issued, the price per unit of the New Issue Instruments, and the name of each Person to whom the New Issue Instruments are proposed to be issued, if known;

(ii)    grant each Preemptive Rights Member the option to purchase, at the same price and on the same terms at which the Company proposes to sell such New Issue Instruments, all or any portion of such Preemptive Rights Member's share of any proposed issuance of New Issue Instruments (the "<u>Preemptive Share</u>"), which such Preemptive Share shall equal, with respect to each Preemptive Rights Member, (x) the aggregate number of units of the New Issue Instruments to be issued multiplied by (y) the Ownership Percentage of such Preemptive Rights Member; and

(iii)    by its terms remain open and irrevocable for a period of ten (10) Business Days from the delivery of the Preemptive Rights Offer (the "<u>Preemptive Period</u>").

(b)    Within the Preemptive Period, each Preemptive Rights Member may give its written irrevocable notice to the Company of its acceptance of the Company's offer to sell New Issue Instruments up to such Preemptive Rights Member's Preemptive Share (a "<u>Notice of Acceptance</u>"), which Notice of Acceptance shall set forth the number of units of the New Issue Instruments that such Preemptive Rights Member is willing to purchase from the Company.  Such Notice of Acceptance shall constitute an irrevocable acceptance of such offer.  If the Company does not receive a Notice of Acceptance from any Preemptive Rights Member during the Preemptive Period with respect to any New

Issue Instruments, such Preemptive Rights Member shall be deemed to have waived its opportunity to purchase such New Issue Instruments, and the Company shall be free to issue and sell such New Issue Instruments to any Person at a price per unit of the New Issue Instruments not less than the price set forth in the Preemptive Rights Offer and on such others terms and conditions which, taken as a whole, are no less favorable to the Company than those set forth in the Preemptive Rights Offer, at any time within ninety (90) days after the expiration of the Preemptive Period. Any New Issue Instruments not sold within such period shall be subject de novo to the requirements of this Section 8.3.

(c)    If the Company receives a Notice of Acceptance from any Preemptive Rights Member within the Preemptive Period, such Preemptive Rights Member shall purchase from the Company, and the Company shall sell to such Preemptive Rights Member, the number of New Issue Instruments specified in such Preemptive Rights Member's Notice of Acceptance (up to such Preemptive Rights Member's Preemptive Share), upon the terms and conditions specified in the Preemptive Rights Offer.

(d)    The rights of each Preemptive Rights Member under Section 8.3(a) shall not apply to any of the following New Issue Instruments:

(i)    New Issue Instruments issued in connection with an IPO;

(ii)    New Issue Instruments issued to third parties in connection with the issuance by the Company of indebtedness otherwise permitted to be incurred pursuant to this Agreement; provided that that the aggregate amount of such New Issue Instruments do not exceed, in the aggregate, fifteen percent (15%) of the then-issued aggregate Limited Liability Company Interests, including such New Issue Instruments, on a fully diluted basis;

(iii)    New Issue Instruments or options to purchase New Issue Instruments issued as compensation to the Company's or its subsidiaries' employees, consultants, directors or officers pursuant to any equity or incentive-based compensation plans or agreements entered into by the Company and approved by the Manager, provided that the aggregate amount of such New Issue Instruments do not exceed, in the aggregate, five percent (5%) of the then-issued aggregate Limited Liability Company Interests, including such New Issue Instruments, on a fully diluted basis;

(iv)    New Issue Instruments issued to commercial counterparties in joint ventures or similar commercial transactions; and

(v)    New Issue Instruments issued by any controlled subsidiary of the Company to (i) the Company, (ii) another controlled subsidiary of the Company or (iii) such controlled subsidiary's equity holders on a pro rata basis.

(e)    This Section 8.3 shall terminate immediately upon the occurrence of a Liquidation Event.

## ARTICLE 9
## DISSOLUTION, LIMITATION, AND TERMINATION OF THE COMPANY

9.1    Limitations.    The Company may be dissolved, liquidated, and terminated and have its affairs wound up only pursuant to the provisions of this Article 9, and the Members do hereby irrevocably waive any and all other rights they may have to cause a dissolution of the Company or a sale or partition of any or all of the Company Assets.

9.2    Exclusive Dissolution Causes.    The following and only the following events shall cause the Company to be dissolved, liquidated, and terminated (each, a "Liquidation Event"):

(a)    an election by the Manager with the prior written consent of a Majority in Interest of the Members;

(b)    the sale, transfer or other disposition of all or substantially all of the assets of the Company and its subsidiaries, taken as a whole, in one or a series of related transactions; or

(c)    a judicial dissolution.

Any dissolution of the Company other than as provided in this Section 9.2 shall be a dissolution in contravention of this Agreement.

9.3    Effect of Dissolution.    The dissolution of the Company shall be effective on the day on which the event occurs giving rise to the dissolution, but the Company shall not terminate until it has been wound up, its assets have been distributed as provided in Section 9.4 of this Agreement and its Certificate of Cancellation has been filed with the Delaware Secretary of State.  Notwithstanding the dissolution of the Company, prior to the termination of the Company, the business of the Company and the affairs of the Members, as such, shall continue to be governed by this Agreement.  Nothing in this sentence is intended to limit the survival of provisions of this Agreement that expressly survive the dissolution and termination of the Company.

9.4    Liquidation and Final Distribution Proceeds.    Upon the dissolution of the Company pursuant to Section 9.2, the Company shall thereafter engage in no further business other than that which is necessary to wind up the business, and the Manager, after the establishment of appropriate reserves, shall liquidate all Company Assets and distribute the cash proceeds therefrom.  The cash proceeds from the liquidation of Company Assets shall be applied or distributed by the Company in the following order:

(a)    first, to the payment and discharge of all of the Company's debts and other liabilities to creditors (including Members that are creditors); and

(b)    second, the balance, if any, to the Members in proportion to their Limited Liability Company Interests.

Notwithstanding the foregoing, in the event that the Manager determines that an immediate sale of all or any portion of the Company Assets would cause undue loss to the

**DRAFT**

Members, the Manager, in order to avoid such loss to the extent not then prohibited by the Act, may either defer liquidation of and withhold from distribution for a reasonable time any Company Assets except those necessary to satisfy the Company's debts and obligations.

## ARTICLE 10
## REPRESENTATIONS AND WARRANTIES

10.1    <u>Representations and Warranties of the Members</u>.  Each Member, severally and not jointly, hereby makes the following representations and warranties to the Company and each other Member with regard to such Member:

(a)    such Member has been duly formed and is validly existing in good standing, with all requisite power and authority to execute, deliver and perform its obligations under this Agreement;

(b)    the execution and delivery of this Agreement have been authorized by all necessary action on behalf of such Member, and this Agreement constitutes a valid and binding obligation of such Member, and is enforceable against such Member in accordance with its terms, except as may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability, whether considered at law or equity;

(c)    such Member is acquiring its Limited Liability Company Interests solely for investment, for its account and not with a view to, or for resale in connection with, the distribution or other disposition thereof, except for such distributions and dispositions which are (A) explicitly permitted or contemplated under the terms of this Agreement as well as (B) effected in compliance with the Securities Act of 1933, as amended (the "<u>Securities Act</u>"), the rules and regulations of the Securities and Exchange Commission promulgated thereunder and all applicable state securities and "blue sky" laws;

(d)    such Member understands that there are substantial restrictions on the transferability of the Limited Liability Company Interests under the provisions of this Agreement and the Securities Act, and there may never be a public market for the Limited Liability Company Interests and, accordingly, it may not be possible to liquidate its investment in the Company prior to the dissolution and liquidation of the Company;

(e)    such Member's financial situation is such that it can afford to bear the economic risk of holding the Limited Liability Company Interests for an indefinite period of time;

(f)    such Member's knowledge and experience in financial and business matters are such that it is capable of evaluating the merits and risks of its acquisition of its Limited Liability Company Interests; and

(g)    such Member is an "accredited investor" as defined in Rule 501(a) of Regulation D promulgated under the Securities Act.

Each Member agrees to indemnify, defend, protect, and hold harmless the Company against any and all loss, liability, claim, damage and expense whatsoever (including, without limitation, any and all expenses whatsoever reasonably incurred in investigating, preparing or defending against any litigation commenced or threatened or any claim whatsoever) arising out of or based upon any false representation or warranty made by the Member herein.

## ARTICLE 11
## MISCELLANEOUS

11.1    Appointment of Company as Attorney-in-Fact.

11.1.1 Each Member, by its execution of this Agreement or a joinder hereto, irrevocably constitutes and appoints each of the Company and the Manager as its true and lawful attorney-in-fact with full power and authority in its name, place and stead to execute, acknowledge, deliver, swear to, file and record at the appropriate public offices such documents as may be necessary or appropriate to carry out the provisions of this Agreement, including, without limitation:

(a)      all certificates and other instruments (including counterparts of this Agreement), and all amendments thereto, which the Manager deems appropriate to form, qualify, continue or otherwise operate the Company as a limited liability company (or other entity in which the Members will have limited liability comparable to that provided in the Act) in accordance with this Agreement, in the State of Delaware and the jurisdictions in which the Company may conduct business or in which such formation, qualification or continuation is, in the opinion of the Manager, necessary or desirable to protect the limited liability of the Members; and

(b)      all amendments to this Agreement adopted in accordance with Section 11.2, and all instruments which the Manager deems appropriate to reflect a change or modification of the Company in accordance with the terms of this Agreement.

11.1.2 The appointment by all Members of each of the Company and the Manager as attorney-in-fact shall be deemed to be a power coupled with an interest, in recognition of the fact that each of the Members under this Agreement will be relying upon the power of the Company and the Manager to act as contemplated by this Agreement in any filing and other action by it and shall survive the Transfer of all or any portion of the Limited Liability Company Interests of such Member in the Company.

11.2    Amendments.

11.2.1 Each Member shall become a signatory hereto by signing such number of counterpart signature pages to this Agreement, and such other instruments, in such manner, as the Manager shall determine.  By so signing, each Member shall be deemed to have adopted and to have agreed to be bound by all of the provisions of this Agreement.

11.2.2 Except as otherwise provided in this Agreement, and subject to Section 5.3.6(g), any and all amendments to this Agreement may be made from time to time by the vote of a Majority in Interest of the Members; provided that any provision requiring

the vote or consent of greater than a Majority in Interest of the Members shall require the same level of consent to be amended.

11.2.3 Except as otherwise provided in this Agreement, and subject to Section 5.3.6(g), amendments may be made to this Agreement from time to time by the Company, at the direction of the Manager, without the consent of any Member: (a) to cure any ambiguity or to correct any provision herein which may be inconsistent with any other provision herein; (b) to delete or add any provision of this Agreement required to be so deleted or added by any federal or state official, which addition or deletion is deemed by such official to be for the benefit or protection of all of the Members; (c) to take such actions as may be necessary (if any) to ensure that the Company will be treated as a corporation for U.S. federal income tax purposes; and (d) to amend this Agreement, pursuant to the power of attorney granted to the Company and the Manager, to reflect the admission of any additional Member, the Transfer of any equity interests or the issuance of additional equity interests. The Company shall provide prompt written notice of any such amendments to the Members.

11.2.4 In making any amendments, there shall be prepared and filed by, or for, the Company, such documents and certificates as may be required under the Act and under the laws of any other jurisdiction applicable to the Company.

11.3    Accounting. Subject to Section 448 of the Code, the books of the Company shall be kept on such method of accounting for tax and financial reporting purposes as may be determined by the Manager.

11.4    Entire Agreement. This Agreement constitutes the entire agreement among the parties hereto pertaining to the subject matter hereof and fully supersedes any and all prior or contemporaneous agreements or understandings among the parties hereto pertaining to the subject matter hereof.

11.5    Further Assurances. Each of the parties hereto does hereby covenant and agree on behalf of itself, its successors, and its assigns, without further consideration, to prepare, execute, acknowledge, file, record, publish, and deliver such other instruments, documents and statements, and to take such other action as may be required by law or reasonably necessary to effectively carry out the purposes of this Agreement.

11.6    Notices. Any notice, consent, payment, demand, or communication required or permitted to be given by any provision of this Agreement shall be in writing and shall be (a) delivered personally to the Person or to an officer of the Person (as designated by such Person to receive any such notice or, in the absence of such designation, any officer of such Person) to whom the same is directed, (b) sent by nationally recognized overnight courier service (with tracking capability), (c) via facsimile or (d) via e-mail, addressed as follows: if to the Company, to the Company at the address set forth in Section 2.3 hereof, at facsimile number: 972.681.9687 or at email address: jason@cubicenergyinc.com or to such other address as the Company may from time to time specify by notice to the Members; if to a Member, to such Member at the address set forth in Exhibit A, or to such other address as such Member may from time to time specify by notice to the Company. Any such notice shall be deemed to be delivered, given and

received for all purposes as of: (i) the date so delivered, if delivered personally, (ii) upon receipt, if sent by courier service, or (iii) upon confirmation of receipt, if transmitted by facsimile or email.

11.7    <u>Governing Law</u>.  This Agreement, including its existence, validity, construction, and operating effect, and the rights of each of the parties hereto, shall be governed by and construed in accordance with the laws of the State of Delaware without regard to otherwise governing principles of conflicts of law.

11.8    <u>Binding Effect</u>.  Except as otherwise expressly provided herein, this Agreement shall be binding on and inure to the benefit of the parties hereto, their heirs, executors, administrators, successors and all other Persons hereafter holding, having or receiving an interest in the Company.

11.9    <u>Confidentiality</u>.  Without limiting the provisions of <u>Section 6.5</u>, each party hereto agrees that the provisions of this Agreement, all understandings, agreements and other arrangements between and among the parties, and all other non-public information received from, or otherwise relating to, the Company or any Member, shall be confidential, and that such parties shall not disclose or otherwise release to any other Person (other than another party hereto) such matters, without the written consent of the Company, as determined by the Manager; <u>provided</u>, <u>however</u>, that a Member may disclose confidential information to the Member's partners, members, officers, employees, board members, attorneys, accountants, consultants or other professionals on a need-to-know basis or to the extent necessary to obtain their services in connection with monitoring its investments in the Company, as applicable, which Persons shall be bound by confidentiality obligations that would restrict them in a manner consistent with this <u>Section 11.9</u> as if a Member. A Member shall be responsible for any breach of such confidentiality obligations by any Persons to which it discloses information pursuant to the foregoing provisions of this <u>Section 11.9</u>.  The obligations of the parties hereunder shall not apply: (a) to information already known to the general public other than as a result of a breach of this covenant or (b) to any party to the extent that the disclosure by such party of such confidential information  is required by applicable law or by any federal, state or local judicial or regulatory body with jurisdiction over such party, but only that portion of such confidential information which is required or would be required to be furnished to avoid liability for contempt or the suffering of other material judicial or governmental penalty or censure; <u>provided</u> that, prior to disclosing such confidential information, a party shall, to the extent practicable, notify the Company thereof, which notice shall include the basis upon which such party believes the information is required to be disclosed.

11.10    <u>Counterparts</u>.  This Agreement may be executed in any number of multiple counterparts, each of which shall be deemed to be an original copy and all of which shall constitute one agreement, binding on all parties hereto.  The parties agree and acknowledge that delivery of a signature by facsimile or by electronic delivery in .pdf or .tiff format shall constitute execution by such signatory.

11.11    <u>Waivers</u>.  No waiver by any Member of any default with respect to any provision, condition or requirement hereof shall be deemed to be a waiver of any other provision, condition

or requirement hereof, nor shall any delay or omission of any Member to exercise any right hereunder in any manner impair the exercise of any such right accruing to it thereafter.

11.12  <u>Preservation of Intent</u>.  If any provision of this Agreement is determined by an arbitrator or any court having jurisdiction to be illegal or in conflict with any laws of any state or jurisdiction, then the Members agree that such provision shall be modified to the extent legally possible so that the intent of this Agreement may be legally carried out.  If any one or more of the provisions contained herein, or the application thereof in any circumstances, is held invalid, illegal or unenforceable in any respect or for any reason, then the validity, legality and enforceability of any such provision in every other respect and of the remaining provisions hereof shall not be in any way impaired or affected, it being intended that all of the Members' rights and privileges shall be enforceable to the fullest extent permitted by law.

11.13  <u>Certain Rules of Construction</u>.  Every covenant, term, and provision of this Agreement shall be construed simply according to its fair meaning and not strictly for or against any Member, and any ambiguities shall be resolved without reference to which party may have drafted this Agreement.  All Article or Section titles or other captions in this Agreement are for convenience only, and they shall not be deemed part of this Agreement and in no way define, limit, extend or describe the scope or intent of any provisions hereof.  Unless the context otherwise requires: (a) a term has the meaning assigned to it; (b) an accounting term not otherwise defined has the meaning assigned to it in accordance with the generally accepted accounting principles in the United States as in effect from time to time; (c) "or" is not exclusive; (d) words in the singular include the plural, and words in the plural include the singular; (e) "herein," "hereof" and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section or other subdivision; (f) all references to "clauses," "Sections" or "Articles" refer to clauses, Sections or Articles of this Agreement; (g) any pronoun used in this Agreement shall include the corresponding masculine, feminine or neuter forms; (h) all references to "including" or any variation thereof will be construed as meaning "including without limitation"; (i) the word "extent" in the phrase "to the extent" means the degree to which a subject or other thing extends, and such phrase does not mean simply "if"; and (j) the sign "$" when used in this Agreement means the lawful money of the United States of America.

11.14  <u>Jurisdiction</u>.  Each Member hereby submits to the jurisdiction of any state or federal court sitting in the State of Delaware in any action or proceeding out of or relating to this Agreement or the transactions contemplated herein.  Nothing in this <u>Section 11.14</u> limits the rights of the Company or any Member to commence any proceedings or to serve process by another manner permitted by law in any other court of competent jurisdiction; nor will the bringing or continuing of proceedings in one or more jurisdictions preclude the bringing or continuing of proceedings in any other jurisdiction, whether concurrently or otherwise.  Each Member's obligation under this <u>Section 11.14</u> will survive the dissolution, liquidation and winding up of the Company.  Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Each party hereto waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in respect of any litigation as between the parties directly or indirectly arising out of, under or in connection with this Agreement or the transactions contemplated hereby or disputes relating hereto.

**DRAFT**

11.15   <u>No Third Party Beneficiaries</u>.   Nothing contained in this Agreement (other than the provisions of <u>Section 5.3.3</u>, <u>Section 5.4</u> and <u>Section 5.5</u>), express or implied, is intended to or shall confer upon anyone other than the parties hereto (and their successors and permitted assigns) and the Company any right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

**DRAFT**

## LIMITED LIABILITY COMPANY AGREEMENT

## OF

## CUBIC ENERGY, LLC

IN WITNESS WHEREOF, the undersigned Member has caused this counterpart signature page to the Limited Liability Company Agreement of Cubic Energy, LLC, to be duly executed on the date set forth below, to be effective as of the date first above written.

AIO III CE, L.P.


By: **DRAFT** _____
    Name:
    Title:


Executed on [●]

**DRAFT**

## LIMITED LIABILITY COMPANY AGREEMENT

### OF

### CUBIC ENERGY, LLC

IN WITNESS WHEREOF, the undersigned Member has caused this counterpart signature page to the Limited Liability Company Agreement of Cubic Energy, LLC, to be duly executed on the date set forth below, to be effective as of the date first above written.

Corbin Opportunity Fund, L.P.

By: **DRAFT**
    Name:
    Title:

Executed on [●]

**DRAFT**

## LIMITED LIABILITY COMPANY AGREEMENT

### OF

### CUBIC ENERGY, LLC

IN WITNESS WHEREOF, the undersigned Member has caused this counterpart signature page to the Limited Liability Company Agreement of Cubic Energy, LLC, to be duly executed on the date set forth below, to be effective as of the date first above written.

O-CAP Partners, L.P.

By: **DRAFT** _____
    Name:
    Title:

Executed on [●]

**DRAFT**

## LIMITED LIABILITY COMPANY AGREEMENT

### OF

### CUBIC ENERGY, LLC

IN WITNESS WHEREOF, the undersigned Member has caused this counterpart signature page to the Limited Liability Company Agreement of Cubic Energy, LLC, to be duly executed on the date set forth below, to be effective as of the date first above written.

O-CAP Offshore Master Fund, L.P.

By: **DRAFT**_____
    Name:
    Title:

Executed on [●]

SC1:3965072

**DRAFT**

EXHIBIT A

**Attached to and Made a Part of
Limited Liability Company Agreement of
Cubic Energy, LLC
(a Delaware Limited Liability Company)**

*Schedule of Members*

| Member | Address | Limited Liability Company Interest |
|---|---|---|
| AIO III CE, L.P. | Anchorage Capital Group, L.L.C.<br>610 Broadway, 6th Floor<br>New York, NY 10012<br>Attention:  General Counsel<br>Email: legal@anchoragecap.com<br>Facsimile:  212-432-4601 | 757.576 |
| Corbin Opportunity Fund, L.P. | Corbin Capital Partners Management, LLC<br>590 Madison Avenue,<br>31st Floor<br>New York, NY 10022<br>Attention:  Daniel Friedman<br>Email: dfriedman@corbincapital.com<br>Facsimile:  212-634-7399 | 166.667 |
| O-CAP Partners, L.P. | O-CAP Advisors, LLC<br>600 Madison Avenue, 14th Floor<br>New York, NY 10022<br>Attention:  Lloyd Jagai<br>Email: lloyd@o-corp.com<br>Facsimile:  646.225.5208 | 43.409 |
| O-CAP Offshore Master Fund, L.P. | O-CAP Advisors, LLC<br>600 Madison Avenue, 14th Floor<br>New York, NY 10022<br>Attention:  Lloyd Jagai<br>Email: lloyd@o-corp.com<br>Facsimile:  646.225.5208 | 32.348 |

Exhibit A

**DRAFT**

EXHIBIT B

**Attached to and Made a Part of
the Limited Liability Company Agreement of
Cubic Energy, LLC
(a Delaware Limited Liability Company)**

*Initial Manager*

[The Manager shall be any person appointed by a Majority in Interest of the Members.]

**<u>Exhibit 4-a</u>**

**Reorganized Cubic Energy Operating Agreement (Changed Pages Only Blackline)**

(see attached)

**DRAFT**

**LIMITED LIABILITY COMPANY AGREEMENT**

**OF**

**CUBIC ENERGY, LLC**

LIMITED LIABILITY COMPANY INTERESTS IN CUBIC ENERGY, LLC, A DELAWARE LIMITED LIABILITY COMPANY, HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY STATE SECURITIES LAWS AND ARE ISSUED IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND SUCH LAWS. SUCH LIMITED LIABILITY COMPANY INTERESTS MAY NOT BE TRANSFERRED WITHOUT (A) REGISTRATION UNDER THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS, UNLESS AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT AND SUCH LAWS IS THEN AVAILABLE, AND (B) COMPLIANCE WITH ALL OTHER RESTRICTIONS ON TRANSFER CONTAINED IN THIS LIMITED LIABILITY COMPANY AGREEMENT.

DRAFT

## TABLE OF CONTENTS

**Page**

**ARTICLE 1 DEFINITIONS** ................................................................................2

**ARTICLE 2 ORGANIZATIONAL MATTERS** ...........................................5
    2.1    Formation ...............................................................................5
    2.2    Name.......................................................................................5
    2.3    Principal Place of Business; Other Places of Business ........5
    2.4    Business Purpose ...................................................................5
    2.5    Designated Agent for Service of Process .............................5
    2.6    Term ......................................................................................6

**ARTICLE 3 CAPITAL STRUCTURE; TAX TREATMENT** ....................6
    3.1    Capital Structure....................................................................6
    3.2    Capital Contributions.............................................................7
    3.3    Loans by Third Parties..........................................................7
    3.4    Limited Liability of the Members .........................................7
    3.5    Tax Treatment........................................................................7

**ARTICLE 4 DISTRIBUTIONS** ..................................................................7
    4.1    Distributions Generally .........................................................7
    4.2    Limitations on Distributions .................................................7
    4.3    Withholding ...........................................................................7

**ARTICLE 5 VOTING AND MANAGEMENT** .........................................8
    5.1    Member Voting ......................................................................8
    5.2    Manager..................................................................................8
    5.3    Manager Powers and Obligations..........................................9
    5.4    Manager Reimbursements ....................................................11
    5.5    Manager and Member Indemnification ...............................11
    5.6    No Member Management .....................................................12

**ARTICLE 6 BOOKS AND RECORDS AND REPORTING** ....................13
    6.1    Books and Records ..............................................................13
    6.2    Information Rights................................................................13
    6.3    Third Party Valuation ..........................................................13
    6.4    Company Tax Elections, Tax Controversies .......................14
    6.5    Confidentiality of Information .............................................14
    6.6    Withholding Documentation ................................................14

**ARTICLE 7 TRANSFERS OF INTERESTS** ...........................................15
    7.1    Member Transfers................................................................15
    7.2    Transfer Restrictions............................................................15
    7.3    Admissions, Withdrawals and Removals .............................16
    7.4    Withdrawal of Certain Members ..........................................16

DRAFT

# LIMITED LIABILITY COMPANY AGREEMENT

## OF

## CUBIC ENERGY, LLC

THIS LIMITED LIABILITY COMPANY AGREEMENT (including all exhibits and schedules attached hereto and made a part hereof, this "Agreement") is made and entered into as of the [●] day of [●], 2016, by and among the Persons executing this Agreement on the signature pages hereto as members (each, a "Member" and, together with such other Persons that may hereafter become members as provided herein, referred to collectively as the "Members").

## RECITALS

WHEREAS, the Company was initially formed as a Texas corporation with the name Cubic Energy, Inc., whose articles of incorporation were filed with the Secretary of State of the State of Texas on August 30, 1999;

WHEREAS, on December 11, 2015, the Company, together with each of its subsidiaries, filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code (as defined herein) in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

WHEREAS, on [●], 2016, the Bankruptcy Court entered an order confirming that certain Third Amended Prepackaged Plan of Reorganization of Cubic Energy, Inc., *et al.*, pursuant to Chapter 11 of the Bankruptcy Code (as may be further amended, modified, or supplemented from time to time, the "Cubic Plan");

WHEREAS, on the date hereof (the "Effective Date"), the Cubic Plan became effective;

WHEREAS, pursuant to the Cubic Plan, on the Effective Date, all equity interests in the Company existing as of the Effective Date were cancelled and annulled, and the Company filed a certificate of conversion to limited liability company and a Certificate of Formation (as defined herein) of the Company with the Secretary of State of the State of Delaware, thereby converting the Company from a Texas corporation to a Delaware limited liability company under the Act (as defined herein);

WHEREAS, pursuant to the Cubic Plan, on the Effective Date, Limited Liability Company Interests (as defined herein) in the Company were issued to the Members in the amounts listed in Exhibit A hereto;

WHEREAS, the Members intend that the Company will be treated as a corporation for U.S. federal and state income tax purposes; and

WHEREAS, the parties desire to set forth their understanding with respect to their relationship and the operation of the Company, effective as of the Effective Date.

DRAFT

"Significant Member" means, at any time, a Member whose aggregate Ownership Percentage is equal to at least five percent (5%).

"Tag-Along Member" has the meaning specified in Section 8.2.1.

"Tag-Along Sale" has the meaning specified in Section 8.2.1.

"Transfer" means, with respect to any Limited Liability Company Interest, a direct or indirect sale, transfer, gift, grant, conveyance, assignment, bequest, or disposition by any other means, whether for value or no value and whether voluntary or involuntary (including, without limitation, by realization upon any Encumbrance or by operation of law or by judgment, levy, attachment, garnishment, bankruptcy or other legal or equitable proceedings).

"Transfer Restriction Date" means [●], 2018[1].

"Valuation Agent" has the meaning specified in Section 6.3.

## ARTICLE 2
## ORGANIZATIONAL MATTERS

2.1    Formation.  The Members hereby confirm the formation of the Company as a Texas corporation on August 30, 1999 and the conversion of the Company from a Texas corporation to a Delaware limited liability company pursuant to the Cubic Plan, the terms of this Agreement and the Act.  Pursuant to Section 18-201(d) of the Act, this Agreement shall be effective as of the time of the filing of the Certificate of Formation.  The Manager may approve and cause to be executed and filed any duly authorized amendments to the Certificate of Formation from time to time in a form prescribed by the Act.  The Manager shall also cause to be made, on behalf of the Company, such additional filings and recordings as the Manager shall deem necessary or advisable.  The rights and liabilities of the Members shall be as provided in the Act, except as otherwise expressly provided herein.  In the event of any inconsistency between any terms and conditions contained in this Agreement and any non-mandatory provisions of the Act, the terms and conditions contained in this Agreement shall govern.

2.2    Name.  The name of the Company is "Cubic Energy, LLC".  The Manager may change the name of the Company from time to time, in accordance with applicable law.

2.3    Principal Place of Business; Other Places of Business.  The principal place of business of the Company is located at [●], 9870 Plano Road, Dallas, Texas 75238, or such other place within or outside the State of Delaware as the Manager may from time to time designate. The Company may maintain offices and places of business at such other place or places within or outside the State of Delaware as the Manager deems advisable.

---

[1]    To be the second anniversary of the Effective Date.

DRAFT

2.4     Business Purpose.  The Company has been formed for the purpose of engaging in any lawful business determined by the Manager and permitted by the Act.

2.5     Designated Agent for Service of Process.  So long as is required by the Act, the Company shall continuously maintain a registered office and a designated and duly qualified agent for service of process on the Company in the State of Delaware.  As of the date of this Agreement, the address of the registered office of the Company in the State of Delaware is [●].615 South DuPont Highway, in the City of Dover, County of Kent, Delaware 19901.  The Company's registered agent for service of process at such address is [●].National Corporate Research, Ltd.

2.6     Term.  The Company commenced as a Texas corporation on August 30, 1999 and converted to a Delaware limited liability company on the Effective Date, and shall continue until the completion of a Liquidation Event.

# ARTICLE 3
# CAPITAL STRUCTURE; TAX TREATMENT

3.1     Capital Structure.

3.1.1     Limited Liability Company Interests.  As of the date of this Agreement, the Company has one class of Limited Liability Company Interests.  The Limited Liability Company Interests issued and the Ownership Percentages of the Members, as of the Effective Date, including each Member's name and address, are set forth on Exhibit A hereto.  The Manager (without the consent of or notice to any party hereto)  shall update Exhibit A from time to time to reflect the withdrawal of Members and admission of Members pursuant to Section 7.3, as well as to reflect the issuance of equity interests, including Limited Liability Company Interests, or any changes in the Members' respective Limited Liability Company Interests, pursuant to the terms of this Agreement or as otherwise permitted by this Agreement.  The Limited Liability Company Interests issued and the Ownership Percentages set forth on Exhibit A shall be conclusive absent manifest error.   The Company may issue Limited Liability Company Interests in fractional amounts. Unless and until the Manager shall determine otherwise, Limited Liability Company Interests shall be uncertificated.

3.1.2     Additional Members.  Except as otherwise provided in this Agreement and subject to Sections 5.3.6, 8.3 and 11.2, the Company may issue additional equity interests, including Limited Liability Company Interests, to such Persons as the Manager determines to be in the best interests of the Company, and any such additional issuance may result in a dilution of the Ownership Percentage (or other measure of participation) of any previously issued Limited Liability Company Interests. The Company shall admit the holder of any Limited Liability Company Interests issued by the Company to such Person as an additional Member of the Company upon the execution and delivery by such Person of a joinder to this Agreement and other documents reasonably requested by the Manager, in each case, in form and substance satisfactory to the Manager and the Manager shall update Exhibit A to reflect the issuance of additional equity interests.

DRAFT

to receive any such notice or, in the absence of such designation, any officer of such Person) to whom the same is directed, (b) sent by nationally recognized overnight courier service (with tracking capability), (c) via facsimile or (d) via e-mail, addressed as follows: if to the Company, to the Company at the address set forth in Section 2.3 hereof, at facsimile number [●]; 972.681.9687 or at email address [●]: jason@cubicenergyinc.com or to such other address as the Company may from time to time specify by notice to the Members; if to a Member, to such Member at the address set forth in Exhibit A, or to such other address as such Member may from time to time specify by notice to the Company.  Any such notice shall be deemed to be delivered, given and received for all purposes as of: (i) the date so delivered, if delivered personally, (ii) upon receipt, if sent by courier service, or (iii) upon confirmation of receipt, if transmitted by facsimile or email.

11.7    Governing Law.  This Agreement, including its existence, validity, construction, and operating effect, and the rights of each of the parties hereto, shall be governed by and construed in accordance with the laws of the State of Delaware without regard to otherwise governing principles of conflicts of law.

11.8    Binding Effect.  Except as otherwise expressly provided herein, this Agreement shall be binding on and inure to the benefit of the parties hereto, their heirs, executors, administrators, successors and all other Persons hereafter holding, having or receiving an interest in the Company.

11.9    Confidentiality.  Without limiting the provisions of Section 6.5, each party hereto agrees that the provisions of this Agreement, all understandings, agreements and other arrangements between and among the parties, and all other non-public information received from, or otherwise relating to, the Company or any Member, shall be confidential, and that such parties shall not disclose or otherwise release to any other Person (other than another party hereto) such matters, without the written consent of the Company, as determined by the Manager; provided, however, that a Member may disclose confidential information to the Member's partners, members, officers, employees, board members, attorneys, accountants, consultants or other professionals on a need-to-know basis or to the extent necessary to obtain their services in connection with monitoring its investments in the Company, as applicable, which Persons shall be bound by confidentiality obligations that would restrict them in a manner consistent with this Section 11.9 as if a Member. A Member shall be responsible for any breach of such confidentiality obligations by any Persons to which it discloses information pursuant to the foregoing provisions of this Section 11.9.  The obligations of the parties hereunder shall not apply: (a) to information already known to the general public other than as a result of a breach of this covenant or (b) to any party to the extent that the disclosure by such party of such confidential information  is required by applicable law or by any federal, state or local judicial or regulatory body with jurisdiction over such party, but only that portion of such confidential information which is required or would be required to be furnished to avoid liability for contempt or the suffering of other material judicial or governmental penalty or censure; provided that, prior to disclosing such confidential information, a party shall, to the extent practicable, notify the Company thereof, which notice shall include the basis upon which such party believes the information is required to be disclosed.

DRAFT

Member's obligation under this <u>Section 11.14</u> will survive the dissolution, liquidation and winding up of the Company.  Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Each party hereto waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in respect of any litigation as between the parties directly or indirectly arising out of, under or in connection with this Agreement or the transactions contemplated hereby or disputes relating hereto.

11.15   <u>No Third Party Beneficiaries</u>.  Nothing contained in this Agreement (other than the provisions of <u>Section 5.3.3</u>, <u>Section 5.4</u> and <u>Section 5.5</u>), express or implied, is intended to or shall confer upon anyone other than the parties hereto (and their successors and permitted assigns) and the Company any right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

SCI:3965072.911

DRAFT

**LIMITED LIABILITY COMPANY AGREEMENT**

**OF**

**CUBIC ENERGY, LLC**

IN WITNESS WHEREOF, the undersigned Member has caused this counterpart signature page to the Limited Liability Company Agreement of Cubic Energy, LLC, to be duly executed on the date set forth below, to be effective as of the date first above written.

AIO III CE, L.P.

By: **DRAFT**
     Name:
     Title:

Executed on [●]

DRAFT

# LIMITED LIABILITY COMPANY AGREEMENT

## OF

## CUBIC ENERGY, LLC

IN WITNESS WHEREOF, the undersigned Member has caused this counterpart signature page to the Limited Liability Company Agreement of Cubic Energy, LLC, to be duly executed on the date set forth below, to be effective as of the date first above written.

Corbin Opportunity Fund, L.P.

By: **DRAFT** _____
    Name:
    Title:

Executed on [●]

SC1:3965072.9

**DRAFT**

## LIMITED LIABILITY COMPANY AGREEMENT

## OF

## CUBIC ENERGY, LLC

IN WITNESS WHEREOF, the undersigned Member has caused this counterpart signature page to the Limited Liability Company Agreement of Cubic Energy, LLC, to be duly executed on the date set forth below, to be effective as of the date first above written.

O-CAP Partners, L.P.

By: **DRAFT** _____
    Name:
    Title:

Executed on [●]

SC1:3965072.9

**DRAFT**

## LIMITED LIABILITY COMPANY AGREEMENT

## OF

## CUBIC ENERGY, LLC

IN WITNESS WHEREOF, the undersigned Member has caused this counterpart signature page to the Limited Liability Company Agreement of Cubic Energy, LLC, to be duly executed on the date set forth below, to be effective as of the date first above written.

O-CAP Offshore Master Fund, L.P.

By: **DRAFT**  _____

    Name:

    Title:

Executed on [●]

SC1:3965072.9

**DRAFT**

EXHIBIT A

**Attached to and Made a Part of
Limited Liability Company Agreement of
Cubic Energy, LLC
(a Delaware Limited Liability Company)**

*Schedule of Members*

| Member | Address | Limited Liability Company Interest |
|---|---|---|
| AIO III CE, L.P. | Anchorage Capital Group, L.L.C.<br>610 Broadway, 6th Floor<br>New York, NY 10012<br>Attention:  General Counsel<br>Email: legal@anchoragecap.com<br>Facsimile:  212-432-4601 | 757.576 |
| Corbin Opportunity Fund, L.P. | Corbin Capital Partners Management, LLC<br>590 Madison Avenue,<br>31st Floor<br>New York, NY 10022<br>Attention:  Daniel Friedman<br>Email: dfriedman@corbincapital.com<br>Facsimile:  212-634-7399 | 166.667 |
| O-CAP Partners, L.P. | O-CAP Advisors, LLC<br>600 Madison Avenue, 14th Floor<br>New York, NY 10022<br>Attention:  Lloyd Jagai<br>Email: lloyd@o-corp.com<br>Facsimile:  646.225.5208 | 43.409 |
| O-CAP Offshore Master Fund, L.P. | O-CAP Advisors, LLC<br>600 Madison Avenue, 14th Floor<br>New York, NY 10022<br>Attention:  Lloyd Jagai<br>Email: lloyd@o-corp.com<br>Facsimile:  646.225.5208 | 32.348 |

Exhibit A

**DRAFT**

EXHIBIT B

**Attached to and Made a Part of
the Limited Liability Company Agreement of
Cubic Energy, LLC
(a Delaware Limited Liability Company)**

*Initial Manager*

[The Manager shall be any person appointed by a Majority in Interest of the Members.,]

~~The initial Manager and his or her affiliations will be disclosed prior to the Confirmation Hearing in accordance with 11 U.S.C. § 1129(a)(5) and Section 3.17 of the Cubic Plan, as amended.~~]

**Exhibit 5**

**Cubic Asset Debtor Officers and Other Governance Representatives**

(see attached)

**In re: Cubic Energy, Inc., et al.**
**Proposed Member of Initial Reorganized Cubic Energy Board of Managers**

The identity and affiliations of the proposed member of the initial Reorganized Cubic Energy Board of Managers, if any, will be disclosed in the Plan Supplement on or prior to the Effective Date in accordance with 11 U.S.C. § 1129(a)(5) and Section 3.17 of the *Third Amended Prepackaged Plan of Reorganization of Cubic Energy, Inc., et al., Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 174] (as may be further amended, modified, or supplemented from time to time).

SC1:4039595.3

**In re: Cubic Energy, Inc., et al.**
**List of Officers of Reorganized Cubic Asset Debtors**

<u>Cubic Energy, LLC</u>

The names, titles, affiliations and compensation of the officers, if any, of Cubic Energy, LLC will be disclosed in the Plan Supplement on or prior to the Effective Date in accordance with 11 U.S.C. § 1129(a)(5) and Section 3.12 of the *Third Amended Prepackaged Plan of Reorganization of Cubic Energy, Inc., et al., Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 94] (as may be further amended, modified, or supplemented from time to time, the "Plan").

<u>Cubic Asset Holding, LLC and Cubic Asset, LLC</u>

The names, titles, affiliations and compensation of the officers, if any, of Cubic Asset, LLC will be disclosed in the Plan Supplement on or prior to the Effective Date in accordance with 11 U.S.C. § 1129(a)(5) and Section 3.12 of the Plan.

**<u>Exhibit 5-a</u>**

**Cubic Asset Debtor Officers and Other Governance Representatives**
**(Changed Pages Only Blackline)**

(see attached)

**In re: Cubic Energy, Inc., et al.**
**Proposed Member of Initial Reorganized Cubic Energy Board of Managers**

The identity and affiliations of the proposed member of the initial Reorganized Cubic Energy Board of Managers, if any, will be disclosed ~~at~~<u>in the Plan Supplement on</u> or prior to the ~~Confirmation Hearing~~<u>Effective Date</u> in accordance with 11 U.S.C. § 1129(a)(5) and Section 3.17 of the *~~Second~~Third* *Amended Prepackaged Plan of Reorganization of Cubic Energy, Inc., et al., Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. ~~94~~<u>174</u>] (as may be further amended, modified, or supplemented from time to time).

**In re: Cubic Energy, Inc., et al.**
**List of Officers of Reorganized Cubic Asset Debtors**

<u>Cubic Energy, LLC</u>

The names, titles, affiliations and compensation of the officers, if any, of Cubic Energy, LLC will be disclosed ~~at~~<u>in the Plan Supplement on</u> or prior to the ~~Confirmation Hearing~~<u>Effective Date</u> in accordance with 11 U.S.C. § 1129(a)(5) and Section 3.12 of the *~~Second~~<u>Third</u> Amended Prepackaged Plan of Reorganization of Cubic Energy, Inc., et al., Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 94] (as may be further amended, modified, or supplemented from time to time, the "Plan").

<u>Cubic Asset Holding, LLC and Cubic Asset, LLC</u>

The names, titles, affiliations and compensation of the officers, if any, of Cubic Asset, LLC will be disclosed ~~at~~<u>in the Plan Supplement on</u> or prior to the ~~Confirmation Hearing~~<u>Effective Date</u> in accordance with 11 U.S.C. § 1129(a)(5) and Section 3.12 of the Plan.